**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**SUNQUEST PROPERTIES, INC. and**
**CARRIAGE HOUSE APARTMENTS**
**PARTNERSHIP,**                                                    **PLAINTIFFS**

**v.**                                    **Civil Action No. 1:08-CV-687-LTS-RHW**

**NATIONWIDE PROPERTY AND**
**CASUALTY INSURANCE COMPANY**
**and JOHN DOES 1-5,**                                            **DEFENDANTS**

<u>**MEMORANDUM IN SUPPORT OF NATIONWIDE'S MOTION FOR SANCTIONS**</u>

Nationwide submits this Memorandum in support of its motion for the imposition of sanctions against Plaintiffs and their counsel for their repeated, bad-faith abuses of the discovery process in this matter. As Nationwide has digested the thousand-plus pages of documents that Plaintiffs produced on November 30, 2009 in response to Nationwide's Motion to Compel—doubling Plaintiffs' production two weeks *after* the close of discovery—it has become increasingly apparent that Plaintiffs not only intentionally withheld a bevy of critical documents, but have made affirmative misrepresentations in depositions, expert reports, and pleadings before this Court. As is explained at length below, this conduct warrants the dismissal of this action. Alternatively, Nationwide requests that the Court prohibit Plaintiffs from using the testimony or evidence of their hybrid claims consultant/public adjuster/litigation expert/"impartial" appraiser Lewis O'Leary in any fashion in this litigation; preclude Plaintiffs from pursuing appraisal; and decline to afford Plaintiffs an unwarranted second chance, after the close of discovery, to create a new expert report.

## I. PLAINTIFFS WITHHELD CRITICAL DOCUMENTS UNTIL AFTER THE CLOSE OF DISCOVERY DESPITE THEIR RESPONSIVENESS TO MONTHS-OLD DISCOVERY REQUESTS AND REPEATED, SPECIFIC DEMANDS.

As Nationwide explained in full detail in its pending November 16, 2009 Motion to Compel Discovery Responses [Dk. 192], while Nationwide conducted depositions of Plaintiffs' fact witnesses, utilizing the partial production made to that point by Plaintiffs, it became increasingly clear that there were a substantial number of important documents that Plaintiffs and their agents were aware of but had not yet produced. Plaintiffs' witnesses and their counsel agreed under oath to produce these documents. (*See, e.g.*, Oct. 6, 2009 Deposition of Lewis O'Leary at 22-23, 34, 59-60, 93, 124-25 (Ex. 1); Oct. 20, 2009 Deposition of Ralph Brockman at 32, 115-16, 123, 172, 231 (Ex. 2).) As the discovery deadline approached, however, Plaintiffs had yet to respond to Nationwide's repeated and specific demands that they comply with their discovery obligations. (*See, e.g.*, Oct. 30, 2009 Letter R. Gilmore to M. Brown & N. Gaudet ("Given that the November 16 close of discovery is fast approaching, I must insist that plaintiffs and Mr. O'Leary complete production of the documents and information identified above no later than Thursday, November 5. If we do not receive these remaining documents by that time, Nationwide will seek relief from the Court.") (Ex. 3); Nov. 6, 2009 Email R. Gilmore to M. Brown & N. Gaudet ("Please confirm that you will produce the documents requested in my letter from last week, or that you are refusing to do so. To date, … I have not received either a response to the letter or the documents that letter references.") (Ex. 4).) Facing the close of discovery and Plaintiffs' continued intransigence, Nationwide was obliged to move this Court for an order compelling Plaintiffs to produce the extensive list of previously withheld documents

and any other responsive documents within their possession. (*See* Nov. 16, 2009 Mot. to Compel Disc. Resps. [Dkt.192].)[1]

Having failed for weeks to produce any of the long-overdue documents, Plaintiffs suddenly (and curiously) were able to collect and organize over 1,000 pages of years-old documents in time to respond in less than ten days to Nationwide's Motion to Compel, which was filed just before the close of discovery. Notably, in neither their pleading to this Court nor their letter to Nationwide did Plaintiffs offer ***any explanation*** for their decision to keep this voluminous production from Nationwide until two weeks after the discovery deadline expired, instead offering only that they "believe" their late response to be "responsive to Defendant's requests and Motion to Compel," and stating baldly that they have "worked diligently to ensure that Defendant's requests are answered." (Nov. 25, 2009 Resp. to Mot. to Compel Disc. Resps. at 1 [Dkt. 203]; *see id.* at Exhibit A.) Nor have Plaintiffs in any way contested the fact that, as Nationwide argued in its Motion to Compel, these documents "are critical to the claims and defenses in this case and clearly responsive to Nationwide's discovery requests." (Mot. to Compel at 1.)

Included in Plaintiffs' untimely production were an enormous number of emails, letters, and memoranda—including centrally relevant correspondence between Plaintiffs' employees and agents, Mr. O'Leary, the buyers of the Carriage House property, Plaintiffs' public adjusting

---

[1]    While the point is ultimately of no relevance, Plaintiffs' counsel is flatly incorrect in making the confounding representation that Nationwide somehow promised not to file a motion to compel "as long as plaintiffs were trying to comply." (Dec. 7, 2009 Reply to Def.'s Opp. to Pls.' Mot. to Complete Disc. & Supp. Expert Reports at 1 [Dkt. 212].) Plaintiffs have consistently filed out-of-time and procedurally improper motions without preserving their rights. Nationwide, on the other hand, gave Plaintiffs every opportunity to meet their discovery obligations without intervention of the Court, but ultimately had no choice but to preserve its rights by moving to compel before the close of discovery after Plaintiffs failed to produce the promised documents. Indeed, on the same day Plaintiffs reported to the Court that they would finally produce these documents, Plaintiffs also presented an out-of-time motion to extend the discovery deadline to allow them to correct long-known problems of their own making with their expert causation report. (*See* Nov. 25, 2009 Mot. for Extension of Time to Complete Disc. & Supp. Expert Reports [Dkt. 201].)

company WorldClaim, and the holders of Plaintiffs' mortgage—that dwarfed Plaintiffs' prior production of similar correspondence.  As an initial matter, well over 900 of the "1150 Bates-numbered pages of documents" of Plaintiffs' prior productions were actually policy or adjusting documents that had been sent to Plaintiffs by Nationwide during the handling of Plaintiffs' claim.  (Dec. 4, 2009 Pls.' Surrebuttal to Mot. to Compel Disc. Resps. at 2 [Dkt. 210].)  Setting aside the documents which Plaintiffs simply returned to Nationwide, Plaintiffs had only produced some 250 new pages of documents by the close of discovery—making this out-of-time production of over 1,000 pages roughly *quadruple* Plaintiffs' true production to that point in time.  Among their paltry production during the discovery period, Nationwide has only been able to identify six emails and seven letters (four of which were sent to or from Nationwide), as compared to the dozens upon dozens of emails, letters, and memos finally produced after the close of discovery.  The notion that the volume of Plaintiffs' production since they filed suit in August of 2008 in any way indicates that Plaintiffs "have worked hard to fulfill their discovery obligations" is simply false.  (*Id.*)

## II.  PLAINTIFFS' INEXCUSABLY LATE PRODUCTION REVEALS A HOST OF MISREPRESENTATIONS AND PREVIOUSLY UNDISCLOSED FACTS.

Even more disconcerting than Plaintiffs' substantial delay in production is the fact that they appear to have deliberately avoided producing a host of critical documents unfavorable to their position.  Plaintiffs' untimely production reveals a huge number of documents that are centrally relevant to the claims at issue in this lawsuit.  Moreover, the circumstances documented below indicate that Plaintiffs and their witnesses have been less than forthright during discovery, and must account for this misconduct.

**A.    Newly Disclosed Documents Reveal Prior Affirmative Misrepresentations.**

Plaintiffs, their representatives, and their hybrid claims consultant/public adjuster/litigation expert/appraiser, Mr. O'Leary, could not have been clearer in misrepresenting key aspects of Mr. O'Leary's work in advancing Plaintiffs' claim.  In particular, the following two facts were represented on multiple separate occasions and were, as of the close of discovery, uncontested based on the statements made by Plaintiffs: (1) Mr. O'Leary has only been compensated on an hourly rate; and (2) he did not produce drafts or other statements of his opinion other than those disclosed pursuant to this Court's scheduling order.  Yet the documents produced after the close of discovery reveal that these assertions are demonstrably false.

Regarding Mr. O'Leary's compensation arrangement, Ralph Brockman, the majority owner of the Carriage House Partnership, testified that Mr. O'Leary had always been paid on an hourly basis:

> Q. Well, prior -- did you have a different compensation arrangement with Mr. O'Leary prior to filing this lawsuit?
>
> A. No.
>
> Q. So --
>
> A. *It's been the same all the way through.*
>
> Q. -- when you first began working with him at some point in 2007, it's always been on an hourly basis --
>
> A. Yes.
>
> Q. -- without any contingent --
>
> A. … *[T]he arrangement for payments was the same.  It was by the hour.*

(R. Brockman Dep. at 172-73.)[2]  Further, in attempting to portray Mr. O'Leary as impartial, Plaintiffs represented to the Court that Mr. O'Leary's "compensation is paid by the Insureds on

---

2    Emphasis added unless otherwise noted.

an hourly basis" and that "*[h]e has no direct financial stake in the outcome of this case*."  (Nov. 16, 2009 Mem. in Opp. to Mot. to Strike Lewis O'Leary at 8 [Dkt. 176]; *see id.* at 1 ("Insureds have paid Mr. O'Leary a substantial sum, based on his hourly rate"); *id.* at 3 ("Here, Mr. O'Leary has been paid by the Insureds [by] the hour for his work … ."); July 17, 2009 Pls.' Memo in Reply to Def.'s Resp. in Opp. to Mot. for Appraisal [Dkt. 45] ("Mr. O'Leary has no stake in the outcome of this matter.  His payment is in no way tied to the results of this case.  His payment is the same regardless of the opinion he gives.").)  Finally, Mr. O'Leary personally asserted that his compensation was on an hourly basis in the expert report and deposition he provided in this matter.  (*See* June 29, 2009 Expert Report of Lewis O'Leary at 6 ("My compensation for this assignment has been the payment of $200 per hour for actual consulting.") (Ex. 5); *see also* O'Leary Dep. at 202-204 (affirming hourly wage arrangement found in report).)

Newly produced documents, however, show that at least part of Mr. O'Leary's compensation for his work on this case has been, and apparently still is,[3] ***contingent*** upon Plaintiffs' ultimate recovery.  (*See* Revised Services Agreement, Version 1 (CH001159) (signed copy of retention agreement providing for Mr. O'Leary to receive "a total of 4% of the value of the claim") (Ex. 6); Revised Services Agreement, Version 2 (CH001160) (Ex. 7); Aug. 20, 2008 Email R. Brockman (via S. Belk) to L. O'Leary at CH001204 (attaching two versions of retention agreement and explaining changes to terms of contingent fee provision) (Ex. 8).)  Just-disclosed correspondence regarding this fee arrangement not only confirms the existence and importance of the contingency arrangement, but raises serious concerns about manipulation of the appraisal and discovery processes.  (*See* Jan. 29, 2008 Email L. O'Leary to R. Brockman (via S. Belk) at CH001185-86 ("I am forwarding a ***separate contract*** for these services which would

---

[3]    *See infra* page 9 & n.6.

have been performed by the Public Adjuster. ... **The 2 services must remain separate for reasons Ralph and I have already discussed.**") (Ex. 9); Apr. 15, 2008 Letter R. Brockman to Carriage House/Compass Pointe Investors at CH002350 (stating that Mr. O'Leary **"implies a ten million [dollar] forecast and payment of 3% of the gross to him"** for his work on "Phase II" of Plaintiffs' and Mr. O'Leary's claim strategy) (Ex. 10); Mar. 17, 2008 Email L. O'Leary to R. Brockman (via S. Belk) at CH001188 (stating that he will take on the role of a public adjuster for an advance of "0.75% of the projected amount of the claim, which is $75,000, with a balance of the fee (2.25%) being paid at the end of the claim") (Ex. 11).)[4]

Similarly, Plaintiffs, their agents, and their experts and consultants, testified that Mr. O'Leary had only reduced his opinions to writing in the expert litigation report filed with this Court in this matter. (*See, e.g.*, R. Brockman Dep. at 99 ("Q. Were there any prior versions of the report? Did you review drafts and offer questions or comments? A. I don't recall any."); *id.* at 163 ("Q. And has Mr. O'Leary generated any other reports besides this one for Carriage House? A. Not to my knowledge.").) In fact, Plaintiffs' untimely production reveals an abundance of evidence relating not only to newly produced, prior drafts of the litigation report, but also to earlier undisclosed reports prepared for Plaintiffs. For instance, Mr. O'Leary communicated to Plaintiffs that he had created a previously undisclosed and unmentioned "preliminary report of findings, setting out the merits of the case and why these merits are sufficient to win a[] claim for the majority of the damages." (Apr. 9, 2008 Email L. O'Leary to S. Belk at CH001190 (Ex. 12); *see also* March 23, 2008 Invoice at 001169 (listing work preparing "Report of Findings") (Ex. 13); Jan. 26, 2008 Planning Memo (Ex. 14).) Other emails

---

[4]    Contrary to this newly produced document, which indicates that he performed public adjusting services for Plaintiffs, Mr. O'Leary represented in his deposition that he did not perform any such services for any property owners. (*See* O'Leary Dep. at 19.)

attach draft estimates for individual buildings and request that Ralph Brockman "review and comment." (*Compare* Sept. 8, 2008 Email L. O'Leary to S. Belk at CH001207 (sending estimates for buildings #1 and #2 for Carriage House and noting that he was able to create a "far more defendable" estimate than WorldClaim that was also fifty percent higher) (Ex. 15); July 6, 2008 Email L. O'Leary to R. Brockman (via S. Belk), at CH001200 (forwarding estimate of one building to Mr. Ralph Brockman) (Ex. 16); June 29, 2008 Email J. Wiggins to L. O'Leary at CH001200 (sending estimate of one building to Mr. O'Leary and indicating that WorldClaim estimate "is at [$]171,348.00 and I came in at [$]230,391.00") (Ex. 17), *with* O'Leary Dep. at 84-85 (stating "I don't recall ever publishing a draft of that report" and indicating that he had never sent initial drafts of the report to anyone at Sunquest or to Sunquest's counsel); Nov. 4, 2009 Deposition of Jerry Wiggins at 176-77 (indicating that he did not send any draft estimates to Mr. O'Leary but instead "finished the estimates and sent them off") (Ex. 18).)[5]

**B.    Numerous Previously Withheld Documents Reveal Critical New Facts Plaintiffs Previously Failed To Disclose.**

Apart from the outright misrepresentations reflected in the two examples just given, there are scores of additional late-produced documents that reveal uncomfortable facts that Plaintiffs previously failed to disclose. For example, in response to Nationwide's request that Plaintiffs' produce, *inter alia*, "all billing records reflecting the time Mr. O'Leary has spent on work for Sunquest Properties and the fees he has charged for his services," (Oct. 7, 2009 Letter R.

---

[5]    Also notable is that neither Mr. O'Leary nor Mr. Wiggins produced this or any other of the numerous emails recently produced by Plaintiffs in response to Nationwide's document subpoenas, not to mention those produced earlier in discovery by third-party consultants. Simply put, the constant unveiling of emails and other correspondence in their name has belied the positions that these men took during their depositions. (*See* O'Leary Dep. at 24-25 ("Q. [I]s there anything, either correspondence or claims documents … in connection with your work on the Carriage House property? A. Rather than take a chance, I just sent my entire file down here."); Wiggins Dep. at 42 ("Q. Have you produced all e-mails that you've exchanged relating to the Carriage House property? A. I don't know that I have -- I don't think I have any e-mails relative to the Carriage House property. I'm not a big email person. Q. If you did have any such emails, would you have produced them? A. I would, yes.").)

Gilmore to M. Brown & N. Gaudet at 1 (Ex. 19)), Plaintiffs gave Nationwide what they termed a "transaction list from ProBuilders regarding Mr. O'Leary's work for the plaintiffs," with entries totaling $51,533, (Oct. 20, 2009 Email N. Gaudet to R. Gilmore (Ex. 20)).  Yet Plaintiffs' post-discovery production contains not only detailed invoices that have been in Plaintiffs' possession for years, but also a document listing payment entries to Mr. O'Leary totaling $106,273.59, none of which are dated earlier than September 10, 2009.  (Payments to O'Leary at CH001177 (Ex. 21).)  Notably, despite the fact that these payments only account for work performed thru mid-September, the logs still reveal a total payment to Mr. O'Leary that more than doubles the previously reported payment.

Even more troubling, in light of Plaintiffs' representations that Mr. O'Leary "has no direct financial stake in the outcome of this case," (Mem. in Opp. to Mot. to Strike O'Leary at 8), is another newly produced retention agreement between Mr. O'Leary and Plaintiffs that demonstrates what appears to be a bald attempt to manipulate the litigation process by paying Mr. O'Leary a contingent fee through the back door.  Plaintiffs produced a third log reflecting payments to Mr. O'Leary as being drawn out of a $190,000 "cap" on future payments for his services under an agreement signed on September 22, 2009, long after Mr. O'Leary had completed his expert report and just two weeks before his deposition.  (*See* Sep. 23, 2009 New Contract Log at CH001178 (indicating that fees are "capped @ 190,000") (Ex. 22); *see also* Sept. 22, 2009 Letter M. Brown to L. O'Leary at CH001161-62 ("You will be paid $200 per hour for your work, with your fees capped at $190,000 during the course of the project.") (Ex. 23).)[6]  The circumstances surrounding this agreement strongly suggest that Mr. O'Leary's fee

---

[6]    At Mr. O'Leary's fee of $200 per hour, he would have to work 950 hours in order to reach this cap.  Plaintiffs have offered no explanation for how or why these figures were arrived at in light of the fact that Mr. O'Leary had already created his expert report, for which he had only apparently billed $106,273.59 to date.  Interestingly, when the two figures are added together, they fall less than $4,000 shy of $300,000—or three

arrangement as both a litigation expert and "impartial" appraiser is tied directly to the contingency fee recovery to which he was entitled under prior fee arrangements.

Also telling is a comparison of Plaintiffs' post-discovery email production with that made prior to the discovery deadline. Plaintiffs' initial production included just one piece of correspondence: a blank email forwarding photographs to Mr. O'Leary. (*See* June 19, 2008 Email S. Belk to L. O'Leary (Ex. 24).) Susan Belk, an accountant employed by Brockman Enterprises, also produced an email that she sent to Mr. O'Leary indicating simply that contact had been made with Nationwide claims personnel. (July 25, 2009 Email S. Belk to L. O'Leary (Ex. 25).)

In response to Nationwide's Motion to Compel, however, Plaintiffs have produced no less than sixteen pieces of correspondence sent directly to or from Mr. O'Leary, most of which feature critical facts and highly damaging admissions that were never previously disclosed. These documents reveal stunning facts regarding "Part 1 of [Mr. O'Leary's] assignment," which was to "*[d]evelop a case for why the carrier owes [Plaintiffs] more, a lot more*, than what they have paid." (Mar. 17, 2008 Email L. O'Leary to R. Brockman (indicating that he will "style an argument for [Plaintiffs'] case").) In a memo to Ralph Brockman, Mr. O'Leary plotted his illegitimate scheme to use the appraisal process to "go after the difference between the price [Mr. Brockman] sold the properties for, 'as is' and the price [the buyers] got for them after repairing them," an "amount[] which will exceed the cost to repair." (Jan. 26, 2008 Planning Memo at CH001181, CH001183 (describing theory for appraisal under which, "because we are looking at the spread between affording a large discount for having to sell 'as is' versus what Greg

percent of $10 million. (*See* Apr. 15 R. Brockman Letter to Investors (stating that Mr. O'Leary ***"implies a ten million [dollar] forecast and payment of 3% of the gross to him"***); Mar. 17, 2008 Email L. O'Leary to R. Brockman (stating that he will take on the role of a public adjuster for an advance of "0.75% of the projected amount of the claim, which is $75,000, with a balance of the fee (2.25%) being paid at the end of the claim").)

[Stewart] sold it for after making the repairs," "[t]hat spread **is** the amount of the ACTUAL loss and will probably exceed 100% of the cost to repair," which "will make this an exceptionally good case to pursue") (emphasis in original).)  Mr. O'Leary bragged about the fact that he had been "intimately involved" in "the production of the forensic report that justifies the new, massive estimates," and requested an advance on his 3% contingency fee of $75,000 based on a "forecast" recovery of $10 million.  (*Id.* at CH001182; Apr. 15, 2008 Letter R. Brockman to Carriage House/Compass Pointe Investors at CH002350).)  Of course, at that point Mr. O'Leary had not yet even created his bogus estimates.  To do so, which he deemed necessary only "to basically validate what portion of the difference should be allocated to wind versus flood," (Planning Memo at CH001181), Mr. O'Leary thought it wise not to follow what he deemed to be a clearly cut-and-pasted WorldClaim report, reasoning instead that if he was "to have any hope of credibility, the scope in each apartment must vary somewhat and I think I know how to get there" (*id.* at CH001182).  He also provided a back-up option if the appraisal route did not work: Plaintiffs would "trap" Nationwide "into some Breach of Contract conduct" and then leverage that into a reduced contingency fee when it hired counsel.  (Feb. 24, 2008 Email L. O'Leary to R. Brockman (via S. Belk) at CH001187 (Ex. 26).)  Among other things, these facts constitute powerful additional evidence of Mr. O'Leary's already clear unfitness to serve as an "impartial" appraiser and a litigation expert.

Similarly, a production that Plaintiffs made during the discovery period – albeit one-and-a-half months late – in response to Nationwide's request for documents relating to Plaintiffs' sale of the property, repairs to the complex, and all communications with realtors, lenders, and the buyers, included just three emails and two letters that actually related to the Carriage House property.  (*See* July 14, 2009 Def.'s 2nd Set of Reqs. for Prod. Docs. Propounded to Pls.

Sunquest Properties Inc. & Carriage House Apartments P'ship (Ex. 27).)[7]  These documents, one of which is from immediately after the storm and the remainder of which are dated after the sale had already been consummated, almost exclusively address unimportant logistical details.  By comparison, the documents produced after the close of discovery contain well over *fifty* pieces of correspondence among the persons and entities identified by Nationwide, along with hundreds of pages of other relevant documents that are clearly responsive to Nationwide's Second Set of Requests for Production.[8]

Plaintiffs' newly produced documents span the most centrally relevant time periods and include many important admissions and previously undisclosed pieces of information.  For instance, Ralph Brockman admitted that he "do[es] not think we can win on wind and storm vs. flood," and indicated that their case depended on recovering for increases in the "cost to rebuild"—a dubious proposition in light of the fact that Plaintiffs have since admitted that they can only recover actual cash value.  (*See* Aug. 28, 2006 Letter R. Brockman to Investors at CH001432 ("We of course would love to collect punitive damages but we cannot bank on this.") (Ex. 36).)  The new production also includes reams of documents relating to Plaintiffs' decision to sell the property, which they now claim they were forced to do by Nationwide's failure to provide insurance proceeds, allegedly "depriv[ing] the Plaintiffs of a valuable income-producing asset."  (Oct. 8, 2009 Letter N. Gaudet to K. O'Scannlain at 2 (Ex. 37).)  Yet contrary to their

---

[7]  (*See* Aug. 30, 2005 Email L. Phillips to A. Swanson, B. Brockman, Unknown Recipient & G. Underwood at CH001168 (discussing mortgage holder) (Ex. 28); June 9, 2006 Letter B. Brockman to L. Solomon at CH001160 (discussing payment to mortgage holder under reservation of rights) (Ex. 29); June 13, 2006 Email J. Landry to B. Furr at CH001158 (discussing sale logistics) (Ex. 30); June 23, 2006 Email S. Belk to D. Pilger at 1162 (requesting documents naming actual corporate purchasing entity) (Ex. 31); July 7, 2006 Letter B. Furr to S. Rimes at CH001170 (discussing Compass Pointe) (Ex. 32); Aug. 29, 2006 Email L. Phillips to S. Belk at CH001169 (discussing Compass Pointe) (Ex. 33); Oct. 19, 2006 Letter R. Brockman to D. Pilger at CH001161 (requesting information relating to cost to repair property) (Ex. 34); Sept. 7, 2008 Email L. Phillips to D. Harvey at CH001154 (discussing Compass Pointe) (Ex. 35).)

[8]  For example, see sources cited in the paragraph below.

litigation position, new documents indicate that, for example, Mr. Ralph Brockman could hardly contain "how excited [he] was to see the 'as is' appraisal for each complex which indicate[d] to [him] that [Plaintiffs] should immediately list each complex for sale for the as is price" and scuttle plans to refurbish the complexes.  (Undated Letter R. Brockman to B. Furr at CH001683 (Ex. 38).)  Perhaps even more compelling is the fact that Plaintiffs withheld documents in which they make the exact same assertions leveled here against Nationwide against the holder of their mortgage—whom they have already sued (and now settled with).  (*See* Oct. 30, 2006 Ltr. C. McBride to B. Furr at CH001985 ("Our clients' total loss … is estimated to be $10,600,000.00, not counting prepayment penalties and other fees.  However, the Partnership lost the opportunity to realize the profits they would have otherwise realized, had they not been forced by LNR to sell their interests in the properties at a distressed price.") (Ex. 39).)

Plaintiffs have offered no explanation for why they made an initial run of only innocuous correspondence documents, withholding large numbers of far more important and problematic documents until after the close of discovery, and after Nationwide moved to compel production.[9]

---

[9] Plaintiffs surely had sufficient awareness of the possibility of legal action to keep these documents accessible. Not only did they sue LNR Partners, their mortgage holder, for purportedly causing the same economic harms now attributed to Nationwide, but they were planning to sue Nationwide, at the latest, in the fall of 2006. (Aug. 7, 2006 Letter R. Brockman to M. Fusco at CH001405 (indicating that "[n]ow it is apparent we will have to litigate" against Nationwide) (Ex. 40).)  Similarly, many of the documents produced include handwritten notes, appearing to be from Ralph Brockman, directing his employees to put documents in the "Carriage House/Compass Pointe" file.  (*See, e.g.*, Apr. 26, 2006 Email J. Kinard to M. Fusco at CH001394 (Ex. 41); May 3, 2007 Email L. O'Leary to S. Belk at CH001193 (Ex. 42); Aug. 22, 2007 Email L. O'Leary to R. Brockman (via S. Belk) at CH001179 (Ex. 43); Aug. 30, 2007 Ltr. R. Brockman to M. Fusco at CH001435 (Ex. 44).)  *See also* R. Brockman Dep. at 97-98 (indicating that Mr. O'Leary "probably has two copies of everything we had in the file"); *id.* at 85, 123 (referencing documents from "the file").)  Plaintiffs have yet to explain whether they selectively withheld documents that were in the same file as that from which their pre-discovery deadline productions came.

### III.  PLAINTIFFS HAVE PREVIOUSLY ABUSED THE DISCOVERY PROCESS BY FAILING TO PROVIDE THEIR EXPERT WITH OBVIOUSLY RELEVANT MATERIALS AND SEEKING TO REOPEN DISCOVERY TO CORRECT MR. O'LEARY'S ADMITTEDLY INVALID EXPERT REPORT.

Despite the fact that their expert disclosures were due, and were originally filed, on June 30, 2009, Plaintiffs have moved this Court, after the close of discovery, to reopen discovery until January 31, 2010—seven full months after their expert reports were due—to permit them to craft wholly new damage estimates.  As became apparent at the deposition of Mr. O'Leary, and as was unmistakably reemphasized at that of Jerry Wiggins,[10] the individual who actually did the estimating work that underlies Mr. O'Leary's conclusions, Mr. O'Leary's expert report is admittedly fatally flawed and unreliable.  (O'Leary Dep. at 95, 242; Wiggins Dep. at 144 ("Q. Would you feel comfortable relying on the estimates that you've previously made at this point in time?  A. No, not with this information that I have now, no.").

Yet as Nationwide has already demonstrated, Plaintiffs' request to re-do the estimates included in Mr. O'Leary's expert litigation report is a problem exclusively of Plaintiffs' own making.  (*See* Dec. 4, 2009 Nationwide Resp. in Opp. to Pls.' Mot. for Extension of Time to Complete Disc. at 5-9 [Dkt. 211]; Nov. 16, 2009 Mot. to Preclude Lewis O'Leary & Jerry Wiggins from Presenting Evidence or Test. Re Estimates of Damage to Pls.' Property [Dkt. 194].)  Despite the fact that Plaintiffs have "provided [Mr. O'Leary] with an enormous amount of material from the files that we accumulated," such that "it's fair to say that Lewis probably has two copies of everything [Plaintiffs] had in the file," they did not provide him with the

---

[10]  Plaintiffs refer to Mr. O'Leary's assistant, Jerry Wiggins, as an "expert," even though Plaintiffs did not designate him as such.  Plaintiffs' references are likely a recognition that, as their deposition testimony made clear, Mr. Wiggins, *not* Mr. O'Leary, actually created the Xactimate damages estimates on which Mr. O'Leary relies, with little if any input from Mr. O'Leary.  Plaintiffs' failure to designate Mr. Wiggins as an expert is yet one more example of their failure to abide by the expert disclosure requirements of Federal Rule 26 and the Court's Case Management Order, and further underscores the need to preclude either witness from presenting damages estimates.  Nationwide objects to any attempt by Plaintiffs to surreptitiously designate or tender Mr. Wiggins as a testifying expert.

hundreds of post-storm photographs and detailed engineering reports that were produced to them by Nationwide, beginning in January of 2009 and occurring in full no later than May 12, 2009, well in advance of Plaintiffs' disclosure deadline. (R. Brockman Dep. at 97, 98.) Rather than providing these key documents to Mr. O'Leary when they received them, and rather than addressing this problem when it came to light in Mr. O'Leary's October 6 deposition, Plaintiffs waited until after the discovery deadline had expired, and after Nationwide had moved to exclude these admittedly invalid estimates, before moving to reopen and extend discovery.

## IV.    THE COURT SHOULD APPLY STERN SANCTIONS AGAINST PLAINTIFFS FOR THEIR MISREPRESENTATIONS AND WILLFUL EFFORTS TO WITHHOLD DOCUMENTS.

Plaintiffs' and their expert's abuse of their discovery obligations and flouting of this Court's scheduling order deserves harsh sanctions. Nationwide's development of its defense over the course of discovery, including months of preparing for and taking depositions, crafting trial strategy, and drafting court filings and additional discovery requests, has been turned upside down by Plaintiffs' post-discovery production. Plaintiffs' conduct has placed Nationwide in a position of having to completely re-develop its case, back-tracking to the point at which it received Plaintiffs' initial production and began developing its defense, as much of Nationwide's effort during the discovery period has now been rendered out-of-date and incomplete. Coupled with Plaintiffs' out-of-time request for an eight-week extension to develop entirely new expert reports to replace those that Plaintiffs and their experts concede are now invalid, it is apparent that Plaintiffs do, in fact, seek to re-do this entire case after the close of discovery. Nationwide submits that this conduct should be sanctioned as punishment to Plaintiffs, redress to Nationwide, and deterrence of future similar acts.

**A.    Plaintiffs' Claims Should Be Dismissed For Their Widespread Abuse Of The Discovery Process.**

Federal Rule of Civil Procedure 37(b)(2)(A)(v) authorizes a court to dismiss an action with prejudice as a sanction for failure to obey a discovery order, subject only to review for an abuse of discretion. *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1486 (5th Cir. 1990). Dismissal with prejudice is appropriate where four factors are present: (1) willfulness or bad faith; (2) conduct attributable to the client; (3) prejudice to the opposing party; and (4) a lesser sanction would be an inefficacious deterrent. *Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030, 1031-32 (5th Cir. 1990) (upholding district court's dismissal of plaintiff's personal injury suit after he failed to produce documents and supplement interrogatory responses); *United States v. $49,000 Currency*, 330 F.3d 371, 374, 376 (5th Cir. 2003) (upholding district court's default judgment for government in forfeiture case after claimants failed to provide disclosures, answer interrogatories, and produce documents).

In the present case, Plaintiffs' late disclosure of key documents, including documents that establish outright misrepresentations and omissions of key facts, as well as their selective withholding of damaging documents, all constitute willful acts by Plaintiffs. Plaintiffs' post-discovery production contains a broad array of new facts and documents far more substantial than Plaintiffs' prior production. Coupled with the evidence indicating that these documents were withheld intentionally, Plaintiffs' telling inability and unwillingness to explain their failure to produce these admittedly responsive, centrally relevant documents can be attributed to nothing other than intentionality. At the same, Plaintiffs seek this Court's permission to take a second chance at producing admissible expert damages estimates, after their grossly inflated initial estimates proved unsupportable. There can be little doubt that Plaintiffs' discovery abuses have prejudiced Nationwide, which has spent months developing its defense, including multiple

rounds of briefing motions and taking sixteen depositions, based on a set of facts that has now been completely transformed after the close of discovery. Indeed, Nationwide did not even receive this new production until November 30, 2009, just two weeks before the ***extended*** dispositive motions deadline. While Nationwide's motion for summary judgment will surely benefit from this production, Nationwide has had no opportunity to confront Plaintiffs' witnesses with these devastating facts to obtain admissions and further develop its case. *See, e.g.*, *Nilson v. Nationwide Mut. Ins. Co.*, No. 1:07cv990-LTS-MTP, 2009 WL 1285854, at *2 (S.D. Miss. May 6, 2009) ("There is only one week remaining before the discovery deadline, and Defendant would clearly be prejudiced if Plaintiffs were allowed to pursue a claim at trial which they were unable to explore during discovery because of Plaintiffs' failure to abide by their discovery or disclosure obligations. Accordingly, as a sanction, the court will 'prohibit[ ] [the plaintiff] from supporting' this claim at trial or on any dispositive motion.") (first modification in original) (quoting Fed. R. Civ. P. 37(b)(2)(A)(ii); citing Fed. R. Civ. P. 37(c)(1) & 37(d)).

Whether Plaintiffs or their counsel are primarily responsible for this inexcusable failure to comply with their discovery obligations remains unclear because Plaintiffs have yet to make any representations or offer any evidence to explain it—which the Court should demand that they do. What is clear, however, is that Plaintiffs and their expert have all had a hand in making affirmative misrepresentations—under oath and to this Court—and have given numerous misleading factual accounts both of the events in question and their conduct during discovery. Under these circumstances, Plaintiffs' disregard of this Court's Scheduling Order and their discovery obligations as set forth in the Federal Rules of Civil Procedure, as well as their intransigence with respect to their expert, Lewis O'Leary, make clear that lesser sanctions will not sufficiently deter such conduct. Particularly in light of their out-of-time attempt to re-do

their entire damages case after failing to cure its admitted lack of merit during discovery, Plaintiffs should not be allowed to move forward with this suit after withholding evidence in an effort to manipulate the discovery process and skew the facts in their favor. Instead, under the standard articulated in *Coane* and reiterated in *$49,000 Currency*, this Court should dismiss Plaintiffs' action with prejudice for their bad-faith, intentional acts and failure to comply with valid discovery requests.

This Court has dismissed cases for similar discovery abuses. In *Thompson v. Northrop Grumman Ship Systems, Inc.*, No. 1:01cv111, 2005 WL 1593943 (S.D. Miss. June 24, 2005), the plaintiffs in a Jones Act suit failed to supply their counsel with full discovery responses as requested by defendant. This Court applied the test set forth in *$49,000 Currency*, found the failure willful, attributable to the plaintiffs, and undeterred by lesser sanctions, and therefore dismissed plaintiff's claim with prejudice. *Id.* at *1-*2. In *Eaves v. K-Mart Corp.*, 193 F. Supp. 2d 887 (S.D. Miss. 2001), the plaintiff in an racial discrimination suit failed to adequately respond to defendant's discovery requests, and provided incomplete and evasive answers in his deposition. This Court found the plaintiff responsible for his own conduct and dismissed his claim with prejudice. *Id.* at 895. Likewise, the Fifth Circuit has upheld default judgments and dismissals for comparable discovery violations. In *McLeod*, the court upheld the district court's entry of default judgment for plaintiff after the defendant violated the Court's docket control order by refusing to fully comply with plaintiff's discovery requests. *McLeod*, 894 F.2d. at 1485. Similarly, in *O'Neill v. AGWI Lines*, 74 F.3d 93, 96 (5th Cir. 1996), the court upheld the district court's dismissal of plaintiff's suit after plaintiff violated the court's Rule 16 order by failing to fully provide requested information at a pretrial conference. These precedents demonstrate that this Court and the Fifth Circuit take discovery delay and abuse seriously, and that dismissal is

not too harsh a remedy for willful conduct prejudicial to the opposing party.  As in the situations

above, the proper sanction for Plaintiffs' conduct is dismissal of the present suit with prejudice.

     **B.**     **In The Alternative, Mr. O'Leary Should Be Stricken In All Respects From This Matter And Plaintiffs Should Be Precluded From Pursuing Appraisal.**

If the Court determines not to dismiss this action, it should apply other significant

sanctions both to punish and deter future instances of Plaintiffs' discovery abuses.  Nationwide

first requests that Mr. O'Leary be precluded from serving any role in this matter, not only for the

reasons Nationwide has offered in its other pending motions, but also as a sanction for the

unscrupulous conduct described above on the part of Plaintiffs, their counsel, and Mr. O'Leary

himself.  (*See* Oct. 22, 2009 Mem. in Supp. of Nationwide's Mot. to Strike Lewis O'Leary as

Plaintiffs' "Competent and Impartial" Appraiser [Dkt. 132]; Mot. to Preclude O'Leary &

Wiggins.)  Specifically, Mr. O'Leary should be struck as Plaintiffs' designated litigation expert

and "impartial" appraiser, and Plaintiffs should be precluded from offering any testimony or

evidence from Mr. O'Leary or Mr. Wiggins at the trial of this matter.  *See Robbins v. Ryan's*

*Family Steak Houses East, Inc.*, 223 F.R.D. 448, 451-55 (S.D. Miss. 2004) (striking experts and

precluding plaintiffs from presenting expert testimony at trial, where plaintiffs failed to

supplement expert reports for several months and then attempted to supplement one month

before trial, because although the importance of the testimony weighed in favor of admitting it,

plaintiffs offered no explanation for their tardiness, allowing the experts to testify would

prejudice the defendant, and a continuance was not warranted under the circumstances); *see also*

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 572 (5th Cir. 1996)

(upholding district court's striking of expert testimony as a discovery sanction when defendant

failed to comply with the initial court-ordered discovery schedule by failing to provide plaintiffs

with sufficient expert reports).  Particularly in light of Plaintiffs' utter failure to offer any

legitimate explanation for their misconduct, the Court should not permit Plaintiffs to present Mr. O'Leary's testimony and utilize him as their appraiser as if the history of outright misrepresentations, misleading testimony, and undisclosed evidence had never occurred.

Correspondingly, Nationwide requests that the Court deny Plaintiffs' outstanding motion seeking an extension of discovery. (*See* Mot. for Extension of Time to Complete Disc. & Supp. Expert Reports [Dkt. 201].) Plaintiffs' lack of diligence in failing to provide Mr. O'Leary with critical evidence, and then failing to address that issue during the discovery period allowed by this Court's scheduling order, should not be rewarded. Simply put, as it is a product of their own discovery misconduct, this Court should not exercise its discretion to reopen and extend discovery to permit Plaintiffs an unwarranted second chance at re-doing Mr. O'Leary's unsupportable expert report after the close of discovery.

Nationwide further requests that the Court sanction Plaintiffs by precluding them from pursuing appraisal. When this Court granted Plaintiffs' motion and ordered that an appraisal go forward, it made clear that "all counsel are expected to act in good faith in carrying out this Court's directives, and sanctions will be imposed if they do not." (*See* Aug. 18, 2009 Order at 3.) Yet as documented above, Plaintiffs withheld until after the close of discovery multiple documents evidencing contractual arrangements between Plaintiffs and Mr. O'Leary that bear directly on his capacity to serve as an "impartial" appraiser and litigation expert in this matter. *See supra* pages 9-10. Ralph Brockman, the majority owner of Carriage House Apartments Partnership, misrepresented that Mr. O'Leary had never worked for a contingent basis on this claim. Plaintiffs and their counsel repeated that same misrepresentation to this Court in filings. Plaintiffs also withheld documents in which Mr. O'Leary discussed his and Plaintiffs' plan to manipulate the appraisal process to obtain Plaintiffs a "forecast" recovery of $10 million.

Despite being aware of Mr. O'Leary's contingency fee arrangement and his primary role in developing an untoward strategy for maximizing recovery through an appraisal, Plaintiffs have nonetheless named him as an appraiser and litigation expert, describing him in filings to this Court as someone who "has no stake in the outcome of this matter." (July 17, 2009 Mem. in Reply to Def.'s Resp. in Opp. to Pls.' Mot. for Appraisal of the Entire Loss or, in the Alternative, for New Trial at 5 [Dkt. 45].) Plaintiffs' bad faith in seeking this Court's intervention to order appraisal warrants the forfeiture of this Court's enforcement of the appraisal clause. At a minimum, as noted above, Plaintiffs should be foreclosed from utilizing Mr. O'Leary as their "impartial" appraiser.

### C.    At An Absolute Minimum, Nationwide Should Be Permitted To Re-Depose, Entirely At Plaintiffs' Expense, All Witnesses For Whom Previously Undisclosed Information Was Produced Out of Time.

In addition, Nationwide reiterates its request that the Court, should it choose not to dismiss this action, order that discovery be re-opened for the exclusive and limited purpose of permitting Nationwide to re-depose each of the eight witnesses for whom previously withheld correspondence was produced after the close of discovery. Nationwide further requests that Plaintiffs bear all costs and attorney's fees incurred by Nationwide as a result of Plaintiffs' out-of-time production, including preparation and travel for depositions and the preparation of this motion. *See, e.g.*, *Nilson*, 2009 WL 1285854, at *2 ("[S]hould Defendants deem it necessary to re-open Ms. Nilson's deposition to question her about any [documents] provided or obtained after her initial deposition, Defendant may do so, at Plaintiffs' cost.").[11]

---

[11] In their recently and improperly filed surrebuttal to Nationwide's Motion to Compel, Plaintiffs make the snide assertion that, "[u]ndoubtedly, Nationwide will request video depositions, when a video is not necessary, and travel to a variety of states." (*See* Dec. 4, 2009 Surrebuttal to Mot. to Compel Discovery Responses at 1 [Dkt. 210].) Nationwide will, in fact, seek videotaping of these re-opened depositions, just as they have done at their own expense in all of the depositions taken in this matter—a fact of which Plaintiffs were well aware when they decided to produce only a handful of correspondence documents prior to those depositions. Plaintiffs' insinuation that Nationwide has attempted or will seek to raise costs by "request[ing] … travel to a variety of

## CONCLUSION

Plaintiffs' and their expert's remarkable and as-yet unexplained flouting of the Court's scheduling order, derogation of their discovery obligations under the Federal Rules of Civil Procedure, withholding of unfavorable documents, and misleading testimony and representations to this Court merit strong sanctions.  Plaintiffs' intentional discovery misconduct has prejudiced Nationwide, and permitting Plaintiffs to go forward with their claim after such attempted concealment of discoverable information would not only fail to punish Plaintiffs' conduct adequately, but would fail to redress the harm to Nationwide and fail to deter future attempts to manipulate the judicial process.  Under these circumstances, dismissal is appropriate.  In the alternative, Mr. O'Leary should be precluded from serving as a litigation expert or "impartial" appraiser, Plaintiffs should be precluded from further pursuing appraisal, and Plaintiffs should not be afforded a reopening of discovery to create a new expert report.

WHEREFORE, PREMISES CONSIDERED, Nationwide respectfully requests that this Court grant its Motion for Sanctions and enter an order dismissing this action with prejudice or granting the alternative relief requested herein.

THIS, the 10th day of December, 2009.

Respectfully submitted,

NATIONWIDE PROPERTY & CASUALTY
INSURANCE COMPANY, DEFENDANT

---

states" is both confounding and ridiculous.  Counsel for Nationwide has consistently accommodated the locations preferred by Plaintiffs and their witnesses, including hosting a series of depositions in its offices over a one-week span, travelling to Plaintiffs' offices in Monroe, Louisiana for four depositions in two days, and making inconvenient, last-minute changes to travel plans to accommodate Mr. Wiggins' chronic back problems, which were disclosed only a few days before his deposition.

By Its Attorneys
WATKINS LUDLAM WINTER & STENNIS, P.A.

By:    /s/ Laura L. Hill
       LAURA L. HILL
       lhill@watkinsludlam.com

H. Mitchell Cowan (MSB No.7734)
Laura Limerick Gibbes (MSB No. 8905)
F. Hall Bailey (MSB No. 1688)
Janet D. McMurtray (MSB No. 2774)
Christopher R. Shaw (MSB No. 100393)
Laura L. Hill (MSB No. 102247)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, MS 39205
Telephone: (601) 949-4900
Facsimile: (601) 949-4804

Of Counsel:
Daniel F. Attridge, P.C. (Bar No. 44644)
Christian D.H. Schultz (Bar. No. 44747)
Robert B. Gilmore (Bar No. 44997)
Kate S. O'Scannlain (Bar No. 45034)
Jeffrey A. Todd (Bar No. 45916)
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Suite 1200
Washington, DC 20005
Tel:  (202) 879-5000
Fax: (202) 879-5200

## CERTIFICATE OF SERVICE

I certify that I have this day electronically filed the foregoing using the Court's ECF system, which sent electronic notification of such filing to:

> Nathan M. Gaudet
> Matthew K. Brown
> SULLIVAN, STOLIER AND RESOR, APLC
> 909 Poydras Street, Suite 2600
> New Orleans , LA 70112
> 504/561-1044
> Fax: 504/561-8606
> ngaudet@ssrlawfirm.com
> mbrown@ssrlawfirm.com

This the 10th day of December, 2009.

> By:    /s/ Laura L. Hill
> LAURA L. HILL
> lhill@watkinsludlam.com