**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**SUNQUEST PROPERTIES, INC.  and
CARRIAGE HOUSE APARTMENTS PARTNERSHIP
          PLAINTIFFS**

**VS                                    CIVIL ACTION NO. 1:08-CV-687-LTS-RHW**

**NATIONWIDE PROPERTY AND CASUALTY
INSURANCE COMPANY; NATIONWIDE MUTUAL
INSURANCE COMPANY; NATIONWIDE MUTUAL
FIRE INSURANCE COMPANY; and
JOHN DOES 1-5
          DEFENDANTS**

**<u>MEMORANDUM IN OPPOSITION TO MOTION FOR SANCTIONS</u>**

MAY IT PLEASE THE COURT:

Plaintiffs, Carriage House Apartments Partnership and Sunquest Properties, Inc. ("Insureds") file this Memorandum in Opposition to the Motion for Sanctions filed by Defendant, Nationwide Property and Casualty Insurance Company ("Nationwide"). Nationwide's motion attacks Insureds and counsel for Insureds, armed only with the fact that documents were produced after the discovery cut-off to support its theories. Nationwide submits no evidence other than the timing of the most recent production by Insureds to support its attacks.  This motion lacks substance and should be denied. Nationwide's complaints and the situation in which the parties find themselves can be remedied by a simple extension of time to complete discovery, which is not prejudicial to either party and is totally harmless.  Most importantly, the extension of time to complete discovery, as already requested by the Insureds, will alleviate Nationwide's concerns.

1

As previously stated by Insureds, both parties share blame for the necessity of a discovery extension. This extension would relieve any supposed prejudice from which Nationwide feels it currently suffers and would not affect the trial date. Further, this extension of time would relieve the prejudice suffered by Insureds. Nationwide's expert twice revised his estimate, once less than twenty-four hours before his deposition and once the day of the discovery cut-off. Nationwide also failed to produce flood estimates, as requested by Insureds, which should have been included in Nationwide's Rule 26 disclosures.[1] Insureds did not have a realistic opportunity to question Nationwide or its experts about these estimates. Much of Nationwide's motion and memorandum relates to its claim that it will have to "completely re-develop its case." While this is highly unlikely, an extension of time will allow both Nationwide and Insureds to prepare in any way they deem necessary without prejudice to either party.

I.    **Background**

Due to the tenor of Nationwide's most recent motion and memorandum, Insureds must revisit the history of this dispute. Following Hurricane Katrina, Nationwide paid a small portion of Insureds' damages. The amount paid by Nationwide did not approach the actual amount of damage and did not include all elements of damage. Because Nationwide did not pay all amounts due, Insureds could not afford to pay the mortgage on the property. After a dispute with Insureds' mortgage company (which is completely

---

[1] Nationwide's flood estimates are worth mentioning. According to Nationwide's Responses to Plaintiffs' Second Set of Interrogatories and Requests for Production of Documents dated December 1, 2009, Nationwide "specifically produced copies of the requested 'flood estimates' by e-mail on November 9, 2009." This e-mail contained only a single roof estimate. Further, it was transmitted long after the depositions of Nationwide's experts and representatives, despite the fact that it was drafted on September 20, 2005 and the cover letter by Mr. Charles Higley, Nationwide's Rule 30(b)(6) representative, is dated October 28, 2009. Therefore, even if this was a flood estimate, Insureds would have had no opportunity to question Nationwide about it. Nationwide offers no explanation for the obvious and blatant misrepresentation in its discovery responses to the effect that one vague roof estimate was sworn to be the 18 flood estimates – one for each building.

irrelevant to the current dispute), LNR Partners, Inc., and after selling the property "as is," Insureds satisfied its mortgage obligations to LNR Partners, Inc.   Because the property was sold, Insureds were deprived of a valuable income-producing asset.

In an attempt to mitigate their damages by recouping some of this asset's value and because Nationwide's damage estimates were faulty, Insureds attempted to invoke the appraisal provision of Nationwide's policy.  Nationwide resisted, forcing Insureds to file suit.  Many letters and lawyers later, Insureds petitioned this Court to order appraisal of the property.  Nationwide resisted.

After the Court ordered appraisal, it required each party to name an appraiser. The Court further ordered those appraisers to submit umpire candidates to each other.  If the appraisers could not agree on who should serve as umpire, then either party could petition the Court to appoint an umpire.  Insureds selected Mr. Lewis O'Leary as its appraiser, a choice recently upheld by this Court.  Nationwide chose Mr. David Horton as its appraiser.  Mr. O'Leary submitted umpire candidates to Mr. Horton, and Mr. Horton submitted umpire candidates to Mr. O'Leary.  Unfortunately, Mr. Horton did not agree with Mr. O'Leary's candidates and vice versa.  Because the chosen appraisers did not agree on who should serve as umpire, Insureds petitioned the Court to appoint an umpire. Nationwide resisted.

Since then, the parties have engaged in discovery – a process that has been far more time-consuming, for a variety of reasons, than either party anticipated.  While conceding some of the responsibility for delay, Insureds requested an extension of time to complete discovery.   Nationwide simultaneously opposes this extension of time yet complains that its work is now "out of date" and "incomplete."  Now Nationwide takes

this matter a step further by arguing that the Court should dismiss this suit, prohibit Insureds from using the testimony of Mr. O'Leary, preclude Insureds from pursuing appraisal, and deny Insureds' request for an extension of time to complete discovery. Despite Nationwide's lengthy memorandum and exhibits, their arguments do not support any of the relief requested.

**II.    The claims of Nationwide are not supported by the facts of this matter or the arguments of Nationwide's memorandum.**

Nationwide claims that Insureds intentionally withheld a "bevy" of "critical documents" and made "affirmative misrepresentations in depositions, expert reports, and pleadings." Nationwide's claims are unsupportable and false.

**A.    Nationwide attacks Mr. O'Leary even though all documents in its possession actually support the opposite of what it claims.**

Even though the Court has upheld Mr. O'Leary as Insureds' appraiser, Insureds feel compelled to set the record straight on Nationwide's arguments concerning Mr. O'Leary and his payment arrangement. Nationwide makes much of Mr. O'Leary's fee arrangement. As shown by the agreements and billing records between Mr. O'Leary and Insureds, Insureds have always paid Mr. O'Leary on an hourly basis. Nationwide accuses Mr. Ralph Brockman and, incredibly, counsel for Insureds of lying about this arrangement. In support of its claims, Nationwide attaches Mr. O'Leary's agreements and billing records. All of these show exactly what Insureds have testified to – that Mr. O'Leary began this project paid by the hour, was always paid by the hour, and will continue to be paid by the hour should the circumstances require. Mr. O'Leary was not paid a contingency, and he never will be.

A contingency is an event that may or may not occur. In a contingency agreement, the person working is paid only at the end of the assignment, if an award is rendered. If the contingent event, the recovery of money, does not occur, then person on a contingency agreement is not paid. Insureds, on the other hand, paid Mr. O'Leary hourly since the beginning of his involvement in this matter and continue to do so.

As shown by the September 22, 2009 letter Nationwide attaches to its memorandum, "You [Mr. O'Leary] will be paid $200 per hour for your work, with your fees capped at $190,000 during the course of this project." For ease of reference, please see Exhibit "A." This document is signed by counsel, Mr. O'Leary, and Mr. Brockman on behalf of Insureds. This agreement is the entire agreement between Mr. O'Leary and Insureds and supersedes all prior agreements. This agreement speaks for itself – Mr. O'Leary's agreement with Insureds contemplates hourly payment, whether Insureds are awarded $10,000,000 or nothing at all. Payment is not contingent on anything. Mr. O'Leary has no financial stake in the outcome of this matter.

Despite the fact that Nationwide attaches the agreements of Mr. O'Leary and his billing records, which plainly show that Insureds are paying him $200 per hour for his work, subject to a cap of $190,000, Nationwide makes a bizarre argument to claim Mr. O'Leary is currently working under a contingency agreement. In footnote 9 of its memorandum, Nationwide desperately tries to claim Mr. O'Leary's cap is considered a contingent payment. Obviously, no award has been rendered in this matter. Therefore, Insureds could not have possibly paid Mr. O'Leary a contingency. Nationwide complains that Insureds have "offered no explanation for how or why these figures were arrived at" as if Insureds have to justify their hourly expert payment agreements to

Nationwide. The fact remains that Insureds is paying Mr. O'Leary hourly for his participation in this matter, and they always have.

In footnote 9, Nationwide argues that Mr. O'Leary's "forecast" of a ten million dollar payment to Insureds proves that a contingency fee is at work. Nationwide argues that Insureds have actually paid $296,273.59 to Mr. O'Leary, which is less than $4,000 "shy" of $300,000, which is three percent of $10,000,000.[2] The cap that a party pays its expert can be based on anything that party feels is appropriate. Further, past agreements are meaningless because the September 22, 2009 agreement drafted by counsel for Insureds supersedes all prior agreements and contains no contingency language. Despite Nationwide's claims, nothing in Mr. O'Leary's agreements constitute "bald" attempts "to manipulate the litigation process." As the evidence demonstrates, Mr. O'Leary is paid hourly.

### B.     Nationwide offers no support for its claims that Insureds intentionally withheld documents critical to its claims and defenses.

Nationwide claims that Insureds and counsel intentionally withheld documents critical to its claims and defenses. This accusation is false. Counsel for Insureds assured counsel for Nationwide that they would provide the documents requested. Nationwide is now seeking to capitalize on its strategy of overloading Insureds' counsel. Counsel for Insureds worked for weeks to coordinate receipt of these documents from Insureds, review the information provided, Bates-number the documents, and provide them to Nationwide all while preparing extensively for the huge number of depositions noticed by Nationwide. As represented by Insureds, counsel for Insureds advised Mr. Rob Gilmore,

---

[2] Insureds paid Mr. O'Leary $106,273.59 prior to September 10, 2009. This amount was put towards his $190,000 cap. To date, Mr. O'Leary has been paid $131,787.83 with a balance of $58,212.17 left to draw, for a total of $190,000.

counsel for Nationwide, Insureds were still trying to locate documents.  Mr. Gilmore told counsel for Insureds that Nationwide would not file a motion to compel if Insureds were cooperating.   However, two days later, and without the courtesy of counsel for Nationwide contacting counsel for Insureds to tell them that Nationwide had changed its position, Nationwide did in fact file its motion to compel.  Nationwide argues that Mr. Gilmore's October 30, 2009 e-mail proves that Nationwide had threatened to request the Court to intervene, but Mr. Gilmore's assurances came after October 30, on November 6 at depositions on the Mississippi Gulf Coast.  Suddenly, Nationwide filed its Motion to Compel and then later, this attack on Insureds' counsel.

Prior to this motion, no one in any way connected to Nationwide accused Insureds or their counsel of intentionally withholding information.  As far as Insureds could tell, there was no discovery "dispute" because Insureds had already agreed to provide the information but lacked an opportunity to do so.  Even now Nationwide has no proof that Insureds or their counsel intentionally withheld documents except for the fact that the documents themselves were untimely.   Despite the fact that Nationwide has no supporting evidence in making these serious accusations, it attacks Insureds and their counsel.   These attacks are unprofessional, unfounded, and not supported by Nationwide's own memorandum.

In its memorandum, Nationwide claims that the documents recently produced by Insureds are "critical to the claims and defenses" of Nationwide.  Once again, however, Nationwide fails to support this statement.  In fact, Nationwide has avoided any actual "claims or defenses" on the merits of this case instead putting all of its efforts into defeating the appraisal process it created and is now attacking counsel for Insureds.

Apparently the information critical to Nationwide's claims and defenses were the alleged "prior affirmative misrepresentations" of Mr. Brockman, Insureds' counsel, Mr. O'Leary, and Mr. Wiggins. However, a plain reading of Nationwide's memorandum shows that no misrepresentations were made.

First, as noted above, Nationwide attacks Mr. Brockman due to his characterization of Mr. O'Leary's payments as hourly. Of course, Mr. Brockman testified that Mr. O'Leary's work is paid by the hour since the first agreement. Specifically, Mr. Brockman stated, "Lewis would bill for his time. He was hired by the hour and he would bill us for his time monthly…." Please see relevant portions of Mr. Brockman's deposition, page 97, attached as Exhibit "B." Nationwide asked, "How is Mr. O'Leary compensated for the expert work he has performed on behalf of the Carriage House Property?" Mr. Brockman's response was, "Just like this, by the hour." Exhibit B, p. 172. This testimony is in addition to the language quoted by Nationwide. All of this testimony supports the documentary evidence and conclusion that Mr. O'Leary is not being paid a contingency.

Nationwide then attaches Insureds' agreements with Mr. O'Leary which do in fact show that Mr. O'Leary is and was paid by the hour. Nationwide attempts the same misleading tactics to argue that both counsel for Insureds and Mr. O'Leary lied to the Court. Considering the fact that Nationwide's attachments to this frivolous argument support the position of Insureds, Nationwide's argument is completely without support and false.

Next, Nationwide claims Mr. Brockman testified that Mr. O'Leary did not provide drafts of his expert report. In support of this claim, Nationwide points out that

Mr. Brockman was questioned about Mr. O'Leary's drafts of his expert report and responded with "I don't recall any," and "not to my knowledge." First and obviously, the answer of "I don't recall" is not testimony that something did or did not happen. If Mr. Brockman did not recall reviewing any drafts of Mr. O'Leary's expert report, he is not misrepresenting anything. Nationwide again lacks proof for its claims.

What Nationwide mistakes as proof (Mr. O'Leary's planning memoranda) is simply Mr. O'Leary performing the function he was employed to perform – "to highlight the aspects of the evidence favorable to the party" who hired him, as observed by the Court. This is supported by a plain reading of Mr. O'Leary's planning memoranda. As this Court knows, reports to an expert's client are not identical to expert reports prepared for trial purposes. As Mr. O'Leary testified and Nationwide quoted, he did not recall ever publishing "a draft of that report." Mr. O'Leary did not "publish" a "draft of that report," but to expect Insureds' expert never to update his client on the validity of the claim is ridiculous. Mr. O'Leary provided an update to Mr. Brockman on the evidence and facts of the claim. As one can tell from a reading of the planning memoranda and Mr. O'Leary's report, the planning memoranda are not "drafts" of his report.

Nationwide's final alleged misrepresentation is also perplexing. Nationwide claims Mr. Jerry Wiggins lied about his document production simply because Insureds had retained e-mail correspondence that he did not retain. In footnote 5 of its memorandum, Nationwide points out that Insureds produced e-mail correspondence involving Mr. Wiggins. In support of its claim that Mr. Wiggins intentionally withheld these documents, Nationwide attaches testimony from Mr. Wiggins which indicates that

Mr. Wiggins did not retain these e-mails. In other words, Nationwide has no proof to support its accusations.

As the documents offered by Nationwide show, Mr. Brockman did not misrepresent the nature of Mr. O'Leary's engagement, neither Mr. O'Leary nor Mr. Brockman misrepresented the number of drafts of Mr. O'Leary's expert report, and Mr. Wiggins did not misrepresent his retention of e-mail correspondence. Nationwide's arguments fail.

> **C.** **Nationwide claims that the documents contain "critical new facts" which Insureds failed to disclose including alleged admissions by Insureds. However, these alleged admissions are strategic discussions between Mr. O'Leary and Mr. Brockman.**

Nationwide repeats its earlier and similar argument that the documents recently provided contain "critical new facts." In support of this claim, Nationwide once again attacks Mr. O'Leary. Nationwide also argues that Insureds documents contain "highly damaging admissions." As with its other arguments, Nationwide fails to support its claims. The documents contain no admissions or improper statements.

First Nationwide accuses Mr. O'Leary of impropriety based on statements in his planning memoranda to Mr. Brockman. As noted above and by the Court, "[E]xperts are expected to testify on behalf of their employer to establish the most favorable facts and theories the truth will allow." Insureds have always claimed that Nationwide's estimates are faulty. Mr. O'Leary was engaged to find the true value of Insureds' damages. In that regard, Insureds expect Mr. O'Leary to develop a case for why Nationwide owes Insureds more money because Nationwide's estimates were incorrect. This is not improper. Each of Nationwide's alleged statements of impropriety which Mr. O'Leary made to Insureds is taken out of context and reveals Mr. O'Leary's planning and strategy

to support the truth – that the extent of Insureds' damages is far more than Nationwide's meager estimates allowed. As the Court noted, "interested parties" are "parties who have a pecuniary interest in the subject of the contest." Mr. O'Leary's opinion that Nationwide's estimates are not representative of the true measure of Insureds' damages does not make him an "interested party." Mr. O'Leary has no pecuniary interest in the outcome of this matter.

Mr. Brockman, however, does have a pecuniary interest in the outcome of this matter as he is a partner in Carriage House Apartments Partnership. Nationwide accuses Mr. Brockman of making damaging statements such as his comments on the likelihood of winning "on wind and storm versus flood," collecting punitive damages, and seeing an "as is" appraisal for the property." Mr. Brockman has said nothing improper or damaging. Indeed, Mr. Brockman did not make an admission at all.

Mr. Brockman gave his opinion to his fellow partners as to the wind versus flood issue. Of course, Mr. Brockman is not a lawyer, and his opinion on this issue is irrelevant. Mr. Brockman's strategic discussion regarding the claim is not an admission. Nationwide next argues that Mr. Brockman's opinion that Insureds should not "bank" on punitive damages is somehow improper. Naturally, Insureds seek to collect punitive damages – all plaintiffs do. Nationwide does not explain how this statement is improper or an admission. Nationwide argues that Mr. Brockman's comments about the "as is" appraisal is improper or an admission. When an "as is" appraisal of flooded and gutted property reveals an amount higher than expected, considering the property turmoil in the Mississippi Gulf Coast at the time, the property owner should be excited. Nationwide does not support its claims. Finally, Nationwide argues that statements in a letter from

Insureds' attorney to the attorney for LNR Partners, Inc. in an unrelated law suit are damaging to Insureds. Insureds' attorney in that case says that Insureds "lost the opportunity to realize the profits they would have otherwise realized, had they not been forced by LNR to sell their interests in the properties at a distressed price." Again, Nationwide takes these statements out of context. The facts, claims, and defenses of the suit against LNR Partners, Inc. are not the same as those of this matter and are irrelevant.

Finally, in footnote 10, Nationwide argues that Mr. Wiggins, not Mr. O'Leary actually drafted Mr. O'Leary's expert reports, and Insureds "failure to designate Mr. Wiggins as an expert is yet one more example of their failure to abide by the expert disclosure requirements" and the Court's rules. Mr. Wiggins did indeed create the Xactimate damage figures which Mr. O'Leary referenced in his report. Mr. Wiggins is credited in Mr. O'Leary's report, and no person or party in this matter has attempted to hide Mr. Wiggins' contributions. However, Xactimate pricing is relied upon regularly by those in the profession of Mr. O'Leary, Mr. Wiggins, and Nationwide's experts.

Federal Rule of Evidence 703 states that the facts relied upon by an expert for his opinion "may be those perceived by or made known to the expert at or before the hearing." In this case, Mr. O'Leary relies upon such pricing guides as Xactimate on a regular basis. Employing Mr. Wiggins to complete work Mr. O'Leary is qualified to perform but lacks the time to perform is contemplated by Rule 703. Mr. Wiggins was employed to provide Mr. O'Leary with exact prices for the damaged property, which Mr. O'Leary could access himself but lacked the time.

If Insureds had wanted Mr. Wiggins to serve as their expert, Insureds would have hired Mr. Wiggins to serve as their expert. Mr. O'Leary is free to engage any assistance

he might need to complete his report and its foundation.  Based on Fifth Circuit precedent, Mr. O'Leary's opinion, including Mr. Wiggins' work, is admissible because Xactimate pricing is regularly relied upon by those in Mr. O'Leary's profession.  See, *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir. 1980) holding that the "pertinent inquiry" in determining the admissibility of expert testimony, "is whether the facts are of a type reasonably relied on by experts in the particular field."  Indeed, Nationwide cites no rule or case to suggest that Mr. Wiggins' work is not admissible or that Mr. O'Leary is not competent to draw his conclusions.

Nationwide seems to argue that Mr. O'Leary lacks the necessary skill or expertise to complete such an estimate.  Based on the Court's order of December 12, 2009, however, Mr. O'Leary, like other professional appraisers who have testified before the Court, has "demonstrated a high degree of professionalism and expertise."  Mr. Wiggins assists Mr. O'Leary, and this is not improper.  Nationwide's suggestion that Insureds will "surreptitiously designate or tender Mr. Wiggins as a testifying expert" is yet another unprofessional accusation unsupported by any proof.

### D.    Nationwide's proposed sanctions are each incorrect and granting Insureds' Motion for Extension of Time would alleviate all issues presented.

Nationwide makes a variety of suggestions regarding sanctions for the alleged improper conduct of Insureds.  Considering the fact that Insureds' conduct has not been improper, no sanctions whatsoever are warranted.

Factors considered in determining whether a party should be sanctioned pursuant to Federal Rule of Civil Procedure 37 include: (1) prejudice or surprise to party against whom evidence is offered; (2) ability of party to cure prejudice; (3) likelihood of

disruption to trial; and (4) bad faith or willfulness involved in not disclosing evidence at an earlier date. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). Even if Nationwide is prejudiced, which it is not, the prejudice can be cured by the granting of Insureds' Motion for Extension of Time to Complete Discovery. There is little likelihood of disruption to the trial. Insureds have not demonstrated bad faith or willful behavior. As such, sanctions are not appropriate.

Nationwide argues that this action should be dismissed. Dismissal is appropriate when the party acts with willfulness or bad faith, the conduct is attributable to the client, the opposing party is prejudiced, and a lesser sanction would not deter future conduct. In this case, the information cited by Nationwide does not contain what Nationwide claims it does, as stated above. Nationwide claims to have evidence of Insureds' "intentionality," yet only argues that Insureds' production was late. Clearly, this is not sufficient evidence of bad faith to dismiss this action. Cases cited by Nationwide for this premise do not support dismissal of Insureds' claim.

In support of dismissal, Nationwide cites *Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030 (5th Cir. 1990). This case is very different than the case at hand. There, the plaintiff ignored not one but two specific court orders compelling him to produce specific documents then filed a motion to dismiss his own action. *Coane*, 898 F.2d at 1031. Nationwide can rest assured that Insureds will not dismiss this action. Here, Insureds have not violated any order compelling discovery responses. In fact, Insureds complied with Nationwide's requests.

*United States v. $49,000 Currency*, 330 F.3d 371 (5th Cir. 2003) is also very different than this case. In *$49,000 Currency*, the plaintiffs repeatedly promised the

government initial disclosures and discovery responses. 330 F.3d at 373, 374. However, the government attorney was eventually forced to travel to Baton Rouge, Louisiana (the case was in filed Texas) to retrieve the documents. *Id.* at 374. The disclosures were not provided with the documents retrieved, and discovery responses were incomplete. *Id.* Finally, the government filed a motion to compel, and the plaintiffs were ordered to provide disclosures and discovery responses. *Id.* The plaintiffs again failed to respond. *Id.* After the government threatened to file a motion to strike, the plaintiffs simultaneously filed a Rule 12(b)(6) motion and provided discovery responses. *Id.* The Texas district court dismissed the plaintiffs' action, specifically noting that the plaintiffs had failed to comply with the order compelling them to produce disclosures and responses. *Id.* at 377. Again, Insureds did not violate a court order compelling production, but have produced materials to Nationwide. Dismissal is not an appropriate remedy in this case.

This Court is familiar with *Nilson v. Nationwide Mut. Ins. Co.*, No. 1:07-cv-990 at *2, 2009 WL 1285854 (S.D. Miss. May 6, 2009) in which the "draconian remedy" of dismissal was not entered for the plaintiff despite the "lengthy, if not strategic, delay" in providing the medical release. In this matter, Nationwide has not submitted evidence of any "strategic" delay, nor is there such evidence. In *Nilson* the plaintiff promised the medical release, apparently representing to the Court at a status conference that the release would be provided, only to provide the release late. No. 1:07-cv-990 at *2. This is not the case here. Further, the language quoted by Nationwide at page 17 of its memorandum was to clear up any "confusion" regarding a claim for emotional damages that the plaintiff's husband testified he did not plan to assert in the first place. *Id.*

Nationwide does not submit a single case on point to suggest this case should be dismissed, despite claiming that this Court "has dismissed cases for similar discovery abuses."

In *Thompson v. Northrop Grumman Ship Systems, Inc.*, No. 1:01-cv-111 at *1, 2005 WL 1593943 (S.D. Miss. June 24, 2005), the Court specifically advised plaintiffs that failure to respond to the Court's order compelling discovery responses would result in dismissal. Here there has been no such order. In *Eaves v. K-Mart Corp.*, 193 F.Supp.2d 887, 891 (S.D. Miss. 2001), the plaintiff repeatedly defied the Court's order to compel discovery responses and the magistrate judge's orders. His attorney eventually withdrew. *Id.* Again, there has been no order in this matter. In *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1484 (5th Cir. 1990), the plaintiff produced literally nothing for over 13 months from the filing of the suit until its dismissal. In *O'Neill v. AGWI Lines*, 74 F.3d 93, 94 (5th Cir. 1996), the district court instructed the plaintiff to prepare a joint report of meeting and a joint discovery/case management plan. The order specifically warned the plaintiff that failure to comply could result in the dismissal of the suit. *Id.* This never happened. The Texas district court went on to hold that the plaintiff had engaged in "blatant forum shopping," and that he had "grossly improperly filed under Rule 11." *Id.* at 95. These cases cited by Nationwide do not support the "draconian remedy" of dismissal of this action.

Nationwide argues that it is prejudiced by not dismissing this action. However, the granting of Insureds' Motion for Extension of Time to Complete Discovery would alleviate Nationwide's concerns. This extension would not upset the trial date, and Nationwide would have plenty time to assert its claims and defenses. Further, Insureds

would have an adequate opportunity to address Nationwide's discovery short-comings. Nationwide's request to dismiss this matter should be denied.

Nationwide argues that the Court should strike Mr. O'Leary. This claim has been settled by the Court's December 11, 2009 order. However, Insureds submit that Mr. O'Leary is and was paid hourly. His payment will be the same regardless of the outcome of this matter. Nationwide's request to strike Mr. O'Leary should once again be denied. Nationwide cites *Robbins v. Ryan's Family Steak Houses East, Inc.*, 223 F.R.D. 448, 450-451 (S.D. Miss. 2004), but this case involved a situation in which the plaintiff submitted incomplete expert reports on the day of the discovery cut-off and then attempted to supplement them one month prior to trial. In *Sierra Club, Lone Star Chapter v. Cedar Point Old Co.*, 73 F.2d 546, 571 (5th Cir. 1996), the district court found that the defendant did not submit "complete" expert reports. The reports were supposed to contain detailed statements of the expert's opinions and the information relied upon by that expert. 73 F.2d at 571. The defendant's experts' reports each contained a one to two page summaries of the points of each expert's testimony. *Id.* In this case, Mr. O'Leary provided a detailed report of his intended testimony which now needs simple revisions. In fact, this issue could be easily resolved by the appraisal process. This matter is different than *Robbins* because there is time in this case to revise Mr. O'Leary's report and the expert report was not submitted on the day of the cut-off.

Nationwide argues that Insureds should be precluded from pursuing appraisal. Nationwide has attempted to avoid the appraisal provision of its own policy for quite some time. As usual, Nationwide submits no evidence to support this claim. Mr. O'Leary has been paid by the hour and will not be paid on a contingency basis. Mr.

O'Leary did not "plan to manipulate the appraisal process." He planned to testify on behalf of his clients and establish the most favorable facts and theories the truth of this matter allows. Nationwide has not submitted evidence to suggest that appraisal should not go forward.

**III.    Nationwide files an invective-filled diatribe against Insureds and their counsel yet does not have clean hands itself.**

Undersigned counsel was surprised at the personal level of attack and vitriol in Nationwide's motion for sanctions. Insureds and their counsel are doing all they can to cooperate in discovery and to provide all responsive documents. There is always room for improvement, but Insureds and their counsel are trying mightily to comply with the requirements of the Court's orders and rules.

But, if Nationwide wants to make attacks like this based on its counsels' divination of Insureds' thoughts, maybe it should get its own house in order so Nationwide can come to the Court with clean hands itself. Consider two examples of Nationwide's practices:

**A.    Nationwide includes legal counsel on its claims review committees to make the committee meetings and conclusions privileged, so Nationwide can hide the conclusions of the claims review committees, which make the ultimate coverage decisions.**

In the attached Activity Log, which summarizes activity for the Carriage House claim, Nationwide has blacked out all information from the internal claims coverage committee. See attached, Exhibit "C." Is this wrongfully using attorney-client privilege to cloak the ultimate review of the claim in secrecy, for which Shook, Hardy and Bacon and Big Tobacco were punished? Maybe Insureds should assert that this is part of a fraudulent and intentional bad faith Nationwide conspiracy.

Consider the following exchange from the deposition of Charles Higley, Nationwide's 30(b)(6) representative regarding the claims review process which could be used to support this argument:

> Q. Okay. So that's a reference to
> 16 review of the denial internally by someone at
> 17 Nationwide?
> 18 A. Yes.
> 19 Q. And who would have been
> 20 responsible for that review?
> 21 A. We set up a review process that we
> 22 call the claims coverage committee, and a member of
> that process. It really wasn't a committee review.
>
> 2 But that was the title we put on the process that
> 3 conducted the review.
> 4 Q. And who would that have been in
> 5 this case? **Is there any way to know?**
> **6 A. Well, I do know. I know that it's**
> **7 been redacted and the individual who conducted the**
> **8 review is Roger Woods.**
> **9 Q. And who is Roger Woods?**
> **10 A. He is a Nationwide attorney**.
> 11 Q. Does he work in house for
> 12 Nationwide?
> 13 A. Yes, sir. Could we take a quick
> 14 break?
> 15 Q. Absolutely.
> 16 (Recess.)

Higley deposition (attached hereto as Exhibit "D") at 151-152 (emphasis added).

> Q. And who had to review the claim
> 7 before it could be denied?
> 8 A. A team lead would review a small
> 9 claim. But any of our total losses and large
> 10 claims involving any element of denial, we had our
> 11 claims coverage review process in place.
> 12 Q. **And was legal counsel part of that**
> **13 review process?**
> **14 A. Legal counsel comprised for the**
> **15 most part the members of the claims coverage**
> **16 committee. As I said, we did have a claims person**
> **17 present for months and -- first two or three**

**18 months.**
19 Q. Okay. I'd like to mark this as
20 CH-47.

Exhibit D at 216 (emphasis added). In the words of Nationwide's own corporate representative: "**Legal counsel comprised, for the most part, the members of the claims coverage committee."** Nationwide "set up a review process . . . call[ed] the claims coverage committee," put counsel on the committee and then redacted the conclusions of that committee from its documents when it produced them!

These words are quoted directly from Nationwide's corporate representative; they are not created by counsel as are the attacks by Nationwide. Rather than go on a self-righteous tirade impugning the integrity and motives of everyone at Nationwide, however, undersigned counsel believes that this is just another fact that Nationwide will have to live with at trial.

B.    **Nationwide somehow lost evidence central to this case, consisting of all of its flood estimates that were prepared by its adjusters for the Carriage House Property.**

In the Activity Report attached, Nationwide's adjuster reported as follows: "**There is also a flood estimate written for each unit**. A paper copy will be placed in the paper file." Attached as Exhibit "E" at NW2SUN004259 (emphasis added.) Yet, no copies of flood estimates have ever been produced. First, they were said to be on a thumb drive. Then, they were said to be lost. Then, the document attached as Exhibit "F" was produced in discovery by Nationwide with the statement: "Nationwide also specifically produced copies of the requested 'flood estimates' by e-mail on November 9, 2009." Please see discovery responses, attached as Exhibit "G." Of course, as the Court can see, no flood estimates were produced, just one 15-page estimate of the cost of

replacing **one roof**!   Does this mean Nationwide is now contending the roof was damaged by flood?

Nationwide's strident and self-righteous attack seeking dismissal of Insureds' case is particularly puzzling as Nationwide itself obviously does not have "clean hands" in the discovery process.   Undersigned counsel prefers to take witnesses and parties at their word, assume they are doing their best, and avoid assigning evil motives to others whose minds he cannot read.   However, since Nationwide has cast the first stone and claims that Insureds' witnesses are liars, perhaps the Court should consider the loss of key evidence regarding the claim by Nationwide and evaluate whether this is the type of spoliation of evidence that warrants either the dismissal of all of Nationwide's defenses, the pillorying of its key witnesses, or other "appropriate" sanctions.

**IV.    Conclusion**

Nationwide continues to attempt to build a house on a foundation of sand.   However, at each turn, its arguments appear more and more thin.   As noted above, granting Insureds' Motion for Extension of Time to Complete Discovery will resolve all issues presented by Nationwide.   No party will be prejudiced and the delay will not upset the trial date.   The extension is harmless.   As such, Nationwide's Motion for Sanctions should be denied, and Insureds' Motion for Extension of Time to Complete Discovery should be granted.

Respectfully submitted,

_____/s/ *Nathan M. Gaudet*_____
Nathan M. Gaudet (MSB 102608)
Matthew K. Brown (LA BAR (18571), T.A.
*Sullivan, Stolier & Resor, APLC*
909 Poydras Street, Suite 2600
New Orleans, Louisiana 70112
ngaudet@ssrlawfirm.com

**Attorney for plaintiffs, Sunquest Properties, Inc.
& Carriage House Apartments Partnership**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing pleading has this date been electronically filed using the CM/EFC service which will notify counsel of record via electronic mail of this filing.

New Orleans, Louisiana, this 16th day of December, 2009.

_____/s/ *Nathan M. Gaudet*_____
Nathan M. Gaudet