**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**SUNQUEST PROPERTIES, INC. and**
**CARRIAGE HOUSE APARTMENTS**
**PARTNERSHIP,**                                                    **PLAINTIFFS**

**v.**                                          **Civil Action No. 1:08-CV-687-LTS-RHW**

**NATIONWIDE PROPERTY AND**
**CASUALTY INSURANCE COMPANY**
**and JOHN DOES 1-5,**                                        **DEFENDANTS**

**SUPPLEMENT TO NATIONWIDE'S REPLY IN SUPPORT OF**
**MOTION FOR SANCTIONS**

Defendant Nationwide Property and Casualty Insurance Company submits this Supplement to Nationwide's Reply in Support of Motion for Sanction in light of new evidence that shows Plaintiffs' prior representations to the Court were false.  In support thereof, Nationwide states as follows:

1.    Nationwide filed its Motion for Sanctions on December 10, 2009 and filed a reply memorandum in support of its Motion on December 22, 2009.

2.    In their Opposition to Nationwide's Motion, Plaintiffs represented that, "[a]s shown by the agreements and billing records between Mr. O'Leary and Insureds, Insureds have always paid Mr. O'Leary on an hourly basis" and that "Mr. O'Leary has no financial stake in the outcome of this matter."  (Dec. 16, 2009 Mem. in Opp. to Mot. for Sanctions at 4, 5 [Dkt. 226].) Plaintiffs further represented that "Mr. Brockman did not misrepresent the nature of Mr. O'Leary's engagement [and] neither Mr. O'Leary nor Mr. Brockman misrepresented the number of drafts of Mr. O'Leary's expert report." (*Id.* at 10.)

3.    However, recent deposition testimony from both Mr. Brockman and Mr. O'Leary in the other matter being litigated between these parties demonstrates the deceptiveness of these representations.  Indeed, Mr. O'Leary and Sunquest representative Ralph Brockman have now

EXHIBIT A

expressly admitted under oath that their prior testimony and Plaintiffs' representations to the Court were false by acknowledging that *Mr. O'Leary and Mr. Brockman entered into a contingency fee arrangement that was in effect for a full year — during which time Mr. O'Leary prepared his estimates and expert report — until Plaintiffs' counsel told them it was "not legal."* (*See* Jan. 19, 2010 Deposition of Ralph Brockman, *Sunquest Properties, Inc. & Compass Pointe Apartments Partnership v. Nationwide Prop. and Cas. Ins. Co.*, 1:08-CV-692-LTS-RHW, at 37, 40 (explaining that Mr. O'Leary operated under contract entitling him to 4% of Plaintiffs' claim until purportedly superseded by mid-litigation September 22, 2009 agreement) (Ex. 49);[1] Jan. 15, 2010 Deposition of Lewis O'Leary, *Compass Pointe*, at 240 (discussing contract terms) ("Q. And four percent of whatever the final award is, whether it's $1,000,000, $5,000,000, $10,000,000 or $20,000,000; correct?  A. Yes.") (Ex. 50); *id.* at 245 ("Q. But if there was an award of $10,000,000, you would get four percent; correct?  A. *During that particular period of time there was a percentage agreement.*")); *id.* at 237-38 ("Q. And this represents the agreement that you had in place up until the lawyers told you you can't have this agreement; is that right?  A. That's right.  Q. And that took place sometime last fall, correct?  A. I think so.  Q. By 'last fall,' I mean September of 2009, correct?  A. That sounds about right.").)

4.    As Mr. Brockman further admits, contrary to Plaintiffs' representations that he had been truthful in his prior sworn testimony, Mr. Brockman now admits that his testimony on this point was untrue:

| Oct. 20, 2009 Deposition of Ralph Brockman *Carriage House v. Nationwide* at 173 (Ex. 2) | Jan. 19, 2010 Deposition of Ralph Brockman *Compass Pointe v. Nationwide* at 65-66 |
|---|---|
| *Q. Well, prior -- did you have a different compensation arrangement with Mr. O'Leary prior to filing this lawsuit?* | Q. I had asked you … did you have a different compensation arrangement with Mr. O'Leary prior to filing this lawsuit [and |

---

[1]    Exhibits 1-48 are attached to Nationwide's Motion for Sanctions.  Exhibits 49-50 are attached hereto.

| | |
|---|---|
| *A. No.* <br><br> Q. So -- <br><br> A. It's been the same all the way through. <br><br> Q. -- when you first began working with him at some point in 2007, it's always been on an hourly basis -- <br><br> A. Yes. <br><br> Q. -- without any contingent -- <br><br> A. … *[T]he arrangement for payments was the same.  It was by the hour.* | you] answer[ed] no.  Did I read all of that correctly? <br><br> A.  Yes. <br><br> *Q.  When you made that statement under oath that time that was untrue right Mr. Brockman?* <br><br> *A.  That's correct.* |

5.      Additional testimony reveals that, contrary to Mr. O'Leary's report, (*see* June 29, 2009 Expert Report of Lewis O'Leary at 6 (Ex. 5)), and to Plaintiffs' persistent claims that Mr. O'Leary "was always paid by the hour," (Mem. in Opp. to Mot. for Sanctions at 4 [Dkt. 226]), **Mr. O'Leary has been issued multiple "milestone" payments as an "advance" on his entitlement to 4% of Plaintiffs' claim.** (*Compare* O'Leary *Compass Pointe* Dep at 246-47; *id.* at 251-52 ("Q. This invoice, that we're looking at here, does not show any kind of hourly component?  A. That -- that is correct.  It does not.  You're absolutely right."); *with* Jan. 12, 2010 Pls.' Mem. in Opp. to Mot. to Strike O'Leary as Litigation Expert at 2 [Dkt. 235] (misrepresenting that all payments to Mr. O'Leary have been "based on Mr. O'Leary's contract price of $200 per hour").)

6.      Additionally, Plaintiffs represented that an extension of the discovery deadline to permit Mr. O'Leary to create new wind damage estimates would avoid prejudice to Nationwide and delay of the trial.  (*See* Mem. in Opp. to Mot. for Sanctions at 2.)  Yet **Plaintiffs' promises of a grossly out-of-time, mid-January completion of new wind estimates for litigation purposes**

*remained unfulfilled at the time of Mr. O'Leary's January 15 deposition.* (*See, e.g.*, Mem. in Supp. of Mot. for Extension of Time to Complete Discovery and Supplement Expert Reports at 2 ("These reports will be completed by mid-January 2010.").) Contrary to Plaintiffs' claim that the new estimates "completed [Mr. O'Leary's] findings," (Pls.' Mem. in Opp. to Mot. to Strike O'Leary as Litigation Expert at 8), according to Mr. O'Leary it is nothing more than a "preliminary," mixed wind/flood estimate that he prepared for purposes of appraisal. (*See* O'Leary Dep, *Compass Pointe*, at 24, 148.)[2] In fact, Mr. O'Leary admitted that at the time of his deposition he still lacked "another set for the trial that's just wind only," because he "just ha[sn't] had time to mess with that." (*See id.* at 146.)[3] Since even Plaintiffs' self-appointed, out-of-time deadline for completing new reports and the completion of Mr. O'Leary's deposition in this matter passed without new estimates related to this litigation, Plaintiffs' promise of a new expert report can no longer serve as an argument against the sanctions sought by Nationwide.

7.      Nationwide continues to believe that the imposition of sanctions is appropriate, and files this supplement to provide the Court with all available facts which may be relevant to the Court's decision.

WHEREFORE, PREMISES CONSIDERED, Nationwide respectfully requests that this Court grant its Motion for Sanctions and enter an order dismissing this action with prejudice or granting the alternative relief requested.

---

[2]    Mr. O'Leary testified that he had undertaken the same "wind and flood" supplemental estimate for the appraisal process in the Carriage House lawsuit as well, and did not have revised "wind-only" estimates for that case either. *See also id.* at 148-49 ("Q. Okay. And am I correct that for Carriage House those new estimates are the same thing, they're wind and flood? A. Yes, sir. Q. Okay. And those too are also for the appraisal process? A. Yes, sir. Q. And if you wanted to present something to the court or to the jury that was solely wind damage, you'd have to deconstruct your newest ones in some way to break out wind versus flood? A. Yes, sir. *Q. Do you have a plan to do that? Have you been asked to do that? A. It's something that's on the list of things to do. Yes, sir. Q. But as we sit here right now you don't have that? A. No, sir.*").

[3]    Plaintiffs produced what purport to be supplemental "wind-only" estimates for the Compass Point lawsuit on January 25, ten days after Mr. O'Leary's deposition in this matter and the day before Nationwide was to depose Mr. O'Leary's estimator, Jerry Wiggins. Nationwide reserves all rights regarding these supplemental "wind-only" estimates, including specifically the right to move to strike and exclude them from use in this matter.

THIS, the ____ day of January, 2010.

Respectfully submitted,

NATIONWIDE PROPERTY & CASUALTY
INSURANCE COMPANY, DEFENDANT

By Its Attorneys
WATKINS LUDLAM WINTER & STENNIS, P.A.

By:    /s/ Laura L. Hill
       LAURA L. HILL
       lhill@watkinsludlam.com

H. Mitchell Cowan (MSB No.7734)
Laura Limerick Gibbes (MSB No. 8905)
F. Hall Bailey (MSB No. 1688)
Janet D. McMurtray (MSB No. 2774)
Christopher R. Shaw (MSB No. 100393)
Laura L. Hill (MSB No. 102247)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, MS 39205
Telephone: (601) 949-4900
Facsimile: (601) 949-4804

Of Counsel:
Daniel F. Attridge, P.C. (Bar No. 44644)
Christian D.H. Schultz (Bar. No. 44747)
Robert B. Gilmore (Bar No. 44997)
Kate S. O'Scannlain (Bar No. 45034)
Jeffrey A. Todd (Bar No. 45916)
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Suite 1200
Washington, DC 20005
Tel:  (202) 879-5000
Fax: (202) 879-5200

## CERTIFICATE OF SERVICE

I certify that I have this day electronically filed the foregoing using the Court's ECF system, which sent electronic notification of such filing to:

Nathan M. Gaudet
Matthew K. Brown
SULLIVAN, STOLIER AND RESOR, APLC
909 Poydras Street, Suite 2600
New Orleans , LA 70112
504/561-1044
Fax: 504/561-8606
ngaudet@ssrlawfirm.com
mbrown@ssrlawfirm.com

This, the ____ day of January, 2010.

By:  /s/ Laura L. Hill
     LAURA L. HILL
     lhill@watkinsludlam.com

Page 1

                    IN THE UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF MISSISSIPPI
                            SOUTHERN DIVISION




SUNQUEST PROPERTIES, INC.
AND CARRIAGE HOUSE
APARTMENTS PARTNERSHIP,
INC.
                                        PLAINTIFFS


V.                        CASE NO. 1:08-CV-687-LTS-RHW


NATIONWIDE PROPERTY AND
CASUALTY INSURANCE
COMPANY AND JOHN DOES 1-5
                                        DEFENDANTS



            DEPOSITION OF RALPH BROCKMAN



Taken at the instance of the Defendants at Watkins
Ludlam, Gulfport, Mississippi, on Thursday, January
        19, 2009, beginning at 9:04 a.m.



APPEARANCES:


      NATHAN M. GAUDET, ESQ.
      Sullivan Stolier and Resor
      909 Poydras Street, Suite 2600
      New Orleans, Louisiana 70112


            COUNSEL FOR PLAINTIFF

EXHIBIT 49

010bdc74-7cc2-49aa-9407-76abf4f986e9

# Ralph Brockman 1/19/2010

<table>
<tr><td colspan="2">

**Page 2**

1  ROBERT GILMORE, ESQ.
   Kirkland & Ellis
2  655 15th Street, N.W., Suite 1200
   Washington, DC 20005
3
4  MICKY COWAN, ESQ.(VIA TELEPHONE)
   Watkins Ludlam
5  Post Office Box 427
   Jackson, Mississippi 39205
6
7
   COUNSEL FOR DEFENDANT
8
9
10
11  VIDEOGRAPHER: LYNDA MARSHALL
12
13
14
15
16
17
18
19
20
21
22
23  REPORTED BY: Robin G. Burwell, CSR #1651
          Brooks Court Reporting, Inc.
24          12 Lakeland Circle, Suite A
          Jackson, Mississippi 39216
25

</td></tr>
</table>

**Page 4**

1   Exhibit 327 - 1/26/2008 Memo.................53
2   Exhibit 329 - March 17 E-mail.............59
3   Exhibit 330 - 4/9/2008 E-mail.............62
4   Exhibit 180 - Deposition of Ralph Brockman, Carriage
5   House Case...................................64
6   Exhibit 125 - 9/29/2005 Fax.........66
7   Exhibit 478 - 12/29/2006 Complaint.........68
8   Exhibit 479.....................72
9   Exhibit 481 - E-mail......................72
10  Exhibit 480 - E-mail......................73
11  Exhibit 421 - 9/23/2005 E-mail.............75
12  Exhibit 477 - Declaration.................79
13  Exhibit 1 - Policy.........................86
14  Exhibit 314 - 9/23/2005 Letter............118
15  Exhibit 316 - 11/15/2005 Letter............125
16  Exhibit 185 - 12/4/2005 Letter............129
17  Exhibit 198 - Document re: Upward Revision .130
18  Exhibit 157 - Damages Paid................133
19  Exhibit 139 - 12/8/2006 Warranty Deed.......136
20  Exhibit 141 - Corrected Warranty Deed.......138
21  Exhibit 310 - Closing Statement............140
22  Exhibit 424 - 4/24/2006 Letter............143
23  Exhibit 468 - Buy/Sell Agreement..........148
24  Exhibit 466 - 8/18/2006 Letter............149
25  Exhibit 467 - 10/29/2006 Letter............156

**Page 3**

1             INDEX
2   Style and Appearances.....................1
3   Index....................................3
4   Certificate of Deponent...................230
5   Certificate of Reporter...................231
6
7          EXAMINATIONS
8   Examination By Mr. Gilmore................6
9
10            EXHIBITS
11  Exhibit 475 - Notice of 30(b)(6) Deposition.7
12  Exhibit 263 - 6/29/2009 Probuilders Report..10
13  Exhibit 335 - Engagement Letter............12
14  Exhibit 324 - Engagement Letter............12
15  Exhibit 328 - 2/24/2008 E-mail.............17
16  Exhibit 331 - 4/7/2008 E-mail.............25
17  Exhibit 323 - E-mail......................31
18  Exhibit 337 - 8/20/2008 Revised Service
19  Agreement..............................35
20  Exhibit 338 - Revised Service Agreement.....35
21  Exhibit 336 - 8/28/2008 Engagement Agreement for a
22  Commercial Property......................42
23  Exhibit 339 - 9/22/2009 Letter.............42
24  Exhibit 361 - File, Compass Pointe Carriage
25  House....................................48

**Page 5**

1   Exhibit 296 - Amended Complaint............159
2   Exhibit 297 - Plaintiffs' Responses to Nationwide's
3   Interrogatories and Request For Production..173
4   Exhibit 300 - Plaintiffs' Answers to Defendants'
5   Second Set of Interrogatories..............184
6   Exhibit 304 - Answer to Interrogatory
7   Number 28.................................186
8   Exhibit 303 - Answer to Interrogatory
9   Number 25.................................194
10  Exhibit 483 - 12/31/2005 Balance Sheet and Income
11  Statement.................................200
12  Exhibit 484.................................209
13  Exhibit 485 - Handwritten Notes............215
14
15
16
17
18
19
20
21
22
23
24
25

2  (Pages 2 to 5)

010bdc74-7cc2-49aa-9407-76abf4f986e9

## Ralph Brockman 1/19/2010

Page 6

1    VIDEOGRAPHER: This is the video
2  deposition of Ralph Brockman taken by counsel for
3  the defendant in the matter of Sunquest Properties,
4  et al. versus Nationwide Insurance, et al., in the
5  United States District Court, Case Number
6  1:08CV687-LTS-RHW, held in the office of Watkins
7  Ludlam on Tuesday, January 19th, 2010. It is now
8  9:10 a.m. Counsel may introduce themselves.
9    MR. GILMORE: Robert Gilmore, Kirkland &
10  Ellis, LLP, on behalf of Nationwide Property
11  Casualty Insurance Company.
12    MR. GAUDET: Nathan Gaudet for the
13  plaintiffs, Sunquest Properties, Inc. and Compass
14  Pointe Apartment Partnership.
15    MR. COWAN: Micky Cowan on behalf of
16  Nationwide Property and Casualty Insurance.
17    VIDEOGRAPHER: Court reporter will now
18  swear in the witness.
19       RALPH BROCKMAN,
20  Having been first duly sworn, was examined and
21  testified as follows:
22  EXAMINATION BY MR. GILMORE:
23    Q. Good morning, Mr. Brockman. We've met
24  before. Again, my name is Rob Gilmore. I'm with
25  Kirkland & Ellis representing Nationwide. We're

Page 7

1  here today on the second two losses you brought
2  regarding Compass Pointe Apartments.
3    I am going to hand you what's been
4  pre-marked as Defense Exhibit 475, which is the
5  notice of your 30(b)(6) video deposition today.
6    (Exhibit 475 - Notice of 30(b)(6)
7  Deposition marked for identification.)
8    Q. Have you seen this document before, sir?
9    A. I believe so, yes, sir.
10    Q. You understand this lists several topics
11  for which Nationwide has asked plaintiffs to present
12  a representative to testify on?
13    A. Yes.
14    Q. Are you prepared to testify regarding the
15  topics that are listed in Defense Exhibit 475?
16    A. Yes.
17    Q. You're testifying today on behalf of
18  Compass Pointe Apartments Partnership, right?
19    A. Yes.
20    Q. Now, for today's deposition, if I'm asking
21  you a question, I want you to assume that I am
22  asking a question that calls for information for you
23  to give on behalf of the partnership; is that fair?
24    A. Yes.
25    Q. If at any point I want to ask you

Page 8

1  something personally that doesn't have to do with
2  partnership, I'll make sure I let you know that's
3  what I'm doing. Okay?
4    A. Yes.
5    Q. I know you've been deposed before. Just
6  run through the ground rules real quick. It's my
7  job to ask you questions that you understand. Okay?
8    A. Yes.
9    Q. If I ask a question that you don't
10  understand, please let me know. I'll try and
11  rephrase it so that it makes sense; is that fair?
12    A. Yes.
13    Q. If you answer my question, I'm going to
14  assume that you understood my question. Okay?
15    A. Yes.
16    Q. And you just nodded. Since it's being
17  recorded and transcribed, if you can give verbal
18  responses rather than head shakes or "uh-huh"
19  (affirmative response). Give "yes" or "no." We'll
20  save the court reporter here a lot of heartache; is
21  that fair?
22    A. That's fair.
23    Q. You may recall the last time we had
24  deposition for Carriage House Property, numerous
25  times you and I both were speaking over each other.

Page 9

1  That happens during depositions a lot. But if you
2  can just try and let me finish my question, give
3  Mr. Gaudet here an opportunity to object if he wants
4  to, and give your response. Again, that will make
5  it a lot easier for the court reporter here who's
6  trying to transcribe everything; is that fair?
7    A. Yes.
8    Q. Is there any reason why you can't give
9  truthful and accurate testimony here today?
10    A. No.
11    Q. And you'll see looking at Defense
12  Exhibit 475, Topic 4 deals with, "Any and all
13  dealings, communications, or correspondence with
14  WorldClaim's adjuster Lewis O'Leary, Jerry Wiggins,
15  Todd Skinner, Michael Fusco, Lisa Phillips,
16  Donna Bass, Tammy Crossley, Susan Belk,
17  Timothy Brandon, Meleah Jones, Greg Stewart, or any
18  other individual or entity retained or consulted by
19  the partnership and/or Sunquest regarding the damage
20  or losses sustained by Compass Pointe as a result of
21  hurricane Katrina or any insurance claim filed by
22  the partnership as a result of hurricane Katrina."
23  Did I read that correctly?
24    A. Yes.
25    Q. I want to start with that topic today,

3  (Pages 6 to 9)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

---

Page 10

1  specifically with respect to Compass Pointe and your
2  dealings with Lewis O'Leary.
3      (Exhibit 263 - 6/29/2009 Probuilders
4  Report marked for identification.)
5      Q.  Let me hand you what's been marked as 263,
6  which is a June 29, 2009 report from Probuilders,
7  Lewis O'Leary's company, concerning the Compass
8  Pointe Apartments property.  This report was
9  produced to Nationwide by plaintiffs.  Have you seen
10 this document before?
11     A.  Yes.
12     Q.  You recognize this as Mr. O'Leary's expert
13 report for the Compass Pointe case?
14     A.  Yes.
15     Q.  You seen any other versions of this
16 report?
17     A.  From Probuilders?
18     Q.  Yes, from Probuilders or Lewis O'Leary.
19     A.  No, not that I recall.
20     Q.  Do you know whether plaintiffs had an
21 opportunity to review it and ensure that it was
22 accurate prior to it being conveyed to Nationwide?
23     A.  I didn't understand that.  Do I know if
24 plaintiff?
25     Q.  Yes.  I'll rephrase it.  Did plaintiffs

---

Page 11

1  review this report to ensure that it was accurate
2  and truthful prior to providing it to Nationwide?
3      MR. GAUDET:  Object to the form.  Little
4  vague as far as the meaning of "accuracy."
5      Q.  You understand the word "accurate," sir?
6      A.  Yes.  I understand the word "accurate."
7  Did I review this before it was submitted if I
8  understand the question.
9      Q.  Right.  You or anyone on behalf of
10 plaintiffs review it to ensure it was accurate, as
11 you use that word, prior to it being given to me?
12     A.  Yes.  I'm certain that he submitted it to
13 me before Nationwide.
14     Q.  As we sit here today, are you aware of any
15 errors, inaccuracies, or misstatements in Defense
16 Exhibit 263, Mr. O'Leary's report for Compass
17 Pointe?
18     A.  No, I am not.
19     Q.  Turn to the last page of the report.
20 You'll see the page numbers at the top, Page 7 on
21 Defense Exhibit 263.  You'll see there's a second
22 heading there postscript.  Second bullet point
23 reads, "My compensation for this assignment has been
24 the payment of $200 per hour for actual consulting
25 and $100 per hour for my travel time.  Secretarial

---

Page 12

1  is $35 per hour and expenses are billed at cost."
2  Did I read that correctly?
3      A.  Yes.
4      Q.  Sitting here today, do you know whether
5  that was an accurate statement at the time
6  Mr. O'Leary made it on June 29th, 2009 report?
7      A.  Yes.
8      Q.  Was it, in fact, an accurate statement to
9  your knowledge?
10     A.  Yes.
11     (Exhibit 335 - Engagement Letter marked
12 for identification.)
13     (Exhibit 324 - Engagement Letter marked
14 for identification.
15     Q.  I hand you what's been marked as Defense
16 Exhibit 335 and 324.  Let's start with 335, which is
17 a document produced by plaintiffs, Bates numbered
18 CH 1157.  Have you seen this document before, sir?
19     A.  Yes.
20     Q.  Can you tell us what this document is?
21     A.  D-335?
22     Q.  Yes, Defense 335.
23     A.  It's -- it's a document between Carriage
24 House, which puzzles me.  I thought this was
25 addressing Compass Pointe.  But it is an engagement

---

Page 13

1  agreement, consulting agreement as I understood it,
2  with Probuilders represented by Lewis O'Leary to --
3  you'd have to read it.  It gives you the outline of
4  what he is to do in this engagement as a consultant,
5  an overview of it or summary.  It's just to see and
6  research the claim itself to see if it's justifiable
7  claim, as I recall it.
8      He got a retainage of $3,000 deposit on
9  each of these engagements.  It's one with Compass
10 Pointe.  There's a different one with Carriage
11 House.  You'll notice it's a thousand.  There's a
12 note of ours on it and it was paid and it was by the
13 hour.  It says 200 an hour.  And it tells you about
14 the secretarial.
15     And it -- initially, this contract was to,
16 as I said, determine whether we had a justifiable
17 claim in his opinion.  We had already just followed
18 an engagement I made with WorldClaim as a public
19 adjuster, which ran into a dead-end.  The adjuster
20 never could get any -- anywhere with Nationwide.
21     Q.  We'll talk about WorldClaim in a second.
22 I want to go through 335, but I also want to have
23 you look at 324.  You see they look very similar
24 forms, except you'll see written in there at the
25 very top, there's an indication that this is -- 324

---

4  (Pages 10 to 13)

Ralph Brockman 1/19/2010

Page 14

1   is for Compass Pointe.
2       A.  Yes.
3       Q.  You see that, sir?
4       A.  Yes.
5       Q.  Other than the two properties, these
6   agreements in substance are all --
7       A.  The same.
8       Q.  -- the same; that's right?
9       A.  Correct.
10      Q.  You'll see 324 doesn't have a signature
11  from Mr. O'Leary, while 335, the one for Carriage
12  House does.  Regardless, is it your understanding
13  that Mr. O'Leary was operating under these two
14  contracts for both the properties, Carriage House
15  and Compass Pointe?
16      A.  Yes.
17      Q.  So then -- so let's look at 324, which is
18  the one for Compass Pointe Apartments Partnership
19  between Compass Pointe and Mr. O'Leary.  And you'll
20  see it's dated May 10th, 2007, right, sir?
21      A.  Yes.
22      Q.  It says under .3, "Consultant's
23  compensation shall be $200 per hour, plus $35 an
24  hour, plus secretarial, plus all related expenses."
25  Did I read that correctly?

Page 15

1       A.  Yes.
2       Q.  That's similar to what we saw in Defense
3   Exhibit 263, Mr. O'Leary's June 29th report, right?
4       A.  Yes.
5       Q.  Right above that he says, "The scope of
6   the consulting arrangement shall include the
7   following services."  Did I read that correctly?
8       A.  Yes.
9       Q.  It says, "Review evidence and supporting
10  data."  Did I read that correctly?
11      A.  Yes.
12      Q.  "Interview the client and supporting cast,
13  frame the picture of the claim as consultant sees
14  it."  Did I read that right?
15      A.  Yes.
16      Q.  "Provide technical support to the client
17  and/or his representatives regarding presentations,
18  faxes, and standard practices within the industry in
19  the client's attempt to settle their claim."  Did I
20  read that correctly?
21      A.  Yes.
22      Q.  "Should the case resort to the appraisal
23  process, serve as an appraiser and appraiser process
24  relating to damages to the residence."  Did I read
25  that?

Page 16

1       A.  Yes.
2       Q.  "Analyze the damages, gather facts,
3   calculations, and opinions into a formal report, and
4   negotiate with second appraiser or the umpire to
5   reach the fairest possible appraisal award."  Did I
6   read that correctly?
7       A.  Yes.
8       Q.  Those items that I just read, do you
9   believe those are fair characterization of what
10  Mr. O'Leary was retained to do when you signed this
11  in May 2007 on behalf of plaintiff?
12      A.  Yes.  There's an additional item that was
13  written into it.
14      Q.  That's right.  There's an additional
15  handwritten.  Is that your handwriting or
16  Mr. O'Leary's or someone else's?
17      A.  I think that's Mr. O'Leary's.
18      Q.  Mr. O'Leary wrote, "Negotiate a fair fee
19  with WorldClaim for the estimate of damage which is
20  reimbursable from Nationwide should our claim be
21  legitimate."  Did I read that correctly?
22      A.  Yes.
23      Q.  What did Mr. O'Leary mean when he wrote
24  that handwritten addition?
25      A.  You're asking me to say what Mr. O'Leary

Page 17

1   meant.  I can only tell you what I think, but it may
2   not be.
3       Q.  And I'm just asking the plaintiffs, your
4   personal knowledge?
5       A.  Well, we realized that WorldClaim had
6   worked on a contingent basis and didn't draw any
7   money for any of their time and expense.  And yet,
8   they had numerous pictures and estimates that were
9   very valuable to Mr. O'Leary trying to do the above
10  items that you -- that you mentioned.  And I told
11  him that I have not -- was not having much luck with
12  getting Mr. Fusco, Michael Fusco, representing
13  WorldClaim, to move on this.  And so he added this
14  into the scope of work he would do as consultant.
15  And I tried to, you know, get something from
16  WorldClaim.  And subsequently, he was successful and
17  we had to pay some money.  And the records I don't
18  have with me what we paid, but we did reimburse
19  WorldClaim for some of the pictures and the data
20  that they had -- that they had prepared on this
21  claim.
22          (Exhibit 328 - 2/24/2008 E-mail marked for
23  identification.)
24      Q.  Let me show you what we've marked as
25  Defense Exhibit 328.  This is a document produced by

010bdc74-7cc2-49aa-9407-76abf4f986e9

Page 18

1  plaintiffs, Bates numbered CH 2358. Do you
2  recognize this document, sir?
3      A. It's a letter. It's an E-mail.
4      Q. E-mail from probill@aol.com. That's
5  Mr. O'Leary's E-mail address, right?
6      A. Correct.
7      Q. It's dated February 24th, 2008; is that
8  right?
9      A. Yes.
10     Q. And it's to sbelk@brockmanents.com. Did I
11 read that right?
12     A. Correct.
13     Q. That's Susan Belk at Brockman Enterprises?
14     A. Yes.
15     Q. And is she an employee of Compass Pointe
16 or did she perform services on behalf of Compass
17 Pointe?
18     A. She's my office manager and -- she's not
19 employed by Compass Pointe. She's just my office
20 manager. And I am the managing partner of Compass
21 Pointe. So in that regard, that's why she was --
22 and I don't do my own E-mail. It comes to my office
23 manager or my secretary.
24     Q. Is it fair to say as your office manager,
25 given you're the managing partner of Compass Pointe,

Page 19

1  she performs services on behalf of Compass Pointe?
2      A. Yes.
3      Q. And one of those services was interacting
4  with Mr. O'Leary; is that fair to say?
5      A. Yes.
6      Q. Now, this E-mail is actually addressed to
7  "Ralph." Was that common for Mr. O'Leary to send
8  E-mails to Susan when he was trying to send E-mails
9  to you?
10     A. Yes.
11     Q. So Mr. O'Leary writes in Defense
12 Exhibit 328, "Ralph, I'm not sure exactly how to
13 address the payment plan on this other phase of my
14 assignment." Did I read that correctly?
15     A. Yes.
16     Q. Sir, there were two phases for
17 Mr. O'Leary's engagement on behalf of plaintiffs; is
18 that right?
19     A. Mr. O'Leary's -- refers to it as phases.
20 I recall that there were actual contracts that were
21 entered into with Mr. O'Leary, the first of which
22 you've already provided here as your original
23 exhibit. There was a second one and then there was
24 a third one. If I could see the second one and see
25 the date of it and compare it to this date, I could

Page 20

1  testify more accurately.
2      Q. And we'll look at all these agreements
3  that you're referring to, but I just want to make
4  clear when he's referring to "phases," you mean --
5  in your mind, that meant a progression of
6  contractual arrangements with Mr. O'Leary?
7      A. In my mind, that's what I see. I don't
8  know that Mr. O'Leary saw it that way, but in my
9  mind when I read this, that's what I thought. That
10 the first contract we entered into said at the end
11 we saw that there was a legitimate claim. And then
12 we entered into another phase, another contract that
13 was executed. And I think that's what he's
14 referring to in this E-mail.
15     Q. He next writes, "I indicated that I wanted
16 to handle it with a one percent as we went along and
17 a remaining two percent at the end." Did I read
18 that right?
19     A. Yes.
20     Q. Do you know what Mr. O'Leary was referring
21 to when he referred to one percent as we went along
22 and the remaining two percent at the end?
23     A. He's making a pitch here for compensation
24 for the next phase of his assignment, as I see it.
25 It's his sales job to try to make more money with

Page 21

1  another contract arrangement or another phase.
2      2. "One percent as we went along in the
3  remaining two percent at the end." What do those
4  percentages refer?
5      A. I don't know. You'd have to ask him
6  there. He wrote this. It's his pitch. I would
7  assume he's mentioning of what he collected.
8      Q. Of what he collected?
9      A. Of what Nation -- what he got from
10 Nationwide.
11     Q. In other words, what kind of recovery he
12 was able to get Nationwide to pay plaintiffs?
13     A. Again, I don't know what his thought
14 process.
15     Q. When you received this, did you ask him
16 what he meant?
17     A. I don't recall.
18     Q. If you look a little further down, he
19 says, "The effort required to pull off" -- or "of
20 the comprehensive package necessary to force the
21 attorney down to around 20, 25 percent is
22 extensive." Did I read that correctly?
23     A. Yes.
24     Q. Do you know what he was referring to there
25 when Mr. O'Leary wrote "the effort necessary to

6  (Pages 18 to 21)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 22

1  force the attorney down to 20, 25 percent"?
2      A.  I would assume he's meaning that he's got
3  to try to get some attorneys that would work for
4  less than what normally they want is 35 percent or
5  some of them even want half of what they get.  So
6  he's making a pitch here of trying to find an
7  attorney that would work at 20 to 25 percent.
8  That's what I -- I think he meant.  And it would
9  take him a lot of time to do that.
10      Q.  Mr. O'Leary next writes, "In essence, I
11  would have to pull myself off the market for well
12  over a month's worth of time over the next 90 days
13  to get it ready to submit and then trap them into
14  some breach of contract conduct necessary to wet the
15  attorney's appetite enough to secure a significant
16  discount in their fee."  Did I read that correctly?
17      A.  Yes, you did.
18      Q.  When you -- did you ever ask Mr. O'Leary
19  what he meant when he wrote that he would have to
20  trap them into some breach of contract conduct
21  necessary to wet the attorney's appetite enough to
22  secure significant discount in their fee?
23      A.  Not specifically on this -- this E-mail.
24  There was discussion between us on it.  My
25  recollection of it is much like I have a contract

Page 23

1  with Nationwide, or we did, the partnership, and
2  they weren't fulfilling their part of the contract.
3  And he said, "The more you document that, the more
4  in the" -- "if it has to go to litigation, that the
5  more favor the possibility for a breach of
6  contract."  And obviously, he's making a pitch like
7  he -- he -- you know, if they don't -- that that
8  would be a benefit to an attorney ultimately for
9  representing the partnership.  That I recall
10  specifically.  This E-mail, this stuff sent, I don't
11  recall that.
12      Q.  Did you ever ask Mr. O'Leary to trap
13  Nationwide into some breach of contract conduct?
14      A.  No.
15      Q.  Did you ever ask Mr. O'Leary what he meant
16  when he said that he was going to try to trap
17  Nationwide --
18      A.  No.
19      Q.  -- into some breach of contract conduct?
20      A.  Just what I already said.
21      Q.  Other than what you've said, you don't
22  have any other -- other understanding what
23  Mr. O'Leary meant when he said he would try and trap
24  them into some breach of contract?
25      A.  No, sir.

Page 24

1      Q.  Did you ever tell Mr. O'Leary it would be
2  wrong to try and trap Nationwide into some breach of
3  contract conduct?
4      A.  I never discussed this item here with him.
5      Q.  Generally speaking, as a businessman, do
6  you think it's right to try and trap your business
7  counterparts into a breach of contract?
8      A.  You'd have to define "trap" and then I
9  could.  You know, it has a connotation when you say
10  "trap" like you're sneaking up on somebody.  So
11  define "trap" for me.
12      Q.  I'd like to use your definition.  Do you
13  think that's what Mr. O'Leary meant when he used the
14  word "trap"?
15      A.  Possibly, yes.
16      Q.  And do you think it made sense to try and
17  sneak up on Nationwide and trap them into a breach
18  of contract conduct?
19      A.  If one is not fulfilling his end of the
20  contract and refuse to communicate with designated
21  parties for the partnership, then he felt he is
22  fully in his rights to document that and use it
23  against them.  And I think short-term for that is
24  trap.
25          Now, I would not have used the word

Page 25

1  "trap."  I would have used just what I said.
2  Document that the -- the other party is not
3  fulfilling their -- their contract, but he used that
4  word.  I did not.
5          MR. GILMORE:  Can we go off the record a
6  minute?
7          VIDEOGRAPHER:  Off record at 9:35.
8          (Off the record.)
9          VIDEOGRAPHER:  On the record at 9:39.
10          (Exhibit 331 - 4/7/2008 E-mail marked for
11  identification.)
12      Q.  (By Mr. Gilmore)  Let me hand you what's
13  been marked as Defense Exhibit 331.  And it's a
14  document Bates numbered CH 2362 to 2363.  Have you
15  seen this two-page document before, sir?
16      A.  Yes.
17      Q.  And this is an April 7, 2008 E-mail from
18  Lewis O'Leary to Susan Belk directed to you, right,
19  sir?
20      A.  Yes.
21      Q.  And the "Subject" line is "Second
22  Agreement"; is that right?
23      A.  Yes.
24      Q.  The E-mail says, "Ralph, per our call last
25  week, the attached is the proposed second agreement

7  (Pages 22 to 25)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 26

1  we discussed. I show where I had sent this to you
2  back around the first of February, but regardless,
3  if it is in order, please give me a call and let's,"
4  quote, "get her done." Did I read that correctly?
5      A.  Yes.
6      Q.  Do you remember a discussion with
7  Mr. O'Leary early in April regarding a second
8  agreement?
9      A.  Yes. He's always making a pitch, you
10 know, and this was one of them, but I don't think
11 this one was executed, though.
12     Q.  Well, let's take a look at the next page
13 is the attachment that he's sending, correct?
14     A.  Yes.
15     Q.  It says CH 2363, and it's "Services
16 Agreement" at the top, right?
17     A.  Yes.
18     Q.  It says, "Purpose of the services
19 agreement is for the development of two sets of
20 three estimates segregated by wind and flood,
21 supporting evidence that a hurricane Katrina wind
22 claim for multi-family housing units that were at
23 the time known as Compass Pointe located at 41
24 Chicot, Pascagoula, Mississippi, and Carriage House
25 located at 2865 Martin Bluff Road, Gautier,

Page 27

1  Mississippi." Did I read that correct?
2      A.  Yes.
3      Q.  Did I pronounce that street name
4  correctly, sir, or is it Chicot for the Compass
5  Pointe property?
6      A.  I think so, Chicot.
7      Q.  Chicot.
8          MR. GAUDET:  As far as I know.
9      Q.  We'll go with Chicot.
10         MR. GILMORE:  Micky, jump in if it's
11 incorrect.
12         MR. COWAN:  All right.
13     Q.  (By Mr. Gilmore)  There are a series of
14 bullet points that describe what Lewis O'Leary would
15 do for these services, right?
16     A.  Correct.
17     Q.  And first one reads, "Forensic examination
18 of all the available evidence regarding each segment
19 of two losses.  Then interview potential witnesses
20 and a generation of witness statements.  Create an
21 estimate that is supported by the evidence,
22 segregating it into flood and wind.  Create a
23 business personal property loss assessment estimate
24 for both properties.  Create a business income loss
25 assessment.  Develop a proof of loss that sets out"

Page 28

1  -- "all of this out.  And work with attorneys paid
2  by the client to ensure proper legal format for
3  all."  Did I read all of that correctly?
4      A.  Yes.
5      Q.  The first one, "Forensic examination of
6  all available evidence," so far as you know,
7  Mr. O'Leary performed that service, right?
8      A.  Ultimately, yes.
9      Q.  The second one, "Interview potential
10 witnesses and generation of witness statements," do
11 you know whether Mr. O'Leary has interviewed
12 potential witnesses?
13     A.  I'm certain he has, yes.
14     Q.  Do you know if he's generated any witness
15 statements?
16     A.  I don't re -- I don't know.
17     Q.  You ever seen a witness statement that --
18     A.  No, I haven't.  That's why I say I don't
19 know.  I would think he probably has, but I haven't
20 seen them.
21     Q.  "Create estimate that is supported by the
22 evidence, segregating it into flood and wind."  Now,
23 we may disagree whether it's estimates or supported
24 by the evidence, but you would agree he created
25 estimates of damage for winds to Compass Pointe,

Page 29

1  right?
2      A.  Yes.
3      Q.  Now, "Creating business personal property
4  loss assessment estimate for both properties."  Do
5  you know if Mr. O'Leary ever performed or
6  created a business personal property loss assessment
7  estimate?
8      A.  No, I don't.  I don't recall one of those.
9      Q.  The next one, "Create a business income
10 loss assessment."  Do you know if Mr. O'Leary has
11 ever created a business income loss assessment?
12     A.  No, I don't.  I don't think he did, but he
13 may have.
14     Q.  Now, "Develop a proof of loss that sets
15 all of this out."  Did I read that right?
16     A.  Yes.
17     Q.  Do you know if he's developed a proof of
18 loss that sets all of this out?
19     A.  That -- that summary that you submitted
20 earlier --
21     Q.  Defense Exhibit 263?
22     A.  -- shows that proof of loss.
23     Q.  Is that something you would consider a
24 proof of loss?
25     A.  I would --

8  (Pages 26 to 29)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 30

1    Q.   And I produced --
2    A.   Yes.  He had pictures and -- yes.
3    Q.   So that report, Defense Exhibit 263, along
4  with his photographs and the estimates of damage,
5  you would consider that to be the proof of loss?
6    A.   Yes.
7    Q.   And then finally, "Work with attorney paid
8  by the client to ensure proper legal format for
9  all."  And you -- you would agree Mr. O'Leary has
10 worked with attorneys that work on your behalf,
11 correct?
12   A.   Yes.  Again, though, I don't think this is
13 the contract we ever executed.  It's his pitch to do
14 this.  He's -- he's constantly, by E-mail, pitching
15 to get compensation and -- and for these services,
16 but I don't believe we executed it.
17   Q.   Now, then you'll see, "The contractor
18 shall be paid a total of three percent of the value
19 of the claim for these services.  This fee shall be
20 funded as follows:  One percent of the gross amount
21 of the funds received by the insured entity or
22 entities based upon a $10 million forecast for the
23 collective value of all three categories to be
24 funded on agreed milestone basis during the
25 production of the estimate proof of loss package."

Page 31

1  Did I read that correctly?
2    A.   Yes.
3    Q.   The next says, "The difference between the
4  amount paid for these services during the production
5  of the estimate of proof of loss package and
6  three percent of the gross amount of funds received
7  by the insured entity or entities for their attorney
8  for all aspects of these claims within 15 days of
9  receipt of the funds."  Did I read those correctly?
10   A.   Yes.
11   Q.   Sir, it's your testimony that this service
12 agreement was never entered into, right?
13   A.   I do not recall that it was.  It was a
14 pitch by Mr. O'Leary.
15       (Exhibit 323 - E-mail marked for
16 identification.)
17   Q.   Let me hand you what's been marked as
18 Defense Exhibit 323.  It's document Bates number
19 CH 2350 to 2351.  It's E-mail produced by
20 plaintiffs.  This E-mail was -- comes from you.
21 You see second page it says, "Yours truly,
22 Ralph Brockman," right?
23   A.   Yes.
24   Q.   It's sent to Joe Ledoux, Diane McGowan,
25 and Jan Brockman; is that correct?

Page 32

1    A.   Yes.
2    Q.   Can you tell me who those three
3  individuals are, sir?
4    A.   Well, at this time, they were partners.
5  Jan is my wife.  So I just let her be copied.  Diane
6  is her sister, McGowan.  And Joe Ledoux is her
7  brother-in-law.  And they were the heads of the
8  family that were partners in this.  They had other
9  family -- they had family partnerships.  So
10 Joe Ledoux's became his three children.  And Diane's
11 became her two children.  So even though they may
12 not have been, per se, the owners, they were the
13 heads of the family partnerships.  That's why they
14 were copied.
15   Q.   You'll see -- you look down to -- well,
16 strike that.
17       This E-mail was apprising other partners
18 in the partnerships about what Lewis O'Leary has
19 been doing on behalf of the partnerships; is that
20 right?
21   A.   Yeah, that's correct.
22   Q.   If you look at the fourth paragraph, it
23 says, "It is now time to decide if we enter into" --
24 I'm sorry -- "if we enter the second service
25 agreement referred to as phase two, copy enclosed.

Page 33

1  Note that he implies a $10 million forecast in
2  payment of three percent of the gross to him with
3  advances based on .75 of the projected claim 75,000,
4  and the balance, 2.25 percent, being paid at the end
5  of the claim.  Should the balance be less than
6  10,000" -- "10 million, his balance would be
7  adjusted proportionate to what is collected.  He's
8  essentially requesting 75,000 cash-flow to prepare
9  the items in phase two."  Did I read that correctly?
10   A.   Correct.
11   Q.   This paragraph summarizes the proposed
12 phase two second service agreement with O'Leary; is
13 that right, sir?
14   A.   Yes.
15   Q.   And part of it is ongoing cash to finance
16 his ongoing work for the plaintiff; is that right?
17   A.   Which paragraph are you referring to?
18   Q.   This fourth paragraph here.  The $75,000
19 cash-flow, that's to allow him to continue his
20 ongoing work; is that right?
21   A.   That's correct.  That's what it says.
22   Q.   And then a payment of three percent of the
23 gross to him with advances based on .75 for the
24 projected claim.  The three percent of the gross to
25 him refers to his $10 million forecast; is that

9  (Pages 30 to 33)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 34

1  right, sir?
2      A.  I believe that's correct.
3      Q.  Now, go down to the very bottom and then
4  carrying over to the next page.  The bottom of 2350,
5  you write, "We have forwarded his compensation for
6  phase one by undistributed cash in our account.  Our
7  current cash balance is $44,070 and it's sufficient
8  to cover the balance of phase one, but not the
9  75,000 for phase two.  This will require a capital
10  call from each of us, and if you do not wish to
11  pursue this further, then it is your right and
12  please advise.  I guess I am a sucker and really
13  want to go forward."  Did I read all of that
14  correctly?
15      A.  Correct.
16      Q.  Why did you write, "I guess I am a sucker
17  and really want to go forward"?
18      A.  Well, Lewis is apparently making all kind
19  of pitches.  And -- and -- and that $10 million is a
20  big number.  And sometimes you want to believe I
21  know that we had a huge loss way more than we
22  collected from Nationwide.  And in all of these
23  pitches he's making, I'm -- yeah, I'm buying it.  I
24  think it's worthwhile to go forward.  And maybe I'm
25  a sucker for believing it, but I said what --

Page 35

1  exactly what I thought at the time.  "I guess I'm a
2  sucker and really want to go forward."  But I wasn't
3  going to bind my partners into -- to that.  I'm
4  giving them a choice here that they can get out now
5  or it's gonna cost a lot more money going forward.
6  We still haven't got the contract that was signed,
7  though.
8      Q.  I'm going to show you what plaintiffs have
9  produced.  It's marked -- hand you two separate
10  documents.  Defense Exhibit 337, which is produced
11  by plaintiffs, Bates number CH 1159, and Defense
12  Exhibit 338, CH 1160.
13          (Exhibit 337 - 8/20/2008 Revised Service
14      Agreement marked for identification.)
15          (Exhibit 338 - Revised Service Agreement
16      marked for identification.)
17      Q.  Sir, each of those documents is entitled
18  "Revised Service Agreement," right?
19      A.  I see one.  Wait a minute.
20      Q.  337, 338?
21      A.  Yes.
22      Q.  They look very similar.  Have slightly
23  different handwriting -- I guess handwritten
24  notations on them, which we'll go through in a
25  second.  I want to start at the top, though.  It

Page 36

1  says, "Revised Services Agreement," so this is a
2  different agreement than the one we looked at a few
3  minutes ago that Mr. O'Leary had E-mailed you in
4  April, right, sir?
5      A.  Yes.
6      Q.  Now, if you look at the itemization of the
7  specific services he would be performing for each
8  property, you go through those, you see at the top
9  on 337 and 338, those appear to be the same as his
10  proposal from April, right?
11      A.  That's correct.
12      Q.  And you'll see the payment terms are a
13  little different; isn't that right, sir?
14      A.  Yes.
15      Q.  I want to go through each of them and have
16  you explain the differences that are handwritten or
17  typed in each of these two documents.  On 337, it
18  says about halfway down, "The contractor," that's
19  Mr. O'Leary, right?
20      A.  That's who?
21      Q.  Mr. O'Leary is the contractor, right?
22      A.  I suppose that's Probuilders.
23      Q.  Probuilders, Mr. O'Leary's company, right?
24      A.  Yes.
25      Q.  "The contractor shall be paid a total of

Page 37

1  four percent of the value of the claim or 88,500,
2  whichever is higher for these services."  Did I read
3  that correctly?
4      A.  Yes.
5      Q.  You'll see Defense Exhibit 338 says, "The
6  contractor shall be paid for both agreements a total
7  of four percent of the value of the claim or a
8  125,000, whichever is higher, for these services."
9  Did I read that correctly, including that
10  handwritten notation?
11      A.  Yes.
12      Q.  Sir, looking at Defense Exhibit 337, go
13  down to the bottom.  That's your signature dated
14  August 20th, 2008, right, sir?
15      A.  Yes.
16      Q.  Now, there are also some handwritten notes
17  at the very bottom of the page on 337.  It says,
18  "Paid to date 10,000.  Balance to draw 53,500.
19  Adjusted total 63,500."  Did I read that correctly?
20      A.  Yes.
21      Q.  There are initials next to it.  You see
22  those initials, sir?
23      A.  Yes.
24      Q.  Whose initials are those?
25      A.  They're mine.

10  (Pages 34 to 37)

Ralph Brockman 1/19/2010

Page 38

1    Q.   Look at CH 1160, Defense Exhibit 338.  And
2  that document also has your signature on it; is that
3  right, sir?
4    A.   Correct.
5    Q.   Now, both these documents are also signed
6  by Linda O'Leary.  Is that Mr. O'Leary's wife?
7    A.   Yes.
8    Q.   She's indicated to be vice-president for
9  Probuilders.  Is that your understanding?
10   A.   Yes.
11   Q.   Both Defense Exhibit 337 and Defense
12  Exhibit 338 are signed agreements between you and
13  Mr. O'Leary's company for the services we discussed
14  a few minutes ago on behalf of Compass Pointe and
15  Carriage House.  Is that -- is that fair to say?
16   A.   Yes.
17   Q.   Do you have any explanation as to the
18  slightly different terms in terms of the dollar
19  figures in Defense Exhibit 337 and 338?
20   A.   No, I don't.  I think -- it seems like one
21  of them would have been agreement for Compass Pointe
22  and the other one for Carriage House, but it doesn't
23  state that.  I don't know why.
24   Q.   And I -- that could be it.  That's one of
25  the reasons I was asking you.  Neither of these

Page 39

1  documents indicate it is specific to one property or
2  the other.  Is it your understanding that one or the
3  other is for one property and the other is for the
4  other property?
5    A.   That's what I would think because they're
6  different amounts of --
7    Q.   Regardless, though, both of these were in
8  effect for the two properties, whichever was
9  specific to one of the properties, right?
10   A.   Yes, for an interim period of time.  It
11  then got negated by yet a third and final contract.
12       (Exhibit 336 - 8/28/2008 Engagement
13  Agreement for a Commercial Property marked for
14  identification.)
15   Q.   I want to hand you something else, 336,
16  Defense Exhibit 336, which is another document
17  produced by plaintiffs, Bates number CH 1158.  You
18  see this document is different from 337 and 338 that
19  we looked at previously, right, sir?
20   A.   Yes.
21   Q.   It's entitled "Engagement Agreement For a
22  Commercial Property."  "There exists a service
23  agreement by and between Mr. Ralph Brockman, the
24  authorized representative for Brockman Enterprises,
25  et al., hereby collectively referred to as the

Page 40

1  client, and Lewis O'Leary, the property loss
2  consultant, hereafter referred to as the
3  consultant."  Did I read that correctly?
4    A.   Yes.
5    Q.   It says, "The purpose of this service
6  agreement and the terms and conditions are set out
7  in the attached document."  When it says "the terms
8  and services are set out in the attached document,"
9  is it referring to the attached document that we saw
10  -- looked at a few minutes ago?
11   A.   I would -- I would assume that, yes, sir.
12   Q.   It's dated -- signed by you; is that
13  right?
14   A.   Yes.
15   Q.   It's dated August 28th, 2008?
16   A.   Yeah, the same date as the revised service
17  agreement, yes.
18   Q.   So these were -- this was executed the
19  same date as the revised service agreement.  Is that
20  your recollection?
21   A.   Yes.
22   Q.   It's also signed by -- is that -- well,
23  actually Lewis?
24   A.   No.  This was actually signed by Lewis.
25  It sounds like -- I don't know that Lewis became

Page 41

1  aware of something that his wife wasn't or I wasn't,
2  and then he sends this E-mail on the same day.  And
3  it has some different computations of what's been
4  paid to date.  And a different computation of the
5  balance remaining.  I can't explain it.  Lewis sends
6  a lot of paperwork.  But yes, I signed it on the
7  same date and I initialed the -- the writing below,
8  which is my writing.
9    Q.   Do you know -- can you give an explanation
10  as to what this purpose of this document is in
11  relation to the previous two ones we looked at?
12   A.   The only item appears to me that is the --
13  the capping funding of future service of 15 grand.
14  And the first document didn't have a cap in.  So
15  this is in addition to the -- the other executed
16  revised service agreement.  And why it shows a
17  different amount paid to date than the other
18  documents, I don't know.  But it does cap a future
19  funding and additional 15 grand.  And --
20   Q.   So that --
21   A.   That's to be paid out of the same progress
22  basis at same hourly rate, plus expenses.  So he's
23  to continue to be paid that $200 an hour to be
24  capped at 15,000.  So that's an addition, more or
25  less like an addendum, to these contracts we entered

11   (Pages 38 to 41)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 42

1  into.  Executed on the same day.
2      Q.  You would agree that cap is silent as to
3  his entitlement under Defense Exhibit 337 and 338 to
4  four percent of the value of the claim?
5      A.  Yes, it's silent.
6      (Exhibit 339 - 9/22/2009 Letter marked for
7  identification.)
8      Q.  Let me hand you what's been marked as
9  Defense Exhibit 339.  This has been Bates numbered
10  CH 611 to 612.  Have you seen this document before,
11  sir?
12      A.  Yes.
13      Q.  This is a letter prepared by your
14  attorneys, Matthew Brown and Nathan Gaudet, at
15  Sullivan Stolier and Resor?
16      A.  Yes.
17      Q.  Dated September 22nd, 2009, right?
18      A.  Yes.
19      Q.  If you turn to the second page, is that
20  your signature on it, "Approved by Ralph Brockman as
21  agent for Sunquest Properties, Inc., Compass Pointe
22  Apartments Partnership, and Carriage House Partners
23  Partnership"?
24      A.  Yes.
25      Q.  Dated September 24th, 2009?

Page 43

1      A.  Correct.
2      Q.  You'll see above it, do you recognize that
3  as Mr. O'Leary's signature, also dated
4  September 24th, 2009?
5      A.  Yes.
6      Q.  Have you read through this document, sir?
7      A.  Yes.
8      Q.  Why was this document created, sir?
9      A.  Well, Mr. O'Leary has had a point in time
10  in here from August 20th, '08 up and to -- up and to
11  this date, in which if he had collected anything, he
12  would have received a compensation as outlined by
13  the contract executed on August 20th.  But he didn't
14  collect anything at all.  Just like WorldClaim
15  didn't collect anything.  They had a seven percent
16  contingency fee and a contract.  They didn't collect
17  anything other than what I paid them for their
18  expenses to get the photos and the estimates.
19  Mr. O'Leary had a pretty long period of time to try
20  to collect something and he struck out, too.
21      So it became very clear that the only way
22  that I would possibly ever collect anything was to
23  engage an attorney.  The first one that was engaged
24  was actually Will Clark, and Will Clark actually, I
25  believe -- no, it wasn't Will Clark.

Page 44

1      MR. GAUDET:  Wynn.
2      A.  Wynn Clark.  And he actually filed suit
3  himself before the statute of limitations expired.
4  Subsequent to that, Mr. Clark didn't have a staff
5  sufficient to handle the claim, but he was very
6  effective in filing the suit before the statute of
7  limitation was out.  And then we gravitated --
8  discovered Matthew Brown and had worked with him
9  before.  And so we then got Matthew to substitute
10  counsel in place of Wynn Clark.  And he was apprised
11  of all the agreements prior to this that we had that
12  -- that had always paid a draw of $200 an hour on
13  every one of them.  But he never got anything.
14      So now it was time to enter yet the final
15  agreement that superseded all the previous
16  agreements.  And Mr. Brown prepared this and we
17  both, Lewis and I, agreed to it.  Certainly, the
18  dollar amount now is capped a lot higher.  But I
19  went along with it.
20      Q.  I want to ask you a few things about this
21  document, sir.  First of all, it doesn't refer to
22  any prior agreements --
23      A.  No.
24      Q.  -- between plaintiffs and Mr. O'Leary,
25  does it?

Page 45

1      A.  No.
2      Q.  Defense Exhibit 339 doesn't say that any
3  prior agreements are superseded or terminated, does
4  it, Mr. Brockman?
5      A.  No.
6      Q.  Why did you agree to cap Mr. O'Leary's fee
7  at 190,000 during the course of this agreement,
8      A.  Well, I wanted a cap myself.  I mean, it's
9  just I didn't want anything open-ended.  Mr. O'Leary
10  is kind of like if you read the original agreement,
11  we had much, much smaller fees and this thing is
12  growing and growing and growing.  Well, it -- it was
13  a huge loss.  I think it grew on him.  It required
14  literally thousands of man-hours possibly to approve
15  the claim.  And that's why this amount kept
16  increasing.  And I finally had to put a foot to it
17  and said, "I got to have a cap, period.  No more.
18  I've heard two different" -- "You've had your try to
19  settle it with World" -- I mean, "Nationwide and
20  failed.  WorldClaim had one and it failed."
21      I'm sorry.  (Telephone rings.)
22      So that's why I insisted on a cap, and we
23  entered this contract.  And it is the one that we're
24  abiding by and have been ever since dated
25  September 22nd, '09.

12  (Pages 42 to 45)

Ralph Brockman 1/19/2010

Page 46

1    Q. Are you aware of any -- any other document
2  that terminates the revised services agreements that
3  we looked at a few minutes ago that were entered
4  into in August?
5    A. No, not a document that terminates it.
6    Q. Any other kind of communication other than
7  a document that terminates revised service
8  agreement?
9    A. This is the contract that we entered into.
10 Just like the one in August was a new agreement that
11 -- that replaced Mr. O'Leary's first agreement.
12 This became an agreement that replaced Mr. O'Leary's
13 second agreement. But there was no, to my
14 knowledge, termination document ever executed or
15 signed.
16    Q. Go back to 337 and 338. Each of them says
17 -- the line right under the bullet points, "By
18 mutual agreement, the two parties have elected to
19 modify the existing agreement. The following are
20 the terms and conditions of the modified agreement."
21 Did I read that correctly?
22    A. Yes.
23    Q. No such similar language appears in
24 Defense Exhibit 339, right, sir?
25    A. Correct. Now, this was prepared, this

Page 47

1  Exhibit 337 and 8, by Lewis O'Leary. The Defense
2  Exhibit 339 is prepared by Matthew Brown.
3    Q. You reviewed 339 to make sure it was
4  accurate?
5    A. Yes, sir.
6    Q. Did Mr. O'Leary ever tell your attorneys
7  that he had prior signed agreements with plaintiffs?
8    A. I don't know. I would assume he did.
9    Q. Did you ever ask Mr. O'Leary if he had
10 told your attorneys whether --
11    A. I don't --
12    Q. -- you had prior signed agreements with
13 him?
14    A. He knew we had agreements, yes, Mr. Brown
15 did. I don't recall him reading the agreements as
16 we have today, but yes, he very clearly knew that we
17 had agreements and were provided those, I'm pretty
18 sure, by Mr. O'Leary.
19    Q. Do you know when Mr. O'Leary provided
20 either you or your attorneys the signed agreements?
21    A. Obviously, prior to this date of
22 September of '09. I would assume it was probably
23 within the 30 days of that date.
24    MR. GILMORE: Go off record to change
25 tape.

Page 48

1    VIDEOGRAPHER: Off record at 10:11. End
2  of tape one.
3    (Off the record.)
4    VIDEOGRAPHER: Beginning tape two. On the
5  record at 10:11.
6    Q. (By Mr. Gilmore) I'm going to hand you
7  some other communications with Mr. O'Leary. First,
8  361.
9    (Exhibit 361 - File, Compass Pointe
10 Carriage House marked for identification.)
11    Q. This is a document Bates numbered CH 1193.
12 You see at the top is a document -- some handwritten
13 notation, right, sir?
14    A. Yes.
15    Q. Whose handwriting is that?
16    A. That's mine.
17    Q. Does it say, "File, Compass Pointe,
18 Carriage House"?
19    A. Yes.
20    Q. Is there a file on these two properties?
21    A. Yes.
22    Q. Is that at Brockman Enterprises?
23    A. Yes, sir.
24    Q. Is that where this document came from?
25    A. Yes, sir.

Page 49

1    Q. When was that file searched in response to
2  request for production in this litigation?
3    A. Gosh, I don't know. It was before the
4  first deposition. Y'all were provided the whole
5  file. I think you came to the premises and examined
6  the whole file.
7    Q. I don't believe any attorney for
8  Nationwide has inspected plaintiffs' documents on
9  the premises. It's your testimony that this
10 document was found in plaintiffs' file prior to your
11 first deposition, which I believe was October 20th?
12    A. Yes, sir.
13    Q. And, in fact, in response to discovery
14 requests, did plaintiffs search their files or
15 search the Compass Pointe and Carriage House files
16 that are referenced in this document?
17    A. Yes, sir.
18    Q. Is your testimony today that any
19 responsive documents that were found in those two
20 files were produced to Nationwide in this discovery?
21    A. Yes, sir.
22    Q. That was given to your attorneys and they
23 produced it, right?
24    A. Yes, sir. The first attorney received a
25 copy of the whole file. Maybe that's who came. I'm

www.BrooksCourtReporting.com
1-800-245-3376

Ralph Brockman 1/19/2010

Page 50

1  not certain who came to the office.
2      Q.  The first attorney would be Wynn Clark?
3      A.  Wynn Clark.  So but I think in some of the
4  legal proceedings, Nationwide demanded any and all
5  information and this was provided from that file.
6      Q.  This document, specifically an E-mail from
7  Lewis O'Leary addressed to Susan Belk, was it sent
8  to your direction?
9      A.  Yes.
10     Q.  It says Number 4, "Because we are looking
11  at the diminished value aspect, I will need to" --
12  "to assistance of a very competent real estate
13  appraiser, one that is ready, willing, and able to
14  work closely with me.  If he is gone, my editing
15  time will be minimal."  Did I read that correctly?
16     A.  Yes, sir.
17     Q.  Do you know what Mr. O'Leary was referring
18  to when he said "because we're looking at diminished
19  value aspect"?
20     A.  He -- this is his opinion.  And, of
21  course, he's building groundwork.  This was back in
22  May of '07 before he even entered into the
23  August '08 agreement.  He's constantly building a
24  proof that he feels like he can substantiate this
25  claim.  And one of them was the diminished value

Page 51

1  aspect where it's kind of like they use a parable
2  like if you damage a car that's brand new a block
3  the dealership and it's a big scratch on the door,
4  then you get it repainted.  Well, obviously, your
5  door cost so much to repaint, but now you've got a
6  diminished product in value.  That -- that brand new
7  car that has a repainted door is no longer worth
8  what it was when it left the dealership.  I remember
9  that.  And I think he mentioned something about we
10  have damaged property here that might not ever be
11  worth what it was prior to the storm.  That was --
12  that's vaguely what I recall.
13     Q.  To use that analogy that you described, is
14  it your contention that Nationwide is responsible to
15  pay plaintiffs any amount of diminished value that
16  the properties might have had following hurricane
17  Katrina?
18     A.  It is not my claim.  I left all of this to
19  the attorney.  Where he saw -- if he saw a legal
20  exposure, then he is supposed to go for it.  If he
21  thought this was going up the wrong street, then he
22  was not supposed to go for anything more than what
23  he felt we were legally entitled to.  But this is a
24  pitch that Lewis made.
25     Q.  The next one he writes, "5.  Because I'm a

Page 52

1  firm believer that proving your point coming from
2  two directions is always better, I will need to work
3  with AGC on estimated cost to have done the work
4  yourself to prove that the," quote, "diminished
5  value is not disproportionate with regard to the
6  cost of repairs.  A 1.5 ratio is a good target."
7  Did I read that correctly?
8      A.  Yes.
9      Q.  Did you have Mr. O'Leary talk with a
10  general contractor on estimated cost to have done
11  the work yourself?
12     A.  The only one that he talked to, I believe,
13  was the contractor that rebuilt it, Carriage House
14  and Compass Pointe.
15     Q.  That would be Greg Stewart?
16     A.  Greg Stewart.
17     Q.  Madison Homes?
18     A.  Madison Homes.  That's the only one I know
19  he talked to.
20     Q.  Do you know what he meant when Mr. O'Leary
21  wrote "a 1.5 ratio is a good target"?  Did you ask
22  Mr. O'Leary what he meant when he wrote that?
23     A.  No, I didn't.
24     Q.  Sitting here today, do you have an
25  understanding what Mr. O'Leary is referring to when

Page 53

1  he says "a 1.5 percent ratio is a good target"?
2      A.  No, I don't know what he meant.
3      Q.  Is he referring to how much more
4  diminished value might be beyond cost of repairs?
5      A.  I just don't know.
6          (Exhibit 327 - 1/26/2008 Memo marked for
7      identification.)
8      Q.  Let me hand you 327.  This is a document
9  produced by plaintiffs, Bates numbered 2355 to 2357.
10  You'll see I think it appeared out of order in the
11  files as it was produced.  But it's a three-page
12  memo from Mr. O'Leary to you, dated January 26th,
13  2008?
14     A.  Yes, sir.
15     Q.  Why did Mr. O'Leary send this memo to you?
16     A.  I don't know, other than just he's
17  continuing to work under that second contract that
18  was executed.  He's trying to get a claim paid by
19  Nationwide.  He was trying to get them to agree to
20  appraisal process, which was denied.  And he's just
21  sending me an update of January 26th.  As I gather
22  it, an update of information that's pertinent to his
23  trying to develop a claim that Nationwide will pay.
24     Q.  Now, if you turn to the third page of this
25  document, which is actually Page 2 of Mr. O'Leary's

14  (Pages 50 to 53)

Ralph Brockman 1/19/2010

Page 54

1  memo.
2        MR. GAUDET:  It's out of order.
3     Q.  It's -- yeah.
4     A.  Yeah, it's out of order.
5     Q.  Right.  It's the page Bates numbered 3257,
6  which is the third page of this document.  It's
7  actually page -- numbered Page 2 of his memo.
8     A.  Yes.
9     Q.  You see at the bottom -- and these
10 photographs are difficult to look at in the document
11 as -- as it was produced.  But he's pointing out
12 some photographs and he's referring to how to
13 allocate damage based on wind versus water; is that
14 correct?
15    A.  I guess so, yes, sir.
16    Q.  Now, Mr. O'Leary writes -- the last
17 sentence in that long middle paragraph, "These pics
18 combined with the passage of time without power,
19 heat, and lack of ability to dry out these interiors
20 within a week or two make for near perfect argument
21 that all second finishes would have been lost,
22 affording all of the second floors and half the
23 damages for the first floor, a portion above the
24 waterline on the ground floor for the wind portion."
25 Did I read that correctly?

Page 55

1     A.  Yes, sir.
2     Q.  He then goes on to write, "Under normal
3  circumstance, this would amount to 75 percent the
4  amount of the loss.  But in this case, because we
5  are looking at the spread between affording a large
6  discount for having to sell as is, for instance,
7  what Greg sold it for after making the repairs, that
8  spread is the amount of the actual loss and will
9  probably exceed a hundred percent of the cost to
10 repair."  Did I read all of that correctly?
11    A.  Yes.
12    Q.  Mr. O'Leary is telling you that in his
13 opinion, the actual loss that plaintiffs should
14 claim should exceed the cost to repair; fair to say?
15    A.  That's what he says here.
16    Q.  Did you ever respond to Mr. O'Leary's
17 statement in this memo?
18    A.  Oh, not -- not really.  I just filed this
19 -- all of his updates.
20    Q.  Well, his statement that the actual loss
21 that plaintiffs should claim should exceed a hundred
22 percent of the cost to repair, is that a statement
23 that you've ever discussed with him?
24    A.  No, sir.
25    Q.  Do you know whether Mr. O'Leary's current

Page 56

1  estimates exceed a hundred percent of the cost to
2  repair the properties?
3     A.  I think what he's meaning here -- maybe
4  I'm wrong -- but we could not collect anything from
5  Nationwide.  We had payment obligations on the
6  mortgage.  And we were now at the point where we'd
7  run out of money.  So we are now going to be in
8  default on the mortgage.  And, therefore, you're
9  forced to try to pay that mortgage.  You're forced
10 to sell the property as is.  And when you're selling
11 damaged properties, you may be selling them at a
12 value less than they would be if you had the money
13 to fix them.
14       So I believe that's what he's trying to
15 say here, is that selling them damaged is a
16 difference, as an extra loss you're taking, that a
17 third party won't take if they have money to fix
18 them.  I think that's what he's meaning here.  And
19 -- and we did sell the properties as is, both of
20 them.
21       The mortgage required us -- and this is a
22 weird one.  The mortgage required us to pay all
23 insurance proceeds to the mortgage.  And then the
24 same mortgage said, "If you prepay it, now you have
25 prepayment penalties."  This was just -- this storm

Page 57

1  never ended.
2        And the prepayment penalties were over
3  $800,000 between the two properties.  So I had to
4  get another lawyer to fight that.  And his name was
5  Brunini and he's in Jackson.  He was actually my
6  son-in-law at the time's father, Ed Brunini.  And he
7  told me he could make them look bad before any judge
8  to take advantage of a group of people that have
9  been already devastated by a storm.  But that they
10 had the legal argument that was more -- that was
11 correct.  They had the right to charge that.
12    Q.  When you're referring to "they," this is
13 LNR Partners?
14    A.  LNR, the servicer for the mortgage.
15    Q.  LNR Partners, just so we're clear, has
16 nothing to do with Nationwide, right, sir?
17    A.  Nothing to do with Nationwide.
18    Q.  LNR Partners demanded that plaintiffs pay
19 over insurance proceeds that Nationwide had given to
20 plaintiffs?
21    A.  Correct.
22    Q.  That was well over a million dollars that
23 they demanded be paid over to LNR, right?
24    A.  Right.
25    Q.  That was shortly after the storm, right?

15  (Pages 54 to 57)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 58

1    A. It was -- it was a good while after the
2  storm. We still had the -- the loss of rent coming
3  in from Nationwide. So we could service the
4  mortgage for a period of time. But just like
5  WorldClaim couldn't provide anything for a number of
6  months, now Lewis hadn't provided anything, now
7  we're running out of money. So we have to sell the
8  properties as is.
9    Q. Just so I'm clear, your attorneys paid
10 over the insurance proceeds that Nationwide gave to
11 plaintiffs?
12   A. I'm not sure that we did immediately. I
13 think we used those funds to -- that was some of the
14 cash we had in the bank. We ultimately paid the
15 mortgage off with the funds from the sale of the
16 properties.
17   Q. Putting aside the loss of rent payments,
18 the property damage payments that Nationwide had
19 been paid, those were all handed over to LNR at
20 their demand; isn't that --
21   A. I'm not certain. It was handed over to
22 us. It was paid to Sunquest, the managing agent.
23 He deposited the money and my brother's testimony
24 follows tomorrow. How much of that was paid to LNR,
25 I don't know. I do know LNR subsequently was paid

Page 59

1  in full, but primarily we couldn't pay it off
2  without selling the properties. I mean, we owed way
3  more money than the -- than the insurance that we
4  collected from Nationwide.
5    Q. Well, we'll go over with Mr. Brockman,
6  your brother, Bill Brockman, tomorrow. Is it your
7  testimony he has more knowledge about the
8  litigation than --
9    A. Not the litigation. He has more knowledge
10 about you asked was the mortgage -- was the
11 insurance proceeds paid to LNR. I don't recall that
12 they were. I don't think LNR was paid anything but
13 the monthly payments, but Bill is better -- would be
14 able to testify to that. I don't think they were
15 paid anything but the monthly payments until we got
16 the proceeds from the sale.
17   Q. Let me go through some more documents
18 regarding LNR. Let's finish up looking at
19 correspondence and communications with Mr. O'Leary.
20     (Exhibit 329 - March 17 E-mail marked for
21 identification.)
22   Q. Let me hand you Defense Exhibit 329. This
23 is Bates numbered CH 2359. It's an E-mail dated
24 March 17th --
25   A. Yes, sir.

Page 60

1    Q. -- from Mr. O'Leary to you?
2    A. Yes, sir.
3    Q. It says, "Ralph, beyond what I've already
4  sent, please let me know if the following is what
5  you want as a follow-up to all that I've sent
6  already. Part one of my assignment is to, (a),
7  develop a case why the carrier owes you more, a lot
8  more than what they've paid you using forensics and
9  standard practice as applies to this policy argument
10 for your case." Did I read that correctly?
11   A. Yes.
12   Q. He then writes, "The aid you in
13 disconnecting for WorldClaims at minimum cost." We
14 discussed that already, right, sir?
15   A. Yes, sir.
16   Q. He then writes, "Aid you in reducing the
17 cost of WorldClaim's replacement, XL Public
18 Adjusters, down from seven percent." Did I read
19 that correctly?
20   A. Yes.
21   Q. Did plaintiffs retain a public adjusting
22 firm named XL Public Adjusters to assist them in
23 their claim against Nationwide?
24   A. Did we?
25   Q. I asked the question, did plaintiffs

Page 61

1  retain XL Public Adjusters to assist them in their
2  claim against Nationwide?
3    A. I do not know. I don't believe so. I
4  don't know who XL Public Adjusters is.
5    Q. Do you remember having any dealings with
6  anyone at XL Public Adjusters?
7    A. There was one other gal that made a pitch.
8  We interviewed four or five adjusters.
9    Q. Was that Tammy Lee Crossley?
10   A. One of them was Tammy. She was very
11 valuable. She was on the site the day after the
12 storm to take pictures, and maybe that's her
13 company. I don't know. But we never hired anybody
14 as an adjuster other than WorldClaim. Of course,
15 this is back in March of '08, way before we entered
16 into that second contract. It's still more just
17 inside E-mails that Lewis is sending us before he
18 has this contract.
19   Q. You don't have any information about
20 whether XL Public Adjusters -- strike that.
21     You don't believe that plaintiffs ever
22 actually retained XL Public Adjusters?
23   A. No, sir. I know they didn't.
24   Q. You're not aware of seeing any estimate
25 that XL Public Adjusters generated?

16  (Pages 58 to 61)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 62

1    A.  No, I've not.  I've never seen an estimate
2  from them that I can recall.
3        (Exhibit 330 - 4/9/2008 E-mail marked for
4  identification.)
5    Q.  Let me hand you 330, document Bates
6  numbered CH 2360 to 2361.  And this is an E-mail
7  from Mr. O'Leary to you April 9th, 2008, right?
8    A.  Yes.
9    Q.  He's forwarding something he had
10  previously sent March 26th.  This is update on his
11  work that we looked at a moment ago?
12    A.  Yes, sir.
13    Q.  Now, Number 2.2 in his E-mail, he says,
14  "Find out what XL Public Adjusters had that would
15  benefit the cause and negotiate the deal for them to
16  do the investigative work necessary to develop a
17  replacement estimate for the original WorldClaim
18  estimate."  Did I read that correctly?
19    A.  Yes, sir.
20    Q.  So then he writes in bold, "Negotiated a
21  price of $5,000 for all of their photos and
22  supporting affidavits in their cooperation as a
23  witness, provided assistance to the insured and
24  establishing an alternative game plan to the
25  redevelopment of the estimates without the premium

Page 63

1  expense of using a public adjuster to implement
2  same."  Did I read that correctly?
3    A.  Yes, you did.  And now that I see that
4  number, it must be Tammy Crossley that owned
5  XL Public Adjusters.  They were interviewed early
6  on, but WorldClaim got the contract.  But then she
7  had made a number of photographs.  I mean, the day
8  after the -- for a solid week, she photographed
9  everything on the properties.  And Lewis O'Leary
10  thought that that information was very valuable to
11  building the case and negotiated a price at 5,000,
12  which I agreed to pay.
13    Q.  Have you seen those photographs?
14    A.  Some of them, but those that he E-mailed
15  to me, some that he attached to his claim.
16    Q.  So all the photos -- it's your
17  understanding that all the photographs that he
18  purchased from Tammy Crossley went to O'Leary, not
19  necessarily the plaintiffs files; is that right?
20    A.  Yes, sir.
21        MR. GILMORE:  Counsel, you may have gotten
22  into this with Mr. O'Leary, Mr. Schultze on Friday
23  at his deposition, but I know we've asked for this.
24  To the extent he has any of these photographs that
25  he purchased from Tammy Crossley that weren't either

Page 64

1  attached to the report or already produced, just ask
2  to confirm that all such documents are in search for
3  and produced.
4        MR. GAUDET:  I'll do that again, confirm
5  again.  Just out of curiosity, did she not -- did
6  Tammy not -- y'all subpoenaed her, right?
7        MR. GILMORE:  Yeah.  I know that she
8  produced -- I believe she produced photographs in
9  response to her subpoena, and that to the extent
10  that there's any daylight between what she produced
11  and what Mr. O'Leary has.
12        MR. GAUDET:  Got you.
13        MR. GILMORE:  Let's take a five-minute
14  break.
15        VIDEOGRAPHER:  Off the record at 10:35.
16        (Off the record.)
17        VIDEOGRAPHER:  On the record at 10:46.
18    Q.  (By Mr. Gilmore)  I'm going to hand you
19  what's been marked as Defense Exhibit 180.  I turn
20  to the page we're going to look at.  It's Page 172,
21  starting at Line 22.
22        (Exhibit 180 - Deposition of
23  Ralph Brockman, Carriage House Case marked for
24  identification.)
25    Q.  This is a copy of transcript of your

Page 65

1  deposition in the Carriage House case.  Did you have
2  an opportunity to read this transcript after it was
3  recorded?
4    A.  I had gotten through about half of it.  I
5  don't know if I've gotten this far.  But I see
6  several Line 22s.  Which one?
7    Q.  On Page 172.  It's the page near the right
8  corner.
9    A.  Yes.
10    Q.  And I had asked you question by
11  Mr. Gilmore, "Did any element of Mr. O'Leary's
12  computation contingent upon success of settling the
13  claim or prevailing in litigation?"  Answer, "That
14  is taboo.  He made that clear on the outset, and so
15  did my counsel.  Whereas, with WorldClaim,"
16  Mr. Brown answered, "they actually got
17  seven percent."  Mr. Brown, "Let him ask his
18  question."  Answer, "And okay.  I don't know what
19  the difference is."  Question by Mr. Gilmore, "Well,
20  prior, did you have a different compensation
21  arrangement with Mr. O'Leary prior to filing this
22  lawsuit?"  Answer, "No."  Did I read all of that
23  correctly?
24    A.  Yes.
25    Q.  When you made that statement under oath

www.BrooksCourtReporting.com
1-800-245-3376

Ralph Brockman 1/19/2010

Page 66

1  that time, that was untrue, right, Mr. Brockman?
2      A.  That's correct.
3      Q.  Put that down.
4          (Exhibit 125 - 9/29/2005 Fax marked for
5  identification.)
6      Q.  I'm going to hand you what's been marked
7  as Defense Exhibit 125.  You can put that down right
8  there.  I might go back to it later.
9  This is a document produced by Nationwide, Bates
10  number NW1SUN4595 through 4604.  And it is a
11  September 29th, 2005 fax from Leah Solomon at
12  LNR Partners to Jim Biggs at Nationwide, attaching a
13  letter to Nationwide.  If you turn to the second
14  page of this document, Bates number 4596, is the
15  letter itself.  Have you seen that letter before,
16  sir?
17      A.  Yes, I believe I have.  I don't know when.
18      Q.  And it has copied at the bottom,
19  "cc: Compass Pointe Partner, care of Sunquest
20  Properties, Inc."?
21      A.  Yes, sir.
22      Q.  You recall Ms. Solomon sending you a
23  carbon copy of this letter she sent to Nationwide?
24      A.  I recall Sunquest Properties sending it to
25  me.  I don't think Leah did, but maybe.

Page 67

1      Q.  And Ms. Solomon at LNR Partners writes to
2  Nationwide, "Dear Sirs, LNR Partners, Inc. is
3  special servicer for the lender and is empowered to
4  act on their behalf with regards to the loan and any
5  insurance claims where lender has an interest.
6  Please be advised that pursuant to the certificate
7  of insurance, copy which is attached, the loss payee
8  additional insured for any claims under the policy
9  shall be made payable to LaSalle Bank National
10  Association as trustee for GS Mortgage Securities
11  Corporation, too."  Did I read that correctly?
12      A.  Yes.
13      Q.  Then underneath that she writes, "Please
14  be advised that lender is entitled to hold policy
15  proceeds in excess of $50,000 pursuant to the terms
16  of its loan with the borrower insured."  Did I read
17  all that correctly?
18      A.  Yes, sir.
19      Q.  That statement that you made in that
20  letter, is it your understanding that's based on the
21  mortgage loan agreement for the Compass Pointe
22  property?
23      A.  Yes, sir.
24      Q.  December 2006, Compass Pointe, as well as
25  Carriage House and various partners, including

Page 68

1  yourself and your brother, brought suit against LNR
2  Partners and the mortgage companies, right?
3      A.  Yes, sir, I believe so.
4          (Exhibit 478 - 12/29/2006 Complaint marked
5  for identification.)
6      Q.  Let me hand you what's been marked as
7  Defense Exhibit 478.  And this is copy of
8  December 29th, 2006 complaint filed in Jackson
9  County, Mississippi Chancery Court by the plaintiffs
10  here, as well as other entities, against LNR
11  Partners and other defendants?
12      A.  Yes, sir.
13      Q.  Prior to this complaint being filed, did
14  you review it for accuracy?
15      A.  I'm not sure.
16      Q.  Have you ever seen this document before
17  today?
18      A.  Yes.
19      Q.  How about before it was filed, did you
20  have opportunity to review it?
21      A.  I'm not sure, but I think so.
22      Q.  Sitting here today, are you aware of any
23  inaccuracies in this document?
24      A.  No, sir.  No, sir.
25      Q.  Can you turn to Page 7 of the complaint

Page 69

1  that begins "LNR Partners"?  You'll see numbered
2  Paragraph 22.  You see that, sir?
3      A.  Yes, sir.
4      Q.  Plaintiffs wrote in Paragraph 22 in their
5  complaint against LNR Partners filed December 26th
6  -- 29th, 2006, "In the course of such negotiations,
7  LNR received the insurance proceeds from the insurer
8  of the property despite repeated requests by the
9  partnership to require such funds toward restoration
10  of the premises and/or satisfaction of the debt.
11  LNR ignored such request and held such proceeds in
12  non-interest-bearing escrow account while the
13  parties negotiated."  Did I read that correctly?
14      A.  Yes, sir.
15      Q.  At the time plaintiffs intended that to be
16  true statement, right?
17      A.  Yes, sir.  And that's probably what
18  happened to proceeds.  I guess Nationwide paid it to
19  LaSalle.
20      Q.  Look at next paragraph, which is Paragraph
21  23, still on Page 7 of the complaint.  In Paragraph
22  23 says, "The negotiations between the parties were
23  abruptly cut short, however, by a letter sent by
24  LNR, acting on behalf of GMAC Commercial Mortgage
25  Co. as master servicer, and LaSalle Bank, national

18  (Pages 66 to 69)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 70

1  lender of the loans, dated February 15th, 2006, to
2  the partnerships demanding that the debt remaining
3  on the loan be paid off no later than February 28th,
4  2006.  At the time of this demand, the defendants
5  were aware of the fact that alternative financing
6  could not be put in place by February 28th, 2006,
7  nor that a buyer of the properties could be found
8  and a sale consummated by such time.  By virtue of
9  this demand, therefore, LNR effectively left the
10  partnerships with the only viable option to sell the
11  properties at a distressed value."  Did I read that
12  correctly?
13      A.  Yes, sir.
14      Q.  At the time that the complaint was filed,
15  plaintiffs intended those statements in Paragraph 23
16  to be true and accurate, right?
17      A.  Yes, sir.
18      Q.  If you turn to next page, Page 8, you read
19  the last sentence in Paragraph 25.  Plaintiffs write
20  in their complaint against LNR Partners, "Finally,
21  despite the fact that they asserted possession and
22  control of insurance proceeds and refused to apply
23  such proceeds towards the restoration of the
24  properties or toward the indebtedness of the
25  properties, the defendants properly charged the

Page 71

1  partnerships a penalty as associated with
2  indebtedness."  Did I read all that correctly, sir?
3      A.  Yes.
4      Q.  At the time that plaintiffs wrote that in
5  their complaint filed against LNR Partners, they
6  intended that to be a true statement, right?
7      A.  Yes, sir.  But even if they gave us the
8  money, it wasn't enough to restore the properties.
9      Q.  It's fair to say you didn't even have the
10  money to begin any of the restoration, right?
11  That's why you sued LNR Partners, correct?
12      A.  That's correct, but that wasn't enough.
13  You know, the 700,000 is not going to restore, 6,
14  7 million.
15      Q.  And they --
16      A.  I don't know.  And they were invoking --
17  we were technical default.  We -- we ran out of the
18  money to be able to pay the monthly payments.  So we
19  took an offense toward them trying to save the
20  800,000 plus penalties they were trying to charge.
21  This case was settled, by the way, for approximately
22  50 percent of what they could have charged us
23  legally.  And then, of course, we lost our legal
24  fees, too.  We had to pay for those.  But it was
25  settled for about 400,000 is my recollection rather

Page 72

1  than the 800,000 that we were exposed to.  And they
2  were paid in full with the proceeds from the sale as
3  is.
4          (Exhibit 479 marked for identification.)
5      Q.  I'm going to show you what's been marked
6  as Exhibit 479.
7          (Exhibit 481 - E-mail marked for
8  identification.)
9      Q.  Let me hand you -- I said "479."  Let me
10  hand you what's been marked as 481, which is a
11  document produced by plaintiffs, Bates numbered
12  CH 1683.  And this is a letter prepared by you to
13  Brett Furr?
14      A.  Yes, sir.
15      Q.  Brett Furr is an attorney who is
16  representing LNR Properties; isn't that right?
17      A.  I'm not sure.  I don't -- it just don't --
18  it doesn't ring a bell right now.  This is
19  definitely an E-mail from me at taylorportion.com it
20  says.
21      Q.  You don't recall sitting here who
22  Brett Furr is?
23      A.  No, sir.  You can enlighten me and I'm
24  sure I will, but this is a long time ago.  But I --
25  well, I copied John Landry, who is my personal

Page 73

1  attorney in Monroe, tax attorney, my brother, and
2  Leah Solomon with LNR.  It'll come back, but it
3  doesn't right now.
4          (Exhibit 480 - E-mail marked for
5  identification.)
6      Q.  Let me -- I'll show you what's been marked
7  as Exhibit 480.
8      A.  It -- it probably -- is he with -- he
9  shared apparently somewhere some date --
10  unfortunately this E-mail is not dated -- an
11  appraisal.  It must be LNR.  Maybe the LNR got an
12  appraisal as is themselves.  And then ultimately
13  shared it with us, perhaps after our lawsuit or
14  prior to.  But at some point, they shared these
15  appraisals.
16      Q.  All right.
17      A.  I don't know who he is with.
18      Q.  I'll show you a letter with your attorneys
19  from Brunini to Mr. Furr concerning the dispute with
20  LNR Partners.  You've seen that document which is
21  marked Defense Exhibit 480.  Does that refresh your
22  memory as to who Mr. Furr is?
23      A.  Let me -- it shows here he's with Taylor,
24  Porter, Brooks & Phillips, not LNR.  This is written
25  by our attorney that filed a claim against LNR.

Ralph Brockman 1/19/2010

Page 74

1   Q.  Let's look at Defense Exhibit 481.
2  Perhaps it will refresh your memory as to this
3  exchange with Mr. Furr.  You write, "Brett, as an
4  owner of Carriage House and Compass Pointe and a
5  principal in Sunquest Properties, the managing
6  agent, John Landry has forwarded to my attention
7  your last communication to him, which included an
8  appraisal summary for Carriage House and Compass
9  Pointe."  Did I read that correctly?
10   A.  Yes, sir.
11   Q.  The appraisal summary were appraisals
12  prepared by LNR Partners and the banks valuing the
13  properties?
14   A.  I don't know.
15   Q.  Sitting here today, you don't recall
16  seeing these appraisals or what they involved?
17   A.  Obviously, I write that I was excited to
18  see the appraisal for each complex.
19   Q.  That's right.  Your next paragraph in this
20  letter you write, "I cannot tell you how excited I
21  was to see the as-is appraisal for each complex,
22  which indicates to me that we should immediately
23  list each complex for sale for the as-is price.  And
24  even after commission, what is left would be more
25  than the debt and accrued interest and leave

Page 75

1  something for investors."  Did I read that
2  correctly?
3   A.  Yes, sir.
4   Q.  Seeing that sentence, do you recall
5  receiving appraisals and becoming excited about the
6  prospect of selling the properties afterwards as you
7  write in this document?
8   A.  Yes, sir.  And I even asked, "Furthermore,
9  please provide me with a copy of each appraisal."
10   Q.  Do you know if you've ever seen a copy of
11  appraisal?
12   A.  Obviously, I did.  And I would say the
13  appraisal would be the realtor's best selling tool.
14  And I'm certain we use those appraisals to help sell
15  them and get the as-is price we got, which was just
16  as I pointed out in this letter enough.  It exceeded
17  the mortgage.  Each sale exceeded what we owed.  At
18  least it was enough to -- to pay off our mortgage
19  and settle the issue with the mortgage company.
20   Q.  Let me hand you what's been marked as
21  Exhibit 421.
22   A.  I mean, Exhibit 480 apologized for lack of
23  LNR for responding to -- to us.  So I still can't
24  place Brett Furr.
25   (Exhibit 421 - 9/23/2005 E-mail marked for

Page 76

1  identification.)
2   Q.  And this is another document produced by
3  plaintiffs.  It's Bates number CH 2298.  It's an
4  E-mail from your brother, Bill Brockman, to
5  sbonds@brockman.com and Lisa Phillips?
6   A.  Yes, sir.
7   Q.  Who is sbonds@brockman.com.  I imagine
8  Sherry Bonds is --
9   A.  Yes.
10   Q.  -- near the top.
11   A.  Yes.
12   Q.  I guess my question, who is Sherry Bonds?
13   A.  She worked as my secretary for number of
14  years.  She now works for my oldest son and she's
15  still in the building.  But she retired from that
16  position with me and helps him, my son.
17   Q.  Have you seen this document before today?
18   A.  I'm certain I have, yes, sir.
19   Q.  When you say you're certain you have,
20  you're certain that you have, why do you say that?
21   A.  Because I say, "File RWB" here, and that's
22  my initials.
23   Q.  So that means that this was put in the
24  Carriage House or Compass Pointe file?
25   A.  Yes, sir.

Page 77

1   Q.  Similar to the other document we looked at
2  previously, another E-mail?
3   A.  Yes, sir.
4   Q.  Now, your brother, Bill, writes at the
5  bottom -- we'll work our way from bottom up -- "I
6  have forwarded correspondence from LNR Partners.  By
7  so doing, do not construe that I think we should
8  provide them anything, let alone sign the agreement.
9  They are aware we are uninsured to some unknown
10  extent.  It is probably in our best interest to keep
11  them somewhat in the dark and/or exaggerate the
12  degrees which we are underinsured."  Did I read that
13  correctly?
14   A.  Yes, sir.
15   Q.  Do you recall having discussion with your
16  brother, Bill Brockman, regarding plaintiffs being
17  underinsured or uninsured to some unknown extent
18  after hurricane Katrina?
19   A.  Well, obviously, we were, if we don't have
20  enough insurance to replace the complex.  But that
21  -- I don't -- I don't know how much the total
22  insurance policy was.  But this is Bill's
23  observation, not mine.
24   Q.  This is dated September 23rd, 2005,
25  correct?

20  (Pages 74 to 77)

www.BrooksCourtReporting.com
1-800-245-3376

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 78

1    A.  Yes, sir.
2    Q.  And at that point, Nationwide had not even
3  issued all the payments for the payments it did
4  issue to plaintiffs for hurricane Katrina damage,
5  right?
6    A.  Correct.  I think what Bill is referring
7  to is we know that we don't have flood coverage.  So
8  there's going to be a shortfall of underinsurance.
9  We were not in the flood zone, ironically.  We
10  didn't have flood in category five previously,
11  Camille.  So we did not buy flood insurance.  It was
12  not required.  So he knows we're going to be
13  underinsured by that portion of the flood damage.  I
14  think that's what he's referring to here.
15    Q.  Now, the last sentence he says, "I told
16  them we were hopeful regarding the loss of rents for
17  Carriage House, less certain regarding Compass
18  Pointe."  Do you know what he meant by that?
19    A.  Where is that again?  You say last
20  sentence?
21    Q.  The last sentence in Bill Brockman's
22  E-mail.
23    A.  I don't know exactly what he meant, no,
24  sir.  But you'll have him tomorrow.
25    Q.  You can put that aside.

Page 79

1    (Exhibit 477 - Declaration marked for
2  identification.)
3    Q.  I'm going to hand you what's been marked
4  as Defense Exhibit 477, which was a declaration
5  filed in plaintiffs' lawsuit against LNR Partners.
6  Have you seen this document before, sir?
7    A.  Yes.
8    Q.  And this is declaration from your brother,
9  William G. Brockman, right?
10    A.  Yes, sir.
11    Q.  At the time this was prepared and -- and
12  signed by him and submitted in this case, did you
13  have an opportunity to review it?
14    A.  I do not recall that I reviewed it prior
15  to this filing.
16    Q.  Now, he writes in Paragraph 2, "I serve as
17  managing partner of Compass Pointe Apartments
18  Partnership and the Carriage House Apartment
19  Partnerships, which are partnerships created in
20  connection with the ownership of two apartment
21  complexes commonly known as the Carriage House
22  Apartments and the Compass Pointe Apartment's
23  properties located in Jackson County, Mississippi."
24  Did I read that correctly?
25    A.  Yes, sir.

Page 80

1    Q.  Now, I'm confused.  I thought that your
2  prior testimony were you were the managing partner
3  of these partnerships?
4    A.  Well, I did, too.  These are family
5  partnerships that did not elect formally a managing
6  general partner.  That's very tough in a family to
7  let one person be the boss of all things.
8    Sunquest Property was the managing agent.
9  And my brother was the focal point person for
10  Sunquest Properties.  So the day-to-day operations
11  are actually managed by Sunquest.  And my brother,
12  Bill, is the point person.  So he alleges here that
13  he is the managing partner on this document, which
14  is a legal document prepared by -- I don't know the
15  attorney here.  And but throughout the proceedings,
16  I have been the point person for the family.  That
17  is the family comes to me and I go to Sunquest for
18  brother Bill.  But he is representing himself, you
19  are quite correct, as managing partner.
20    So I guess in the sense we both have acted
21  that way.  He in operating the day-to-day affairs of
22  the partnerships, and me in my relationship with the
23  family members.
24    Q.  Turn to the next page of this declaration
25  from your brother that was submitted on behalf of

Page 81

1  both Carriage House Partners and Compass Pointe
2  Apartments Partnerships.  Paragraph 5, this
3  declaration reads, "Hurricane Katrina caused
4  catastrophic damage to both parties, rendering the
5  Carriage House Apartments a hundred percent
6  untenable and Compass Pointe Apartments
7  approximately 55 percent untenable."  Did I read
8  that correctly?
9    A.  Yes.
10    Q.  With respect to Compass Pointe Apartments,
11  as you sit here today, that 55 percent untenable is
12  accurate according to plaintiffs?
13    A.  Initially, the difference in design
14  between the two is Carriage House are walk-up
15  apartments with the kitchen units downstairs and
16  bedrooms upstairs.  Compass Pointe is designed, they
17  are flats, one-story flats, two-story flats.  You
18  walk up the stairway outside the building to the
19  second floor.
20    So initially, there were still some
21  tenants residing in this second floor of -- of
22  Compass Pointe.  And that -- that went away pretty
23  fastly as moisture and mold took place.  He probably
24  can testify when that began.  But early in the game
25  we felt like there was some units on the second

21  (Pages 78 to 81)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 82

1  floor that people did continue to reside in because
2  there was no housing in the area anyway.  And they
3  lived in some horrible circumstance, which Donna
4  Bass can testify to, because there was no alternate
5  housing.  Now, that didn't last very long before
6  everything became untenable.  But there was a period
7  of time that -- that he contemplated that -- that
8  45 percent of them were tenable.
9      Q.  Let's look at March -- the date on Page 3
10 of this declaration is March 22nd, 2007, right,
11 Page 3 of the declaration?
12     A.  Yes, sir.
13     Q.  By his signature?
14     A.  Yes, sir.
15     Q.  And that's well after -- almost a
16 year-and-a-half after hurricane Katrina, right?
17     A.  That's right.
18     Q.  Let's go back to Paragraph 5.  He says,
19 "Subsequently, the city of Gautier, Mississippi
20 condemned all apartments at Carriage House and the
21 city of Pascagoula, Mississippi condemned all
22 downstairs apartments at Compass Pointe."  Did I
23 read that correctly?
24     A.  Yes, sir.
25     Q.  It references Exhibits 1 and 2 which are

Page 83

1  attached to this declaration.  I believe we've seen
2  one of these before.  The first one is the
3  condemnation notice for Carriage House, right?
4      A.  Yes, sir.
5      Q.  The second one is the condemnation notice
6  for the Compass Pointe Apartments, right?
7      A.  Yes, sir.
8      Q.  And in large letters at the bottom, it
9  says, "All downstairs apartments."  Those were the
10 ones condemned, right?
11     A.  Yes.
12     Q.  Not the upstairs apartments?
13     A.  That's October of '05.
14     Q.  Are you aware if at any later point the
15 city of Pascagoula condemned upstairs apartments at
16 Compass Pointe?
17     A.  I'm not.
18     Q.  Sitting here today, to the best of your
19 knowledge, the second-story apartments at Compass
20 Pointe were never condemned?
21     A.  I don't know, but my brother can tell you.
22     Q.  That's fair.  We'll ask him tomorrow.
23 Turn to Page 3 of his statement of his declaration.
24 It says, "The partnership stopped paying the monthly
25 payment due on the mortgages beginning with the

Page 84

1  payments due on September 5th, 2005."  Did I read
2  that correctly?
3      A.  Yes, sir.
4      Q.  And plaintiffs Sunquest, Compass Pointe,
5  and Carriage House intended that to be a true
6  statement at the time they submitted this
7  declaration to the court, right?
8      A.  Yes.
9      Q.  Paragraph 7 reads, "Pursuant to the terms
10 of the loan documents, the required insurance was in
11 place in effect for both of the properties when
12 hurricane Katrina made landfall on August 29th,
13 2005.  In September and October 2005, the
14 partnership received checks totalling approximately
15 1.2 million in insurance proceeds for the property
16 damage to both properties.  These were turned over
17 by the partnerships to LNR."  Did I read all that
18 correctly?
19     A.  Yes, sir.
20     Q.  At the time that plaintiffs Sunquest,
21 Carriage House, and Compass Pointe submitted this
22 declaration, they intended that statement in
23 Paragraph 7 to be true, right?
24     A.  Yes, sir.  That clears up an earlier
25 question you had of me and I was unaware whether the

Page 85

1  insurance proceeds were tendered.  This indicates
2  they were.
3      Q.  Sitting here today, can you tell the jury
4  what amount Nationwide would have had to pay that
5  would not have been claimed by LNR Partners
6  following hurricane Katrina?
7      A.  Repeat that.
8      Q.  Sitting here today, can you tell the jury
9  what amount plaintiffs think had Nationwide paid LNR
10 Partners would not have had paid over to them
11 pursuant to loan agreements?
12     A.  Gosh, LNR was just as hardball as you
13 could get.  I don't know.  If -- if -- if they felt
14 we had enough to rebuild, would they allowed us to
15 rebuild?  That's the question you'd have to ask LNR.
16 I don't know.  Had we received enough to rebuild,
17 normally, that's happened to us before on this
18 property on a loan and we rebuilt it.  There was no
19 hitch at all.
20         We had the loss that Nationwide covered
21 with Georges.  It was a different mortgage company.
22 We subsequently refinanced and LNR was the servicer
23 and I can't answer that.  I just don't know what
24 their position would be.  But I think they were
25 aware that the replacement cost because they got

22  (Pages 82 to 85)

Ralph Brockman 1/19/2010

Page 86

1   that in-house appraisal, you know, they were aware
2   that the replacement cost was much more than the
3   insurance proceed.  So they then made their demands
4   for all the proceeds.
5       MR. GILMORE:  We can go off the record to
6   change the tape.
7       VIDEOGRAPHER:  Off the record at 11:19.
8   End of tape two.
9       (Off the record.)
10      VIDEOGRAPHER:  Beginning tape three.  On
11  the record at 11:20.
12      (Exhibit 1 - Policy marked for
13  identification.)
14      Q.  (By Mr. Gilmore)  Let me hand you what's
15  been marked as Defense Exhibit 1, and it's Bates
16  numbered NW1-SUN15 through 97 -- I'm sorry --
17  through 110.  Have you seen this document before
18  sir?
19      A.  I haven't had a chance to review it.  I'm
20  not certain.  I'm not certain.  I don't see where
21  I've initialed it to be filed or anything.
22      Q.  Well, this was produced by Nationwide.  My
23  question is, have you seen a copy of this?  It's the
24  -- it reads on the first -- first page, "It's true
25  and correct" -- "a true copy of Policy 63BP139742003

Page 87

1   issued to Sunquest Properties, Inc., effective
2   November 11, 2004 to November 11, 2005."  Did I read
3   that correctly?
4       A.  Yes, sir.
5       Q.  And if you turn to the third page of that
6   document, you'll see on Page Bates number 17, middle
7   of the page it has the described premises located at
8   "41 Chicot Street, Pascagoula"?
9       A.  Yes, sir.
10      Q.  That's Compass Pointe property, right?
11      A.  Yes, sir, I believe so.
12      Q.  Have you ever seen a copy of this policy
13  for the Compass Pointe properties with Nationwide?
14      A.  I don't recall.  Acquiring insurance is
15  one of the functions of the managing agent, Sunquest
16  Properties.  I'm fairly certain -- and my brother
17  can testify to this -- that when we bought these
18  properties, we assumed -- assumed the financing that
19  was in place and raised capital from the partners.
20  And I'm also fairly certain that the insurance in
21  place was with Nationwide, and we continued that
22  relationship.  I believe the firm was Fletcher or
23  something down here locally.
24      Q.  Jay Fletcher?
25      A.  Yes, sir.  I believe that was -- yes, sir.

Page 88

1   I know that he was the agent for selling the
2   insurance.  So this -- this would probably be
3   something that was submitted to Sunquest for sure.
4   I don't recall seeing the policies itself.  I
5   usually bottom line when we got quotes during the
6   year for all of our properties.  My brother would
7   submit those to me.  Not the policies itself, later.
8   I trusted his due diligence to make sure the
9   policies were all -- you know, I just looked at the
10  total premium and the bids that were submitted to
11  make sure that we had reputable companies.  So that
12  -- I don't recognize it, but I don't question that
13  it is what you say it is.
14      Q.  Would your brother, Bill Brockman, have
15  more knowledge about the policies that were in
16  place?
17      A.  Yes, sir.
18      Q.  Have you ever read any insurance policies
19  for either of the plaintiffs' properties?
20      A.  No, sir.
21      Q.  Sir, you understand that this policy by
22  terms excludes coverage for damage caused by
23  floodwater, right?
24      A.  Yes, sir.  That came -- I'm certain this
25  is the same as the one we went over with Carriage

Page 89

1   House.  And in those depositions, I recall you
2   reading the exclusions.  I'm certain this one
3   probably has the same.  However, you haven't
4   outlined what page they're on.
5       Q.  Well, and we can go through them.  I guess
6   my -- my question I want to ask you first is whether
7   you understand -- or whether you're alleging -- I
8   think you answered prior in Carriage House case was
9   no.  Is it the same in this case, Compass Pointe is
10  not claiming that they're owed any money for damage
11  caused by flood under Nationwide policy?
12      A.  Absolutely.  We understood from the word
13  "go" that's an exclusion and we were not covered.
14      Q.  And generally speaking, putting aside
15  whether you've ever seen copy of the actual policy
16  itself, you understand that insurance policy is a
17  contract, right?
18      A.  Yes, sir.
19      Q.  And it's a contract that lays out the
20  coverages and amounts of coverage that the insurer
21  is providing the insured; fair to say?
22      A.  Yes, sir.
23      Q.  Other than what's in this policy, are you
24  aware of any other documents, any other kind of
25  insurance policies or anything else that provide

23  (Pages 86 to 89)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 90

1   insurance coverage to plaintiffs for the properties
2   that are in this lawsuit?
3       A.  I don't have them here, but I'm certain we
4   probably had liability insurance, also.  It's
5   typical.  And then you have an umbrella policy that
6   comes into cover properties beyond the what they
7   call underlying coverage.  But other than that, I
8   doubt there would be any other insurance.  Certainly
9   not for the physical plant.
10      Q.  There are -- have plaintiffs made any
11  claims for damage to Compass Pointe property based
12  on any kind of insurance document other than their
13  Nationwide policy?
14      A.  Not that I'm aware of.
15      Q.  And I know we're here for the Compass
16  Pointe case.  I believe I asked before, but if I
17  didn't.  Was the same true for Carriage House,
18  acknowledge --
19      A.  Yes.
20      Q.  Carriage House has not filed any claim for
21  insurance coverage for damage incurred during
22  hurricane Katrina --
23      A.  None.
24      Q.  -- other than through Nationwide policy?
25      A.  Yes, that's correct.

Page 91

1       Q.  Brockman Enterprises has kind of umbrella
2   organization that has interest in a lot of
3   properties through partnerships?
4       A.  I believe the umbrella on this was
5   actually Sunquest.  It's a policy that covers -- we
6   had like 45 different properties and we have an
7   umbrella comes in and each property has its
8   underlying insurance for -- for liability.  But if
9   there's something catastrophic that exceeds the
10  underlying, then the umbrella comes in and covers
11  the properties.
12      Q.  Does that umbrella policy provide coverage
13  for property damage or just liability?
14      A.  Just liability.
15      Q.  Are any of the properties that are managed
16  by Sunquest Properties, to your knowledge, insured
17  through Nationwide policy?
18      A.  You'll have to ask my brother.  My
19  knowledge, these were the only two recollection.
20  And that changes every year.  There may be a new
21  company that's more competitive than others.  But I
22  had such a pleasant experience with Nationwide on
23  Georges and I insisted we continue to -- to write
24  insurance with them, even on years when their
25  premiums were more.

Page 92

1       Q.  Did plaintiffs ever make any efforts to
2   claim benefits or credits under the Mississippi
3   GO Zone Program?
4       A.  Not on these properties.  I don't know.
5   There was some -- look, we were scraping for any
6   possible alternatives to -- to be able to sell and
7   dispose of the properties.
8       Q.  What is your understanding of what the
9   GO Zone Program was?
10      A.  The GO Zone was -- it's a program that
11  federal government issued to try to help those
12  restore properties.  And if you were in the GO Zone,
13  you were allowed to have what they called immediate
14  charge-off.  Another investor, for instance, can
15  write off instead of over 20 years or 30 years, I
16  think, it's life of building.  They can write it all
17  off the first year, half of it, the GO Zone.
18      So if one spent let's say $10 million in
19  restoring a property in the GO Zone, normally
20  instead of having a 30-year life for physical plant,
21  you could write half of that off in one year.  So
22  $5 million of the 10 you spent could be written off
23  in one year.  So if you have a tax liability in your
24  partnership with a lot of tax liability, that's a
25  beautiful write-off.  It was meant to help restore

Page 93

1   damaged properties in the GO Zone, which is
2   primarily south Mississippi, Louisiana, and parts of
3   Texas.
4       If, however, you ever sold the property
5   before the holding period, then you had to recapture
6   all of that in those taxes you saved as -- as
7   ordinary income.  So it's a nice front door, but
8   it's a pretty ugly back door if you get out of it
9   unless you keep it for the entire holding period.
10      Q.  Did you, as the owner of Brockman
11  Enterprises, invest in any properties after
12  hurricane Katrina in the GO Zone?
13      A.  I looked at some and I bought one and it
14  was in New Orleans called West Chase.  But after
15  seeing the back door and, you know, if you sell a
16  property, you're entitled to long-term capital gain
17  if you've held it more than a year.  And that tax
18  rate for federal purposes is 15 percent.  The state
19  is another five usually.
20      Q.  Lower than ordinary income?
21      A.  Lower than ordinary.  But if you got the
22  GO Zone tax rate, the recapture is ordinary.  And so
23  -- and I looked at them hard to see, golly, should I
24  take advantage of it?  I opted not to because my
25  ordinary tax is, what, 39 percent now.  I think it's

24  (Pages 90 to 93)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 94

1  36 plus 10 surtax, 39.6 percent, or something like
2  that. So my ordinary income tax right at 40 percent
3  is higher than the federal tax. It's higher than
4  the 15 that the long-term capital gain. So the
5  back-door penalty is so onerous and I elected to
6  waive it and not even take the GO Zone tax credits
7  on that. That's the only property I bought in the
8  GO Zone.
9      Q. When did you buy the West Chase property?
10     A. I don't know exactly. I've had it
11  probably two or three years.
12     Q. That was in two or three years, either
13  2006 or 2007?
14     A. I would say that. I can find the date
15  exactly.
16     Q. Was that the property you invested in with
17  David Pilger and Greg Stewart?
18     A. Yes.
19     Q. And how much -- were there renovations
20  involved with that property?
21     A. Oh, yes, major.
22     Q. Had that property been damaged by
23  hurricane Katrina?
24     A. Oh, yes, yes.
25     Q. How much did you and Mr. Pilger,

Page 95

1  Mr. Stewart have to spend to renovate that property?
2      A. Gosh, I'd have to go to the books. I
3  mean, I can't remember. It was a lot of money.
4      Q. I'm asking you not as Carriage House
5  representative, but just as Brockman Enterprises; is
6  that fair?
7      A. Yes, sir.
8      Q. As Brockman Enterprises, how were you able
9  to fund the financing of renovating the West Chase
10  property in conjunction with Mr. Stewart and
11  Mr. Pilger?
12     A. Well, we each put up a pretty substantial
13  amount of money and the finance was provided by
14  inner construction loan.
15     Q. You borrowed along with Mr. Pilger and
16  Mr. Stewart?
17     A. Yes.
18     Q. The three of you borrowed a loan to
19  renovate West Chase?
20     A. Yes, sir.
21     Q. Do you remember when that financing was
22  put in place?
23     A. Not exactly, but it was almost
24  immediately. We got the loan approved before we
25  started it.

Page 96

1      Q. How long did it take to renovate
2  West Chase?
3      A. Probably say it was a year. It was 380
4  units. It was a lot of buildings, a lot of units.
5      Q. Do you know if Mr. Pilger, Mr. Stewart
6  were able to claim GO Zone credits for the purchase
7  and renovation in Compass Pointe property?
8      A. They could have possibly. Certainly would
9  have qualified, but I don't know if they did. I
10  understood after the fact they took one of the
11  properties and converted into condos and sold it to
12  investors and they came out pretty good -- real good
13  by doing that. I don't know if investors came out
14  good because of this back-door penalty. But the
15  investors were probably buying for those tax credits
16  to get that immediate write-off. Now, that's
17  selling each individual unit and I think they did
18  that on Carriage House. I don't -- they were
19  deposed, too. I don't know why you didn't ask all
20  of that to them, but -- but indeed, they did sell
21  those units and they came out good by reselling them
22  after they were completely renovated.
23         In fact, that's what -- when I found that
24  out, that's what developed as the ongoing
25  relationship a little bit. Golly, that's -- let's

Page 97

1  possibly do the same at West Chase.
2      Q. Was it your understanding that you had to
3  be purchasing the property in order to get the
4  GO Zone?
5      A. Yes. You had to be the owner. You had to
6  purchase it. You could have -- I think you could
7  still -- you qualified even if you owned it with the
8  loss because it's the improvements that would
9  qualify for in the GO Zone. The acquisition price
10  cannot be accelerated. In other words, you bought a
11  property for 5 million. You spent 10 million
12  renovated. You cannot accelerate the acquisition
13  price half in the first year. Only the money you
14  spent, the 10 million in renovate. But it -- but
15  yes, you would qualify for the renovation cost if
16  you're in the GO Zone.
17         And that's my understanding of tax law.
18  But, golly, that law is very thick. I mean, a tax
19  attorney would have to explain all of it.
20     Q. Did any of the partners in Compass Pointe
21  contribute and join the partnership -- the ownership
22  group that bought and renovated the West Chase
23  Apartments complex?
24     A. The only two that have been -- were -- I
25  don't even know if they were partners in Compass

25  (Pages 94 to 97)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 98

1  Pointe. I don't know their relationship who
2  actually bought it. But I understood that
3  David Pilger and Greg Stewart were two individuals
4  that were involved in Compass Pointe, but they
5  brought in some other partners. I don't know who
6  they were.
7      Q. Let me clarify my question. At the time
8  that plaintiffs in this lawsuit, one of which is
9  Compass Pointe Apartments Partnership, owned the
10  property, there were several partners in Compass
11  Pointe Partnership, right?
12     A. When we owned it?
13     Q. Yes.
14     A. Yes.
15     Q. Did any of those owners join you in
16  purchasing and renovating the West Chase Apartment
17  complex?
18     A. No, sir.
19     Q. How long did it take for David Pilger and
20  Greg Stewart, buyers of Compass Pointe complex, to
21  renovate the property from start to finish?
22     A. I don't know exactly, but I think it was
23  probably six, seven months, maybe nine, but you'd
24  have to ask them.
25     Q. Do you know about approximately when they

Page 99

1  started renovating Compass Pointe?
2      A. Oh, it was immediate.
3      Q. When you say "immediate," what date?
4      A. Immediate upon purchase.
5      Q. Did they start renovating prior to Compass
6  Pointe?
7      A. I'm not so certain they didn't jump the
8  gun on one of them and start. You know, part of it
9  is removing debris. You're not starting to build,
10  but you're removing debris and the sheet rock and,
11  you know, all of that. I think they did that when
12  the -- as soon as the ink was dry on the contract.
13  Before it was actually executed, I think they
14  started removing debris on one of them for certain.
15  But it was -- but it was immediate. Once we cut our
16  deal and they bought it, they started immediately.
17  They -- they had mobilized and were ready to go and
18  it impressed me that -- how fast they moved.
19     Q. I'm going to talk with you about what
20  happened at Compass Pointe during immediately after
21  hurricane Katrina. Let's start with when hurricane
22  Katrina happened the end of August 2005, who of
23  employees for the plaintiffs was at the property at
24  the time hurricane Katrina?
25     A. Donna Bass was the project manager, both

Page 100

1  of them. We had what we called a resident manager
2  and she was the manager. She was an employee of
3  Sunquest Properties.
4      Q. And do you know if she was at the property
5  during the storm?
6      A. At one of them I know during she rode the
7  storm out, stayed down there. She can't live in
8  both places. My brother will have to tell you where
9  she lived.
10     Q. Do you know of any employees of either
11  Compass Pointe or Sunquest other than Donna Bass?
12  Do you know if any of them rode the storm out at the
13  Compass Pointe property?
14     A. No, I don't. I don't know if there were
15  any others. There may have been, but I'm not aware.
16     Q. And at what point were representatives of
17  plaintiffs able to get into the property after
18  hurricane Katrina to inspect what had happened?
19     A. Donna could go in that very next day when
20  the storm subsided and the floodwaters receded,
21  which was pretty quickly.
22     Q. Have you had conversations with Donna Bass
23  as to what she saw on her first trip back?
24     A. Yes. But, you know, just the horror, the
25  damage.

Page 101

1      Q. Do you know when she actually was at the
2  property again after hurricane Katrina?
3      A. During it, as I understood it.
4      Q. Do you know if Donna Bass took photographs
5  when she first returned?
6      A. Yeah, she took photographs. And that
7  other young lady that was making a pitch took the
8  most.
9      Q. Tammy Crossley?
10     A. Yes. But Donna took her own photographs,
11  also. It's amazing. One of the most shocking
12  things that came out that I saw in those photographs
13  and when I personally viewed it is you would
14  literally see a room sometimes without any windows
15  blown out, complete water stains all over the second
16  floor, and you wouldn't understand why. You would
17  see seaweed in that room. You wouldn't understand
18  why. And I later found out that the seals on the
19  windows from the force of those hurricane winds will
20  actually blow water through and around the seal and
21  seaweed around the seal. And it absolutely shocked
22  me, but I saw the photographs and I saw it myself.
23     Q. Your testimony that you yourself saw
24  seaweed inside the buildings at Compass Pointe?
25     A. Absolutely.

26  (Pages 98 to 101)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 102

1    Q.   Was that on the first floor or second
2  floor?
3    A.   Oh, I mean, we saw it -- some of it on the
4  second floor.  Obviously, you can understand where
5  windows shattered and blown out.  But there were
6  some windows weren't shattered and you could still
7  see it.
8    Q.   How many units do you recall seeing
9  seaweed?
10   A.   I'm not certain.  I don't -- I walked
11 through probably half the buildings and half the
12 units.  Saw the same old, same old, same old.
13   Q.   You say you walked through about half the
14 units at Compass Pointe?
15   A.   Yes, sir.
16   Q.   Do you remember which ones specifically?
17   A.   No, sir.
18   Q.   Did you walk through first story, second
19 story, or both?
20   A.   Both.
21   Q.   When did you first personally walk through
22 Compass Pointe after the storm?
23   A.   Well, I'm not certain whether it was a
24 week or two after the storm, but pretty quickly.
25 And we met with Jim Biggs with Nationwide I think it

Page 103

1  was a week after the storm.  And Jim Biggs is the
2  same man that -- that's -- that was represented
3  Nationwide under Georges.  And -- and they had work
4  staff putting blue tarpaulins on all the buildings
5  on both sides.
6    Q.   You testified about this earlier.  It was
7  your belief that he was the person who had adjusted
8  this claim in hurricane Georges, which had been I
9  guess about seven years prior to hurricane Katrina.
10 Now, I'll represent to you that Mr. Biggs testified
11 he hadn't been involved in adjusting that claim.
12 I'm curious as to how you came to believe that he
13 had been involved in handling hurricane Georges
14 claim for either of these two properties?
15   A.   Well, he was on the site.  Once again, we
16 were securing it.  He didn't physically have a crew
17 that installed the blue tarpaulins during Georges,
18 but there was a contractor that was engaged by
19 Nationwide, by Jim Biggs representing Nationwide, to
20 put on those blue tarps.
21   Q.   This is hurricane Georges?
22   A.   This is hurricane Georges.  He inspected
23 virtually every unit and he would estimate the
24 damage.  And I just -- since he was estimating the
25 damages, I assumed that he was putting pencil to the

Page 104

1  price.  He's estimating the scope for certain.
2  That's where you start.  And I just assumed that he
3  -- after he detailed the scope of work in Georges,
4  that he was doing the -- the estimate of cost, also.
5  And he testified -- you're telling me now that he
6  didn't.  But he did estimate the scope of the
7  damages.  I know that.  And he was also doing the
8  same thing with a much, much larger crew on the
9  Katrina claim.
10   Q.   So your recollection that when Mr. -- when
11 you visited the site at Compass Pointe and Carriage
12 House after hurricane Katrina, you saw Jim Biggs and
13 you recognized him?
14   A.   Oh, yes, sir.
15   Q.   And did you talk with him --
16   A.   Oh, yeah.
17   Q.   -- about his prior work on these
18 properties during hurricane Georges?
19   A.   Yes, sir.
20   Q.   And it's your testimony he testified -- he
21 told you -- he talked with you about having
22 previously worked on adjusting the properties?
23   A.   Well, I mean, I met him at the properties,
24 the same properties after Georges.  I don't recall
25 him talking about the Georges, but I know I said

Page 105

1  something like, "Here we go again."  You know, "It's
2  been a long time, but here we go again."  And so I
3  thought he would be performing the same duties.
4    Q.   You didn't have any issue with how he had
5  adjusted -- you and Nationwide had adjusted your
6  hurricane Georges claim, right?
7    A.   No, not at all.  You'll have to
8  understand, though, we had a construction company
9  owned that I sold my son in Louisiana in Monroe.
10 And we were able to -- to mobilize our own crews
11 from Louisiana.  If we had tried to use the crews on
12 the coast that were available, we would have never
13 gotten it in for what Nationwide paid then.
14   Q.   Is that hurricane Georges?
15   A.   Yes, sir.  I mean, these guys have more
16 work they can possibly get to.  So what do they do
17 with the pricing?  Boom, boom, boom.  They go up,
18 up, up.  So what we did, we mobilized our own crews
19 to come down after Georges to hit it hard and fast
20 and furious and get out of there.  And the first few
21 years they renovated, boom, that's where they lived.
22 In other words, we didn't have to try to find a
23 house for them.  They concentrated on housing for
24 themselves first and then stayed there until the job
25 was finished.  We got it in for the budget, but it

27  (Pages 102 to 105)

Ralph Brockman 1/19/2010

Page 106

1  would -- the cost of that, we would have never done
2  it if we had to use local suppliers and local
3  subcontractors because they just had more work than
4  they could get to.
5      Q.  That was -- the construction company you
6  used renovated hurricane Georges damage, that was
7  company owned by your son; is that correct?
8      A.  Yes, sir.  I sold Brockman Builders,
9  Incorporated to my oldest son.
10     Q.  Is that company still in existence and do
11 construction work?
12     A.  Yes, yes.
13     Q.  Did you -- I think you testified
14 previously that you -- in your deposition for
15 Carriage House case, that you walked the property
16 with your son.  Was that Wes Brockman?
17     A.  Yes, sir.
18     Q.  Did plaintiffs ask Brockman Builders, your
19 son, Wes Brockman's, company, to prepare and
20 estimate to repair the damage at Compass Pointe?
21     A.  No, sir, not a bid or estimate.
22     Q.  Did plaintiffs consider ever asking
23 Brockman Builders to perform any of the construction
24 work at Compass Pointe?
25     A.  Yes.  I was going to consider him

Page 107

1  completely.  Had we received enough funds to pay for
2  the windstorm portion, then we would have raised
3  capital amongst the partnership to pay for the flood
4  portion.  And he would have been certainly invited
5  as he was the last time to perform because I think
6  he would have been able to do it quicker and
7  cheaper, just like he did the last time.  But we
8  never had -- and I wasn't going to waste his time --
9  his time when I didn't even have the funds to pay
10 him.
11         So -- and I didn't do that with other
12 contractors either.  There were others who would
13 have liked to done the work, but I knew we didn't
14 have funds.  I'm a contractor myself.  I don't -- I
15 treat them -- I don't do people that way.  I'm just
16 not going to let them waste their time and do an
17 estimate for me and then not even have a chance at a
18 job.  So I never got an estimate from a contractor.
19     Q.  Your son's company or any other company?
20     A.  Not from a contractor.  We got a scope of
21 the work performed by an architect, purely scope,
22 because I could see things were different.  You
23 could see it.  First off, it was like looking at it.
24 We had a real problem.  And I could see the
25 attitudes were different even with Jim Biggs.  And

Page 108

1  -- and then that's when I went and hired an
2  architect to not get into price, just get the scope,
3  what have we got to do.
4         And his scope was -- was there for me to
5  review and WorldClaim estimated the scope and the
6  two were even different.  I mean, there's a real
7  problem here on scope.  Because when you have
8  moisture on the second floor, in the subfloor of the
9  second floor, and you have to replace the subfloor
10 on the second floor, if you've got to remove that
11 before you put a laminated piece of plywood
12 underneath the next floor, you're looking into a lot
13 more cost.  If you have to replace all the decking
14 on the -- on the roof, you're looking at substantial
15 more cost than -- than just refelting it and putting
16 on shingles.
17         So the scope that I got from all these
18 so-called experts, WorldClaim, the architect,
19 Lewis O'Leary, they even differ to the scope.  And
20 the ones that obviously that say, "You need to
21 replace that subfloor on the second floor, the
22 decking on the top, and here are so many trusses,"
23 those claims are way, way up there, higher for
24 damage than those who didn't -- who eliminated
25     Q.  Sir, we -- we looked at the declaration

Page 109

1  from your brother in the lawsuit you filed against
2  LNR Partners previously.  Immediately after the
3  storm, Nationwide paid almost -- over a million
4  dollars for the damage to these properties.  None of
5  that money ended up in the pockets of the plaintiffs
6  immediately following the storm, right?
7      A.  It looks to me that what we've witnessed
8  today it went to LNR, except loss of rents.  The
9  loss of rents I don't think went to LNR, but my
10 brother can testify to that.  I believe that
11 continued to flow into the partnership because I
12 have financial statement here.
13     Q.  We also saw in the declaration that the
14 company stopped paying mortgage on these properties,
15 right?
16     A.  At some point, absolutely.
17     Q.  He actually testified as of the
18 September 2005 payment, which would have been the
19 first payment after the property?
20     A.  Right.
21     Q.  The rent payment is what's used to pay the
22 mortgage, right?
23     A.  The rents -- you mean the rents --
24     Q.  The rent paying the tenants -- from the
25 tenants was used to pay the mortgage?

28  (Pages 106 to 109)

Ralph Brockman 1/19/2010

Page 110

1    A.  Yes, yes.
2    Q.  Generally, more than enough to pay the
3  mortgage, right?
4    A.  That's correct.  But in this case, you
5  don't have the tenants paying.  You have Nationwide
6  paying the loss of rent.  So they equal one another.
7  The Nationwide loss of rent equals what a hundred
8  tenants were paying.
9    Q.  And so it's your testimony that you
10  believe, but you're not certain that the loss of
11  rent payments from Nationwide paid, plaintiffs were
12  using to pay their mortgage?
13    A.  Well, I thought we were.  But it sounds
14  like Bill stopped paying the mortgage, probably
15  under my direction in September.  So those loss of
16  rent payments were used to salvage the debris,
17  remove it, keep a staff there.  We still had a
18  minimal staff we had to keep there.  A fund travel,
19  fund expenses, fund negotiations with WorldClaim,
20  and all the other public adjusters that were making
21  a pitch to us.  We used, I think, the loss of
22  rents -- Bill will verify this tomorrow -- to
23  continue to fund the operations without paying that
24  on the mortgage.  Now, he may say differently, but.
25    Q.  Plaintiffs incurred expenses to continue

Page 111

1  to maintain operations immediately after hurricane
2  Katrina; is that fair?
3    A.  Yes.  I mean, you had some units still
4  inhabited on one complex.  You had enormous amount
5  of tenant mess.  I mean, tenants run off and leave
6  food in their refrigerators in their evacuation and
7  it is horrible.  I mean, the odors, everything.  You
8  try to get that -- you use your own workforce to
9  remove as much debris and get the dumpster as you
10  can.  We tried to do that.  It takes funds and we
11  kept I think the --
12    Q.  Beyond the loss of rents amounts that
13  Nationwide paid, did plaintiffs ever ask Nationwide
14  to pay for any of these additional expenses incurred
15  in cleanup and maintaining operations, putting aside
16  repairing property damage?
17    A.  We were trying to get Nationwide to pay
18  the claim, and they paid what they said they owed.
19    Q.  My question was a little different.  Did
20  plaintiffs ever go back to Nationwide and say,
21  "You're paying the amount of rents we've lost, but
22  we've incurred these additional expenses.  Here's a
23  calculation or here's a receipt.  Can we have a
24  payment of that amount?"  Did plaintiffs ever do
25  that?

Page 112

1    A.  I don't know if Sunquest, per se, asked
2  for more money.  I know WorldClaim asked and asked
3  and asked and asked.
4    Q.  Well, we've seen -- you've seen
5  WorldClaim's estimates before, right, sir?
6    A.  Yes.
7    Q.  They're for property damage, right?
8    A.  I'm not sure it's -- yes, yes.  It's
9  property damage.  I'm not sure if that estimate
10  includes flood or not, though.
11    Q.  Mr. O'Leary actually wrote you an E-mail
12  after reviewing the estimate saying that they're
13  cookie cutter and what can't be relied upon, right?
14    A.  That was his opinion.
15    Q.  Did you ever tell him he was wrong?
16    A.  No.  I didn't tell him he was wrong.  That
17  was his opinion.  But that WorldClaim did not
18  include the removal of this decking on roof that was
19  damaged, nor any of the subfloor.  So you can -- you
20  can actually reconcile Lewis O'Leary's estimate to
21  WorldClaim if they equal one another in scope.
22    Q.  And we'll -- we can cover that, but let's
23  stick to my questions.  My question is, WorldClaim
24  did an estimate -- did not provide an estimate to
25  Nationwide of additional expenses that plaintiffs

Page 113

1  had incurred in maintaining operations, right?
2    A.  I don't know what WorldClaim asked for.
3  Only thing they told me is they cannot get a line of
4  communication with Nationwide.  In fact, the last
5  time --
6    Q.  You're not aware of any -- you're not
7  aware of any communication that plaintiffs submitted
8  to Nationwide saying, "Beyond loss of rents, we've
9  incurred x amount of extra expenses.  Please submit
10  payment to us for that expenses"?
11    A.  I don't know what WorldClaim submitted.
12    Q.  Other than what WorldClaim might or might
13  not have submitted, plaintiffs did not submit any
14  communication along with Nationwide, correct?
15    A.  I know I didn't submit any, but -- and you
16  can -- you can ask my brother tomorrow.
17    Q.  I'll ask Mr. Bill Brockman on behalf of
18  Sunquest.  But so your testimony is Compass Pointe
19  never asked Nationwide to pay for additional
20  expenses necessary to maintain its operations beyond
21  a loss of rents which Nationwide did pay for, right?
22    A.  You say Compass Pointe never asked
23  Nationwide for additional expenses and/or costs?
24  You talking about just the expenses to remove debris
25  or you talking about the claim itself to the

29  (Pages 110 to 113)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 114

1 buildings?
2     Q.  Not for property damage.  Additional
3 expenses to maintain operations beyond loss of
4 rents?
5     A.  No, no, we didn't.
6     MR. GILMORE:  You want to break for lunch
7 now?
8     VIDEOGRAPHER:  Off the record at 11:57.
9     (Off the record.)
10    VIDEOGRAPHER:  On the record at 12:58.
11    Q.  (By Mr. Gilmore) Good afternoon,
12 Mr. Brockman.
13    A.  Good afternoon.
14    Q.  At the break, you had mentioned you found
15 out from one of your attorneys who Brett Furr is?
16    A.  Yes, sir.
17    Q.  He is an attorney for one of the banks
18 that held the mortgage; is that right?
19    A.  Yes, sir.  As opposed to LNR, who was the
20 servicer of the mortgage.  And he provided the
21 appraisal just -- which was very nice and
22 accommodating --
23    Q.  Okay.
24    A.  -- that helped us sell the properties for
25 the value we got.

Page 115

1     Q.  Let's go back to right after hurricane --
2 I'm sorry.  Let's go back to right before hurricane
3 Katrina.  Did plaintiffs take any measures to
4 protect the property from the storm before it
5 arrived?
6     A.  I'm not -- I'm not certain.  I'm really
7 not.  You'll have to ask Brother and Donna Bass.  I
8 don't think they could have done anything other than
9 try to board some windows.  And but -- and it was
10 class three when it hit, which this thing was highly
11 unusual that a class three would do ten times more
12 damage than a class five would do.
13    Q.  You had mentioned after the storm that Jim
14 Biggs had arrived with a team of adjusters from
15 Nationwide to inspect the property -- property
16 damage at Compass Pointe?
17    A.  It wasn't adjusters.  It was a bunch of
18 kids.  They couldn't hold a tape, couldn't climb up
19 on ladders.  And I think Biggs was directing them on
20 what to do.  I don't think they were adjusters.  I
21 thought Biggs was, though.
22    Q.  And in terms of the -- well, these people
23 were inspecting damage, taking photographs, taking
24 measurements at Mr. Biggs' direction?
25    A.  Yes, sir.

Page 116

1     Q.  There's another gentleman, do you remember
2 a Nick Hatfield?  Do you remember his name?
3     A.  No, sir, I don't recall.
4     Q.  He was a younger guy with -- also with
5 Nationwide experienced?
6     A.  I think they divided into teams and he was
7 probably one of the team leaders.
8     Q.  In terms of the people you spoke with who
9 are Nationwide employees working on the adjustment
10 of the claim, other than Mr. Biggs, do you remember
11 having conversations with anyone else?
12    A.  No, sir.
13    Q.  And you walked -- personally, you walked
14 the property with Mr. Biggs after hurricane Katrina?
15    A.  Not with Mr. Biggs, no.  I walked it on my
16 own.  He was directing these various teams he had
17 and he was on site.  But no, I did not walk the
18 buildings with him.
19    Q.  Did any other employee or plaintiffs or
20 someone acting on plaintiffs' behalf accompany
21 Mr. Biggs and Nationwide teams as they inspected the
22 property?
23    A.  Not to my knowledge.  This was ongoing for
24 days.
25    Q.  Do you recall giving any kind of recorded

Page 117

1 interview or statement to anyone at Nationwide?
2     A.  No, sir.
3     Q.  Do you recall whether any other employees
4 of plaintiffs or representatives of plaintiffs gave
5 any kind of interview or statement that was
6 recorded?
7     A.  Not to my knowledge.
8     Q.  There were tenants who rode out the storm
9 at Compass Pointe Apartments, correct?
10    A.  I believe so.  Not a lot of them, but
11 there were some.
12    Q.  Have you spoken with any of them?
13    A.  No.
14    Q.  Do you know if any plaintiffs, employees,
15 or representative have talked with any of the
16 tenants who rode out the storm during hurricane
17 Katrina?
18    A.  Perhaps Donna Bass, the resident manager,
19 talked with some.  And she is more qualified to tell
20 you how many tried that tried to ride the storm or
21 rode the storm out.
22    Q.  Other than tenants and Donna Bass, are you
23 aware of any other individuals at the property who
24 rode out the storm that would have firsthand
25 knowledge about the storm?

www.BrooksCourtReporting.com
1-800-245-3376

Ralph Brockman 1/19/2010

Page 118

1    A. I do not know. There may have been a
2 maintenance man, and Donna Bass would be aware of
3 who that would be.
4    (Exhibit 314 - 9/23/2005 Letter marked for
5 identification.)
6    Q. Let me hand you what's been marked as
7 Defense Exhibit 314. This is a document plaintiffs
8 produced to us. It doesn't have a Bates number. It
9 is a September 23rd, 2005 letter from Nationwide to
10 Sunquest. And is that -- do you recognize the
11 handwriting on the top corner of that document?
12    A. Yes.
13    Q. Whose handwriting is that?
14    A. Oh, no. I -- I don't know who it is.
15    Q. It's someone -- an employee that works at
16 Brockman Enterprises?
17    A. I think it's Sunquest because it's
18 addressed to Sunquest and their box number. And it
19 does say, "Copy, Ralph, Bill, Lisa, and Jay Landry."
20 And I think that an employee of my brothers at
21 Sunquest who wrote this. But certainly, I was
22 copied and I recognize it now.
23    Q. Now, this is a letter from Jim Biggs,
24 right?
25    A. That's correct.

Page 119

1    Q. Do you recall seeing this document?
2    A. Yes, sir.
3    Q. At the time of or immediately after
4 hurricane Katrina?
5    A. Well, that's probably this thing that says
6 it was received October 6, I believe.
7    Q. It's difficult to see from that time
8 stamp, but I would agree October 5th.
9    A. Or 5th. It was dated September 23rd. Our
10 offices like to stamp when we receive stuff. And I
11 certainly probably forwarded this over to my
12 immediately upon receipt. So it would be within the
13 first week of October when I saw this. And he
14 stated it was sent by Jim Biggs, claims department.
15    Q. The letter to Sunquest Properties writes,
16 "In response to your claim, Nationwide Property and
17 Casualty Insurance Company (Nationwide) has
18 performed an investigation and inspected the damages
19 to your property. Based on this investigation and
20 the information available to Nationwide, a portion
21 of your claim has been determined to be from a
22 covered peril. And portions have been determined to
23 be from water or waterborne material as defined in
24 your policy." Did I read that correctly?
25    A. Yes, sir.

Page 120

1    Q. It's fair to say in that statement that I
2 just read Nationwide was notifying plaintiffs that a
3 portion of their claim was covered and was going to
4 be paid off and a portion was not covered, right?
5    A. Correct.
6    Q. It goes on to cite exclusion language from
7 floodwater damage that's present in policy. I think
8 you testified -- you testified earlier that you
9 understand and are not claiming that Nationwide's
10 policy covers for flood damage, right?
11    A. That's correct. What bothered me when I
12 got this, under B, "Exclusions," Item 1, it has a
13 little "g," it says "water." Now, I mean, flood
14 damage, I know that we're not covered and it's
15 exclusion. But water, I thought if it was wind
16 driven, it would be included. But he's saying here,
17 if I understand it correctly, that even water is an
18 exclusion, rain or wind-driven water. I assume. I
19 don't know. But that -- I knew we had a problem
20 right when I read this. It was pretty obvious.
21    Q. Sir, you understand today that some of the
22 money that Nationwide has paid was for damage to --
23 for both wind and wind-driven rain, right?
24    A. Yes. I don't know if you're going to say
25 -- if they may say it's wind what they paid for, but

Page 121

1 not water, not wind-driven rain. I -- I don't know.
2 At this time, I just don't know where they're coming
3 from. I know the amount are way --
4    Q. If you read the exclusion under water,
5 take the time to read those "1", "2", "3", "4" --
6    A. Is little "g" under "1" or is little "g"
7 before the "1" in parenthesis?
8    Q. You'll see this letter, the "1", "2", "3",
9 "4", and then "A", "B", "C" under parenthesis, read
10 those and tell me if any of those reference "wind"
11 or "rain" in them.
12    A. You want me to start reading on the
13 parenthesis "1"?
14    Q. Right. If you look through the -- said,
15 "Water Exclusions" that they're citing for your
16 policy.
17    A. Okay. It says, "Flood, surface water,
18 waves, tides, tidal waves, overflow, or any body of
19 water" --
20    Q. It's a long question. Let me rephrase.
21 If you take opportunity to look through this, I
22 think you'll see, and tell me if you agree, they
23 don't -- these exclusions don't reference "rain" or
24 "wind-driven rain"?
25    A. Yes, it does under little "1". It says,

31 (Pages 118 to 121)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 122

1  "All whether driven by wind or not."
2      Q.  Well, number "1" says, "Flood, surface
3  water, waves, tides, tidal waves, overflow, or any
4  body of water or their spray, all whether driven by
5  wind or not."  Did I read that correctly?
6      A.  "All whether," yes, yes, you did.
7      Q.  Okay.  You would agree rain is not flood,
8  surface water, waves, tidal waves, overflow, or any
9  body of water, correct?
10     A.  Yes.  But whether driven water is excluded
11 by this.
12     Q.  Well, you're sounding confused about this
13 letter.  When you received this letter, did you ask
14 Nationwide, "Are you paying for repairs or damage
15 caused by wind-driven rain"?
16     A.  No, I didn't.
17     Q.  Did anyone from Nationwide ever tell you,
18 "We're not paying for damage caused by wind-driven
19 rain"?
20     A.  This to me says it in writing that they're
21 not.  It was water driven by wind or not is not
22 covered.  Unless I'm -- am not reading it right,
23 that's what it says.  So I think it's very clear
24 what their position is on -- on water driven by
25 wind, which I disagreed with.  You're right in that

Page 123

1  it doesn't say "rain."  Of course, that's not
2  excluded.  You know, rain isn't excluded.  But rain
3  driven by wind is excluded by how I read this
4  letter.
5      Q.  Did you ask anyone else at Sunquest
6  Properties whether they shared your understanding of
7  what Nationwide was saying in this letter?
8      A.  I don't recall.
9      Q.  But you understand sitting here today that
10 Nationwide issued payments and -- for damage caused
11 by wind-driven rain to plaintiffs' property, right?
12     A.  I'm not sure what they said on their
13 check.  You know, I'm not sure.  I know they're
14 paying for the windstorm portion of the damage.  I
15 know they're paying for rain that comes through a
16 hole in the roof.  But I'm not certain by what I'm
17 reading here that what they're paying was ever
18 included wind-driven rain.  Maybe that's our
19 difference.  Maybe that's why there's so much
20 disparity in the difference.  Jim Biggs can answer
21 what it meant here.  I can't.
22     Q.  Putting aside what other witnesses have
23 testified to or not, I'm trying to understand what
24 plaintiffs' contentions are.  And are plaintiffs
25 contending that Nationwide has not paid them any

Page 124

1  damage caused by wind-driven rain at these
2  properties?
3      A.  I haven't said that.  I'm just reading
4  this.  This letter says they're not.  It's an
5  exclusion.  Maybe Nationwide overruled Mr. Biggs and
6  said, "Yes, we are."  I don't know.  But I don't
7  have any proof that they say they're paying for
8  wind-driven rain.
9      Q.  When you're saying that this exclusion
10 that's cited in this letter would seem to include
11 wind-driven rain, the number "1" in parenthesis
12 reads, "Flood, surface water, waves, tides, tidal
13 waves, overflow, or any body of water or their
14 spray, all whether driven by wind or not."  I read
15 that correctly, right?
16     A.  Absolutely.  "All whether driven by wind
17 or not," meaning that driven by wind it's excluded
18 or not driven by wind it's excluded.
19     Q.  If it is water damage caused by one of
20 these types of water, you would agree that
21 wind-driven rain is not flood, right?  And it's not
22 surface water.  It's not waves.  It's not tides.
23 It's not tidal waves.  It's not overflow of a body
24 of water or spray from a body of water or waves?
25     A.  Correct.

Page 125

1      Q.  Is that fair, sir?
2      A.  Yes.
3          (Exhibit 316 - 11/15/2005 Letter marked
4  for identification.)
5      Q.  I'm going to hand you what's been marked
6  as Defense Exhibit 316.  And this is another letter
7  that was produced by plaintiffs and not Bates
8  numbered.  It is a November 15th, 2005 letter from
9  Jim Biggs at Nationwide to you and your brother,
10 Bill Brockman, correct, sir?
11     A.  Yes, sir.
12     Q.  It has a Bates stamp at the bottom -- I'm
13 sorry -- a date stamp at the bottom that says
14 received appears November 21st, 2005.  It's
15 difficult to read, isn't it?
16     A.  It's difficult, but it's close.  It was
17 dated November 15th, so that's probably the 21st or
18 23rd, something like, yes, sir.
19     Q.  Sitting here as the corporate
20 representative for plaintiffs, did Compass Pointe
21 receive this letter from Nationwide?  Have you seen
22 this document before today?
23     A.  I believe so, yes, sir.
24     Q.  And a letter from Mr. Biggs reads, "This
25 letter is sent per our last conversation in

32 (Pages 122 to 125)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 126

1  reference to the loss of rent on Compass Pointe
2  property, at which time I expressed my desire to
3  expedite repairs, as well as the balance of the loss
4  of the rent." Did I read that correctly?
5      A.  Yes.
6      Q.  Do you recall conversation prior to this
7  November 15th letter with Mr. Biggs regarding loss
8  of rent at Compass Pointe property?
9      A.  I don't recall the conversation, but he --
10 he addressed the letter to Bill and I, and
11 conversation could have been with Bill.
12     Q.  Do you have any basis to doubt that
13 Mr. Biggs had a --
14     A.  No.
15     Q.  -- conversation with you or your brother
16 regarding his desire to expedite repairs and pay
17 loss of rent?
18     A.  No cause for doubt.
19     Q.  Now, you'll see the next sentence reads,
20 "See attached spreadsheet which details the units
21 that have been determined unlivable from your
22 hurricane loss of 8/29/05.  You will also note that
23 per my review, I have projected a completion of
24 these covered damages through February 2006.  This
25 period covers six months from the date of the loss,

Page 127

1  which should be adequate to expedite the repairs of
2  covered damages." Did I read all of that correctly?
3      A.  Yes, sir.
4      Q.  Then the next sentence reads, "This
5  projection takes in consideration that the scope and
6  payment for exterior covered damages were completed
7  and payment made 9/29/05, along with scope and
8  payment for interior covered damages made on
9  10/20/05.  It is my intent to make this final
10 payment of $86,622 on the loss of rent by 12/2/05
11 unless you have documentation that would change the
12 progression of the loss." Did I read all of that
13 correctly?
14     A.  Yes, you did.
15     Q.  Let's take that apart.  First, he's saying
16 that Nationwide issued --
17         (Telephone rings.)
18     A.  Sorry.
19     Q.  First, Mr. Biggs says in this letter that
20 Nationwide issued payments for exterior damage
21 September 29th, correct?
22     A.  Yes.
23     Q.  And, in fact, Compass Pointe and Sunquest
24 received payments from Nationwide on September 29th
25 for exterior damage, right?

Page 128

1      A.  Yes.
2      Q.  Then there was additional payments for
3  Nationwide -- I'm sorry.  Payments on 9/29/05, that
4  would have been exactly one month after hurricane
5  Katrina occurred, right?
6      A.  Yes.
7      Q.  Hurricane Katrina occurred August 29th,
8  right?
9      A.  Right.
10     Q.  Scope and payment for interior covered
11 damage paid on October 20th, 2005 were received by
12 Compass Pointe, right?
13     A.  Yes.
14     Q.  Then subsequently Mr. Biggs had
15 discussions with plaintiffs regarding their loss of
16 rent claim; is that right?
17     A.  I believe so, yes, sir.
18     Q.  And those discussions are reflected in
19 this letter and the spreadsheet that's attached,
20 right?
21     A.  Yes.
22     Q.  Now, let's turn to the spreadsheet, which
23 you see is an Excel spreadsheet entitled "Loss of
24 Income." And have you seen this document before?
25     A.  I don't recall going over the spreadsheet.

Page 129

1  I just recall the -- the letter.
2      Q.  Do you know whether Mr. Biggs prepared
3  this spreadsheet or whether plaintiffs'
4  representatives provided this spreadsheet to
5  Mr. Biggs?
6      A.  I don't know.  I do know, though, that he
7  says it's his intent to make final payment by 12/2.
8  And he's projected damages through '06, covering six
9  months.  I believe it took longer than six months,
10 and I do believe that there was a subsequent
11 addition to loss of rents collected, maybe for that
12 reason.  I mean, all he can do is project.  It took
13 more than six months.
14     Q.  We'll look at that in a second.  I just
15 want to show it.  The last page of this document,
16 Defense Exhibit 316, there are totals that project
17 six months of loss rent at $14,437 per month, right?
18     A.  Yes.
19     Q.  That would have been based on information
20 from plaintiffs, right?
21     A.  Yes.  Rent roll from plaintiffs and they
22 total 86,622, the amount he says he would pay.
23         (Exhibit 185 - 12/4/2005 Letter marked for
24 identification.)
25     Q.  I'm going to hand you Defense Exhibit 185,

33 (Pages 126 to 129)

Ralph Brockman 1/19/2010

Page 130

1  which is a December 4th, 2005 letter from you to
2  your brother, Bill Brockman, from Jim Biggs. It's
3  Bates number NW1-SUN1355. Have you seen this
4  document before?
5      A. I don't recall it, but yes, I believe I
6  have.
7      Q. You'll see --
8      A. Yes, I've seen this.
9      Q. You'll see this letter follows up the
10  correspondence on 11/15/05?
11      A. Correct.
12      Q. And he attaches the payment of 86,622 on
13  the rent loss cash out?
14      A. Yes, sir.
15      Q. And Compass Pointe received a rent loss
16  payment from Nationwide of 86,622, right?
17      A. Yes, sir.
18      MR. GILMORE: GO off the record to change
19  tape.
20      VIDEOGRAPHER: Off record at 1:20. End of
21  tape three.
22      (Off the record.)
23      VIDEOGRAPHER: Beginning tape four. On
24  the record at 1:20.
25      (Exhibit 198 - Document re: Upward

Page 131

1  Revision marked for identification.)
2      Q. Let me hand you what's been marked as
3  Defense Exhibit 198. And this is a document Bates
4  numbered NW1-SUN-1384 through 1389. Have you seen
5  this document before, sir?
6      A. I'm not sure. There's no letter
7  accompanying it. This is just -- looks like a
8  revised loss of rent schedule that pays 15,324
9  rather than the 14,000.
10      Q. Previously, you testified you recall there
11  was an upward revision?
12      A. Yes, and this must be it.
13      Q. Does this document reflect that upward
14  revision. And that was based on additional
15  information from plaintiffs given to Nationwide; is
16  that correct, sir?
17      A. Or maybe in discovery. I was going to see
18  what month he went through over here. He went
19  through February on this one, the first one. And he
20  went through February here. He's adjusted it from
21  14,437 a month to 15,324. It's about 5,000 more,
22  plus or minus, sir.
23      Q. You'll see then at the top there's a
24  notation that says, "Revised 12/13/05"?
25      A. Yes, sir. That's after his letter, I

Page 132

1  believe.
2      Q. That's all right. His letter we looked at
3  a moment ago from December 4th.
4      A. Right.
5      Q. Did plaintiffs provide Nationwide with the
6  additional information that led to this upward
7  revision?
8      A. I don't know.
9      Q. Did plaintiffs ever tell Nationwide that
10  six months of rent was insufficient to cover the
11  lost rent that the property had incurred prior to
12  commencing this litigation, I guess, with
13  Nationwide?
14      A. I don't know. This would be something
15  that I prepare my brother for to answer tomorrow.
16      Q. Sir, I've noticed that you've gotten a
17  handwritten list of various topics. You're taking
18  notes during this deposition. Are these -- can you
19  tell me what you're writing down?
20      A. Well, right now, I just wrote "six-month
21  rent loss on Compass Pointe and revision from 86
22  plus to 91,944." Was there another revision?
23      Q. You and I don't have a problem with you
24  writing notes to yourself. What I would like to
25  ask, though, is that at the conclusion -- as we get

Page 133

1  to the end of this deposition that we just mark the
2  notes that you have handwritten down as an exhibit
3  and attach that to the deposition transcript.
4      A. That's all right with me, as long as I can
5  take a copy to my brother.
6      Q. You'll get your original back. We'll just
7  make a photocopy of everything you've written down.
8      (Exhibit 157 - Damages Paid marked for
9  identification.)
10      Q. I'm going to hand you what's been marked
11  as 157. And this is a document produced by
12  plaintiffs, not Bates numbered. Have you seen this
13  document before?
14      A. I believe so, yes, sir.
15      Q. Can you tell me what it is?
16      A. It looks like the damages that Nationwide
17  paid or we received on both Carriage House and
18  Compass Pointe. It's broken down on Carriage House
19  interior, exterior, recoverable, depreciation, and
20  loss of rents. And the same way on Compass Pointe.
21      Q. And let's -- since we're working on the
22  Compass Pointe case in this deposition, let's take a
23  look at those numbers. For Compass Pointe, it lists
24  payments for interior damage of $230,263.94?
25      A. Yes, sir.

34  (Pages 130 to 133)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 134

1    Q.  Do you know how that figure was calculated
2  by plaintiffs?
3    A.  I think this is provided by Nationwide to
4  us.  And I just asked my office manager what did we
5  receive on both these properties.  And this is
6  her -- this is her summation.
7    Q.  Your office manager, meaning Susan Belk?
8    A.  Yes.
9    Q.  So Susan Belk --
10   A.  I think these are her computation of what
11  we received.
12   Q.  She tallied up all the checks that
13  Nationwide issued to plaintiffs?
14   A.  Yeah.  I wish it was dated because we
15  supplemented when all this discovery started in '09
16  two more payments from Nationwide in '09.  So this
17  is not dated.  This would precede those payments.
18   Q.  So prior to -- during Nationwide's
19  adjustment on the claim prior to litigation, this
20  reflects the payments that plaintiffs have recorded
21  from Nationwide for Compass Pointe property?
22   A.  Yes, sir, I believe so.
23   Q.  Okay.  So it just says interior -- before
24  we get into it, just go through the numbers.  Do you
25  know what Ms. Belk did to prepare this document?

Page 135

1    A.  No, sir, but I'm sure she got the checks
2  and the breakdown that Nationwide sent her.  And she
3  just made a compilation of both of them on this one
4  sheet for me.
5    Q.  The interior figure is $230,263.94, right?
6    A.  Yes, sir.
7    Q.  The entry for exterior damage is
8  $109,875.65?
9    A.  Yes, sir.
10   Q.  Recoverable depreciation payment is listed
11  as $43,019.74, correct?
12   A.  Yes, sir.
13   Q.  That leads to a total of property damage
14  payments by Nationwide of Compass Pointe of
15  $383,159.33?
16   A.  Yes, sir.
17   Q.  Now, underneath that, there are two
18  entries "Loss of Rents."  One is 8,000 -- I'm sorry
19  -- 86,622?
20   A.  Yes, sir.
21   Q.  We looked at that correspondence on that
22  payment before, right?
23   A.  Right.
24   Q.  The next one is "Loss of Rents," $5,322,
25  correct?

Page 136

1    A.  Yes, sir.
2    Q.  That's a total of 91,944, correct?
3    A.  Yes, sir.
4    Q.  Do you know how many months of Compass
5  Pointe mortgage payment those total loss of rents
6  would have been able to cover at the time of
7  following hurricane Katrina?
8    A.  I would imagine six months.  This -- it's
9  not -- you don't -- we make -- this property was
10  making around 17, 18,000 a month after expenses.
11  And so, you know, if you have six months of loss of
12  rents, it would probably have been able to pay
13  six-month mortgage payment, I think, eventually.
14   Q.  Then the total sum at the bottom, total
15  received for Compass Pointe, $475,103.33?
16   A.  Yes, sir.
17   Q.  Sitting here today, putting aside the
18  payments post litigation, you don't have any reason
19  to doubt the accuracy of this figure, right?
20   A.  No, sir.
21      (Exhibit 139 - 12/8/2006 Warranty Deed
22  marked for identification.)
23   Q.  I'm going to hand you what's been marked
24  as Defense Exhibit 139.  Do you recognize this
25  document, sir?

Page 137

1    A.  I'm trying to.  I don't understand it
2  because it says $10.  It's conveying Compass Pointe
3  to Platinum Investments, LLC.  And I know we sold it
4  for more money than $10.  I think it was 2,700,000.
5    Q.  I think you're right based on other
6  records.
7    A.  Yeah.  So there's some reason for this,
8  and I don't know what it is.
9    Q.  Well, I'll represent to you that warranty
10  deeds often have a nominal sum when they're
11  reflecting a transfer.
12   A.  Okay.
13   Q.  But I wanted to ask you is this -- do you
14  recognize this as the warranty deed that actually
15  transferred ownership of the property from Compass
16  Pointe's -- Compass Pointe Partnership to Platinum
17  Investments, LLC?
18   A.  I believe so, yes, sir.
19   Q.  It's dated December 8th, 2006, signed by
20  your brother, William Brockman.  You see that at the
21  bottom?
22   A.  Yes, sir.
23   Q.  Was December 8th, 2006 the day of the
24  transfer of ownership from Compass Pointe
25  Partnership to Platinum Investments occurred?

35  (Pages 134 to 137)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 138

1     A.  To the best of my knowledge, yes, sir.
2  But again, my brother signed it, so I think he's
3  more qualified to answer than me.
4     Q.  Who is -- who are the owners of Platinum
5  Investments, LLC?
6     A.  Well, I didn't know exactly.  I knew that
7  David Pilger and Greg Stewart were two of them, or
8  at least I thought they were.  I don't know how many
9  others there were.
10     Q.  Sitting here today, plaintiffs are only
11  aware of those two individuals as owners?
12     A.  That's correct.
13     Q.  Let me hand you --
14     A.  But I think there were others, though, I
15  mean.
16        (Exhibit 141 - Corrected Warranty Deed
17  marked for identification.)
18     Q.  Let me hand you what's been marked as 141.
19  Again, this is produced in discovery.  It's entitled
20  "Corrected Warranty Deed."  Have you seen this
21  document before, sir?
22     A.  Yes, sir.
23     Q.  You see it's -- at second page, it's
24  signed by your brother, William Brockman, dated
25  April 16th, 2007, correct?

Page 139

1     A.  Yes, sir.
2     Q.  You see middle of page, there is a bold
3  and underlined statement that reads, "This corrected
4  warranty deed is being rerecorded to add the
5  paragraph reserving the grantor's right, title, and
6  interest in all insurance claim pertaining to
7  hurricane Katrina."  Did I read that correctly?
8     A.  Yes, sir.
9     Q.  Do you recall why that change was made in
10  this document, the corrected warranty deed, versus
11  the original deed?
12     A.  Well, I recall in the agreement that we
13  reserve the rights, but it was an oversight in
14  preparation of warranty deed to include.  And I
15  think this -- this corrected that oversight.  And I
16  notice it's dated in April, and I think the first
17  one you said was in December.  So within three or
18  four months, a new one was prepared that complied
19  with the spirit of our agreement.
20     Q.  But is it your testimony that the actual
21  title and property transferred to Platinum
22  Investments, LLC as of the first warranty deed,
23  December 8th, 2006; is that correct?
24     A.  I believe if you --
25     Q.  Sure.  I'll rephrase it.  I'll rephrase

Page 140

1  it.  Would the -- the fact that this was rerecorded
2  with this addition doesn't change the fact that the
3  property was sold and transferred to Platinum
4  Investments, LLC on December 8th, 2006, right?
5     A.  I believe that's correct, yes, sir.
6     Q.  I'm not asking you for a legal opinion.
7     A.  Yes.
8     Q.  Just in terms of factual, your
9  understanding is that the sale finished?
10     A.  It finished.  It made mistake on reserving
11  the rights and they went along with the correcting
12  it.  But the title actually, I believe -- I'm no
13  lawyer.  I think the title was transferred in
14  December.
15        (Exhibit 310 - Closing Statement marked
16  for identification.)
17     Q.  I'm going to hand you what's been marked
18  as Defense Exhibit 310.  Do you recognize this
19  document, sir?
20     A.  Yes, sir.
21     Q.  Can you tell me what it is?
22     A.  It's a closing statement.  It's referred
23  to as a settlement statement here on the sale of
24  Compass Pointe to Platinum Investments.
25     Q.  You'll see the settlement date is listed

Page 141

1  as 12/08/06, correct?  You see that on the right?
2     A.  Yes, sir, that's correct.
3     Q.  Now, underneath that in the column
4  entitled "K.  Summary of Seller's Transaction," it
5  has listed on Line 401, "Contract Sales Price,
6  2,700,000."  Did I read that correctly?
7     A.  Yes, sir.
8     Q.  And that was the price that Platinum
9  Investments paid to Compass Pointe Partnership --
10     A.  Yes, sir.
11     Q.  -- to purchase the property?
12     A.  Yes, sir.
13     Q.  Now, looking further down in Column K in
14  the right-hand side of that settlement statement,
15  you'll see it says, "Reductions and Amount Due to
16  Seller," correct?
17     A.  Yes, sir.
18     Q.  And there's one sum for 175,000 underneath
19  that, right?
20     A.  Yes, sir.
21     Q.  And that's an earnest money amount that
22  Platinum Investments had already paid?
23     A.  Yes, sir.  It's deposit they put up when
24  we signed the buy/sell agreement I suppose.  Yes,
25  sir.

36  (Pages 138 to 141)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 142

1    Q.   Now, underneath that, there's a line item
2    that says "Existing Loans Taken Subject To," and
3    "Payoff of First Mortgage Loan," and "Payoff of
4    Second Mortgage."  You see those three lines?
5        A.   Yes, sir.
6        Q.   There's no sums next to any of those three
7    lines, are there, sir?
8        A.   No.
9        Q.   Do you know why the mortgages that Compass
10   Pointe Partnership had that were being serviced by
11   LNR Partnership -- LNR Partners are not reflected in
12   this settlement statement for the sale of the
13   property for Platinum Investments?
14       A.   No, I don't.
15       Q.   When were the loans -- well, strike.  At
16   this point in December 2006 when this settlement
17   statement was being prepared and closing was
18   occurring, had the mortgages on Compass Pointe
19   property already been paid off by the partnership?
20       A.   I'm not sure.  My brother was the party to
21   this settlement statement, not I.  I just don't
22   know.  I would have thought they would have been
23   shown here in -- in the settlement statement.
24       Q.   You'll see at the bottom when there are
25   some taxes added on to the -- or I guess removed

Page 143

1    from the -- from the total amount, as well as the
2    credit for the deposit, it says, "Cash to Seller
3    $2,500,352.13."  Did I read that correctly?
4        A.   Yes.  Yes, sir.
5        Q.   Do you know how much money Compass Pointe
6    Partnership made from the sale of the property after
7    paying off the mortgages?
8        A.   It wouldn't be money made.  You mean what
9    the surplus was after they paid the mortgage?
10       Q.   That's right.
11       A.   I do not recall, but I know there was a
12   surplus, though.
13           (Exhibit 424 - 4/24/2006 Letter marked for
14   identification.)
15       Q.   Let me hand you what's been marked as
16   Exhibit 424.  And this is a document produced by
17   plaintiffs, bearing Bates number CH 2319.  It's a
18   letter on your letterhead?
19       A.   Yes, sir.
20       Q.   And it's dated April 24, 2006?
21       A.   Yes, sir.
22       Q.   It says, "Summary For Investors Re:
23   Compass Pointe, Carriage House"?
24       A.   Yes, sir.
25       Q.   It says, "Dear Investors, We just received

Page 144

1    a payoff on both for mortgage company.  We are
2    checking their charges which is a rip-off, but we
3    have no choice.  Hopefully, the closing on the
4    Carriage House will be enough to pay off both
5    mortgages, we can stop the penalty."  Did I read
6    that correctly?
7        A.   Yes, sir.
8        Q.   It says, "Payoff Compass Pointe."  And
9    then it has an entry of "$1,842,342"?
10       A.   Yes, sir.
11       Q.   Do you know where that figure would have
12   come from?
13       A.   I'm certain that it's probably what they
14   were saying we owed on the mortgage.  This was our
15   records.  And you showed that we deposited 2,500,000
16   plus.  And you asked while ago how much surplus
17   funds we had.  We subtract the escrow here for some
18   reason.  I don't know what that was for.
19       Q.   The escrow would be amounts that you had
20   paid into the escrow account?
21       A.   That's the insurance probably.  That took
22   the -- remember, they took the insurance payment and
23   put it in a non-interest-bearing account and that
24   was in escrow for us.  So you pay off the mortgage
25   and you credit the escrow that they got from

Page 145

1    Nationwide.  It shows here 346.  So the balance is
2    1,496,000.  And at this time, we received 2.5.  This
3    is about 1.5.  So we had a surplus of about a
4    million dollars after the payment of Compass, or
5    that's what was planned to be.
6        Q.   That was what was planned to be.  And
7    then, similar story, it's your understanding for the
8    payoff of Carriage House?
9        A.   Carriage House, yes, sir.
10       Q.   Would the escrow amount include anything
11   other than insurance proceeds, for instance, taxes
12   or --
13       A.   It could be some taxes, but they took the
14   taxes out from -- from us over here on the
15   settlement statement.  So yes, escrow could be
16   property tax and it could be insurance premiums.
17       Q.   So at the bottom, you were projecting in
18   April 2006, total balance for both on payoff
19   1,496,045 for Compass Pointe, 1,089,293 for Carriage
20   House, for total balance of 2,585,338, right?
21       A.   Yes, sir.
22       Q.   In April 2006, you're anticipating as
23   sales price of both properties of $5,353,500?
24       A.   That's correct.  We put substantial money
25   in these properties when we bought them.  And so

37  (Pages 142 to 145)

Ralph Brockman 1/19/2010

Page 146

1  some of this is getting our own capital back.  It's
2  not all profit.  But it is certainly surplus that we
3  got more than what we owed.  I don't think this has
4  the settlement final in -- in LNR in it, though.
5      Q.  Let me hand you Exhibit 425, which is
6  another letter from you a couple of days later,
7  produced by plaintiff, bearing Bates number CH 2320.
8  And it's addressed to Joe Ledoux, Jan Brockman, your
9  brother, Bill Brockman, and Diane McGowan.  I think
10  you indicated those are shall we call them
11  principals of the partners in these properties?
12      A.  Yes, sir.
13      Q.  And you write, "Dear Investors, Bad news
14  as per the attached.  Now it appears we'll be
15  engaged in litigation.  Landry advised today that we
16  raise separate funds to bring each mortgage current
17  and bring our Mississippi attorney into the loop.
18  They refused using insurance proceeds to bring the
19  mortgage current and that is why we need to send
20  separate funds."  Did I read that correctly?
21      A.  Yes, sir.
22      Q.  And "they" is LNR Partners, correct?
23      A.  Yes.
24      Q.  "They" -- when you're referring to "they"?
25      A.  Yes, sir.

Page 147

1      Q.  You go on to write, "If they refuse to
2  accept these funds, it is our opinion that they are
3  then exposed to punitive damages."  Again, we're
4  talking about LNR Partners in that statement, sir,
5  right?
6      A.  Yes, sir.
7      Q.  Then at the bottom of that letter, you
8  write, "Note.  To bring both mortgages current, it
9  will take $687,031.26.  We have 434,504 in Carriage
10  House and 118,879 in Compass Pointe."  Did I read
11  that correctly?
12      A.  Yes.
13      Q.  Do you know what those two latter sums,
14  $434,504 in Carriage House and 118,879 in Compass
15  Pointe, refer to?
16      A.  That's the cash we have in the accounts I
17  believe at that time, which I believe a lot of that
18  was loss of rents.  I don't think LNR ever intended
19  that, but probably -- I know they intended found out
20  today the big loss of property.  I don't think they
21  would intended the loss of rents.  In my -- in my
22  letter here, I'm telling them what -- what came up
23  after my letter of April 24th.  In two days we find
24  out now, we got to separate funds to bring mortgage
25  current.  Maybe that's why it wasn't shown on the

Page 148

1  settlement statement.  I don't know.
2      Q.  When did plaintiffs first have discussions
3  with Mr. Stewart and Mr. Pilger about buying
4  Platinum Investments -- I'm sorry -- about buying
5  Compass Pointe property?
6      A.  I don't know.  I know that they -- they --
7  we closed it in December.  Wasn't it December 8th or
8  something like that by these documents?  I would
9  imagine it would have preceded that by a month, six
10  weeks, perhaps even more.
11      (Exhibit 468 - Buy/Sell Agreement marked
12  for identification.)
13      Q.  I'm going to hand you what's been marked
14  as Defense Exhibit 468.  Do you recognize this
15  document, sir?  It's Bates number CH 153 to 155.
16      A.  Yes, sir.  It's buy/sell agreement
17  executed by my brother and David Pilger.  I'm trying
18  to see if it's Compass Pointe.  It is for Compass
19  Pointe and it is -- refers to the 175 earnest money
20  deposit that was shown on the closing statement.
21  It's not dated by Pilger.  It's dated by my brother
22  to be late June of '06, June 23rd.
23      Q.  And to your knowledge, is this the
24  agreement to buy and sell the property between
25  Compass Pointe Partnership and Platinum Investments?

Page 149

1      A.  Certainly appears so because of the
2  deposit.  And I'm trying to find the total sales
3  price.
4      Q.  You see on number two on the first page,
5  it says, "Purchase Price $2,700,000"?
6      A.  Yes, that's it.  It appears to be document
7  that was a buy/sell agreement.
8      (Exhibit 466 - 8/18/2006 Letter marked for
9  identification.)
10      Q.  I want to hand you another document also
11  produced by plaintiffs.  It's Bates numbered 466.
12  It's marked 466.  It's Bates numbered Carriage House
13  1522 through 1533.  This is a August 18th, 2006
14  letter from you to Greg Stewart, correct?
15      A.  Yes, sir.
16      Q.  Can you tell us what this document is,
17  Mr. Brockman?
18      A.  It's purchase payment agreement for
19  Compass Pointe.  And I'm trying to see who executed
20  this one.  This one has me executing it.  And dated
21  August 18th.  The other one was dated when, 23rd of
22  June.  So it appears that there was some changes to
23  the one my brother executed, changes between
24  June 23rd and August 18th, and -- but they both
25  referred to the 175 as deposit.  I don't -- I don't

38  (Pages 146 to 149)

Ralph Brockman 1/19/2010

Page 150

1  know if the first one had anything to do about
2  closing. Let me go to it and see. It didn't refer
3  to a closing in the first document my brother
4  signed. This one does. "Provide for closing to
5  occur 45 days after settler finally settles and
6  concludes any and all outstanding property insurance
7  claim with respect to the property."
8      Q.  And that's one difference between the
9  August and June agreements, right?
10     A.  Yes. Yes, there is.
11     Q.  Now, if you look at -- looking at 466, the
12  August agreement that you sent to Greg Stewart, if
13  you look at Bates number CH 1525, which is Page 4 of
14  the purchase and sell agreement, provision Paragraph
15  8, entitled "Lease of Property," correct?
16     A.  Yes.
17     Q.  It says, "From and after the date of this
18  agreement, through and including the date of closing
19  or other earlier termination of this agreement,
20  seller does hereby lease and let exclusively unto
21  buyer, and buyer does hereby rent from seller the
22  property, said lease to be on the terms and
23  conditions herein set forth. Beginning
24  September 1st, 2006, continuing thereafter on the
25  first day of each calendar month, through and

Page 151

1  including the date of closing or other earlier
2  termination of this agreement, buyer shall pay a
3  monthly rental of $14,729.17 per month as a monthly
4  rental amount for buyer's use and occupancy of the
5  property." Did I read that correctly?
6      A.  Yes, sir.
7      Q.  This provision provides that the buyer,
8  Platinum Investments, was leasing the property from
9  the date of this -- September 1st, 2006, rather,
10 until the date of closing; is that correct?
11     A.  Yes, sir.
12     Q.  This is in addition to the earlier
13 June 2006 sales agreement, right?
14     A.  Yes, sir.
15     Q.  Do you know why this addition was made?
16     A.  I don't know whether it was maybe having
17 to do with their financing. I just don't recall
18 exactly.
19     Q.  Prior to this -- the execution of the
20 June 2006 --
21     A.  When was the closing, the settlement
22 statement closing? Wasn't it December of '06?
23     Q.  That's right.
24     A.  Yeah. I think they're trying to get their
25 financing together. And we have buy/sell agreement

Page 152

1  that's executed in the second one was the final
2  agreement in August of '06 and until the closing.
3  They're spending their money in rehab. And -- and
4  then before they get their loan approved, and
5  they're leasing it for basically the same rents that
6  we had in the loss of rents, you know,
7  approximately, per month, almost 15,000 a month for
8  that short period of time, which would be September,
9  October, November, portion of December.
10     Q.  I have a couple of questions about this.
11 First, how did the parties agree on this 14,729.17
12 figure?
13     A.  Apparently, that's pretty close to what
14 rents were we were receiving from tenants. If you
15 remember earlier, we got an increase from 14 --
16 about 14,7 to 15 something. So at the time, this
17 was probably the same thing we were providing the
18 insurance company. The 14,729 was the loss of rent
19 from the tenants.
20     Q.  At this point in August 2006, were there
21 still tenants at the property paying rents to
22 Sunquest and Compass Pointe?
23     A.  No, I don't believe so, no, no. I think
24 everybody vacated so he could do his -- his rehab.
25     Q.  When -- at what point did the buyers begin

Page 153

1  their rehab? Was it prior to August 18th, 2006?
2      A.  No, sir. I would imagine it began right
3  after this August statement. Before the closing.
4  And it didn't bother me. They're putting a lot of
5  money in that property and improving it every day.
6  So we have a property that's getting worth more and
7  more. And we're collecting almost 15,000 a month
8  while he's doing it. But I was accommodating them
9  because they're helping our values, but he
10 apparently didn't have his ducks in a row and
11 investors and loans. So this -- this provision was
12 added really to accommodate both of us.
13     Q.  So, sir, it's fair to say that the closing
14 that occurred February 2006 fell through, they would
15 have been paying about approximately 15,000 a month
16 in rents between August and December, right?
17     A.  Yes, sir.
18     Q.  And during that period, they were
19 renovating at their own expense the property,
20 correct?
21     A.  That's my recollection, yes, sir.
22     Q.  Had for some reason they'd not been able
23 to secure financing and the closing had fallen
24 through, you would have received this substantially
25 more valuable property?

39 (Pages 150 to 153)

Ralph Brockman 1/19/2010

Page 154

1    A.  That's how I saw it.
2    Q.  So this was a pretty good deal for you?
3    A.  I thought it was a good deal for our
4  investors.  That's why we did it.
5    Q.  How much did the buyers, Platinum
6  Investments, spend to renovate the Compass Pointe
7  property; do you know, sir?
8    A.  No, sir.  I've asked for that information
9  multitudes of times.  And I think Mr. Stewart was
10  deposed.  And I would imagine everyone would have
11  asked him that question.  But I do not have a copy
12  of his deposition.
13    Q.  You haven't found out one way or the
14  other?
15    A.  No, sir.
16    Q.  I'm not asking you to disclose
17  attorney-client privilege communication.
18    A.  I'm asking you now.  How much did he spend
19  on these properties?
20    Q.  Do you have any estimate based on your
21  understanding of work that he did or anything you've
22  heard from anyone as to how much they spent to
23  repair the property?
24    A.  I would say seven-and-a-half million at
25  least.

Page 155

1    Q.  To renovate the Compass Pointe property?
2    A.  I don't know.  I'm not sure if that's not
3  both of them.
4    Q.  Just asking specifically about Compass
5  Pointe right now.
6    A.  I don't know how much.  I just heard --
7  that's -- that's hearsay, really.  Greg would cut
8  corners if he could to save money, too.  I don't
9  know if Greg actually did everything that the people
10  recommended he do.
11    Q.  Have you been to the property --
12    A.  No, sir.
13    Q.  -- since it was completely renovated?
14    A.  (Witness shakes head negatively.)
15    Q.  Sitting here today, you can't identify any
16  damage that wasn't repaired by the buyers, right?
17    A.  No, sir, I can't.
18    Q.  When was the last time that you were at
19  Compass Pointe?  I know it's not called that
20  anymore, but what used to be Compass Pointe
21  property?
22    A.  I don't recall.
23    Q.  Was it 2006, 2007?
24    A.  I think after we sold it and got our
25  money, I never went back.

Page 156

1    Q.  I'm sorry.  I think you just said this.
2  You haven't been -- you haven't walked around the
3  property and looked at what's been done to the
4  property since renovation?
5    A.  No, sir.
6    Q.  You can't speak to how the renovations
7  affected the property versus the condition of the
8  property was in prior to hurricane Katrina; is that
9  right?
10    A.  No, sir.
11    Q.  I'm just going to show you a document,
12  plaintiffs' 467.
13      (Exhibit 467 - 10/29/2006 Letter marked
14  for identification.)
15      MR. GAUDET:  You mean defense.
16    Q.  Defense 467.  Plaintiffs' Bates number
17  1547, CH 1547.  This is October 19th, 2006 letter
18  from you to Mr. Pilger, right?
19    A.  Yes.
20    Q.  Now, you're writing, "Dear David, In
21  accordance with our contract, Paragraph 6, Closing,
22  calls for the seller to provide 45-day notice in
23  writing.  Please accept this letter as required
24  notice.  Although we doubt our claim will be settled
25  with insurance company, we would appreciate you

Page 157

1  providing us with a total cost of rebuilding the
2  complex, which information may help us with
3  insurance recovery.  Your cooporation is
4  appreciated."  Did I read all that correctly?
5    A.  Yes, sir.
6    Q.  Let's start with the first part.  This was
7  providing notice -- 45-day notice for closing?
8    A.  Yes, sir.  I think the agreement that we
9  signed required us to give them a notice, and that's
10  what this -- that was one of the purposes for this
11  letter is to give them that notice.
12    Q.  By October 19th, 2006, they were able to
13  get any problems they had with their financing
14  straightened out; is that correct?
15    A.  I don't know if it was before the 19th.  I
16  know they gave notice they had to come with the
17  money and 45 days from October 19th.  So in that
18  45 days, they certainly got their ducks in a row.
19    Q.  At this point then, what you were telling
20  Mr. Pilger was that it was time to close or time to
21  move on; is that fair?
22    A.  Yes.  I had great expectations that they
23  would close.
24    Q.  And, in fact, we know they did
25  subsequently on December 8th, 2006.  Now, at what

40  (Pages 154 to 157)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 158

1  point -- we've seen this communication with
2  Mr. Pilger in October 2006. We know the closing
3  occurred in December 2006. At what point did --
4  given those dates, did you begin talks with
5  Mr. Pilger, Mr. Stewart about investing in
6  West Chase property?
7      A. I don't think it was at this time. I was
8  going to make sure we got our money and everything
9  went smooth and just like it was supposed to. It
10  was certainly after. It was after their closing, my
11  recollection is. And I'm asking them in this letter
12  for the information that would provide us with what
13  they spent rebuilding not just this one, but both
14  complexes.
15      Q. Did Mr. Pilger ever give any kind of
16  response to this letter?
17      A. Mr. Pilger is not the contractor. Madison
18  was the contractor, but, you know.
19      Q. Did either Mr. Pilger --
20      A. Both cooperative. But, man, they didn't
21  want to get involved in any lawsuit. They didn't
22  want to have to be deposed. They wanted to run go
23  hide. They didn't want -- and this is why I had so
24  much problem getting this information.
25      Q. You're not aware of either Mr. Pilger or

Page 159

1  Mr. Stewart or anyone affiliated with the buyers
2  ever responding to Defense 467?
3      A. Not aware of it. I'm going to ask my
4  attorney here to go check the deposition of the two
5  of them and see if they gave that information in the
6  deposition.
7      MR. GILMORE: Let's take a five-minute
8  break.
9      VIDEOGRAPHER: Off the record at 2:04.
10      (Off the record.)
11      VIDEOGRAPHER: On the record at 2:13.
12      (Exhibit 296 - Amended Complaint marked
13  for identification.)
14      Q. (By Mr. Gilmore) Let me hand you what's
15  been marked Defense 296. It's the amended complaint
16  filed in this Compass Pointe case. Do you recognize
17  this document, sir?
18      A. Yes.
19      Q. Sitting here today, are there any errors
20  or inaccuracies that you're aware of in this
21  document?
22      A. Not that I'm aware of.
23      Q. Turn to Page 5 of this document. You'll
24  see "Second Claim, Breach of Contract, and
25  Declaratory Relief." See Paragraph 22 says, "Under

Page 160

1  the contractual coverage Nationwide agreed to ensure
2  for direct physical loss to cover property from a
3  covered cause of loss." Did I read that correctly?
4      A. Yes, sir.
5      Q. Paragraph 23, "The damage and loss of
6  property was covered by contract." Did I read that
7  correctly?
8      A. Yes, sir.
9      Q. Which damage and loss of the property was
10  covered by the contract?
11      A. I don't understand your question.
12      Q. In your complaint, plaintiffs make the
13  statement that the damage and loss to the property
14  was covered by the contract?
15      A. Right.
16      Q. And I want to know which damage and loss
17  to the property are plaintiffs claiming are covered
18  by the contract?
19      A. I don't know. I think all of the damage
20  involved windstorm and driven was what we considered
21  to be covered by the contract.
22      Q. In this litigation, plaintiffs have
23  designated Lewis O'Leary to prepare estimates of
24  damage and loss to the property that plaintiffs are
25  claiming were covered by the contract, right?

Page 161

1      A. I'm trying to find that paragraph. Can
2  you help me?
3      Q. Paragraph 22 on Page 5, 22 and 23.
4      A. Yes, I see that. But I don't see where it
5  refers to "Lewis O'Leary."
6      Q. I'm not saying it does. It was just a
7  question. In this litigation, plaintiffs have
8  designated Lewis O'Leary as an expert who is
9  preparing estimates of the damage and loss to the
10  property that was covered by the contracts,
11  plaintiffs are claiming, right?
12      A. I think so, amongst others, also. I think
13  there were other experts besides Lewis.
14      Q. What other experts have plaintiffs
15  designated in this litigation?
16      A. I don't -- I don't see his witnesses
17  outline here. But I do know that he at one time
18  talked about an engineer on the coast that knew that
19  windstorm hit, et cetera, et cetera, et cetera.
20      Q. In terms of someone who's calculating a
21  number, a description, dollar figure for the damage
22  and loss to the property that was covered by the
23  contract which Compass Pointe is claiming in this
24  litigation, is there anyone other than Lewis O'Leary
25  in this case?

41 (Pages 158 to 161)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 162

1      A.  Not to my knowledge, no, sir.  I think
2   there was another meteorologist or something like
3   that.
4      Q.  Sure.  With respect --
5      A.  Other experts, but not regarding the
6   physical damage to the property.
7      Q.  Paragraph 24 of the complaint reads,
8   "Nationwide's breach of contract and conduct caused
9   contract damages for the complete and full extent of
10  damage and loss to the apartment buildings, building
11  personal property, and for debris removal, and loss
12  of business income."  Did I read all of that
13  correctly?
14     A.  Yes, sir.
15     Q.  Let's go through each of those categories.
16  "The complete and full extent of damage and loss to
17  the apartment buildings," those are Lewis O'Leary's
18  damage estimates for physical damage to apartment
19  buildings that plaintiffs are putting forward,
20  right?
21     A.  Yes, sir.
22     Q.  The next one, "Building personal
23  property," are you aware of anything other than any
24  building personal property items in Mr. O'Leary's
25  estimates that plaintiffs have identified as an item

Page 163

1   of damage in this case?
2      A.  The only personal property that I'm aware
3   of would be in the -- the -- in the manager's
4   office.  You know, you have machine -- adding
5   machines, whatever, maybe computers, your couches,
6   and you know, reception area.  You have maintenance
7   equipment, maybe for the pool and the yards, the
8   lawn mowers, you know, brooms and brushes and hoses
9   and whatnot.  I -- you know, just normal stuff that
10  is not comprised of the physical complex.  I
11  think that's what he's referring to as personal
12  property.
13     Q.  When you say "he," you mean?
14     A.  The lawyer, Will Clark.
15     Q.  Okay.
16     A.  Wynn Clark.
17     Q.  The attorneys who prepared this on behalf
18  of plaintiffs?
19     A.  Yes, sir.
20     Q.  Now, you ran through a number of items
21  that may be building personal property.  Can you
22  tell me sitting here today, do you know how many of
23  those, if any, were damaged or destroyed by
24  hurricane Katrina?
25     A.  I would imagine all of them did, but I

Page 164

1   don't think it's a great, great huge number.  I
2   mean, not like the scope that happened with the
3   buildings.
4      Q.  Can you give an estimate at all of what
5   personal building, personal property?
6      A.  Fifty to 75,000, probably.  It's a
7   ballpark, yes.
8      Q.  Has anyone on behalf of plaintiffs made an
9   effort to itemize what the business personal
10  property --
11     A.  Not to my knowledge.
12     Q.  -- plaintiffs have lost?  Just a reminder,
13  you've been doing real good so far.  But I don't
14  know it's getting late in the day.  Let me try and
15  finish my question --
16     A.  I'm sorry.
17     Q.  -- before you answer.  Much better than
18  last time I have to say.
19        MR. GAUDET:  I agree.
20     Q.  Obviously, whatever your attorneys have
21  done to prepare you.
22        The next category is "Debris Removal."
23  Again, anything other than the estimate that is in
24  Mr. O'Leary's estimate, do you know of an estimate
25  for debris removal?

Page 165

1      A.  No, sir.  I don't know if Mr. O'Leary's --
2   that could be double dip here.  Mr. O'Leary
3   estimated for debris removal that would not be
4   additional debris removal unless he overlooked what
5   the tenants left themself and abandoned.  I just
6   would have to ask Mr. O'Leary if he included in his
7   estimate the debris removal of tenant possessions.
8      Q.  Did plaintiffs incur expense --
9      A.  Not to my knowledge.
10     Q.  I'm sorry.  Did plaintiffs incur expenses
11  for debris removal prior to the sale of the
12  property?
13     A.  Not to my knowledge.
14     Q.  And then the final category that's in
15  Paragraph 24 of the amended complaint is "Loss of
16  Business Income," correct?
17     A.  Yes, sir.
18     Q.  That's not something that Mr. O'Leary has
19  or is going to calculate, right?
20     A.  I think that's loss of rent.  It may be
21  the income profit.  Maybe he's referring to the --
22  we have a loss of the profit from losing the
23  facility.  We now have an ongoing loss of profit
24  that's 17, 18 grand a month I was telling you about.
25  He may be referring to that.

42 (Pages 162 to 165)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 166

1    Q.   And that was my question.  In terms of
2  loss of business income, that would mean profits
3  from the income, the rental income that have been
4  generated?
5    A.   Yes, sir.
6    Q.   Can you give me every reason that
7  plaintiffs are contending Nationwide should be
8  liable for -- strike that question.
9         Can you give me -- are you contending that
10 -- in this litigation that Nationwide did not act in
11 good faith?
12   A.   Yes, sir.  I believe that's what it says.
13   Q.   Can you give me every reason factually for
14 plaintiffs contending that Nationwide did not act in
15 good faith?
16   A.   I'm a bottom-line businessman.  And when,
17 in my opinion, windstorm damaged about 85 percent of
18 this property.  I think even Nationwide's engineer
19 said 75 percent in his report.  If you follow any
20 rule of estimation at 75 or 85 times the physical
21 damage caused by windstorm, you would get an amount
22 that would grossly exceed what was tendered to this
23 partnership.
24        I have some experience in flood.  I had a
25 project of 80 units flood about two feet about two

Page 167

1  weeks before I completed it.  It's called
2  Meadowbrook Park in Monroe, Louisiana.  It was all
3  flood.  It from big rain, backed up a ditch, and
4  flooded it.  It was simple.  You just take a skill
5  saw and set it aside the fence and rip off the
6  sheetrock three or four foot above the slat.  You
7  put six carpenters to work and six skill saws,
8  you've taken out the -- you've ripped the sheetrock
9  out from four feet down, and take insulation out,
10 and take base cabinets out.  And if the floor is
11 destroyed, you take it out and put it all back in
12 and it's over with.  And that property I restored in
13 six weeks' time, eight weeks most.  So I have some
14 experience in flood, but I have never seen anything
15 so devastating as this.
16        As I pointed out, you have eight-inch
17 masonry wall blown to the ground that were in walls
18 to these buildings.  You have rain that penetrated
19 the seals on windows.  You had subfloors wet as they
20 could be on second floor.  It was catastrophic and
21 if you built it back to how it was at the beginning,
22 you'd have to replace the floors, which explains
23 these estimates being so far apart.
24        So I saw then that whether Nationwide had
25 their backs to the wall because Bank of America

Page 168

1  bought them, or they had backs to the wall because
2  Katrina was so catastrophic to their exposure, they
3  -- they chose to draw the line in the sand and --
4  and say, "It's all flood."  It's 90 percent flood,
5  apparently, not 10 percent.  They didn't even say
6  it's 75 flood, which is what their own engineer said
7  it was -- 75 windstorm.  Their own engineers said
8  75.  They didn't offer that.
9         I mean, Rob, it's not your fault.  You had
10 client back to the wall, but the client breached his
11 contract.  In my opinion, he didn't bargain in good
12 faith.  He stonewalled my -- my adjuster,
13 WorldClaim.  He stonewalled Lewis O'Leary.  Lewis
14 thought we were entitled to appraisal.  He was
15 stonewalled on that.  He never got a chance to get
16 any money.  He never got any money collected from --
17 from the -- from your client.  He never did.  He got
18 paid his 200 an hour just like he saw.  He never got
19 any money when he had at one time some incentive to
20 get more.
21        The only person that got any money is an
22 attorney by the name of Matthew Brown who follows up
23 this contract is filed.  And we received through
24 discovery two subsequent payments.  Even if you had
25 those payments, you get an amount that's way less

Page 169

1  than what I believe was the honest windstorm and
2  damage on Compass Pointe and Carriage House.
3    Q.   Let's go through this.  You don't know the
4  exact amount that the buyers spent to repair the
5  property, right?
6    A.   No, sir.
7    Q.   Nationwide never told you that it was
8  90 percent flood damage.  You can't point to any
9  communication for that?
10   A.   Their engineers said 75 caused by
11 windstorm.  That's the only thing I read in some of
12 their reports.
13   Q.   Right.  And nowhere has Nationwide ever
14 said that they thought it was 90 percent flood
15 damage to the property?
16   A.   No, no.  I think it's -- no.  But if you
17 interpellate the numbers, that's about what you get.
18   Q.   Well, interpellate -- when you say
19 "interpellate the numbers," you have to interpellate
20 the numbers based on estimates from --
21   A.   You've got --
22   Q.   Hold on, sir.  You've got to interpellate
23 the numbers based on either estimates from
24 WorldClaim or estimates from Lewis O'Leary.  Those
25 are the only two estimates you know of the actual

43  (Pages 166 to 169)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 170

1  damage to Compass Pointe, right, other than
2  Nationwide's?
3      A.  Other than the scope -- we have -- we have
4  Nationwide.  You have WorldClaim's.  You have an
5  architect I hired that identified scope.  You have
6  an owner that bought it and redid it.  There are a
7  lot of sources of what they did.  They differ in
8  scope.  That's why you have different amounts in
9  losses.
10      VIDEOGRAPHER:  Off the record at 2:29.
11  End of tape four.
12      (Off the record.)
13      VIDEOGRAPHER:  Beginning tape five.  On
14  the record at 2:30.
15      Q.  (By Mr. Gilmore)  You're referring to an
16  architect.  Timothy Brown didn't calculate or
17  estimate figures to repair the damages, right?
18      A.  Yes, sir.  Only scope.
19      Q.  WorldClaim did provide estimates, right?
20      A.  I think scope and prices.
21      Q.  Mr. O'Leary advised plaintiffs that those
22  estimates were no good and he was going to do new
23  ones, correct?
24      A.  Yes, sir.  Because they did not follow the
25  scope that Brandon had, nor did they follow the

Page 171

1  scope that the pitchers indicated with that.
2      Q.  Mr. O'Leary has prepared estimates with
3  the help of an assistant named Jerry Wiggins to your
4  knowledge, right?
5      A.  Yes.  Yes, sir.
6      Q.  As we sit here today, do you know whether
7  Lewis O'Leary and Jerry Wiggins have generated
8  estimates for wind damage to the Compass Pointe
9  property that they themselves consider reliable and
10  worth presenting to a jury?
11      A.  It's my recollection that they did, but
12  that that was thrown out and they had to redo a
13  total estimate of the total damages -- the total
14  damages.  And that the court would decide what was
15  windstorm in damage and what would be flood.  So
16  they are now redoing their numbers for the total
17  loss, which would include both.  And they're not
18  getting involved in trying to determine which is
19  flood and which is windstorm.  Now, that's my
20  recollection now.
21      Q.  You haven't learned in this litigation
22  that Mr. O'Leary and Mr. Wiggins have said that they
23  need to redo their estimates of damage for the
24  properties, Carriage House and Compass Pointe?
25      A.  I believe they were directed by Mr. Brown

Page 172

1  that that's what he had to do.  That in the
2  discovery with courts and that -- that he needs to
3  get away from saying what is windstorm.  He needs to
4  say what the total is.  And he can then explain why
5  he thinks so much of it is one than the other.  But
6  he is now engaged to prepare what the total loss
7  was.
8      Q.  Do you know if Mr. O'Leary is an engineer,
9  licensed engineer?
10      A.  No, sir, I don't.
11      Q.  Have you ever asked him if he's a licensed
12  engineer?
13      A.  No, sir, I haven't.
14      Q.  Is it important to you -- do you think it
15  would be important whether you have an engineer
16  analyze the extent and cause and scope of damage to
17  your properties?
18      A.  An engineer that doesn't have as much
19  experience in building as say an architect or
20  building contractor would or insurance adjuster, he
21  may know more about flow of water down a sewer pipe,
22  and lift stations, and -- and those type of things,
23  and drainage, and, you know, on properties, and
24  utilities.  But as far as buildings, I've never seen
25  engineers be that up-to-date on what buildings

Page 173

1  should cost.  If you use one, you're going to have a
2  big overrun.  I can tell you that.
3      (Exhibit 297 - Plaintiffs' Responses to
4  Nationwide's Interrogatories and Request For
5  Production marked for identification.)
6      Q.  I'm going to hand you what's been marked
7  as Defense Exhibit 297.  This is Plaintiffs'
8  Responses to Nationwide's Interrogatories and
9  Request For Production.  Have you seen this document
10  before, sir?
11      A.  I don't recall it.  I probably have.  I
12  haven't had a chance to review it here.  Signed by
13  Nathan.  Yes, sir.
14      Q.  When you say "yes, sir," you do recall
15  seeing this before?
16      A.  I believe so, yes, sir.
17      Q.  Before it was provided to Nationwide, did
18  you review it to ensure that it was true and
19  accurate?
20      A.  Yes, sir.
21      Q.  Sitting here today, you're not aware of
22  any things that need to be corrected, right?
23      A.  No, sir, not -- it's a pretty long
24  document, but -- it -- read as fast possible.  I
25  don't see anything that needs to be corrected.

44  (Pages 170 to 173)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 174

1    Q.  If you turn to -- let's see, it's a fax
2  header at the top.  It's Page 25.  It's response to
3  Interrogatory 23.  And Interrogatory Number 23 asks
4  plaintiffs to, "Identify each item or category of
5  damages for which you seek an award in this lawsuit.
6  And as to each such item or category provide the
7  following:  (A) the amount of monetary compensation
8  sought for each item or category of damages; (B) the
9  method used to derive each amount identified in (A);
10 (C) the factual legal basis for each item or
11 category of damage you claim, including the identity
12 of each specific provision of the commercial policy
13 or any other document that supports your contention
14 that coverage exists; and (D) the identity of all
15 documents and persons with knowledge that relate to
16 each item or category of damages you assert."  Did I
17 read all that correctly?
18    A.  Yes.
19    Q.  Plaintiffs' response reads, "Categories of
20 damage include but are not limited to property
21 damage, business income loss, expert expense, loss
22 of rents, loss of contents, business, personal, and
23 property, and loss of future revenues.  The amount
24 of compensation, method used to calculate amounts,
25 and factual basis for each category will be

Page 175

1  explained in any reports provided by plaintiffs'
2  experts."  Did I read that correctly?
3    A.  Yes, sir.
4    Q.  Let's go through the categories.  Property
5  damage we discussed, and that's -- expert that
6  plaintiffs have designated presents estimate of
7  property damage is Lewis O'Leary, right?
8    A.  Yes, sir.  Where are you -- where are you
9  now?
10    Q.  I'm looking at response to Interrogatory
11 Number 23.
12    A.  Yes, sir.  In the first title it says?
13    Q.  "Property.  Categories of damage include
14 but are not limited to property damage."  That's the
15 first part of plaintiffs' response, right?
16    A.  Right.
17    Q.  Property damage, an estimate or estimates
18 are being presented by Lewis O'Leary, right?
19    A.  Yes, sir.
20    Q.  Business income loss is the loss of rent
21 that we discussed previously?
22    A.  I think this is the income that the
23 partnership loses, not the loss of rents.
24    Q.  Well, the --
25    A.  Loss of profit.

Page 176

1    Q.  The loss of profit would be a subset of
2  loss of rents, right?  The loss of profit is net.
3  The loss of rent is gross; is that fair to say?
4    A.  Yes, sir.
5    Q.  You'll see the next -- next two categories
6  are "Extra Expense" and then "Loss of Rents."  So if
7  we take business income loss -- sorry.  If we take
8  loss of rents, that would include business income
9  loss, the profits, the partnership, right?
10    A.  I think so.
11    Q.  Now, we -- there are two others here,
12 "Extra Expense" and "Loss of Contents, Business,
13 Personal Property."  We discussed those a little
14 bit.  "Extra Expense," you can't identify a
15 categorization of what extra expense plaintiffs have
16 incurred beyond property damage, loss of business
17 contents, and loss of business income, right?
18    A.  I don't know if he means the -- an extra
19 expense of some of these fees we -- we had to endure
20 or prepayment penalties, legal fees, or expert
21 witnesses.  I don't know.  I know the attorney could
22 explain that better than I.
23    Q.  Well, I mean, I appreciate that.  And in
24 fact, Mr. Gaudet has undertaken to verify these
25 responses in a separate document.  But my question

Page 177

1  is you're suing my client and you're asking for a
2  lot of money.  I'm just trying to understand the
3  basis and the amount.  And you have these categories
4  here.  Is the -- can plaintiffs' point to what extra
5  expense they're claiming and how much that extra
6  expense is in this litigation from my client?
7    A.  Well, I'm not the lawyer, but I consider
8  damages, extra expenses, those to -- if -- if the
9  claim is paid off timing manner, I don't have
10 multitudes of lawyers.  I don't have multitudes of
11 extra witnesses.  I don't have Lewis O'Leary.  I
12 don't have Wynn Clark, Nathan Gaudet, Matthew Brown,
13 John Landry.  I don't have the prepayment penalty
14 with LNR.  I don't have the firm of Brunini firm
15 fees.  There's an -- I don't have the travel expense
16 coming down to all these depositions and back.  And
17 yes, I would consider those extra expenses that had
18 the claim been paid and satisfied promptly, even if
19 I had to take 15, 20 percent less than I thought I
20 was due, those expenses would have been eliminated.
21 In my mind, I think they're extra expenses.  I agree
22 with your interpretation that the loss of income is
23 gross.  Business income is net.  Loss of contents we
24 discussed.  Probably 50 to 75 can be maximum.  My
25 brother can probably give that breakdown even better

45  (Pages 174 to 177)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 178

1  than I. Loss of future revenues and loss of
2  business income are kind of redundant. How far in
3  the future are you entitled to any loss of revenues
4  now that you've lost your property? I don't know.
5  That's a -- that's a legal question. But they're
6  one -- you're counting twice there and you can't
7  count it twice.
8      Q. So -- so let's -- if you look at this
9  then, we can divide into property damage, loss of
10 business revenue, which would include profit going
11 back or into the future at some point?
12     A. Correct.
13     Q. Extra expense. I want to revisit that.
14 And loss of business, personal property contents; is
15 that fair?
16     A. Yes, sir.
17     Q. Those are the categories plaintiffs
18 seeking at, right?
19     A. Yes, sir.
20     Q. Let's go back to "Extra Expense." You
21 threw a lot of things in there regarding the lawsuit
22 with LNR Partners. We looked at documents that
23 showed almost immediately after the storm when
24 Nationwide issued significant payments. We were
25 here so we know you don't think they're sufficient.

Page 179

1  But significant payments, LNR Partners was still
2  holding onto those and is not letting you use any of
3  those monies to restore the property; that's fair,
4  right?
5      A. They knew 485,000 was not going to restore
6  this property.
7      Q. Well, sir, you actually sued them saying
8  that by them holding that amount of money, you
9  weren't able to use those funds for restoration.
10 Isn't that what you said in that lawsuit?
11     A. Absolutely, it wasn't. I was hopeful that
12 -- that -- that either WorldClaim or Lewis O'Leary
13 or somebody would get a fair shake from Nationwide,
14 and you add that to what Nationwide paid
15 additionally, that the two would close the gap,
16 which didn't happen.
17     Q. It's fair to say that -- well, sir, in the
18 lawsuit against LNR, we read the complaint and
19 statements submitted to the court that plaintiffs
20 believed because LNR refused to release these
21 insurance proceeds, they had to sell the property at
22 distressed value; that's fair, right?
23     A. Yes, sir.
24     Q. So when we talk about paying the lawyers
25 at Brunini or John Landry, you're talking about

Page 180

1  payments for fees in that lawsuit that chose to
2  bring against LNR Partners, right? It's yes or no
3  questions. That's what you're referring to when you
4  list those, correct?
5      A. Yes, but there's a chain of events. I
6  don't have a problem with LNR Partners if I have
7  enough money from Nationwide.
8      Q. Well, we -- you don't know --
9      A. But when I don't get enough money from
10 Nationwide, then I have a problem with LNR Partners.
11 Indeed, yes, we sued them. As far as I am
12 concerned, the more we got from them, the less
13 exposed Nationwide is because they started the chain
14 of events.
15     Q. Well --
16     A. And we did settle for 50 percent, which
17 was a pretty good settlement under the -- according
18 to what the Brunini firm said. He was delighted to
19 get 50 percent because they were in the right to get
20 a hundred percent.
21     Q. Sir, they didn't let you use any of the
22 $1.2 million that Nationwide had paid for these two
23 properties to restore the properties following
24 hurricane Katrina?
25     A. That is correct.

Page 181

1      Q. Now, the second part of plaintiffs
2  response to Interrogatory Number 23 says, "The
3  amount of compensation method used to calculate
4  amounts and factual basis for each category will be
5  explained in any reports provided by plaintiffs'
6  experts." Did I read that correctly?
7      A. Yes.
8      Q. Now, let's talk about the first category
9  of damage. For property damage, the plaintiffs'
10 expert reports that plaintiffs are putting forth in
11 this case are Mr. O'Leary's, right?
12     A. And his associate.
13     Q. His assistant, Jerry Wiggins?
14     A. Yes, sir.
15     Q. Plaintiffs have not identified or
16 designated a expert who has calculated lost business
17 revenues, either past or future; that's fair to say,
18 right, sir?
19     A. My counsel has asked me to compute what
20 the loss of business income is. And I have brought
21 it and I think he plans to introduce that into
22 evidence today.
23     Q. Other than what you yourself have
24 attempted to calculate as lost revenues, no other
25 expert on behalf of plaintiffs has attempted to

46  (Pages 178 to 181)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 182

1 calculate lost revenues, right?
2     A.  That's to date correct.
3     Q.  When you say "to date," are plaintiffs
4 working with another expert or consultant to try and
5 calculate lost revenues?
6     A.  No, sir.  Before it would come to trial,
7 they may so choose.  It depends on their -- their
8 decision to -- is it worth it to go get another
9 expert or not.  I'll leave that up to him.  There
10 are appraisers that can -- can project loss of
11 future income and value what that could be.  May be
12 worth while doing so.  It may not be worth expense,
13 but I will leave that up to counsel.
14     Q.  Sir, this litigation has been going on for
15 quite a while, right?
16     A.  Oh, yes, sir.
17     Q.  And there is a trial date in this case --
18 I'm sorry -- Carriage House that's April -- this
19 case is set for June of this year.  You're aware of
20 that, right?
21     A.  Yes, sir.
22     Q.  You understand part of the reason why I'm
23 taking your deposition is so that I can understand
24 defending on behalf of my client what plaintiffs are
25 arguing and how much money they're trying to get

Page 183

1 from client, right?
2     A.  Yes, sir.
3     Q.  You would agree it's fair to give
4 Nationwide timely notice of what plaintiffs' damages
5 claims are, right?
6     A.  Yes, sir.
7     Q.  So, how much are plaintiffs claiming that
8 they are owed in lost future revenues?
9     A.  It's not introduced yet, but I brought
10 with me a balance sheet, an income statement of
11 number of properties and I brought a number of
12 properties.  And most proper methodology for -- most
13 frequently used methodology for valuing the
14 properties what we call trading 12 months profit and
15 loss statement.
16     Q.  Do you have a copy of this document from
17 this closing?
18     A.  Yes, sir.  In fact, here, you're welcome
19 to it and -- into evidence.  That this stated
20 balance sheet on Compass Pointe, December 31, 2005.
21 It gives the -- it's July -- only gives --
22     Q.  Before we talk about it, do you have a
23 copy for me or do we need to go off the record?
24         MR. GAUDET:  We'll go off record and make
25 a copy.

Page 184

1         MR. GILMORE:  Okay.  Let's go off record
2 and make a copy of it.
3     VIDEOGRAPHER:  Off record at 2:48.
4     (Off the record.)
5     VIDEOGRAPHER:  On the record at 2:51.
6     Q.  (By Mr. Gilmore)  Sir, while we're having
7 copies of that document you brought with you today,
8 I'm going to hand you what's been marked as Defense
9 Exhibit 300.
10     (Exhibit 300 - Plaintiffs' Answers to
11 Defendants' Second Set of Interrogatories marked for
12 identification.)
13     Q.  This document is Plaintiffs' Answers to
14 Defendants' Second Set of Interrogatories.  Have you
15 seen this document before?
16     A.  Yes, sir.
17     Q.  Did you have an opportunity to help
18 prepare it or review it for accuracy?
19     A.  I reviewed it.  I didn't prepare it.  It
20 was prepared by my attorney with the assistance of
21 all our files and information we provided him.
22     Q.  Sitting here today, are you aware of any
23 errors or inaccuracies in this document?
24     A.  No, sir, I'm not.
25     Q.  If you turn to the second page of Defense

Page 185

1 Exhibit 300, you'll see Interrogatory Number 27 from
2 Nationwide, which asks plaintiffs, "Please state the
3 date on which you originally purchased the Compass
4 Pointe Apartments complex and the original purchase
5 price."  Did I read that correctly?
6     A.  Yes, sir.
7     Q.  It says, "Response:  Compass Pointe
8 Apartments complex was originally acquired by
9 plaintiffs on January 29th, 1998, the price of
10 1,970,000."  Did I read that correctly?
11     A.  Yes, sir.
12     Q.  Sitting here today, to the best of your
13 knowledge, that is accurate sales date and price?
14     A.  Yes, sir.  I believe so.  Surely
15 researched it and put the right price down.  I can't
16 remember, you know, what happened 12 years ago.  But
17 I would assume they researched the file and found
18 out from my office manager that this was acquisition
19 price.
20     Q.  The next interrogatory, Number 28, says,
21 "Please itemize any and all expenses you incurred as
22 a result of repairing damage and/or renovating
23 Carriage House (sic), Compass Pointe complex
24 following hurricane Katrina, including a list which
25 identifies which items and repairs/renovation you

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 186

1  claim were necessary to repair the damage caused by
2  hurricane Katrina." Did I read that correctly?
3      A.  Yes, sir.
4      Q.  And you understand this interrogatory is
5  asking for information on repairs for Compass Pointe
6  Apartments, right?
7      A.  Yes, sir.
8      Q.  That's how plaintiffs responded to it?
9  That's the request that plaintiffs responded to for
10 information on Compass Pointe?
11     A.  Yes, sir.
12     Q.  Now, the response on the next page reads,
13 "Please see attached accounts payable check
14 register." Did I read that correctly?
15     A.  Yes, sir.
16     Q.  Let me now hand you Exhibit 304 which is
17 the document produced by plaintiffs entitled "Answer
18 to Interrogatory Number 28," the one that we just
19 read.
20        (Exhibit 304 - Answer to Interrogatory
21 Number 28 marked for identification.)
22     Q.  Are you familiar with this document,
23 Mr. Brockman?
24     A.  No, sir.
25     Q.  How did plaintiffs determine that this was

Page 187

1  the document that responded to Interrogatory Number
2  28 which asked for all expenses plaintiffs incurred
3  to repair damage after hurricane Katrina?
4      A.  I would assume my attorney dealt with my
5  office manager and asked for this breakdown. And
6  she -- she provided this to them because it is a
7  check register of what the vendor paid. This lists
8  check number, given the date, and given amount of
9  each, and then you just read the total.
10     Q.  So the title of this document is "Accounts
11 Payable Check Register For Compass Pointe." Did I
12 read that correctly?
13     A.  Yes, sir.
14     Q.  Do you know how this document was created?
15     A.  I just told you. I thought -- I assume it
16 was my office manager, Susan Belk, who -- who went
17 into the books of Compass Pointe and broke this out
18 per the request of my attorney.
19     Q.  And is it your understanding and
20 contention that each of the items listed on this
21 accounts payable check register was expenses that
22 plaintiffs incurred to repair the property?
23     A.  You say "to repair the property." We
24 didn't repair the property. Okay? The person we
25 sold to completely repaired the property. But these

Page 188

1  are the incidental items that we -- we did during
2  this interim period. We did pay for out of pocket
3  during this period of time.
4      Q.  The interim period you're referring to is
5  the date of the first check payment --
6      A.  Yes.
7      Q.  -- which is September 1st, 2005?
8      A.  Yes, sir.
9      Q.  The last payment on the last page is dated
10 October 27th, 2006; is that right?
11     A.  That's correct. And the contract with --
12 was actually dated -- the lease contract was dated
13 in September of '06, but the sale went through in
14 December '06. But this were the out-of-pocket
15 expenses we paid for during that interim period, but
16 it was not to fix -- repair all the property.
17     Q.  I want to first go through and just
18 establish that these -- understanding that
19 plaintiffs aren't contending this was all that was
20 required to repair the property completely. With
21 that understanding, what this does reflect is all
22 the money plaintiffs themselves paid out of pocket
23 to do any kind of repairs or renovations to Compass
24 Pointe between the time of hurricane Katrina and
25 when they transferred title to Platinum Investments;

Page 189

1  fair to say?
2      A.  Yes, sir. But it also includes 3,000 for
3  that architect. I don't know if it's Brandon, but I
4  notice 3,000 was spent.
5      Q.  So let's go through -- I don't know want
6  to go through each item, but maybe we can identify a
7  few of these here and you can explain what they are.
8  Now, you mentioned -- there's not page numbers on
9  this document, but it's Item 7174, "April 2006
10 payment to TV Architecture for $3,000." That's
11 Timothy Brandon, right?
12     A.  Yes.
13     Q.  That's for him to repair a -- based on
14 assessment of property following hurricane Katrina?
15     A.  The scope of loss. Not the monetary, but
16 the scope.
17     Q.  When was the last time you spoke with
18 Mr. Brandon?
19     A.  I don't know. I understand nobody was
20 happy with him, but nonetheless, he came recommended
21 and I hired him.
22     Q.  I'm just asking. I assume from your
23 response that you heard that Mr. Brandon abruptly
24 left his deposition after about an hour of
25 questioning?

48  (Pages 186 to 189)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

---

Page 190

1      A.  Yes, sir.  And in a very unprofessional
2   manner.  That's what I heard.  He was unprofessional
3   to my attorney.  I think unprofessional to you or
4   whoever.  He just was unprofessional through and
5   through.
6      Q.  Okay.  Have you had any discussion with
7   Mr. Brandon since that occurred?
8      A.  No, sir.  I don't want to have anymore
9   with him either.
10      Q.  Do you know if you have any intention of
11   calling him as a witness at trial?
12      A.  I don't -- I don't think anybody plans to.
13   They may.  They may --
14      Q.  We'll ask your attorney.
15      A.  -- compare his scope to what
16   Lewis O'Leary's scope is.  But I don't -- I don't
17   think they want to see him again either.
18      MR. GAUDET:  Laura Hill doesn't want to
19   see him again.
20      MR. GILMORE:  I'm not sure about that.  I
21   think she might want to finish that deposition.
22      MR. GAUDET:  Maybe.
23      Q.  (By Mr. Gilmore)  We'll leave that for
24   another day, sir.
25      In terms of payments here, I guess a

---

Page 191

1   couple of payments, who is Norman Allen?  He's on
2   first page, Norman E. Allen, Jr.  It appears several
3   line items for him throughout the document actually.
4      A.  He may be the maintenance man.  I don't
5   know.  My brother could shed some light on that.
6      Q.  That's a question for Bill Brockman?
7      A.  Yes, sir.
8      Q.  How about Valerie Oliver?  Do you know who
9   she is?
10      A.  No, sir.  That's another one.
11      Q.  D-I-B-S, they appear on this chart in
12   several places, or Dibs?
13      A.  What was that name?
14      Q.  Well, it's D-I-B-S, Chem and SPC, Inc.?
15      A.  Chemical and something, Inc.  I don't
16   know.  It could be Chemical Spray Loans or whatever.
17      Q.  Stillworth or Stallworth Discount, I'm
18   assuming, Corp., do you know what that is?
19      A.  No, sir.
20      Q.  Singing River Electric and General
21   Electric Company.  We know what General Electric is.
22   Do you know what Singing River Electric is?
23      A.  No, sir.
24      Q.  There is several payments to Sunquest
25   Properties.  Do you know what those payments are

---

Page 192

1   for?
2      A.  No, sir.  It might be reimbursements for
3   something they -- they spent.
4      Q.  There's a item in November 2005, a payment
5   to Monroe Aviation of $1,047.  That's on the third
6   page.
7      A.  What date?
8      Q.  November 2005, November 14th, 2005,
9   Item 7032.
10      A.  November '05.
11      Q.  Uh-huh (affirmative response.)
12      A.  Yes, sir, I see.  That's probably flight
13   down here.
14      Q.  That's to pay for you and
15   Mr. Bill Brockman to fly down?
16      A.  Yes.  Or one or the other to fly down and
17   back.
18      Q.  That's a -- just a private plane company
19   that you contract with to fly you and him down?
20      A.  Yes.  Well, it's our own company.
21      Q.  Oh, you own Monroe Aviation?
22      A.  Yes, sir.  But we pay so much an hour when
23   we use the plane to offset the operating expenses.
24      Q.  When you say it's your own, it's owned by
25   you and Bill Brockman?

---

Page 193

1      A.  No, not Bill.  That one is owned just by
2   me.
3      Q.  How many planes does Monroe Aviation have?
4      A.  Just one.
5      Q.  What kind of plane is it?
6      A.  Well, it was a different plane back then.
7   I forget what it was.  It was a twin-engine plane.
8      Q.  Propel or twin-engine propeller?
9      A.  Yes.
10      Q.  There's some payments to Rainbow Spring
11   Water, Inc.  Do you know what that's for?
12      A.  No, sir.
13      Q.  Would Bill Brockman be in better position
14   to answer questions about expenses here?
15      A.  Yes, sir.  That's what most of this page
16   is that you wanted a copy of at the end is questions
17   that he should prepare for.
18      Q.  Please remind me at the end to mark and
19   copy that so that we know what to cover with him
20   that you weren't able to cover.  Is that what you're
21   saying your list is?
22      A.  Yes.
23      Q.  So I'll ask him specific questions.  But
24   is it Compass Pointe, the plaintiffs' position that
25   this document and the $71,537.92 is the total amount

Ralph Brockman 1/19/2010

Page 194

1  of expenses incurred as a result of any repairs or
2  renovations that plaintiffs did perform on the
3  property prior to selling it to Platinum
4  Investments?
5      A.  That's my interpretation, but my attorney
6  prepared.
7      Q.  You're the plaintiff, sir, and I am not
8  deposing Mr. Gaudet or Mr. Brown.  So I just want to
9  make sure that's what plaintiffs' response is?
10     A.  Yes, sir.
11     Q.  Now, this is just a plaintiff
12  clarification.  I'm not sure if you'll be able to
13  answer this.  You're still with me on the same
14  document, Defense Exhibit 300?
15     A.  Yes, sir.  Which interrogatory?
16     Q.  I want to go back to Interrogatory
17  Number 25, which says, "Please provide a list of all
18  tenants of the subject property as of August 29th,
19  2005, including any and all last known contact
20  information for such tenants."  And response reads,
21  "Please see tenant list attached hereto.  Contact
22  information has been requested and will be provided
23  upon receipt of same."
24      (Exhibit 303 - Answer to Interrogatory
25  Number 25 marked for identification.)

Page 195

1      Q.  Let me hand you what's been marked as 303,
2  which is what plaintiffs produced to us.  It's a
3  document entitled "Answer to Interrogatory
4  Number 25."  You see it says unit report date is
5  August 31st, 2005?
6      A.  Yes, sir.
7      Q.  Is this the list of tenants who were
8  occupying the Compass Pointe Apartments as of the
9  date of hurricane Katrina?
10     A.  Yes, sir.
11     Q.  So if I go to the I guess the last page of
12  this document, you'll see it has the sum total of
13  the tenant rent for each of these tenants, and that
14  is 53,598; is that correct, sir?
15     A.  I don't see that number.
16     Q.  Turn to the last page of this document.
17     A.  Yes.
18     Q.  Defense Exhibit 303.
19     A.  You said 53.
20     Q.  See under -- under the column "Tenant
21  Rent," you'll see a total.
22     A.  Yes, sir.
23     Q.  And that's 53,598?
24     A.  Right.
25     Q.  So that figure should be the total on a

Page 196

1  monthly basis that the tenants were occupying the
2  property were paying; is that right?
3      A.  Well, I would think so, but I don't -- why
4  are we only getting 14,000, 15,000 a month in loss
5  of rent?
6      Q.  My next question to you, sir, given that
7  the amount that Nationwide had calculated on monthly
8  basis, which after that adjustment was approximately
9  15,000, correct?
10     A.  Yes, sir.
11     Q.  That was based on information that
12  plaintiffs had given to Nationwide.  Nationwide
13  didn't just make that number out of thin air, right?
14     A.  I would assume so, yes.
15     Q.  If you look at that $15,000 a month number
16  compared to the 53,598 a month that your -- that
17  plaintiffs produced in response to Interrogatory
18  Number 25, there is a little under about 38,000 a
19  month difference between the two, right, sir?
20     A.  Absolutely.  Now, I did not review these
21  answers like I did the interrogatory.  His -- his
22  response I reviewed that you read to me, I didn't
23  review this.
24     Q.  Well, sir, I mean, do you understand what
25  an interrogatory is?  It's supposed to be a sworn

Page 197

1  statement from a party answering information that's
2  requested by the other party, right?
3      A.  Yes, sir.  And it says "Contact
4  Information.  Our response has been requested and
5  will be provided upon receipt of same."  So at the
6  time I read this, I don't have that -- that -- this
7  information we're going over.  I'm reading this
8  response.
9      Q.  Sure.  Well, let me --
10     A.  And he didn't even provide it at this
11  time.  This came later.  I don't know what time this
12  was submitted.  It's not dated, unfortunately.  Yes,
13  it is.  This was dated 8/31/05.  This interrogatory
14  is dated when?
15     Q.  This interrogatory response was given to
16  us 28th -- September 28th, 2009.
17     A.  What date?
18     Q.  September 28th, 2009.
19     A.  September 28th.  And sometime later
20  we'll --
21     Q.  Well, let me say this:  I can't explain
22  your interrogatory response.  That's part of the
23  reason why I'm showing you this because this is the
24  response from plaintiffs.  Now, I understand your
25  testimony, sir, you didn't review this to ensure its

50  (Pages 194 to 197)

Ralph Brockman 1/19/2010

Page 198

1  accuracy. That's part of the reason why plaintiffs
2  had to have someone other than Mr. Gaudet to sign
3  these responses on behalf of plaintiffs.
4        My question for you is this: Putting that
5  aside, can you tell us whether this document that
6  your attorneys produced to us in response to
7  Interrogatory Number 25 is a list of the tenants as
8  of August 29th, 2005? Do you have any reason to
9  think it's not?
10       A.  I have no reason to think it's not. I
11  cannot reconcile the sum total, though.
12       Q.  Is there any other explanation other than
13  the fact that some tenants were remaining at the
14  property and paying rent, and only about -- those
15  tenants about 15,000 were no longer paying rent at
16  the time that Nationwide issued payments, right?
17       A.  That wasn't reconcile either because that
18  doesn't reconcile.
19       Q.  Plaintiffs would be in the best position
20  to know who was and who was not staying at their
21  property and paying rent, right, sir?
22       A.  Yes, sir.
23       Q.  Nationwide wouldn't be able to know that
24  unless plaintiff told them, "No, we have more people
25  not paying rent than this 15,000 you paid us,"

Page 199

1  right?
2        A.  Correct.
3        Q.  Can I ask you, sir, if you can -- I'll ask
4  your attorneys as well. To the extent there is any
5  money, any loss of rents beyond the 15,000 a month,
6  that information that Nationwide generated based on
7  what plaintiff had given to them, that they produce
8  it in discovery. Is that fair to ask?
9        A.  I didn't understand that question.
10       Q.  Is it -- I'm asking you, and I'll ask your
11  attorneys as well. If there's any other records
12  that plaintiffs have regarding loss of rents that
13  they claim they suffered beyond the 15,000 that they
14  gave to Nationwide already and that Nationwide used
15  as basis for its payments, plaintiffs please produce
16  that in discovery. Is that fair?
17       A.  Yes, sir.
18       Q.  If there are no other records, is it fair
19  to assume that the amount that Nationwide paid
20  plaintiffs for the loss of rents on a monthly basis
21  was, in fact, loss of rent that plaintiffs suffered?
22       A.  Until I can reconcile this, I can't answer
23  -- I can't answer that. These have a wide
24  disparity. This shows to be a rent roll that shows
25  rents is 50 some odd thousand a month. Can I have a

Page 200

1  copy of this?
2        MR. GAUDET:  Yeah.
3        A.  It should be reconciled. I concur with
4  you.
5        Q.  You can put that aside.
6        MR. GILMORE:  Counsel, let's go off the
7  record for a few minutes. I want to have an
8  opportunity before I ask Mr. Brockman questions
9  about what's handed and marked Defense 483. I want
10  just a few minutes to review this document since it
11  and the handwriting on it were just seen today.
12       MR. GAUDET:  Sure.
13       VIDEOGRAPHER:  Off the record at 3:15.
14       (Off the record.)
15       VIDEOGRAPHER:  On the record at 3:22.
16       Q.  (By Mr. Gilmore) I had just given what
17  we've marked as Defense 483.
18       (Exhibit 483 - 12/31/2005 Balance Sheet
19  and Income Statement marked for identification.)
20       Q.  This is a document that you brought with
21  you today?
22       A.  Yes, sir.
23       Q.  It's a balance sheet and income statement
24  for Compass Pointe Apartments for the period ending
25  December 31st, 2005; is that right?

Page 201

1        A.  Yes, sir.
2        Q.  It has some of your handwritten notes on
3  it, right?
4        A.  Yes, sir.
5        Q.  I'm prepared to ask you some questions
6  about this, sir. Just for the record, Nationwide is
7  not waiving any of its rights and reserving its
8  right to object and move to have this excluded.
9        A.  Yes, sir.
10       Q.  I don't need you to acknowledge it. It's
11  just for the record. I'm going to ask you questions
12  about it since you brought it with you today, and
13  since you've indicated you believe that it bears on
14  damages that plaintiffs are claiming in this case.
15       Can you turn to I guess it's -- they're
16  not page numbers. It's first page of income
17  statement, which is about halfway through, right?
18       A.  Yes, sir.
19       Q.  I see hand -- handwritten circles of "Loss
20  of Rents Insurance Proceeds"?
21       A.  Yes, sir.
22       Q.  And $91,944, right?
23       A.  Correct.
24       Q.  Those are the payments that Nationwide
25  issued in claims, right?

51 (Pages 198 to 201)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Page 202

1    A.  I would assume.
2    Q.  There are no other insurance proceeds for
3  loss of rents other than Nationwide?
4    A.  No, sir.
5    Q.  Now, you got -- now, turning to -- again,
6  there's no page numbers, but it's the third from the
7  last -- third from the last page of this document.
8  Again, the heading is "Income Statement For Six
9  Months At a Glance."  This is the next page that has
10  your handwriting on it, right, sir?
11    A.  Yes.
12    Q.  Now, at the top, there's a column entitled
13  "Year to Date This Year" that you circled?
14    A.  Yes, sir.
15    Q.  What does that column information show?
16    A.  It is 12 months.  It's year to date.  The
17  -- the financials only show the trading six months,
18  specifically, July through December.  But the "Year
19  to Date" column lists those six months, plus January
20  through June.  So your "Year to Date" column would
21  be 12 full months of operation.
22    Q.  Now, if you look down on this chart, there
23  is "Income Or Loss After Reserve Expense" and
24  there's a figure there of $201,348?
25    A.  Yes.  That's after the reserve expenses,

Page 203

1  yes, sir.
2    Q.  Now, what does the $201,348 figure
3  represent?
4    A.  It's -- it's net cash income before any
5  depreciation.  It's the cash income that the project
6  derived for those 12 months, trading 12 months.
7  It's financial statement prepared by Sunquest
8  Properties on Compass Pointe.
9    Q.  So let's -- I guess let's back up a little
10  bit.  If you turn to that page we looked at
11  previously, first page of the income statement?
12    A.  Yes, sir.
13    Q.  That's where we -- we first look at gross
14  income for Compass Pointe; is that right, sir?
15    A.  That's correct.
16    Q.  Now, it has rental income tenants and it
17  lists year to date $698,580; is that right?
18    A.  Yes, sir.
19    Q.  That would be the gross amount of all
20  rents that tenants paid to Compass Pointe for 2005?
21    A.  Yes.  I'm a little puzzled because the
22  storm occurred on August 29th, did it not, '05?
23    Q.  It did.
24    A.  So September, October, November, December
25  would be year loss of rent.  And this is another

Page 204

1  page I'll send home with Brother to reconcile.  But
2  this would include apparently five months where we
3  had the same rental income.  However, rent collect
4  from tenants collect from Nationwide.  But I think
5  this is what he calls potential rent because you see
6  the number is the same all the way across the board,
7  58,215.  That's the potential rent -- rental income.
8  The next column says "Potential Rent if 200%
9  Complete."
10    Q.  And that's based on as you said a hundred
11  percent occupancy, right?
12    A.  That's based on a hundred percent.
13    Q.  So if we look at the -- we were looking at
14  the tenant list that plaintiffs produced in response
15  to Interrogatory Number 25.
16    A.  And that totaled --
17    Q.  Why don't you pull out Defense
18  Exhibit 303?  You look at the back, you'll see the
19  column for "Market Rent" is 58,215, correct?
20    A.  That's correct.  That's potential if
21  you're a hundred percent full.
22    Q.  That number winds up with number in income
23  statement, right?
24    A.  Yes, sir.
25    Q.  The difference between market rent and

Page 205

1  tenant rent is the tenant rent column figures are
2  what plaintiff -- tenants are actually paying?
3    A.  That's right.
4    Q.  Versus the market rent is what plaintiffs
5  believe they could rent to a new tenant tomorrow;
6  fair to say?
7    A.  If it's a hundred percent occupied, also.
8  You're not a hundred percent occupied so there would
9  be a difference there.  If you're 95 percent, it
10  would be less than the market rent, or potential.
11  You have to subtract your vacancies.  If you go on
12  down the "Income" column, you see where he
13  subtracted the vacancies.
14    Q.  And so this -- the -- the chart -- the
15  difference would represent both unoccupied units,
16  right?
17    A.  If you go to September and vacancies and
18  look at August, you'll see a big jump because of the
19  storm increase.
20    Q.  And we're talking about vacancies, we're
21  talking about the amount of money that is lost due
22  to vacancies?
23    A.  Absolutely.  And you'll notice 34,000 when
24  he had that -- that chart there showed you at 58, I
25  believe.  So why is it not 58 and why is it only 34?

Ralph Brockman 1/19/2010

Page 206

1  Well, the answer is probably you've got $24,000
2  worth of tenants on the second floor there at
3  Compass Pointe that are living in those horrible --
4  you know, but be that as it may, it indicates there
5  are some tenants on that second floor in September,
6  October, November, and December. And I can't quite
7  explain -- my brother can do this tomorrow -- the
8  loss of rent proceeds why it is shown as credit
9  here, you know, in parenthesis rather than a plus.
10  You know, it's accounting deal.
11    Q.  You're not sure why that it's showing up
12  like that?
13    A.  I don't know why it's shown. I guess the
14  bottom line it comes out the same. If you look at
15  net rental income, it's 635,988. Last year it was
16  633,533. You know, so it's not but a $2,400
17  increase from one year over the other. And that's
18  including the loss of rent apparently collected from
19  Nationwide. But then the expenses are itemized
20  below or right down the line, virtually every one of
21  them.
22    Q.  So just back up a second. So this
23  document shows that at the end of 2005, plaintiffs
24  had collected $635,998 in rental income, including
25  the loss of rent insurance proceeds from Nationwide,

Page 207

1  right?
2    A.  Yes, sir.
3    Q.  And that's a little less than $2,000 more
4  total than the rent that they had the prior year
5  2004?
6    A.  Yes.
7    Q.  So then we keep working down here?
8  There's other income that's listed here?
9    A.  Yes, sir.
10    Q.  And that is income that actually was
11  earned and received, right?
12    A.  Oh, yes, sir. It's other income. It's
13  broken out. It shows you interest all the way down
14  the line. Methods of collecting income. Then you
15  get into expenses. You subtract two and get bottom
16  line.
17      Now, if you'll look also and one thing
18  here that might distort the figure some and help
19  this year. Look at interest on the mortgage.
20  September, October, November, December, it reflects
21  what we did in discovery today that we -- we stopped
22  making mortgage payments in September.
23    Q.  Can you point to that line?
24    A.  It would be the next page where my
25  handwriting -- look at interest on the mortgage.

Page 208

1    Q.  Yes.
2    A.  Okay.
3    Q.  It shows no payments on interest on the
4  mortgage on September, November, December.
5    A.  No interest -- no interest in September,
6  October, November, December. And that was about
7  $11,018 a month more the previous month. Both 11.
8  So if you -- if you extend that out 11 a month for
9  four months, you can now say that this probably
10  44,000 overstated because it's not reflecting
11  interest. So that's a correction I should make to
12  this 12-month trading reserve deal. It's overstated
13  about 44,000 because we did not show interest. We
14  didn't pay it. That's why it wasn't shown. The
15  statement is accurate, but the valuation is off
16  because I missed about 44,000 in income.
17    Q.  So in other words, the 201,348 should
18  actually be 40 something thousand less?
19    A.  Forty-four less. I'm doing mine now, not
20  yours. But that's -- that puts it at 157,348. So
21  if you use my formula, and this is my corn formula.
22  If you use 10 years income times 157,348, then that
23  valuation becomes 1,573,480, not the 2 million.
24    Q.  I think we'll need to mark a copy of what
25  you've just written as 484.

Page 209

1      (Exhibit 484 marked for identification.)
2    A.  You want to exchange?
3    Q.  We'll make another copy of it at the end.
4    MR. GAUDET:  No more writing.
5    Q.  That's fine. I mean, if you want to keep
6  writing on what's marked as 484.
7    A.  I don't need to write anymore. I just
8  corrected it right here. I'll circle the interest,
9  though.
10    Q.  So what you said is that it's one million.
11  Can you read the number?
12    A.  I judge the interest expense budgeted at
13  11,000 a month because the previous two months was
14  very, very close to 11,000. And four times 11 is
15  44,000. I then subtracted 44,000 from the 201,348.
16  I got 157,348. And then I take ten year times that
17  and it becomes 1,573,480 rather than ten times at
18  201 is ten times 157,348.
19    Q.  You have written on here -- the idea that
20  you have in your mind here is that you're trying to
21  convey what you say is, quote, "the value if kept as
22  investment going forward"?
23    A.  Yes, sir.
24    Q.  What you simply do is multiply this year
25  to date figure, which is now downward adjusted by

53  (Pages 206 to 209)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 210

1   44,000, by 10 years?  Simple as that, right?
2   Nothing else?
3       A.   That's correct.
4       Q.   And how do you come up with the 10 years?
5       A.   Just, you know.
6       Q.   I don't know.  You're going to have to
7   tell me how you come up with the 10 years.
8       A.   It's -- nobody is going to sell a property
9   that's making 157,000 a year unless they get a
10  profit.  And if you figure the return investment for
11  investor, if he pays you for that income stream, you
12  following me, then if he got 157 on -- he's getting
13  a 10 percent return on investments.  He's
14  furthermore sheltered by depreciation.  So he's
15  getting a pretty good return on investment when it's
16  10 percent, and most of that is tax free.  And
17  that's how I valuate in most cases the properties.
18  They will tend to trend income and trend the
19  expenses.  And since your biggest expense is
20  mortgage interest and it more or less stays the
21  same, then your property gets better and better as
22  years goes on.  Because of inflation, your income
23  goes up at a faster rate than expenses.  So he may
24  start out at 10 percent, but if he can gain just a
25  half a percent a year.  By trending expenses greater

Page 211

1   than the -- I mean, income greater than expenses,
2   then his 10 goes to 10.5, goes to 11, 11.5.  And so
3   that's how people that have properties get wealthy.
4           MR. GILMORE:  We'll go off record now.
5           VIDEOGRAPHER:  Off the record at 3:37.
6   End of tape five.
7           (Off the record.)
8           VIDEOGRAPHER:  Beginning tape six.  On the
9   record at 3:38.
10      Q.   (By Mr. Gilmore)  Let me ask you a few
11  questions, sir, still on Defense Exhibit 483 and
12  your handwritten calculation on this income
13  statement of what you think plaintiffs could have
14  generated as investment, I guess, income going
15  forward.
16          The lump sum figure, which after the
17  adjustment we talked about during this deposition,
18  would bring you down to 1.5 million approximately,
19  1.57 million, that is not capitalized or discounted
20  in any way, correct?
21      A.   That's correct.  An appraiser may -- he
22  will take an income approach and they take calls and
23  he'll come up with the number and a cap rate.  And
24  he -- and that's the way appraisers do.  He'll say,
25  "Well, I've got to see what are interest rates

Page 212

1   today."  And he uses a certain cap rate.
2       Q.   And in fact, if tomorrow someone wrote
3   plaintiffs check for $1.57 million, that would be --
4   that would be a windfall because you'd be able to
5   invest that and earn more over 10 years than the
6   number we're talking about here, right?
7       A.   Right now you couldn't.  I mean, right now
8   I can't get bank to pay me about two percent.  So
9   that's what make income properties very attractive.
10  At times, when -- when banks pay you two percent and
11  you can make 10 on this property, then it's a --
12  it's a better investment for cash.
13      Q.   You would agree to discount a future
14  revenue stream, which this is, revenues over 10
15  years, income over 10 years, you have to use a
16  discount rate and discount it to present value,
17  right?  You understand that, right, sir?
18      A.   Yes.  I've done that.  I've done that in
19  my calculation.  Now, we'll see if my counsel gets
20  an appraiser and see what he thinks that you would
21  do.  Yes, if I took 1.573 invest it, I would get
22  two percent.  Why would I sell the property?  And
23  it's taxable at two percent.  And that's -- that's
24  why I still own 45 properties.  You just don't sell
25  them because by the time you pay the tax and

Page 213

1   reinvest the money, you go backwards.  That's why
2   you accumulate so many properties, why you don't
3   sell them.
4       Q.   You don't know whether the proper discount
5   rate?
6       A.   No, but --
7       Q.   You find ten percent, half a percent, right?
8   You would need an appraiser to get that?
9       A.   That's --
10      Q.   You would have to ask expert to come up
11  with that?
12      A.   And he would use a cap rate.  But I'm not
13  gone rob -- rob over years, preview about a 10-year
14  return on any property.  It's done well for me.  And
15  if I can make 10 percent on every property, I'm kind
16  of happy it gets better.
17      Q.   Plaintiffs also sold this property and
18  made money back to the partners in the partnership
19  after paying off their mortgage, right?
20      A.   I don't know how much it showed that the
21  acquisition price at a million -- I think a million
22  seven 970 or so.  And we sold it for, what was it,
23  two million seven.
24      Q.   That's right.
25      A.   So that's about 700,000 profit over, what,

54  (Pages 210 to 213)

Ralph Brockman 1/19/2010

Page 214

1  10 years.
2      Q.  You don't know -- that hasn't been
3  factored into this amount at all, has it?
4      A.  No, no.
5      Q.  And you'd have to factor that in in order
6  to get a fair amount, you know, regardless of
7  whatever kind of discount rates or rates of return
8  you're using to modify these figures, right, sir?
9      A.  Right.
10     Q.  That's province of an expert such as an
11 appraiser or a accountant or an economist; fair to
12 say?
13     A.  Yes, sir.
14     Q.  And this is also based on -- actually,
15 these 10-year revenue projection or income
16 projection that you've come up here doesn't vary
17 occupancy or rent rates according to changes in the
18 real estate market, right?
19     A.  I didn't understand that question.
20     Q.  Sure.  Well, I think you testified about
21 this in your deposition.  Real estate market goes
22 up, then it goes down, right?
23     A.  Yes, sir.
24     Q.  And those kind of fluctuations cause
25 changes in demand and occupancy and the amounts of

Page 215

1  rent you can charge tenants; fair to say?  All those
2  things, right?
3      A.  Yes, sir.
4      Q.  And none of those changes have been baked
5  in at all to this revenue projection at all, right?
6      A.  No, sir.
7      MR. GILMORE:  Let me -- let's go off the
8  record for a second.  I want to kind of go through,
9  see what I have.
10     VIDEOGRAPHER:  Off the record at 3:43.
11     (Off the record.)
12     VIDEOGRAPHER:  On the record at 3:48.
13     Q.  (By Mr. Gilmore)  All right.  Now, I'm
14 going to hand this sticker.  It's Defense
15 Exhibit 485, which we're going to mark this list of
16 handwritten notes.
17     (Exhibit 485 - Handwritten Notes marked
18 for identification.)
19     Q.  We'll make copies of that, but can you
20 tell me what is on this list?
21     A.  Basically, it's questions that I could not
22 answer when you asked them.  Some were answered
23 later that I thought my brother could help -- be
24 helpful with.  So I put, "Bill Questions: Proceeds
25 from insurance tendered to LNR and if so when after

Page 216

1  receipt."  I think we discovered that -- that the
2  big payment for loss that Nationwide made for loss
3  of property was tendered to them, but I don't think
4  we established whether loss of rents were, and I
5  don't believe it was.
6      Q.  We can ask him about that tomorrow.
7      A.  We can ask him about that.  "Were loss of
8  rents deposited paid LNR?"
9      And something about that Leah Solomon
10 wrote Nationwide Insurance, but I think that got
11 answered.  "Who is Brett Furr?"  It got answered.
12     "Did the upstairs ever get condemned?"  I
13 got that as a question mark for him.
14     I've got a note to him, "Don't forget to
15 ask for the 12-month trading income," which we've
16 already gone over the six-month rent loss was there
17 another update.  You remember it went from 86 up to
18 91,000.
19     And there was all of the -- the check
20 register questions that you had, five or six of
21 them.  I asked who they are.  The check register
22 from 9/1/05 to 10/27/06.  And then the big one is
23 Interrogatory 25, which was reconciling the -- the
24 rent roll, the 58,000, to the loss of rent, which
25 was some 15,000 plus.  So I'm hoping Bill can shed

Page 217

1  light on this.
2      And I'll give him these exhibits tonight
3  to go over and have him bring them as you requested
4  since you don't have another copy tomorrow for the
5  depositions.  Maybe he can shed light on some of
6  these.  But that's -- that's what this -- my
7  handwriting is.
8      Q.  And that's fine.  We'll make copy of that.
9  I'd like to have the -- the original given to the
10 court reporter.  We'll make a photocopy of that for
11 everyone.
12     I don't have any questions for you at this
13 time, Mr. Brockman.
14     A.  What about the changes I made to trading?
15     Q.  I appreciate that.  Let's mark that as --
16     MR. GAUDET:  I think you'd marked it
17 again.
18     MR. GILMORE:  Oh, did we mark it again?
19     MR. GAUDET:  About a couple of weeks.
20     MR. GILMORE:  Yeah.  Oh, you're right.
21 It's also double marked as 484.  So we'll -- we'll
22 mark that as 44 and we'll have copies of that.
23     MR. GAUDET:  But I don't think you have
24 copy of either of these.
25     MR. GILMORE:  Yeah.  We'll make -- we'll

55  (Pages 214 to 217)

010bdc74-7cc2-49aa-9407-76abf4f986e9

Ralph Brockman 1/19/2010

Page 218

1  make copies and then attach the originals to the
2  court reporter's transcript.
3      A.  But I need Bill's -- one back for Bill.
4      Q.  (By Mr. Gilmore)  Yeah, yeah.  We'll do
5  that now or wait a minute.  I don't have any
6  questions -- more questions for you at this time,
7  Mr. Brockman.
8      A.  I'm available tomorrow.  I don't have
9  anything to do, but I don't want to come back.
10          MR. GAUDET:  Let's go off the record.
11          VIDEOGRAPHER:  Off the record at 3:51.
12          (Off the record.)
13          VIDEOGRAPHER:  On the record at 3:59.
14          MR. GAUDET:  No questions.
15          VIDEOGRAPHER:  Off record at 3:59.  End of
16  deposition.
17          (Off the record.)
18          (Time noted:  3:59 p.m.)
19          (SIGNATURE / NOT WAIVED)
20  Original:  Robert Gilmore, Esq.
21  Copy:  Nathan M. Gaudet, Esq.
22
23
24
25

Page 219

1          CERTIFICATE OF DEPONENT
   DEPONENT: Ralph Brockman
2  DATE:  January 19, 2010
   CASE STYLE: Sunquest Properties, et al v.
3  Nationwide, et al
   ORIGINAL TO:  Mr. Gilmore, Esq.
4      I, the above-named deponent in the
   deposition taken in the herein styled and numbered
5  cause, certify that I have examined the deposition
   taken on the date above as to the correctness
6  thereof, and that after reading said pages, I find
   them to contain a full and true transcript of the
7  testimony as given by me.
          Subject to those corrections listed below,
8  if any, I find the transcript to be the correct
   testimony I gave at the aforestated time and place.
9  Page    Line              Comments
10  _____  _____   _____
11  _____  _____   _____
12  _____  _____   _____
13  _____  _____   _____
14  _____  _____   _____
15  _____  _____   _____
16
17  This the ____ day of _____, 2010.
18          _____
19
20  State of Mississippi
   County of _____
21      Subscribed and sworn to before me, this the
   _____ day of _____, 2010.
22
23  My Commission Expires:
24  _____
          Notary Public
25

Page 220

1          CERTIFICATE OF COURT REPORTER
2      I, Robin Burwell, Court Reporter and
3  Notary Public, in and for the State of Mississippi,
4  hereby certify that the foregoing contains a true
5  and correct transcript of the testimony of Ralph
6  Brockman, as taken by me in the aforementioned
7  matter at the time and place heretofore stated, as
8  taken by stenotype and later reduced to typewritten
9  form under my supervision by means of computer-aided
10  transcription.
11      I further certify that under the authority
12  vested in me by the State of Mississippi that the
13  witness was placed under oath by me to truthfully
14  answer all questions in the matter.
15      I further certify that I am not in the
16  employ of or related to any counsel or party in this
17  matter and have no interest, monetary or otherwise,
18  in the final outcome of this matter.
19      Witness my signature and seal this the
20  22nd day of January, 2010.
21
22          _____
          ROBIN G. BURWELL
23  My Commission Expires:
24
25

56  (Pages 218 to 220)

010bdc74-7cc2-49aa-9407-76abf4f986e9