IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SUNQUEST PROPERTIES, INC. and
CARRIAGE HOUSE APARTMENTS PARTNERSHIP
    PLAINTIFFS

 VS                                CIVIL ACTION NO. 1:08-CV-687-LTS-RHW

NATIONWIDE PROPERTY AND CASUALTY
INSURANCE COMPANY; NATIONWIDE MUTUAL
INSURANCE COMPANY; NATIONWIDE MUTUAL
FIRE INSURANCE COMPANY; and
JOHN DOES 1-5
    DEFENDANTS

### SURREBUTTAL IN OPPOSITION TO NATIONWIDE'S MOTION
### TO STRIKE LEWIS O'LEARY AS PLAINTIFFS' LITIGATION EXPERT

MAY IT PLEASE THE COURT:

Plaintiffs, Carriage House Apartments Partnership and Sunquest Properties, Inc. ("Insureds") file this Surrebuttal in Opposition to Nationwide's Motion to Strike Lewis O'Leary as Plaintiffs' Litigation Expert. Nationwide has presented new evidence in the form of deposition testimony of Mr. Lewis O'Leary and Mr. Ralph Brockman in the Compass Pointe matter, which Insureds need an opportunity to address. Further, Nationwide's continued affinity for accusing Insureds of lying should be addressed.

**I.**     **Facts and Background**

As this Court is abundantly aware, Insureds suffered severe damage to their property as a result of Hurricane Katrina. That property was insured by Nationwide. Nationwide tendered a small and inadequate sum. Feeling that Nationwide's tender was inadequate, Insureds hired Mr. O'Leary as a consultant to help Insureds to decide if their claim for additional funds from Nationwide was viable. Mr. O'Leary found it to be

1

viable. Next, Mr. O'Leary began a process of drafting estimates of damage and developing an opinion as to the cause of the damages. After Nationwide stone-walled every attempt of Insureds to resolve the matter without litigation, Insureds filed suit. Eventually, Mr. O'Leary was engaged to serve as appraiser and trial expert for Insureds. Because he was already knowledgeable of facts of this matter, recruiting another expert or appraiser was deemed wasteful. Mr. O'Leary has been paid for his work in accordance with various agreements but has never received a contingency fee and will never receive a contingency fee.

Mr. O'Leary began the first portion of his work for Insureds on an hourly basis. His agreement for this portion is attached as Exhibit "A." When Mr. O'Leary attempted to decide the amount and cause of damages, his agreement changed. This agreement is attached as Exhibit "B." However, the very same day that Mr. O'Leary signed his second agreement, he signed an addendum to his first agreement, which kept his hourly provision in place. This agreement is attached as Exhibit "C" and noted that "The consultant hereby agrees to cap future funding of this service at an additional $15,000, to be paid out on the same progress payments basis, at the same hourly rate plus expenses." Finally, when he was engaged to serve as appraiser and expert, undersigned counsel drafted a final agreement, attached as Exhibit "D." As Mr. Ralph Brockman testified at his deposition, the spirit of the agreement attached as Exhibit D was to supersede all of the other agreements. Please see relevant excerpts of deposition of Ralph Brockman, pp. 43-46, attached as Exhibit "E." Mr. O'Leary never received a contingency fee under any agreement.

Mr. O'Leary consistently invoiced Insureds for his work. Attached as Exhibit "F" are Mr. O'Leary's invoices, along with checks, for the work he has performed on this matter. The first page is a spreadsheet from Insureds detailing the dates and amounts of each check. A check for Mr. O'Leary's $6,000 retainer for consulting regarding the viability of the two claims follows. An October 17, 2007 invoice follows, with work described by the hour. A March 23, 2008 invoice follows, with work described by the hour. Next is an August 20, 2008 invoice, which is a line item for $11,590.00.[1] Next is an August 24, 2008 invoice for $12,500, which represents **a percentage of specific work** that had been done up to that time. These percentages represent work that took a particular amount of time because most are not fully complete.

Next is an August 28, 2008 invoice that describes work done by the hour. Next is a September 8, 2008 invoice which is similar to the August 24, 2008 invoice but shows that a greater **percentage of requested tasks** have been complete. Next are two October 14, 2008 invoices, which describe the work completed by the hour. Invoices for February 9 and 17, March 26, April 28, May 29, June 25, July 21 and 23, August 26, September 11 and 23, October 15, November 17, and December 21, 2009 all follow, each describing work done by the hour.

II.     **Law and Analysis**

    A.     **Mr. O'Leary's fee arrangement is proper.**

A small contingency percentage arrangement was initially contemplated but was never paid because there was no recovery. As the Court can see from Exhibit B, for the

---

[1] Nationwide has not asserted that this is representative of a contingency agreement (which is impossible because nothing has been awarded by the Court or through settlement), and Mr. Ralph Brockman testified at deposition that he asked Mr. O'Leary to find a new attorney for him. This amount and invoice for "legal services" represents payment for this request.

3

"second phase" of Mr. O'Leary's assignment, Mr. O'Leary was to receive 4% of the value of the claim or $125,000, whichever is higher, which was funded on the basis of a $63,500 draw. This is further shown in the August 24, 2008, September 8, 2008, and November 4, 2008 invoices in which Mr. O'Leary was paid a draw. Hypothetical recovery payments, of course, are not the payment of a contingency because no award was rendered and the compensation is already paid. Any possibility of Mr. O'Leary ever being paid any contingency at any time was erased with Exhibit D.

By analogy, certain people working in ways similar to Mr. O'Leary can be paid a contingency agreement. Mississippi law allows public adjusters to be paid up to 10% of the amount recovered for their work. Mississippi Code, 83-17-523(1)(a). Should the claim go to trial, and the adjuster be hired as an expert, the adjuster is required to convert his contingency agreement to an hourly agreement. *Id.* at (2)(i). If the adjuster's payment is converted to an hourly payment, **evidence of his prior contingency agreement is not admissible at trial.** *Id.*

The spirit of this law is that Mississippi did not want to require policyholders to spend exorbitant amounts of money hiring a separate person to testify to the claim after promising an adjuster payment. The law does not allow insurers to attack the adjuster needlessly when the contingency language is removed from the contract, and in fact precludes the introduction of the earlier agreement into evidence.

The spirit of this statute should apply to this case even though Mr. O'Leary is a consultant and not a public adjuster. A possible contingency was contemplated for some work, even though Mr. O'Leary always had an hourly agreement in place, even after Exhibit B was signed because Exhibit C reaffirmed the hourly arrangement. After the

4

suit was filed and undersigned realized that contemplation had not been removed, a new superseding agreement was drafted. Nationwide complains that Mr. O'Leary's "milestone" payments are contingency payments, but the milestone payments cannot be a contingency when no award was rendered.

Nationwide claims that plaintiffs ask for contingency payments to be made through the back door. This is impossible when no operative document in this matter allows Mr. O'Leary a contingency, and no award has been rendered, and all payments to Mr. O'Leary have been for work performed. He has no stake in the outcome of this matter. Mr. O'Leary will continue to be paid for his work, regardless of the outcome. Because Mr. O'Leary does not have a stake in the outcome of this litigation, Nationwide's motion is groundless.

### B.    Determination of causation in this case does not amount to the "practice of engineering."

Nationwide states: "Mr. O'Leary lacks the Mississippi engineering licensure necessary to permit him to practice engineering in Mississippi by offering his opinion on causation and questions of scope that require engineering expertise and qualification." Nationwide does not lay the proper foundation for the premise that Mr. O'Leary must be a licensed engineer for the purposes of his report in this case. The Mississippi Board of Licensure for Professional Engineers and Surveyors (the "Board") agreed that such a report is not the practice of engineering.

Based on the underlined portions of his earlier report, the allegation against Mr. O'Leary before the Board was that he was practicing engineering without a license when he issued a report that addressed causation. Here, Mr. O'Leary is not offered as an engineering expert. *Bossier* addressed a situation in which the party tendered an expert

5

specifically categorized as an engineering expert. This situation, on the other hand, deals only with the content of Mr. O'Leary's report.

The Mississippi agency entrusted with the responsibility of regulating the practice of engineering concluded that a report by Mr. O'Leary that gave a causation opinion did not constitute the practice of engineering. The Board does not care in what capacity a non-engineer drafts a report that addresses issues of causation, making it arguably an engineering report. Either the issues as the ones described in Mr. O'Leary's report constitute the practice of engineering or they do not; whether he is an appraiser or an expert is irrelevant. Based on the Board's opinion, Nationwide's motion should be denied.

Even Mr. Martin, Nationwide's estimator, made his own independent causation determinations. Nationwide complains when Mr. O'Leary does the same. Nationwide adamantly stated that Mr. Martin is not a cause and origin expert, to which Mr. Martin agreed. Please see relevant excerpts of deposition of Robert Martin, attached as Exhibit G, pp. 127-128. However, Mr. Martin testified that wall damage incident to ceiling repair (wall damage all the way up to the ceiling) was damage caused by flood. *Id*. at pp. 62-63. Mr. Martin clarified that this decision was his decision. *Id.* Mr. Martin further testified that he, not Nationwide's engineer Mr. James Skees, decided that all damage below the ceiling was caused by flood, despite the fact that the water line rose approximately two feet up the wall of the first floor units. *Id.* at pp. 115-117. This is a determination of cause. Insureds disagree with this finding, but not because Mr. Martin is incompetent. Insureds simply disagree with his finding because it is wrong.

      **C.**    **Nationwide's use of the word "lying" is inappropriate when its own witnesses' statements are inconsistent on the central issues.**

As previously noted, undersigned counsel cannot see into the minds or inner workings of the defense of this claim by Nationwide: even the reasons for claims denial have been shrouded in "attorney-client privilege." Despite this, Nationwide has an revealed many inaccuracies in its statements in this case.

For example, Nationwide's engineer completely ignored obvious first floor mold damage above the first-floor water line by opting instead to refer to it as a child's "finger-painting." In his deposition, Mr. James Skees, the engineer retained by Nationwide, was shown a picture produced by Nationwide Bates-numbered NW-1SUN003892 (attached as Exhibit "H"). Please see relevant excerpts of deposition of James Skees, attached as Exhibit "I." He identified this as an upper kitchen cabinet. Exhibit I, p. 76-77. When asked what was on the inside of the cabinet, Mr. Skees described the obvious mold growth as "finger painting." *Id.* at p. 77. Unlike the brouhaha over O'Leary's contracts, this issue runs to the heart of this case.

Similarly, Nationwide's estimator, Robert Martin, testified that the pricing used by Nationwide for carpet was not Xactimate pricing, yet Nationwide's adjusters testified just the opposite. In his deposition, Mr. Martin stated that he used the carpet pricing that was in Nationwide's original estimate. Exhibit G, pp. 84-90. This is the same estimate in which both Mr. James Biggs, Nationwide's lead adjuster, and Mr. Nick Hatfield, another Nationwide adjuster, testified Xactimate pricing was used. Please see relevant excerpts of depositions of James Biggs and Nick Hatfield, attached as Exhibits "J" and "K," respectively. Mr. Martin testified that the carpet price used in the Nationwide estimates

was *not* in the Xactimate list. Exhibit G, p. 85. In fact, Mr. Martin testified that using Xactimate should result in the same price for all standard grade carpet. *Id.* at p. 103. However, the prices differed.

Discovery is designed to clarify issues such as these – Mr. Skees claim that inner-cabinet spots were "finger-painting," the misunderstanding between Nationwide's adjusters and its estimator concerning the pricing module used on all items, and Mr. Martin's causation determinations. Because someone makes a mistake or a communication breakdown existed does not mean the parties should automatically accuse each other of lying. In Mr. Brockman's more recent deposition, he admitted that he made a misstatement in his previous deposition (even though as Exhibit C shows, an hourly arrangement was *always* in place). Accusations, particularly against opposing counsel, of lying are serious and should be backed up with serious proof. Nationwide does not have this proof but can only continue to make much ado about nothing regarding Mr. O'Leary's agreements.

> D. **The parties find themselves in the same boat regarding issues of revising expert reports and discovery.**

As this matter continues, it has become clear that the parties face similar problems with expert reports and discovery. Like Insureds, Nationwide's damage estimates were inherently flawed and unusable, which is why they were revised multiple times by Nationwide's estimator. These revised estimates were produced long after expert reports were due. Like Mr. Wiggins and Mr. O'Leary, Nationwide's estimator testified that he relied upon prior estimates in making his estimate. Exhibit G, pp. 57-58, 77. Like Mr. Wiggins and Mr. O'Leary, Nationwide's estimator testified that his estimates have evolved based on new or newly-organized information which allowed him to form a

8

clearer picture of his estimation of damages. *Id.*, pp. 60-61. Nationwide chooses to berate Insureds, their counsel, and their representatives. Insureds choose to work with the flow of information to reach accurate data and conclusions. If the names of the parties were redacted, Nationwide's arguments could easily be read to apply to Nationwide and not Insureds. The scenarios are very similar.

On the eve of his deposition, Nationwide's estimator Mr. Robert Martin, revised his estimates. Then, literally minutes after getting on the record for his deposition in the Compass Pointe matter, Mr. Martin changed his testimony again. On the other hand, when Insureds provide Nationwide with revised estimates in the Compass Pointe matter days before Mr. O'Leary's deposition, Nationwide berates Insureds, then refuses to discuss these estimates. Insureds have repeatedly admitted that the discovery process to date has been less than perfect, and Insureds have admitted to a share of the blame. Nationwide, on the other hand, has continuously called Insureds and their representatives liars and acts as though it is beyond reproach.

### III. Conclusion

Mr. O'Leary was not paid a contingency fee. Mr. O'Leary's compensation will not change based on the outcome of this matter. The Mississippi Board of Licensure for Professional Engineers and Surveyors has found that a report drafted by Mr. O'Leary similar to the report in this matter was not representative of the "practice of engineering," as defined by Mississippi law. Nationwide's own estimator made determinations of what was damaged by flood without relying on Nationwide's engineer. Why is Mr. O'Leary not allowed to do the same? Accordingly, Nationwide's Motion to Strike Lewis O'Leary as Plaintiffs' Litigation Expert should be dismissed.

Respectfully submitted,

/s/ *Nathan M. Gaudet*
Nathan M. Gaudet (MSB 102608)
Matthew K. Brown (LA BAR (18571), T.A.
*Sullivan, Stolier & Resor, APLC*
909 Poydras Street, Suite 2600
New Orleans, Louisiana 70112
ngaudet@ssrlawfirm.com

**Attorney for plaintiffs, Sunquest Properties, Inc. & Carriage House Apartments Partnership**

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has this date been electronically filed using the CM/EFC service which will notify counsel of record via electronic mail of this filing.

New Orleans, Louisiana, this 28th day of January, 2010.

/s/ *Nathan M. Gaudet*
Nathan M. Gaudet