Page 1

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2

3   SUNQUEST PROPERTIES, INC.
    AND CARRIAGE HOUSE
4   APARTMENTS PARTNERSHIP
                                         PLAINTIFFS
5

6
    V.            CIVIL ACTION NO. 1:08-CV-687-LTS-RHW
7

8

    NATIONWIDE PROPERTY AND
9   CASUALTY INSURANCE
    COMPANY AND JOHN DOES 1-5
10                                       DEFENDANTS

11

12
        VIDEO DEPOSITION OF LEWIS EDWARD O'LEARY, JR.
13

14      Taken at the instance of the Defendants at
    Sullivan, Stolier and Resor, APLC, 909 Poydras
15   Street, Suite 2600, New Orleans, Louisiana, on
    Tuesday, October 6, 2009, beginning at 9:04 a.m.
16

17

18   APPEARANCES:

19
        NATHAN M. GAUDET, ESQ.
20      MATTHEW K. BROWN, ESQ.
        Sullivan, Stolier and Resor, APLC
21      909 Poydras Street, Suite 2600
        New Orleans, LA 70112
22
            COUNSEL FOR PLAINTIFFS
23

24

25

Page 2

1    ROBERT B. GILMORE, ESQ.
     JEFFREY TODD, ESQ.
2    Kirkland & Ellis, LLP
     655 15th Street, N.W., Suite 1200
3    Washington, DC 20005
4        COUNSEL FOR DEFENDANTS
5
6
7
8    VIDEOGRAPHER: Lynda Marshall
9
10   REPORTED BY:  Kelly Powell, CSR
            Brooks Court Reporting, Inc.
11          Post Office Box 2632
            Jackson, Mississippi 39207
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                INDEX
2    Style and Appearances.....................1
3    Index  ...................................3
4    Certificate of Deponent  ................250
5    Certificate of Court Reporter ...........251
6    Examination By Mr. Gilmore ................4
7    Examination By Mr. Brown ................243
8    267  Notice of Video Deposition .........6
9    268  Subpoena Duces Tecum ..............21
10   177  Resume ............................25
11   176  Mississippi State University .......27
12          Degree
13   183  Expert Witness List ...............57
14   289  Probuilders Insurance Claim ........64
15          Consulting Brochure
16   290  Probuilders Insurance Claim ........64
17          Consulting Brochure
18   174  Probuilders Report of Findings .....86
19   187  Estimate for Building Number 4 ....205
20   237  Photographs .....................216
21   184  Estimate for Building Number 1 ....228
22   236  Photographs .....................229
23   258  Westlaw, Court of Appeals of ......236
24          North Carolina, State of North
25          Carolina v. Lewis O'Leary

Page 4

1        VIDEOGRAPHER:  This is the video
2    deposition of Lewis Edward O'Leary, Jr. taken by the
3    counsel for the defendant in the matter of Sunquest
4    Properties, et al. in the Nationwide -- versus
5    Nationwide Insurance Company, et al., in the United
6    States District Court, Case Number
7    1:08-CV-687-LTS-RHW, held in the office of Sullivan
8    and Stolier on Tuesday, October the 9th [sic], 2009.
9    It is now 9:04 a.m.  Counsel may introduce
10   themselves.
11       MR. BROWN:  My name is Matthew Brown, and
12   I'm counsel for Sunquest, and with me is Nathan
13   Gaudet, co-counsel.
14       MR. GILMORE:  Robert Gilmore, Kirkland &
15   Ellis, LLP, on behalf of Nationwide Mutual Fire
16   Insurance Company.  With me is my colleague Jeffrey
17   Todd, also with Kirkland & Ellis.
18       VIDEOGRAPHER:  The court reporter will now
19   swear in the witness.
20       LEWIS EDWARD O'LEARY, JR.,
21   having been first duly sworn, was examined and
22   testified as follows:
23   EXAMINATION BY MR. GILMORE:
24       Q.  Morning, Mr. O'Leary.
25       A.  Good morning.

Page 5

1        Q.  Could you state your full name for the
2    record, please?
3        A.  Lewis Edward O'Leary, Jr.
4        Q.  What was your date of birth, Mr. O'Leary?
5        A.  November the 4th, 1947.
6        Q.  You've given a deposition before, correct?
7        A.  Yes.
8        Q.  Well, I'm going to just go over the ground
9    rules.  You're probably familiar with them already.
10   I'm here to ask questions that you understand.  If I
11   ask a question that you're not sure you understand,
12   I just ask you to let me know, and I will try and
13   rephrase it.  Is that fair?
14       A.  Yes.
15       Q.  If you answer one of my questions, I'm
16   going to assume that you understood my question.  Is
17   that okay?
18       A.  Yes.
19       Q.  Is there any reason why you can't give
20   full and accurate and truthful answers today in
21   response to my questions?
22       A.  No.
23       Q.  Are you taking any kind of medication or
24   prescription drugs of any type that may impair your
25   ability to testify or remember events in any way?

Lewis Edward O'leary, Jr. 10/6/2009

Page 6

1     A.   I took nine different pills this morning
2  but I think that's more to do with age than
3  anything.
4     Q.   I'm not going to -- I'm not going to ask
5  you to list your medicines as long as you're
6  comfortable that you're able to testify completely
7  and accurately today.
8     A.   Yes, sir, I feel like I am.
9     Q.   Okay.  I'm going to hand you what has been
10 premarked as Defense Exhibit 267.
11     (Exhibit 267 marked for identification.)
12     Q.   (By Mr. Gilmore)  And that's the notice of
13 your deposition in this case.  When did you learn
14 that you were going to be giving your deposition
15 today?
16     A.   I can't tell you the exact date.  I have
17 staff that receive stuff like this, and they will
18 either call me on the phone if I'm on the road or
19 they will tell me when I'm sitting in the office.
20 I've known for a while.
21     Q.   Can you tell me what you did to prepare
22 for today's deposition?
23     A.   Reviewed the materials that I had already
24 submitted, attempted to get into some of the
25 materials that y'all have provided, which I just got

Page 7

1  yesterday, so I really haven't covered a lot of
2  ground with it yet, talked to some of the people
3  that helped me put these reports together to make
4  sure that I was on firm footing in terms of what I
5  was asserting and why.
6     Q.   Can you tell me who you talked with to
7  prepare for today's deposition?
8     A.   Tammy Crossley, which was a public
9  adjuster that first introduced me to this property
10 before I even met Ralph Brockman, Jerry Wiggins, who
11 is a mechanic that bills the Xactimate estimates for
12 me, Todd Skinner, a gentleman that teaches Xactimate
13 in the Pensacola area at one of the local junior
14 colleges, Donna Bass, Ralph Brockman.  I may be
15 missing somebody, but for the moment, that's --
16 that's all I can think of.
17     Q.   Did you talk with the attorneys for
18 Sunquest today, either Mr. Brown or Mr. Gaudet?
19     A.   Yes, sir.
20     Q.   Okay.  What did you talk about with
21 them --
22     A.   I wanted to --
23     Q.   -- to prepare for today?
24     A.   -- know what information had they received
25 from y'all and could I have copies of it to study,

Page 8

1  and they provided me with the stuff.
2     Q.   In this -- you've given depositions before
3  so you're probably familiar with this happening,
4  just so the court reporter can record a clean
5  transcript, I will just ask for you to wait until I
6  finish my question and, likewise, I will try and
7  wait to make sure that you're done with your answer
8  before I ask my next question.  Is that fair?
9     A.   I'll do better.
10     Q.   That way we won't talk over each other --
11     A.   My --
12     Q.   -- and she won't get angry at us.
13     A.   -- my apologies.
14     Q.   No, no need to apologize.  And, again, if
15 at any point you need to take a break, just let me
16 know.
17     A.   Thank you, sir.
18     Q.   We'll -- I'll just ask you to answer my --
19 the question I just posed if there's a pending
20 question, otherwise, we'll take a quick break.
21     A.   Thank you, sir.
22     Q.   You just mentioned a moment ago that you
23 were given some materials to review that you just
24 got yesterday.  Can you tell me what materials those
25 were?

Page 9

1     A.   There was an engineering report.  I may be
2  mispronouncing the man's last name, Skees, an
3  engineer out of, I think, Kentucky.  On the Rock
4  Engineering, I think was his company name.  I was
5  given a number of photographs that were provided by
6  Nationwide that were supposedly taken by the
7  adjusters.  I have no reason to believe that they
8  weren't so there was no implication of that kind.
9     Q.   Any other materials besides the Skees
10 report and photos from the Nationwide adjusters?
11     A.   They gave -- I believe that's all they
12 gave me.
13     Q.   Prior to today, had you looked at any
14 other expert reports from either Sunquest or
15 Nationwide in this case?
16     A.   There were experts that worked with me in
17 the preparation of my report.  Steve Harned, a
18 meteorologist based in Raleigh, prepared a
19 meteorology report for this case.  Terry Moran, a
20 licensed structural engineer on the Gulf Coast,
21 Dr. Neil Hall, an engineer based in Slidell.  I
22 don't believe prior to yesterday I was ever given
23 any engineering reports that were produced for
24 Nationwide.  I'm told that there are some national
25 forensic reports out there on this property, but I

3 (Pages 6 to 9)

Page 10

1   haven't seen them yet.
2       Q.   Would it be important for you to ensure
3   that your work is complete and accurate to review
4   those engineering reports?
5       A.   Absolutely.  Any forensic engineer worth
6   his weight in salt wants to get his hands on any and
7   everything that would be relative to the case to
8   have a total picture.
9       Q.   Have you asked for the reports?
10      A.   I didn't even know they existed before
11  yesterday.
12      Q.   Did you learn about them from reading
13  Mr. Skees' report?
14      A.   That's correct.
15      Q.   Do you anticipate asking for and hopefully
16  having an opportunity to review those reports prior
17  to your testimony at trial?
18      A.   I absolutely want to see any and
19  everything that both sides have to offer.
20  Otherwise, I could end up with an imbalanced picture
21  of the loss.
22      Q.   Now, a moment ago, you mentioned three
23  individuals.  Two of them were Terry Moran and Neil
24  Hall?
25      A.   Dr. Neil Hall, yes, sir.

Page 11

1       Q.   And do you know if either -- is it
2   Mr. Moran?
3       A.   Yes.
4       Q.   -- or Dr. Hall have produced reports for
5   this property?
6       A.   No, sir, they didn't.  They provided
7   support for my report.
8       Q.   So you consulted with those two
9   individuals in connection with preparing your
10  report?
11      A.   Yes, sir.
12      Q.   And I should have mentioned this at the
13  outset.  We have two cases involving Sunquest.  I'm
14  sure you understand this, but this deposition today
15  is for the Carriage House property, so all of the
16  questions I'm going to be asking today are going to
17  relate to that case.  They might, of course, apply
18  to the work you've done for the other Sunquest
19  property in the other case, that's the Compass
20  Point, but we anticipate perhaps at a later date
21  taking your deposition in connection with your
22  report for that case, but today I'm going to be
23  asking you about the Carriage House just so there's
24  no misunderstanding.  Is that fair?
25      A.   Thank you, sir.  That was my

Page 12

1   understanding.
2       Q.   And you talked about individuals you spoke
3   with and materials you read.  Is there anything else
4   that you did to prepare for today's deposition other
5   than what we talked about?
6       A.   I don't think there's anything -- well, in
7   reviewing Mr. Skees -- for the sake of the record,
8   how do you pronounce the man's name?
9       Q.   It's Skees.
10      A.   Okay.  My apologies.
11      Q.   I take it you were not familiar with
12  Mr. Skees before having read --
13      A.   That is --
14      Q.   -- his report?
15      A.   That is correct.  There were things that
16  he alleged in the report that in an attempt to be as
17  prepared as I could be, I did a little bit of
18  research with what limited amount of time I had to
19  work with before this morning.
20      Q.   Can you tell me what those things are from
21  Mr. Skees' report that you investigated prior to
22  today?
23      A.   Well, he alleged that he heard of no
24  widespread copper thefts and related vandalism on
25  the Gulf Coast prior to reading it in my report, and

Page 13

1   I have started building a file on that to show just
2   how widespread it was on the Mississippi Gulf Coast
3   after Katrina in the specific area that we're
4   talking about.
5       Q.   And with the understanding that perhaps
6   you're still investigating that issue as we sit here
7   today, can you tell the jury how many instances of
8   vandalism you are personally familiar with with
9   respect to properties that were damaged during
10  Hurricane Katrina along the Mississippi Gulf Coast?
11      A.   I would have to go back through my files,
12  I worked a lot of files and what parts was vandalism
13  versus straight wind or flood damage, I -- I can't
14  articulate a number to you at this moment.  It -- it
15  was multiple cases where vandalism occurred as the
16  result of power outages and inability to get to a
17  property because of trees down on the roads and
18  such.
19      Q.   Would -- do you have personal familiarity
20  with more than 10 instances of such vandalism
21  allegedly occurring to properties?
22      A.   Yes, sir.  I grew up down here.  I know a
23  lot of these people.
24      Q.   Okay.  Your familiarity with respect to
25  vandalism, does that come from properties that

Page 14

1  you've done work for in connection with as an
2  appraiser or causation consulting?
3      A.  Can you rephrase the question?  I'm --
4      Q.  Sure.  Well, you've said that you're aware
5  of multiple instances of vandalism.  I'm just trying
6  to find out is your awareness from having done
7  professional work on those properties or is it
8  because you know of acquaintances who say that they
9  had their property vandalized during the storm or
10 after the storm?
11     A.  There's one less than a mile from here
12 where there was major vandalism, a commercial
13 property on St. Charles that I was the appraiser on
14 and --
15     Q.  That would be -- I'm sorry.
16     A.  -- hundreds of thousands of dollars worth
17 of vandalism damage before the owner could return to
18 the city.
19     Q.  That would be in -- here in Louisiana?
20     A.  Yes.
21     Q.  How about in the Mississippi Gulf Coast,
22 did you work on properties where you saw that there
23 had been vandalism?
24     A.  When you say "worked on," I'm not down
25 here working as a contractor although I am a

Page 15

1  licensed contractor.  I have done no construction
2  work on any of these projects, so my work would be
3  as a consultant.  I don't know if that qualifies as
4  worked on or not.
5      Q.  I -- I will use worked on the way you use
6  worked on, in any kind of professional capacity.
7      A.  Okay.  In investigating a claim, if you
8  don't investigate the surrounding environment to a
9  claim, whether it be wind or vandalism, I don't feel
10 like you're doing your job.  So if there's a claim
11 that vandalism occurred on a property, I will
12 commonly investigate the area to see if there was
13 vandalism in the area.  I have access through
14 friends -- remember I mentioned to you I grew up
15 down here -- where I can get information from the
16 Sheriff's Department, which I'm gathering right now
17 since Mr. Skees has brought this up, just how
18 widespread it was in that area.
19     Q.  And that's what led to my question.  As
20 you sit here today, can you give an estimate of the
21 number of properties on the Mississippi Gulf Coast
22 that you have done work in connection with where
23 there was vandalism alleged to have occurred?
24     A.  If I find a customer alleging vandalism,
25 and I'm not trying to be cute or get around your

Page 16

1  question, I'm trying to quantify the question, and
2  he says that this house was vandalized, and I find
3  that there are several others in that area that were
4  vandalized via whatever source, whether it be the
5  Sheriff's Department, hearsay or what have you, how
6  do -- how do you want me to quantify a number here?
7  It's -- it's multiple cases I've been involved in
8  where there was vandalism involved, and I found
9  other vandalism in the neighborhood.  How do you
10 want me to quantify the number, I guess?  I'm -- I'm
11 -- once again, I'm not trying to be evasive here,
12 please.
13     Q.  If you're able to give an estimate of how
14 many properties, is it, you know, 10 properties that
15 you worked on where there was -- you believe there
16 was vandalism that occurred?  Was it two properties?
17 Was it 20?  Just a number, your best estimate,
18 that's all I'm asking for, sir.
19     A.  Eight to 10.
20     Q.  Overall, how many properties along the
21 Mississippi Gulf Coast in total have you done work
22 for in connection with Hurricane Katrina in any
23 professional capacity?
24     A.  I can't give you a number at this moment
25 because I operate on different levels depending on

Page 17

1  the customer's need.  If a customer needs me to do a
2  forensic examination of the property and render an
3  opinion on it, that's one service.  If I am to serve
4  as an appraiser on a claim that I may have already
5  done a forensic report on, that's a different
6  service.  Estimating, I do estimating also for
7  customers, so because I do different services,
8  collectively, I'm going to guess and say about 75
9  cases I've been involved in to -- either on a
10 cursory level or heavily involved or somewhere in
11 between.
12     Q.  So let's break that down.  Of the 75
13 cases, how many of those have you prepared a
14 forensic report regarding the cause and origin of
15 damage to the property?
16     A.  I -- I can't give you a number off the top
17 of my head.
18     Q.  Can you give me a best estimate, a range
19 of that's all you can think of right now?
20     A.  A formal report is what you're asking as
21 opposed to a letter expressing an opinion.  I'm
22 trying to find where you break the line here.
23     Q.  Either -- any kind of opinion reduced to
24 writing that you've given to a property owner
25 regarding cause and origin.

www.BrooksCourtReporting.com
1-800-245-3376

Lewis Edward O'leary, Jr. 10/6/2009

Page 18

1     A.   I'm going to say I have produced something
2  in writing on 20 to 25 cases.  It may be more.  I'm
3  just not really ready to give you an exact number.
4     Q.   How many cases have you served as an
5  appraiser for properties on the Gulf Coast in
6  connection with Hurricane Katrina damage?
7     A.   I'm not sure.  You know, if I were to give
8  you a wild guess, I would say 12 to 15.
9     Q.   Fewer cases than cases in which you've
10 offered a cause of origin opinion?
11    A.   Yes, sir.
12    Q.   Another category you worked, I think you
13 said, was providing estimates of repair?
14    A.   Yes, sir.
15    Q.   How many properties have you provided
16 estimates of repair for in connection with Hurricane
17 Katrina damage on the Gulf Coast?
18    A.   An estimate of repair may amount to a
19 single number or a detailed estimate or somewhere in
20 between.
21    Q.   Any of the above.
22    A.   30.
23    Q.   Now, I imagine for some properties you've
24 done -- you've fulfilled multiple roles?
25    A.   Yes, sir.

Page 19

1     Q.   As you're doing here for the Sunquest
2  property; is that right?
3     A.   Yes, sir.
4     Q.   And I'm adding up these numbers and --
5  well, let me just ask this question:  Are there
6  any -- any kinds of professional services that
7  you've rendered to properties other than the
8  categories we've talked about, cause and origin
9  opinions, appraisals and repair estimates?
10    A.   Those are the three main categories, sir.
11    Q.   So there's no other types of services that
12 you've provided to properties on the Gulf Coast
13 concerning Hurricane Katrina damage?
14    A.   They all stem from those three services.
15 I am trained also as an adjuster, so from time to
16 time, I'm asked an opinion on whether or not this
17 would be this type of coverage or this type of
18 coverage referring to a particular form of damage.
19    Q.   Have you performed public adjusting
20 services for property owners?
21    A.   I'm not a public adjuster, no, sir.  I
22 have not been public -- I do work under public
23 adjusters at times who want an estimate from me or
24 want a report from me on my opinions on this.  I say
25 I work under them.  They're the representative of

Page 20

1  the customer.  They recommend to the customer to
2  hire someone like me, and they provide me with the
3  input I need in terms of what information is
4  available for me to work with.
5     Q.   Have you worked as an umpire in connection
6  with appraisals of any properties on the Mississippi
7  Gulf Coast --
8     A.   Yes.
9     Q.   -- concerning -- concerning Katrina
10 damage?
11    A.   Yes, sir.
12    Q.   How many times have you served as an
13 umpire?
14    A.   Twice.
15    Q.   For the approximately 75 properties that
16 you've performed professional services for in
17 connection with Hurricane Katrina on the Gulf Coast,
18 have those services been provided to the property
19 owner in each case?
20    A.   Attorneys at times will hire me and pay
21 me.  Why they're hiring me and paying me, I can't
22 always tell --
23    Q.   Well --
24    A.   -- as opposed to the customer.
25    Q.   Sure.  Well, let's -- we'll break it down.

Page 21

1  Starting with just the customers who've hired you
2  directly, all of the customers who you've been
3  retained by would have been property owners on
4  Hurricane Katrina cases?
5     A.   Yes.
6     Q.   Now, in the instances where attorneys have
7  retained you, do you know in each of those instances
8  were the attorneys representing property owners?
9     A.   Yes.
10    Q.   In the two instances you were appointed as
11 an umpire, were you put forth as an umpire candidate
12 by the appraiser who had been retained by the
13 property owner?
14    A.   I -- I don't really know which side,
15 whether it be the plaintiff attorney or the public
16 adjuster or the consumer, that actually brought my
17 name to bear, but in answer to your question, I
18 think I was brought to bear by the consumer's side
19 of the fence.
20    Q.   Let me hand you what's been premarked as
21 Defense Exhibit 268.
22         (Exhibit 268 marked for identification.)
23    Q.   (By Mr. Gilmore)  And this is a subpoena
24 duces tecum, which just means a document subpoena
25 that you were served with in this case.  Do you

Page 22

1  recognize this?
2      A.  Yes, sir.
3      Q.  And you produced documents to Nationwide
4  and its attorneys in response to this subpoena,
5  didn't you, Mr. O'Leary?
6      A.  I provided everything I had on this case
7  to the plaintiff attorney.
8      Q.  And they, in turn, produced it to --
9      A.  I sent them my original files.  They
10 copied them and whether or not you got them or not
11 is between y'all.
12     MR. GILMORE:  And, Mr. Brown, I will just
13 ask if there is -- I'm assuming that anything that
14 you received from Mr. O'Leary in this case, you
15 forwarded to us.
16     MR. BROWN:  Uh-huh, yeah.
17     Q.  (By Mr. Gilmore)  Is there anything since
18 gathering documents and giving them to Sunquest's
19 counsel, any additional documents that you have or
20 generated in connection with the Carriage House
21 property that you have not since given them?
22     A.  Other than the -- this fresh research that
23 I have begun via getting my hands on this Mr. Skees'
24 report, no, sir.
25     Q.  And, Mr. O'Leary, I will just ask when you

Page 23

1  have -- as you are generating new documents in
2  connection with this additional investigation, I
3  just ask if you could continue to produce those in
4  response to this subpoena.  It has an ongoing
5  obligation for you to produce those documents --
6      A.  I would be happy to, sir.
7      Q.  -- either to us directly or to plaintiff's
8  counsel.
9      A.  Yes, sir.
10     Q.  So beyond those documents that you just
11 started creating for this sort of new investigation
12 of vandalism instances in response to the Skees
13 engineering report, are there any other documents
14 that you have in connection with the Carriage House
15 property that you haven't produced in response to
16 this case?
17     A.  Prior to getting my hands on this
18 gentleman's report, I -- I believe I have given you
19 everything I had that I relied upon that was in
20 print of any sort.  I may have referenced -- you
21 know, I don't have the report here in front of me
22 that I produced, and I haven't spent a lot of time
23 with it in preparing for this, but if I referenced a
24 particular national standard or something like that,
25 and it's not been produced already, I'll go back and

Page 24

1  read my report, and if there is an inference to
2  something public domain that's out there that I
3  referenced, I will certainly produce it in a timely
4  manner, sir.  I stand that I may have not attached
5  every national specification or public domain
6  information in the report as an attachment to the
7  report.  I just don't remember right now.  I produce
8  a lot of reports, and at 62, my memory is not quite
9  as good as it used to be.
10     Q.  Well, we'll have an opportunity to go
11 through your report, so if there's --
12     A.  All right, sir.
13     Q.  -- anything that you see as we go through
14 it --
15     A.  All right, sir.
16     Q.  -- you can just let me know, and we will
17 ask -- if it's a -- beyond publicly available
18 documents, is there anything, either correspondence
19 or claims documents that you may not have relied on
20 in preparing your report but that you received and
21 at least looked at in connection with your work on
22 the Carriage House property?
23     A.  Rather than take a chance, I just sent my
24 entire file down here.  I -- I assume it's been
25 fully copied and provided, but I can't guarantee it.

Page 25

1  Rather than send two full copies to you and to
2  Mr. Brown, I just sent the originals.
3      Q.  And I will accept Mr. Brown's
4  representation that he copied everything that he got
5  from you and provided to us.  I'm going to hand you
6  what's been marked as Defense Exhibit 177.
7      (Exhibit 177 marked for identification.)
8      Q.  (By Mr. Gilmore)  Do you recognize this,
9  Mr. O'Leary, as your resume which you attached to
10 your report for the Carriage House property?
11     A.  Yes, sir.
12     Q.  Is this the most current version of your
13 resume?
14     A.  I think it is.
15     Q.  Well --
16     A.  I should -- I should date them, shouldn't
17 I?
18     Q.  Well, let me ask you this:  When you
19 produced this in connection with your report, which
20 I believe was prepared in June of 2009, have you
21 since updated your resume?
22     A.  I don't think so.
23     Q.  Okay.  The first heading under degrees,
24 you have two colleges listed, Jefferson Davis
25 College, General Engineering, 1967.  Did I read that

Page 26

1  correctly?
2      A.  Yes, sir.
3      Q.  And that's a -- is that a junior college?
4      A.  Yes, sir.
5      Q.  So that general engineering degree, that's
6  an associates degree?
7      A.  We're reaching back 40 years here now.  I
8  graduated from that junior college in -- in
9  pre-engineering, which I think they called general
10  engineering at that time.  That was a long time ago.
11     Q.  I'm not going to ask you to name your
12  professors.  I just wanted to confirm --
13     A.  I would be in trouble if you did.
14     Q.  Your next entry is for Mississippi State
15  University, Marine Engineering and Naval
16  Architecture in 1972.
17     A.  Yes, sir.
18     Q.  Did I read that correctly?
19     A.  Yes, sir.
20     Q.  And that is a bachelors degree, correct?
21     A.  Yes, sir.
22     Q.  And it's a bachelors degree in what was
23  then called engineering technology; is that correct?
24     A.  Yes, sir.
25     Q.  And that's different from an engineering

Page 27

1  degree; is that right?
2      A.  They both are part of the College of
3  Engineering.  The industry applied pressure to the
4  universities to provide what was referred to as an
5  applied engineering degree in the day, someone that
6  could go into the field and resolve problems of a
7  practical nature.  Many engineers are design
8  engineers that are totally lost in the field, and
9  this was an attempt to fill a gap that was -- that
10  existed at that time.
11         (Exhibit 176 marked for identification.)
12     Q.  (By Mr. Gilmore)  I'm going to hand you
13  what's been premarked as Defense Exhibit 176.
14     A.  Yes, sir.
15     Q.  Which I think you also produced with your
16  report.
17     A.  Yes, sir.
18     Q.  This is a copy of a degree you earned from
19  Mississippi State University; is that right?
20     A.  Yes, sir.
21     Q.  Along with a letter from the School of
22  Engineering explaining the program in which you
23  earned your degree, correct?
24     A.  Yes, sir.
25     Q.  Now, Mississippi State University

Page 28

1  Engineering Department no longer offers this degree,
2  right?
3      A.  That is correct.
4      Q.  And if you turn to the letter, which is
5  the second page of Defense Exhibit 176, you see in
6  the second full paragraph, the undergraduate
7  coordinator, a man by the name of Robert A. Green --
8      A.  Yes, sir.
9      Q.  -- he writes, "The degree awarded Mr.
10  O'Leary is not an engineering degree, but is a
11  degree in engineering technology.  There is a
12  significant distinction between the two categories,
13  primarily in the preparation they give the students
14  for future careers."  Did I read that correctly?
15     A.  That is correct.
16     Q.  Is that consistent with your understanding
17  of the difference between the degree you have and an
18  engineering degree?
19     A.  That's why I sought this degree.
20     Q.  And if you skip down to the fourth
21  paragraph, Mr. Green writes, "Although only the
22  engineering programs and not the engineering
23  technology programs at Mississippi State sought and
24  received accreditation by the Accreditation Board
25  for Engineering and Technology (ABET), and although

Page 29

1  the definition is from 1996 and not 1972," I'm not
2  sure if that's grammatical, but the part that I
3  read, did I read that correctly --
4      A.  Yes, sir.
5      Q.  -- in terms of what is there?
6      A.  Yes, sir.
7      Q.  Do you have any understanding why
8  Mississippi State University did not either seek or
9  receive accreditation for the engineering technology
10  program in which you got your degree?
11     A.  First of all, I don't understand what he's
12  writing there.  There were several of us that got
13  our PE stamps after graduation.  We had to go an
14  extra year.  I think it was four years for the BS
15  programs and five years for our program.
16     Q.  You say there are several of us who got
17  their PE stamps.  That's a professional engineering
18  license?
19     A.  That is correct.
20     Q.  Do you have a professional engineering
21  license?
22     A.  No, I do not.
23     Q.  What would you -- what would you have had
24  to do in order to get a professional engineering
25  license?

Lewis Edward O'leary, Jr. 10/6/2009

Page 30

1    A.   Stay in the field for five years.  I left
2  the shipyard that I went to work for when I
3  graduated.  I went to work for Bechtel, a worldwide
4  engineering construction firm after only two years.
5      Q.   When you went to Bechtel, you stopped
6  doing engineering work?
7      A.   No, sir, by no means.  In fact, Bechtel --
8  are you familiar with Bechtel?
9      Q.   I am actually.  They're a client of our
10  firm so I'm generally familiar with them.  I'm
11  sorry.  Go ahead.  I think you were about to say
12  something about Bechtel.  I guess my -- the question
13  I was about to ask, and maybe you can address this,
14  is you had said that you would have needed to
15  complete five years of engineering.
16      A.   In the marine industry.
17      Q.   In the marine industry --
18      A.   Yes, sir.
19      Q.   -- in order to earn a PE?
20      A.   That's correct.
21      Q.   And is it the case that at some point
22  after, I guess you said two years, you stopped doing
23  naval engineering; is that correct?
24      A.   Mechanical engineering is what it is.
25  Marine engineering is mechanical engineering.  It's

Page 31

1  a focus on certain aspects of mechanical
2  engineering.  A typical bachelor of science degree
3  in mechanical engineering would be geared for a
4  variety of directions for a student to go in after
5  graduation, to graduate work, to research areas that
6  we weren't considering.  We got cause and origin
7  theory in college.  They didn't.  We were being
8  prepared for the practical world.
9      Q.   Can you explain for the jury what is the
10  difference between what your professional licensing
11  or certification is that you hold versus what a
12  professional engineer does and has to continue to do
13  in order to be and stay a professional engineer?
14      A.   Keep in mind I have worked with a lot of
15  engineers in my career by working for firms that
16  employ engineers far more than just myself, so I've
17  had a chance to get into the minutiae of what is
18  involved in getting a PE stamp.  The PE program in
19  most states is geared toward a man having a good
20  solid understanding of design principles.  The test
21  itself is geared toward a solid understanding of
22  design principles.  None of the men I've ever spoken
23  to have ever told me there was a single question on
24  the PE exam that involved cause and origin, which is
25  the heart of field engineering.

Page 32

1      Q.   Do you hold yourself out to be an engineer
2  professionally?
3      A.   I put on my business card that I have a
4  degree in the field of architecture and mechanical
5  engineering because the program was a dual nature.
6  The state of North Carolina accepts that as a
7  legitimate title to put on my business card.
8      Q.   My question was a little bit different.
9  In North Carolina where you live and work --
10      A.   Yes, sir.
11      Q.   -- if you tell a potential customer my
12  name is Lewis O'Leary and I'm an engineer, is that
13  improper since --
14      A.   I would --
15      Q.   -- you're not a PE?
16      A.   I would tell these people that I am a
17  property loss consultant.  In several of the states,
18  including Mississippi, I have been accused of
19  practicing engineering without a license, and I have
20  a letter from the state because they sent them a
21  copy of one of my reports, this is practicing
22  engineering without a license, and the board ruled
23  that was not true.  I had signed it as a property
24  loss consultant.  I had titled the report Report of
25  Findings.  I did not cross the line, and I now have

Page 33

1  another letter from Louisiana that says the same
2  thing, that I know where the line is and apparently
3  I respect the line.
4      Q.   Have you received a letter from the
5  Mississippi licensing board for engineering that
6  says you are permitted to continue doing the work
7  that you have done without violating the law against
8  practicing engineering without a license?
9      A.   No, nor would they give me such a broad
10  letter.
11      Q.   Well, have you received a letter from the
12  Mississippi licensing board specific to say an
13  allegation that you were practicing engineering
14  without a license that says what you were doing was
15  legal?
16      A.   I -- I think -- now, I'll go over it
17  again.  I think I answered your question where on a
18  Katrina claim, I generated a forensic report
19  addressing wind versus water, and it was used as a
20  basis to settle the claim, and after the claim was
21  settled, a copy of that report was sent anonymously
22  to the state board that this is practicing
23  engineering.  The state board contacted me about it,
24  asked me questions and gave me a letter that I was
25  not practicing engineering without a license in the

Page 34

1    state.
2        Q.   What was the name of the case that this
3    happened in?
4        A.   It was an Allstate case.
5        Q.   Do you remember the name of the property
6    owner for whom you had been retained?
7        A.   I will give you a copy of the letter from
8    the state board if you'd like.  I keep it with me.
9        Q.   I would appreciate that, if you could
10   produce a copy of that letter that you're referring
11   to.
12       A.   I will be happy to.
13       Q.   Beyond that instance, were there any other
14   instances where you have been accused -- strike that
15   question.  Have there been any other instances where
16   someone has sent a complaint to an engineering
17   licensing board concerning work you have done on
18   Hurricane Katrina claims?
19       A.   I don't always know if a complaint is
20   filed unless the board contacts me.
21       Q.   The ones you know about, are there any
22   others?
23       A.   Here in Louisiana, I was accused of doing
24   the same thing, and I contacted the board and sent
25   them a copy of the full report with all attachments,

Page 35

1    and they ruled that I was not practicing engineering
2    without a license.  And I have that letter, I
3    believe, with me also.  By the way, you're going to
4    have to remind me later of what I'm promising to
5    give you copies of, so if you will --
6        Q.   That's why my colleague here is diligently
7    taking notes --
8        A.   Okay.
9        Q.   -- to memorialize all of those
10   understandings.
11       A.   Very good, sir.
12       Q.   Other than these two instances that you
13   have mentioned, the one in Mississippi and the one
14   in Louisiana, are there other instances where a
15   complaint was sent to a licensing board concerning
16   your work on Katrina claims?
17       A.   I was never contacted so I can't answer
18   the question other than to say the board has not
19   contacted me in Louisiana or Mississippi beyond what
20   I've already told you.
21       Q.   And, again, I'll just -- you probably
22   understand this because you've been deposed before.
23   If I want you to guess or speculate, I will ask that
24   --
25       A.   Yes, sir.

Page 36

1        Q.   -- kind of question.  If I don't, it's
2    just your personal knowledge.  So I'm asking other
3    than the two that we mentioned, are you aware of any
4    other complaints being sent to an engineering
5    licensing board concerning any work you've done on
6    Hurricane Katrina claims?
7        A.   No, sir.
8        Q.   You mentioned earlier that there is a test
9    a candidate needs to take and pass, I imagine, in
10   order to become a professional engineer, a PE; is
11   that correct?
12       A.   Actually there's two.
13       Q.   Two tests?
14       A.   One is called the EIT, engineering
15   training that they usually take shortly after
16   graduation.  Then they have to complete a certain
17   number of years of experience and apply for
18   permission to sit for the PE exam.
19       Q.   After you graduated, did you take the
20   first test, the EIT?
21       A.   No, sir.
22       Q.   You never sat for that?
23       A.   No, sir.
24       Q.   Have you ever studied for it?
25       A.   I actually had the booklet one time,

Page 37

1    considered doing it, but I was a married student in
2    college, and I had one-and-a-half kids when I
3    graduated from college.  It was on the list of
4    priorities, but it was kind of down there, and
5    working for firms like the shipyard and Bechtel,
6    there were tons of PEs.  You have probably seen a
7    lot of engineering reports in your day, and a lot of
8    them have two signatures on them and only one PE
9    stamp, which suggests one guy went out there and did
10   the examination, prepared the material.  The PE
11   reviewed it, approved it, countersigned it and put
12   his stamp on it.  I did a lot of that.  I was the
13   first signature on a lot of cases at both locations.
14   I didn't need a PE stamp is all I'm saying.  I was
15   surrounded by PEs.
16       Q.   Now, your reports in this case were not
17   reviewed and approved and stamped by a PE, correct?
18       A.   They were reviewed by a PE, but they were
19   not stamped by a PE.
20       Q.   Was that PE Dr. Neil Hall?
21       A.   Dr. Neil Hall reviewed the report and
22   Terry Moran both.
23       Q.   Did you consider asking him to approve it,
24   stamp it, and put his name on the report, Mr. Hall,
25   I'm sorry, or Mr. Moran?  Both of them are PEs?

Page 38

1    A.   Dr. Hall is a qualified -- I'm not exactly
2  sure what that means -- PE in Mississippi for
3  testifying purposes.  It's not a straight PE stamp,
4  but I don't know enough about this highly qualified
5  PE certification he has to comment on it.  I would
6  not ask him to countersign it without a full PE
7  stamp, I guess would be the term for it, but I'm
8  struggling to define the term.  Terry Moran, on the
9  other hand, is a full PE in Mississippi.  I could
10 have asked him to countersign it, but I didn't.
11    Q.   Did you ever suggest to Sunquest or
12 Sunquest's attorney that they should have a PE
13 review and approve and stamp on your report that you
14 produced on behalf of Sunquest in this case?
15    A.   Can you rephrase the question, please?
16    Q.   I'm not sure that I can.  I'm just
17 wondering, in the course of your work and preparing
18 your report, did you ever suggest to Sunquest or
19 Sunquest's attorneys that they should retain a
20 licensed PE to review and approve and sign your
21 report for this case?
22    A.   No.
23    Q.   Were there any discussions that you are
24 aware of about whether there needed to be a licensed
25 PE to offer cause and origin engineering opinions in

Page 39

1  connection with this case?
2    A.   Both Dr. Hall and Terry Moran have been
3  active participants in this report, but they did not
4  countersign it.  That was a decision made to do it
5  that way at some point.
6    Q.   Let's go back to your resume, Defense
7  Exhibit 177.  Under the second heading "Technical
8  Training," you have several items listed.  The first
9  one is Leonard's School of Adjusting.
10    A.   Yes, sir.
11    Q.   And when did you attend Leonard's School
12 of Adjusting?
13    A.   I'm going to guess and say '97.  I have a
14 certificate here if you want a copy of it.
15    Q.   I would appreciate that.  Thank you.  Can
16 you tell me briefly what you studied in Leonard's
17 School of Adjusting?
18    A.   They talked about different types of
19 policies.  They explained how to measure a roof and
20 how to measure a room, in essence, how to read a
21 policy and how to put an estimate together.
22    Q.   Anything that you learned in Leonard's
23 School of Adjusting bear on your work in this case
24 for Sunquest and the Carriage House property?
25    A.   In a broad sense, knowing how to adjust

Page 40

1  damages would come to bear on something like that.
2  Certainly, I already knew how to measure a roof and
3  a room before I took the course.
4    Q.   Does Leonard's School of Adjusting teach
5  you how to use -- well, how to prepare adjustment
6  estimates?
7    A.   We did go through how to prepare estimates
8  at that time on a fundamental level.
9    Q.   Is Leonard's School of Adjusting geared
10 primarily towards adjusters who work for insurance
11 companies or public adjusters?
12    A.   I don't think they expressed an opinion
13 one way or the other as they were teaching us these
14 fundamentals.  These fundamentals would be of value
15 regardless of which side of the fence you were
16 working.
17    Q.   Well, did you get a sense of -- you know,
18 the people who attended Leonard's School of
19 Adjusting, were they primarily public adjusters?
20    A.   Several of them were -- claimed to have
21 been contractors, several of them had no background
22 at all for construction.  They just -- someone told
23 them that they ought to look at going into
24 adjusting, and to be honest with you, I just
25 don't -- the class, I'm going to guess and say was

Page 41

1  25, 30 people.  I didn't spend that much time
2  fraternizing with the group.  I mean, there were
3  people that sat at the same table I sat at.  These
4  would be fold-out leg tables, and there would be a
5  series of them, and then there would be another
6  series on the other side of the aisle, and I think
7  for the most part, any socializing I did was with
8  the guys sitting on either side of me.
9    Q.   How long did you study at Leonard's School
10 of Adjusting?
11    A.   It was a week-long school.
12    Q.   The next item is HAAG Engineering seminars
13 on virtually all commercial and residential roof
14 systems.
15    A.   Yes.
16    Q.   Did I read that correctly?
17    A.   Yes, sir.
18    Q.   How many HAAG Engineering seminars have
19 you attended?
20    A.   I don't know.  I have a number of
21 certificates.  I will be happy to give you copies of
22 them if you'd like.
23    Q.   Do you believe those certificates for
24 seminars you've attended are relevant to the work
25 you've done for the Carriage House property?

11 (Pages 38 to 41)

Page 42

1    A.  Yes, sir.
2    Q.  Then I would appreciate seeing those
3  certificates --
4    A.  Okay.
5    Q.  -- if you wouldn't mind producing copies
6  of those.
7    A.  All right, sir.
8    Q.  Can you tell me which certificates for
9  which seminars you believe are relevant to the work
10  you've done on the Carriage House property?
11    A.  These are roof seminars and these are
12  composition shingle roofs on these buildings.  They
13  were covered not only in individual seminars but in
14  the umpire -- not umpire, the inspector
15  certification that I took in 2007.
16    Q.  Do you believe HAAG Engineering is a
17  reputable engineering firm?
18    A.  HAAG has some very honorable people
19  working for it, but like any other significant size
20  organization, you've got stars, you've got duds and
21  you've got everything in between.
22    Q.  It was reputable enough for you to seek
23  out and participate in seminars that they offered,
24  correct?
25    A.  I believe the firm is a reputable firm in

Page 43

1  answer to your question.
2    Q.  Now, the next item you have mentioned here
3  is Roofing Consultants Institute.  In fact, you're a
4  member of the Roofing Consultants Institute; isn't
5  that correct?
6    A.  Yes, sir.
7    Q.  What is the Roofing Consultants Institute?
8    A.  It's a private organization that focuses
9  on the advancement of roofing technology.  It's an
10  invitation only group.
11    Q.  When were you invited to join the Roofing
12  Consultants Institute?
13    A.  I'm going to guess at this moment and say
14  2001.  Gary Cattell, the region director for Region
15  1, which is where Raleigh is located, was my
16  sponsor.
17    Q.  Next bullet point under technical training
18  says, "Tech support for carriers, the appraiser
19  and/or the umpire on 1800 plus or minus appraisals
20  since Hurricane Camille (1969)."  Did I read that
21  correctly?
22    A.  Yes, sir.
23    Q.  What do you mean by tech support?
24    A.  When you go around with an adjuster as
25  either a contractor or a forensic consultant and

Page 44

1  advise them on how to handle certain aspects of the
2  claim.  I grew up in Gulfport.  Camille came right
3  up my back door.
4    Q.  So by tech support, you mean essentially
5  providing professional services of one sort or
6  another?
7    A.  Yes, sir.
8    Q.  And you say since Hurricane Camille in
9  1969.  Have you concentrated on hurricane or other
10  windstorm claims in your professional work providing
11  tech support for carriers, the appraiser and/or the
12  umpire?
13    A.  After Camille petered out, this was
14  something I did on the side.  It was -- it was
15  something that provided extra income for me.  I
16  didn't go back full time into the insurance industry
17  until '94.  Excuse me.  Could we take a break here
18  shortly?
19    Q.  Now, is a good time.
20    A.  Thank you, sir.  I appreciate it.
21    VIDEOGRAPHER:  Off the record at 9:56.
22    (Off the record.)
23    VIDEOGRAPHER:  Beginning tape two.  On the
24  record at 10:06.
25    Q.  (By Mr. Gilmore)  Mr. O'Leary, we're still

Page 45

1  looking at your resume, Defense Exhibit 177.  You
2  say you've worked on approximately 1800 appraisals
3  since Hurricane Camille; is that right?
4    A.  Yes, sir.
5    Q.  Of those, how many have you worked as an
6  appraiser or consultant for the property owner?
7  Give me an estimate.
8    A.  In getting into the wind certification
9  directory, Florida has a school where they teach
10  people to be an umpire, I was asked that same
11  question, and I attempted to the best of my
12  recollection, keeping in mind this was not going to
13  be my career path for life.  This was something that
14  I did because it was a means to an end at some point
15  in my life.  It didn't become -- the tail didn't
16  become the dog until '94, so a certain amount of
17  guess work was involved in this, and I had
18  guesstimated that about 55 percent, based heavily on
19  what I did before '94, was working either directly
20  with an adjuster or with a contractor that was
21  working with an adjuster.  About 55 percent of it, I
22  had estimated, was with a carrier and this number is
23  beginning to change as I spend more time working
24  principally the consumer side of the fence.  55/45
25  is what I had estimated for the directory when I got

12 (Pages 42 to 45)

Lewis Edward O'leary, Jr. 10/6/2009

Page 46

1  into the program.
2      Q.  And you say it's been changing since 1994;
3  is that correct?
4      A.  I still work for some independent
5  adjusters and carriers.  I went on an assignment in
6  Georgia last month for a carrier, but because most
7  of my business seems to come from the consumer side
8  of the fence, that percent -- those percentages will
9  likely within the next few years change to where it
10  will be more on the consumer side than the carrier.
11      Q.  Of your current portfolio of cases or
12  claims that you're working on not just -- including
13  but not just Katrina cases, how many of those are
14  for the property owner approximately?
15      A.  In excess of 90 percent.  If I were to try
16  real hard to come up with a percentage, I would say
17  97, 98 percent.
18      Q.  Now, over the years since you've started
19  working on appraisals, has most of your work been as
20  the actual designated appraiser?
21      A.  Not initially.  Back after Camille, I
22  didn't know enough about the insurance industry to
23  be the appraiser.  It was a technical support role
24  only.
25      Q.  Since 1994 say -- strike that question.

Page 47

1  Well, sitting here today, is most of your work on
2  appraisals as an appraiser?
3      A.  Yes, sir.
4      Q.  Would that be -- kind of a rough
5  percentage would be say 90 percent of your work when
6  you are working on an appraisal is as one of the
7  appraisers?
8      A.  Yes, sir.
9      Q.  And those would be overwhelmingly, I think
10  you said, 97 or 98 percent for property owners; is
11  that correct?
12      A.  Yes, sir.
13      Q.  Still working on your resume, the last
14  main bullet point under technical training lists
15  specific damage assessment schools, field training
16  and/or related academics.  You list a number of sub
17  items underneath that.  Are all of these in your
18  opinion relevant to the work you've done for the
19  Carriage House property?
20      A.  No, sir.
21      Q.  Which of these would be relevant?
22      A.  The second one, 3-tab, architectural and
23  wood shingle roof systems.  Excuse me.  Mold
24  detection and assessment, mold assessment in
25  structures and roof systems, wood, light gauge and

Page 48

1  structural steel framing, analysis of seal failure
2  of double pane windows although these are not double
3  pane windows, and the last one, the field
4  engineering work, I did under others at Bechtel and
5  Pyramid Engineering & Construction in Houston.
6      Q.  These categories where you've had --
7  you've participated in either damage assessment
8  schools, field training or related academics, are
9  these all some kind of formal training?
10      A.  You're familiar with the term on-the-job
11  training?
12      Q.  I am.
13      A.  As a young engineer working for Bechtel,
14  you commonly work under a senior engineer.  This
15  would be a good example of where I got formal field
16  training, on-the-job training in field engineering.
17  We -- we -- it's not always been called forensic
18  engineering.  It was called field engineering for a
19  long time before they dressed the term up and
20  started calling it forensic engineering.
21      Q.  Is field -- in your view, field
22  engineering and forensic engineering are synonymous?
23      A.  Their world circles around cause and
24  origin in both cases.
25      Q.  So when you talk about either field

Page 49

1  engineering or forensic engineering, you essentially
2  mean an engineering determination of cause and
3  origin of damage to a property; is that right?
4      A.  Forensics is a field of engineering in my
5  opinion, so the term forensic engineering is
6  actually the use of the same word, but defining the
7  word a little more carefully to put the two
8  together.
9      Q.  Well, how would you define forensic
10  engineering?
11      A.  You go out into the field to analyze a
12  problem regarding why something that works on paper
13  doesn't work in the field.  May I -- I just heard a
14  clicking noise which tells me I did not turn my
15  phone off.  May I stop for a second and turn my
16  phone off?
17      MR. GILMORE:  Let's go off the record.
18      VIDEOGRAPHER:  Off the record at 10:13.
19      (Off the record.)
20      VIDEOGRAPHER:  On the record at 10:13.
21      A.  Typically in cause and origin work, you
22  begin with what is not, and you eliminate the
23  options down to what it might be, and then the
24  probability based on the evidence what it is most
25  likely with regard to what the issue is.  It's an

13 (Pages 46 to 49)

Lewis Edward O'leary, Jr. 10/6/2009

Page 50

1  analytical method of -- an analytical approach to a
2  practical problem, and it's a special type of
3  engineer commonly that is best suited for that.
4  Because I grew up as the son and grandson of a
5  builder, I came to the table with a practical
6  background for construction, and it seemed to be a
7  natural fit to make me the go to guy in a lot of
8  instances where if there was a field problem with
9  part of the design to send me down there to analyze
10 it.
11     Q.   Turning to your resume and following up on
12 your discussion of cause and origin consulting, you
13 list as the last bullet under Accreditations,
14 Memberships and Affiliations, "Cause and origin
15 consultant to building products suppliers, roofers,
16 engineers, attorneys, general contractors, property
17 owners and insurance industry throughout the
18 southeast." Did I read that correctly?
19     A.   Yes, sir.
20     Q.   Would you say you have done more work as a
21 cause and origin consultant than you have as an
22 appraiser over the course of your career?
23     A.   In my opinion, being a good appraiser is
24 to do cause and origin analysis of the damages,
25 whether it was more likely wind versus water,

Page 51

1  whether it was more likely wear and tear versus
2  wind. I could give you several examples, but those
3  are two good ones. So my work as an appraiser
4  commonly involves production of a report, findings
5  that involves cause and origin.
6      Q.   Is it fair to say in your view, an
7  appraiser does cause and origin analysis plus
8  something more?
9      A.   An appraiser is -- is several things.
10 He's an estimator. He knows how to recognize
11 whether or not an estimate has problems or not and
12 how to address those problems along with cause and
13 origin work. He needs to be mindful also of whether
14 or not certain coverages exist. There's no sense in
15 analyzing damages where there is no coverage in my
16 opinion. No coverage meaning they're strictly the
17 main building coverage, the fences are not covered.
18 Accordingly, will I get out there and figure how
19 much it cost to replace these 500 feet of fences
20 that have been blown down if no coverage exists in
21 the policy. So an appraiser is a number of
22 different things if he is a well-rounded appraiser.
23     Q.   Do you feel that you are fulfilling
24 different -- strike that. Do you feel you have a
25 different professional relationship or you are

Page 52

1  providing just causation consulting services rather
2  than appraisal services?
3      A.   With who?
4      Q.   With your client.
5      A.   I'm not exactly sure how to answer your
6  question, but I will attempt to answer it if you can
7  give me a little latitude here.
8      Q.   And let me know if you need me to rephrase
9  it, but if you think you understand it, go ahead and
10 answer it. I will ask further questions if I'm not
11 sure that that's what I was getting at.
12     A.   There are -- as you are probably aware,
13 there are not many carriers that will employ me for
14 whatever reason. I assume they have their reason,
15 but one of the reasons that were explained to me is
16 some of the carriers started drifting away from me
17 is I said what I thought, and I would take the
18 position if you didn't want to know exactly how I
19 felt about the loss, you shouldn't have hired me.
20 There are public adjusters that will not hire me for
21 that same reason. I am considered fiercely
22 independent by the industry. There are people that
23 work full time for the carriers who rely upon my
24 advice on how to handle certain issues today and the
25 carrier never knows they're using me because there's

Page 53

1  no bill turned in. In other cases, there are bills
2  turned in where the assignment was sophisticated
3  enough they needed me to put hands on on the
4  property and render an opinion. I tell both sides
5  the same story. If you don't want me to render a
6  brutally honest opinion, don't hire me. And I use
7  that same mind set whether I'm an appraiser or
8  writing the forensic report. I think that is the
9  answer to your question. It keeps it simple for me.
10     Q.   When you're acting as an appraiser versus
11 acting -- strike that question. Do you feel -- is
12 it your role to act as an advocate for your client
13 in either capacity, either as appraiser or as a
14 causation consultant?
15     A.   I feel if I'm acting as an advocate for a
16 man's cause without any consideration what the
17 evidence says that it will cripple my credibility,
18 and it will cripple anyone else's credibility if
19 they gloss over evidence in an effort to fully
20 support their client's position.
21     Q.   You testified earlier that nearly all of
22 your work on Hurricane Katrina cases has been for
23 property owners, correct?
24     A.   Correct.
25     Q.   Have you marketed your services to

Lewis Edward O'leary, Jr. 10/6/2009

Page 54

1  insurance companies to work on Hurricane Katrina
2  cases?
3      A.   I had lunch with one of the senior members
4  of the firm that represents Nationwide in Raleigh
5  last year seeing if it was possible to start getting
6  some assignments again.  I do that periodically, and
7  his response was we love you, we know that you know
8  what you're talking about, but it's difficult to use
9  you and then turn around and challenge you on a case
10  where we're on the other side of the fence from you.
11      Q.   Who was the individual?
12      A.   Drew Vanore, Crump, Vanore, Tierney &
13  Brown, although the names may not be in the same
14  order.
15      Q.   They are a law firm?
16      A.   Yes, sir, in -- based in Raleigh, and they
17  represent Nationwide.  In fact, I have a wholesome
18  relationship with Scott Brown.  I consider it
19  wholesome.  We trade joke e-mails.
20      Q.   He is another attorney at that law firm?
21      A.   He represents Nationwide or he did the
22  last time I was involved in a case.  I think six out
23  of the last seven cases where I was involved with
24  Nationwide in North Carolina, Scott and I sat down
25  and had a cup of coffee and the appraisal never

Page 55

1  materialized.
2      Q.   How many actual retentions have you done
3  for Nationwide over the course of your career?
4      A.   When you say retentions, I'm not sure I
5  understand what you mean.
6      Q.   Sure.
7      A.   I didn't work for them.  I did not work
8  for them.  I was the appointed appraiser by -- for
9  the insured.
10      Q.   Have you ever been retained by Nationwide
11  to work on any -- in any professional capacity over
12  the course of your career?
13      A.   I don't think so.
14      Q.   Now, in this case, you're going to be
15  presenting your opinions regarding cause and origin
16  of damages to the Carriage House property, correct?
17      A.   I will be presenting it to the Carriage
18  House property?
19      Q.   Sorry.  You will be presenting your
20  opinions regarding the cause and origin of damage to
21  the Carriage House property in this case, right?
22      A.   Yes, sir.
23      Q.   You will also be presenting your opinions
24  on the estimates for repairing damage to Sunquest
25  property as a result of Hurricane Katrina, correct?

Page 56

1      A.   Yes, sir.
2      Q.   In how many instances over the course of
3  your career have you fulfilled those dual roles in a
4  litigation matter for a property owner?
5      A.   As an estimator and as a forensic
6  consultant?
7      Q.   That's correct.
8      A.   The -- the normal reason that I get as
9  many assignments as I do is because of my blended
10  background because I have the ability to put an
11  estimate together and a forensic report together.
12  It's one of the reasons I got as many assignments
13  after Camille.  Because of my construction
14  background and my junior college degree, I could
15  speak to a basic level of engineering concepts and
16  put an estimate together on the local value for
17  fixing these things we were talking about.
18      Q.   In your view, are the two roles, that is
19  forensic consultant and appraiser, to have different
20  levels of independence from the client performing
21  those duties?
22      A.   Please reword that.
23      Q.   When you're acting as an appraiser, do you
24  have a different level -- are you supposed to have a
25  different level of independence from the client than

Page 57

1  when you are acting as a forensic consultant?
2      A.   An appraiser is supposed to be a third
3  party, and because of that, most of my input that I
4  received on what was and was not damaged was from
5  people that don't work for Ralph Brockman.  Tammy
6  Crossley lost to World Claims in who would get to be
7  the public adjuster to represent Ralph.  If
8  anything, she would, on the surface, be something
9  less than totally in his corner.  She lost.  World
10  Claims got the assignment.  Turning to people like
11  her and the contractor that repaired the property
12  who has no dog in this hunt and Donna Bass who
13  hasn't worked for Ralph since Katrina and works for
14  another group now were the most likely candidates
15  for someone in my capacity to turn to to find out
16  the truth so to speak as opposed to either the
17  Nationwide adjuster or Ralph Brockman and his
18  employees.
19      Q.   I'm going to hand you what's been
20  premarked as Defense Exhibit 183.
21           (Exhibit 183 marked for identification.)
22      Q.   (By Mr. Gilmore)  And this is a list of
23  cases where you were retained as an expert in the
24  past four years; is that correct?
25      A.   Yes, sir.

15 (Pages 54 to 57)

Page 58

1    Q.   Is this an exhaustive list of such cases?
2    A.   No.  I've -- I've been on other cases
3  also.  I just put this together in an attempt to
4  demonstrate that I've -- I've done it on both the
5  state and federal level.
6    Q.   About how many additional cases that are
7  not listed here have you worked as an expert in the
8  past four years?
9    A.   Can you define worked as an expert?
10    Q.   Well, let's start in cases where losses
11  have been found and you had been retained by one
12  party or the other as an expert.  How many of those
13  such instances have you worked in the past four
14  years beyond what are listed on this page?
15    A.   I would hate to guess, but I would say I
16  could easily double this list.
17    Q.   Is there any reason why you left the --
18  those other retentions off this list?
19    A.   There's a lot of overlap in what I do.
20  When you can serve as an expert, you don't always
21  serve as an expert, you serve as the estimator or
22  the forensic consultant or as the appraiser.  It's
23  all a matter of discretion where you draw the line
24  in terms of what I consider being retained
25  principally as an expert as opposed to one of these

Page 59

1  other categories which clearly overlap.  Not
2  everybody can fill three different roles.
3    Q.   How many additional cases have -- were you
4  actually designated as a testifying expert in the
5  litigation that aren't listed on this list?
6    A.   I don't always know when I'm designated as
7  a testifying expert if I'm already involved in a
8  case as an appraiser or as the estimator.  Maybe I
9  should know, but I don't always know.  I can't give
10  you a firm answer to that, and I'm not trying to be
11  evasive, and I will -- as a follow up to this, if I
12  need to, I will attempt to define the list better
13  with the other cases on it.  If that's important to
14  you, I will -- I will do my best.
15    Q.   Well, I would ask if you're able to
16  supplement at least with any additional case where
17  you are designated by one party as someone who would
18  testify at trial --
19    A.   Okay.
20    Q.   -- I would ask if you could produce a
21  supplemented report and provide that to Mr. Brown so
22  that they can produce it to Nationwide.
23    A.   I will do my best, sir.
24    MR. BROWN:  Just to be sure I'm clear, I'm
25  going to repeat back what I think you said.

Page 60

1    MR. GILMORE:  Sure.
2    MR. BROWN:  You want any additional cases
3  not on this D-183 where Mr. O'Leary was designated
4  in a pending --
5    MR. GILMORE:  Litigation matter.
6    MR. BROWN:  -- litigation matter as an
7  expert by one party or the other.
8    MR. GILMORE:  That's correct.
9    MR. BROWN:  Okay.
10    MR. GILMORE:  Yeah.
11    A.   That -- that will require going back to
12  attorneys and asking them did you put me on your
13  list of experts to testify to them letting me know
14  because some of these files have been closed out for
15  a few years.  It's not something I can get
16  instantaneously for you, but I will make the attempt
17  to be more comprehensive.
18    Q.   (By Mr. Gilmore)  Well, to start, would
19  you be able to more readily prepare a list of at
20  least those cases in which you've given a deposition
21  or testified at trial in the past four years?
22    A.   Interestingly enough, every case I've ever
23  been involved in never made it to trial, so we can
24  scratch that one.  I've never climbed on the -- in
25  the witness box and ever testified in an open trial.

Page 61

1  Somehow it always got worked out before it got that
2  far.
3    Q.   Okay.  As an expert?
4    A.   As anything.  I say anything, I -- I've
5  not testified as an estimator.  I've not testified
6  as an appraiser.  I've not testified as an expert or
7  as a contractor.  I've never climbed into a witness
8  box in an open court proceeding to testify on my
9  expertise at any level.
10    Q.   Okay.  But you've been a defendant in some
11  cases?
12    A.   Yes, sir, yes, sir.
13    Q.   Okay.  Well, if -- if you can at least
14  supplement your list with any cases where you have
15  given a deposition in litigation matters in the past
16  four years.
17    A.   I will -- I will do my best to -- to fill
18  in the blanks.
19    Q.   On the -- still looking at Defense
20  Exhibit 183.
21    A.   I'm sorry.
22    Q.   It's quite all right.  The cases that are
23  listed here, how many of these pertain to Hurricane
24  Katrina?  I would assume it's only the St. Charles
25  Parish Hospital versus United Fire Group case?

16 (Pages 58 to 61)

Page 62

1    A.   I -- I would suspect that you are correct.
2    I think the case above it was an Ivan case.
3        Q.   Right.  Since all of the other cases are
4    not in Louisiana, Mississippi or Alabama.  There are
5    other cases, though, that you've given depositions
6    in that were Hurricane Katrina cases, right?
7        A.   I think so.
8        Q.   The Kuhn case is one, for instance, I know
9    of.
10       A.   Yes.
11       Q.   The St. Charles Parish Hospital case that
12   you have listed here, the attorneys for the property
13   owner of that hospital, those -- that was Mr. Brown
14   right here, right?
15       A.   Yes, sir.
16       Q.   And how many cases over the years have you
17   worked with Mr. Brown and his firm?
18       A.   Two.
19       Q.   This one, the Sunquest case --
20       A.   I'm sorry, not counting this one.  I
21   thought that was your question.  I'm sorry.
22       Q.   I should have been more clear.  In
23   addition to these cases for Sunquest --
24       A.   Two.
25       Q.   What was the other one besides the St.

Page 63

1    Charles Parish Hospital?
2        A.   Whitfield versus United Fire.
3        Q.   Did that case also involve a Katrina
4    damage claim?
5        A.   Actually it was a tornado that came
6    through the following spring after Katrina.
7        Q.   How did you first come to work for
8    Mr. Brown's firm?
9        A.   Mr. Brown represented St. Charles Parish
10   Hospital.  St. Charles Parish Hospital was a client
11   of a local public adjusting firm named Dallas Loss
12   Consultants.  They named me as the appraiser on the
13   claim, and because he was the attorney for the
14   client, we ended up working together.  There's
15   actually a third case that you and I worked on
16   together on Laurel Street.  I can't remember the
17   customer's -- it started with a B.  It was a Katrina
18   case.
19       Q.   That was in -- here in New Orleans?
20       A.   Yes, it was a residence.  I want to say
21   Babineaux, but that's not -- Sherry --
22       Q.   Counsel is indicating he knows the name.
23       MR. BROWN:  Barios, wasn't it?
24       A.   Yeah.
25       MR. BROWN:  Barios.

Page 64

1        MR. GILMORE:  Thank you.
2        Q.   (By Mr. Gilmore)  Those three cases beyond
3    the Sunquest cases, they were all for the property
4    owner?
5        A.   That is correct.
6        Q.   The cases that you have listed here on
7    Defense Exhibit 183, how many of those involved
8    appraisals?
9        A.   Becky Hess was not an appraisal.
10   Philadelphia Baptist Church, there was movement
11   toward appraisal, but it never occurred.  There was
12   an appraisal done on Big Bike, but it was before I
13   came along.  Paramount Food, there was talk of
14   appraisal, but it never occurred.
15       Q.   Any other cases you have listed here where
16   you were involved in appraisal?
17       A.   These cases for the defense here at the
18   bottom, I was not -- I was used strictly as an
19   expert.
20       Q.   I hand you what's been marked as Defense
21   Exhibit 289 and 290.
22       (Exhibit 289 marked for identification.)
23       (Exhibit 290 marked for identification.)
24       Q.   (By Mr. Gilmore)  You recognize these as
25   pages from the web site for your company,

Page 65

1    Probuilders; is that correct, Mr. O'Leary?
2        A.   Yes, sir.
3        Q.   When did you start Probuilders?
4        A.   Well, Probuilders, the one named
5    Probuilders on the business card, which is not the
6    full and complete name of my company, is a single
7    word for a reason and that is because this company
8    evolved, and in the evolution, it had different
9    names, all of which involved the one word
10   Probuilders in it.
11       Q.   What today is its current full name?
12       A.   Well, the consulting company is
13   Probuilders of the Carolinas, Incorporated.  The
14   licensed general construction arm is Probuilders of
15   Johnson County.  For a variety of reasons, I was
16   encouraged to segregate the two entities, and I did.
17       Q.   And when did you first start the company
18   that today is called Probuilders?
19       A.   The company Probuilders, Incorporated
20   existed when I came to North Carolina in 1996.
21       Q.   Did you join it as an employee at that
22   time?
23       A.   It was a four-man partnership.  A man
24   named Stanley Soble, a Greensboro, North Carolina
25   resident, had that company name and was operating it

Page 66

1  under that company name.  He was a close personal
2  friend of one of the other three members of the
3  firm, and we came to North Carolina to operate as
4  support for Hurricane Fran writing technical reports
5  and estimates period.
6      Q.   If you look at the second page of Defense
7  Exhibit 289, there is a heading entitled "Your
8  Rights," correct?
9      A.   Uh-huh (affirmative response).  Yes, sir.
10     Q.   Under that heading in your web site for
11  your company, it says, "Regardless of the reason for
12  your claim, if you are at a point where you believe
13  that you have more of a claim than the insurance
14  company agrees to, and you would like to explore
15  your options as to how to proceed in the least
16  expensive and quickest manner, Probuilders can
17  help."  Did I read that correctly?
18     A.   Yes, sir.
19     Q.   This is addressed to property owners,
20  correct?
21     A.   That is correct.
22     Q.   Property owners who are in a dispute with
23  their insurance company regarding a claim, correct?
24     A.   That is correct.
25     Q.   And you are marketing Probuilders, your

Page 67

1  company's services to those property owners?
2      A.   That is correct.
3      Q.   At the end of that section, there is a
4  link entitled "More," correct?
5      A.   Yes, sir.
6      Q.   And that takes someone on your web site to
7  what is marked as Defense Exhibit 90, correct?
8      A.   Yes, sir.
9      Q.   And that page is entitled "Benefits of
10  Insurance Consulting," correct?
11     A.   Yes, sir.
12     MR. BROWN:  290?
13     MR. GILMORE:  Yes, Defense 290.
14     Q.   (By Mr. Gilmore)  And under "Benefits of
15  Insurance Consulting" in your company's web site, it
16  says, "Most of the disputes between property owners
17  and their insurance carriers fall into one or more
18  of the following categories."  Did I read that
19  correctly?
20     A.   Yes, sir.
21     Q.   And there are four -- four bullet points
22  underneath that.  The first one says, "The adjuster
23  was too rushed to look at all of the evidence,"
24  correct?
25     A.   Yes, sir.

Page 68

1      Q.   The second one says, "The adjuster lacks
2  experience and/or training in the subject matter."
3  Did I read that right?
4      A.   Yes, sir.
5      Q.   The third one says, "The damages are the
6  result of more than one cause and the adjuster does
7  not understand how to apply good settlement
8  practices to the claim."  Did I read that correctly?
9      A.   Yes, sir.
10     Q.   And the fourth one says, "The adjuster's
11  guidelines for adjusting are inappropriate."  Did I
12  read that --
13     A.   Yes.
14     Q.   So you list four categories of disputes
15  between property owners and insurance companies,
16  correct?
17     A.   I'm saying that most of the claims fall
18  into one of these four categories.
19     Q.   All right.  So some of the claims could
20  involve more than one of these categories?
21     A.   Which I said also, yes, sir.
22     Q.   Okay.  Now, each of these bullet points
23  deals with something that either the adjuster or the
24  carrier did that was incorrect or improper, correct?
25     A.   That is correct.

Page 69

1      Q.   Now, when you say most of the disputes
2  between property owners and their insurance carriers
3  in your opinion involve something that the adjuster
4  or the carrier did that was incorrect, can you
5  estimate what percentage you mean by most such
6  disputes?
7      A.   Keep in mind, I have been involved in many
8  storms.  I've been involved with many different
9  adjusters, some of which were an auto adjuster
10  yesterday and now they're a property adjuster today,
11  some of which were a casualty adjuster yesterday and
12  now they're a property adjuster today, some of which
13  have absolutely no adjusting experience or
14  construction experience whatsoever yesterday, and
15  now they're a property adjuster today.  This is real
16  world.  I don't think there's a carrier out there
17  that will deny that after a major hurricane when
18  you're attempting to assemble a major staff of
19  people to go and adjust claims on a timely basis
20  that sometimes they pull people in that probably are
21  not well qualified to do what they are about to do.
22  And part of this is to tell people the carriers are
23  not out there necessarily (unintelligible) but
24  things happen sometimes.  They're sending people out
25  there that are too rushed or not qualified enough or

18 (Pages 66 to 69)

Lewis Edward O'leary, Jr. 10/6/2009

Page 70

1  the instructions being given to them are not a good
2  set of instructions for what they're supposed to be
3  doing.  All of these things point in a different
4  direction than they're being cheated.
5      Q.   Can you tell me -- can you put an estimate
6  on how many cases in your opinion -- what percentage
7  of disputes between property owners and insurance
8  carriers involve one of these -- one or more of
9  these four instances where the adjuster or the
10  insurance carrier does something wrong?  Is it
11  70 percent or 80 or 90 percent?
12      A.   Not all of it is doing something wrong.
13  If a man is not qualified to be doing what he's
14  doing, but he was thrown into it because he was a
15  staff adjuster who was available, we need you,
16  you're going, he didn't necessarily do anything
17  wrong.  Ignorance of how to do the job correctly
18  doesn't mean fundamentally that he's doing something
19  wrong on that customer's claim.  He's doing the best
20  he can.  Through no -- through no one's fault, some
21  claims are handled poorly.  You give an adjuster far
22  too many assignments than he can truly handle, he's
23  going to do the best he can to bring them all home,
24  but he may mess up on half of them because he just
25  didn't look at everything.  This property that we're

Page 71

1  involved in here, it appears as though there's a lot
2  of cut and paste involved on the Nationwide
3  adjuster's estimate where he just basically
4  duplicated the same damages over and over again to
5  get through the estimate more quickly.  Does that
6  mean that he tried to cheat the person, I don't
7  think so.  He was just trying to do his job.
8      Q.   Well, Mr. O'Leary, I appreciate that you
9  don't think my client tried to cheat your client.  I
10  would ask you just so we can all wrap this up in a
11  timely way, and we can go more efficiently --
12      A.   Yes, sir.
13      Q.   -- I will ask a question, if you can give
14  a substantive answer.  If you don't understand my
15  answer [sic] let me know.
16      A.   All right, sir.
17      Q.   All I'm asking is we went through these
18  four categories where the adjuster of an insurance
19  company was doing something incorrect or
20  inappropriate.  You say most disputes between
21  property owners and insurance carriers fall into one
22  or more of these categories.
23      A.   Yes, sir.
24      Q.   Can you give me an estimate when you say
25  most, do you mean 70 percent, 80 percent,

Page 72

1  90 percent?  That's all I'm asking for is an
2  estimate of what percentage of these kinds of cases
3  fall into one or more of these categories in your
4  opinion?
5      A.   The ones that I get involved in, keep in
6  mind, I don't get involved in a claim normally until
7  it is at some sort of impasse where they go out and
8  try to hire a high-priced consultant to try to help
9  resolve the impasse.
10      Q.   As I said earlier today, just to the best
11  of your personal knowledge.
12      A.   In excess of 80 percent.
13      Q.   So in the other -- in your opinion, in the
14  other 20 percent of cases -- well, strike that.  In
15  your opinion, there are only about 20 percent of
16  cases involving disputes between property owners and
17  insurance carriers where the adjuster and insurance
18  carrier did do what they were supposed to in
19  adjusting the claim; is that correct?
20      A.   There are categories I left out here,
21  which will affect the percentages that you're now
22  asking me to answer you, one of which is the unit
23  costs are unrealistic that are being presented,
24  which can also cause a dispute.  So when you say
25  where the carrier did nothing wrong at all, and I

Page 73

1  may be paraphrasing what you just asked me.  If I'm
2  going too far with my paraphrasing, please tell me
3  so.  Things like that also crop up to cause a
4  dispute.  It's not listed on here.
5      Q.   Still working on Defense Exhibit 290, and
6  you discuss the appraisal process below that,
7  correct?
8      A.   Yes, sir.
9      Q.   And you say, "This process allows for both
10  the property owner and the insurance carrier to
11  choose third parties called appraisers, who, in
12  turn, choose an umpire to serve as a tie breaker
13  should the two appraisers disagree regarding what
14  should have been awarded for the claim."  Did I read
15  that correctly?
16      A.   Yes, sir.
17      Q.   What does the term third party mean to
18  you?
19      A.   It has a couple of designations.  One is
20  the third appraiser.  Another is he's the umpire.
21  Some people refer to him as the tie breaker.
22      Q.   Does that mean these individuals are not
23  to be affiliated with either party?
24      A.   Correct.
25      Q.   Each -- each of the three people involved

19 (Pages 70 to 73)

Page 74

1  in the appraisal process should have some sort of
2  independence and impartiality from the parties
3  involved in the dispute; is that correct?
4      A.  Would you rephrase that, please?  I'm --
5  and my apologies.
6      Q.  Sure, I'll repeat.  I will try and
7  rephrase my question.  Each of the three individuals
8  involved in an appraisal, the two appraisers and the
9  umpire should have -- should be independent and
10  impartial in conducting their duties.  Is that fair
11  to say?
12      A.  Independent, yes, impartial, yes.
13      Q.  We talked a little bit about what kinds
14  of -- I'm sorry, how many Hurricane Katrina claims
15  you've performed some professional services for.  I
16  wanted to find out a little bit about the types of
17  those claims you've worked on.  First of all, what
18  kinds of properties involved -- were you involved
19  with working on in Hurricane Katrina claims?  And by
20  type of property, I mean residential or commercial?
21      A.  Both.
22      Q.  About what percentage of claims that you
23  worked on were residential properties?
24      A.  When you say residential, apartments are
25  residential style construction.  The same type of

Page 75

1  mind set in addressing a home would apply for the
2  most part on an apartment complex because they're
3  built basically the same way, stick built
4  construction, whereas a commercial building may be
5  made of red iron and light gauge steel and flat
6  roofs.  Am I correct in assuming that when you say
7  what percentage residential, that anything built
8  like a residence?
9      Q.  I'll use that as your definition.  That's
10  your definition, you know, what percentage of claims
11  that you worked on were residential versus
12  commercial claims?
13      A.  I would say roughly two-thirds were
14  residential style construction.
15      Q.  Again, in terms of the overall number of
16  Hurricane Katrina claims you worked on, how many of
17  those involved total losses, what's known as a slab
18  claim?
19      A.  Off the top of my head, I'm going to say
20  at least a half a dozen.
21      Q.  So most of the claims you've worked on
22  have been standing losses?
23      A.  That is correct.
24      Q.  Have you estimated how much you have
25  earned in performing professional services in

Page 76

1  connection with Hurricane Katrina claims?
2      A.  No, sir.
3      Q.  Can you come up with just a ballpark
4  number?  Would it be more than 100,000?
5      A.  Yes, sir.
6      Q.  Would it be more than 500,000?
7      A.  I don't think so.
8      Q.  Would it be somewhere in the range of 300
9  to 500,000?
10      A.  If I were to guess, I would say yes.
11      Q.  Can you describe a little bit for me how
12  you believe the appraisal process is supposed to
13  unfold?
14      A.  In Mississippi?
15      Q.  In Mississippi.  For instance, in this
16  case, I mean, or any of the cases that you've
17  performed appraisals for Hurricane Katrina cases.
18      MR. BROWN:  Could we go off the record for
19  just a second?
20      VIDEOGRAPHER:  Off the record at 10:53.
21      (Off the record.)
22      VIDEOGRAPHER:  On the record at 11:01.
23      Q.  (By Mr. Gilmore)  Mr. O'Leary, when were
24  you first retained by Sunquest to do work on this
25  case?

Page 77

1      A.  I believe it was May 2007.
2      Q.  Can you tell me how you came to begin
3  doing work for Sunquest on this property?
4      A.  Prior to being involved with Sunquest, I
5  was working in a technical support role for Excel
6  Public Adjusters and a couple of attorneys on the
7  Coast who knew Greg Stewart and David Pilcher, the
8  two out of three of the men that formed the
9  partnership that bought these properties, I had been
10  to the property at least a couple of times prior to
11  ever meeting or talking to Ralph.  In fact, the
12  buyers recommended me to Mr. Brockman as someone
13  that may be able to assist him in resolving his
14  outstanding insurance claim.
15      Q.  You had been doing consulting work for the
16  buyers of the Carriage House property before you
17  were retained by Sunquest; is that correct?
18      A.  No, I was doing consulting work for a
19  public adjusting firm that was heavily involved with
20  these buyers on multiple properties.  These -- the
21  buyers owned multiple multi-family properties just
22  as Mr. Brockman owns multiple multi-family
23  properties, and in my association with the public
24  adjuster, she introduced me to the buyers to provide
25  consulting services on some of their matters, who,

20 (Pages 74 to 77)

Page 78

1  in turn, recommended me to Mr. Brockman on his two
2  properties that he had either already sold or was --
3  I'm reasonably sure he had already sold them by that
4  point to these people, because when I first saw
5  them, they were largely finished in terms of the
6  restoration work.
7      Q.   So the first time that you saw the
8  Carriage House property in person was May of 2007?
9      A.   I think it was March.  It was sooner than
10  May.  Let's just put it that way.
11      Q.   By then, the repairs were essentially
12  complete; is that --
13      A.   Yes, sir, yes, sir.
14      Q.   How many times have you visited the
15  Carriage House property in person?
16      A.   I'm going to say at least five times,
17  maybe six.
18      Q.   Can you describe what you did on your site
19  visits to the Carriage House property?
20      A.   Examination of evidence.
21      Q.   Can you explain what examination of
22  evidence entailed?
23      A.   First of all, some of the assertions I've
24  made in the report are based upon physically going
25  up to things like windows and looking at them, the

Page 79

1  detail of construction between the window and the
2  surrounding portion of the weather envelope, which
3  is the exterior of the building, looking at the roof
4  construction, looking at the flashing details,
5  looking at the weather stripping design around the
6  doors, whether or not the doors fit snugly in the
7  casing that they operate in.
8      Q.   All of those observations that you just
9  listed were made of the property after the repairs
10  had been essentially completed, correct?
11      A.   That is correct.
12      Q.   You -- you never visited the property
13  following the storm before the property was
14  repaired, correct?
15      A.   That is correct.
16      Q.   Did you make any effort to determine the
17  differences between the post repair state of the
18  property versus how the property existed prior to
19  Hurricane Katrina?
20      A.   Yes, I did.
21      Q.   What efforts did you make?
22      A.   Interviewing people who would have
23  specific knowledge of what the condition was of the
24  property before the hurricane.
25      Q.   Anything else other than interviewing

Page 80

1  people?
2      A.   Well, there -- a lot of the photographs
3  that were taken by both sides show areas where there
4  may be a water stain, but then there is other areas
5  that -- in that same picture where there is no
6  damage, and those photographs in the undamaged areas
7  suggest that's what it looked like before the storm.
8      Q.   What did you start doing for Sunquest when
9  you were first retained by them in May of 2007?
10      A.   I don't remember mechanically exactly what
11  was said in which phone conversation and which
12  meeting.  I can only give you an overview of what
13  was said over a series of phone conversations and
14  meetings without regard to what was said in which
15  particular phone call or which particular meeting.
16  To the best of my ability, Mr. Brockman wanted to
17  know did he have a case regarding substantially more
18  money than what Nationwide had offered him.
19      Q.   When you were first retained, did you
20  believe that you would ultimately be used as a
21  testifying expert in litigation?
22      A.   No.
23      Q.   Have you had any such discussions about
24  that where you -- with Sunquest or Sunquest's
25  attorneys?

Page 81

1      A.   At that point in time, the -- the Munn
2  decision had not become a significant issue in the
3  marketplace.  Appraisals were being conducted in a
4  more "traditional manner."  I had completed prior to
5  this case two appraisals on Nationwide cases that
6  were conducted in the "traditional manner" where the
7  two sides agreed to let the appraisers determine the
8  damages as the result of wind and wind alone.  So my
9  thought process, if you will, you were asking me
10  about that, I think, was to determine whether or not
11  it was a legitimate case for appraisal using a
12  traditional method of appraisal, and it seemed to be
13  a legitimate case for such.
14      Q.   When you use the phrase "traditional
15  method of appraisal," do you mean appraising damages
16  attributable just to a covered loss, in this
17  instance, wind or wind driven rain?
18      A.   That is the traditional method that dates
19  back.  I mean, I've got forms created within the
20  industry that date back to World War II where it
21  states this is the peril we want y'all to look at
22  and tell us what the damage is as a result of that
23  particular peril.
24      Q.   So when you first began work for Sunquest,
25  your intent was to appraise the damages caused by

21 (Pages 78 to 81)

Page 82

1  wind or wind driven rain alone; is that correct?
2      A.   You're using a term that is hotly
3  contested in this industry, wind driven rain.  I
4  will stop short of that and say wind.
5      Q.   Well, just so there's no ambiguities in
6  our -- as I ask questions and you give answers, when
7  you talk about wind causing the damage, that
8  includes the force of air being pushed against the
9  structure, correct?
10      A.   Yes, sir.
11      Q.   It also includes rain in a wind storm, for
12  instance, that might breach and damage the interior
13  of the structure; is that correct as well?
14      A.   Yes, sir.
15      Q.   Is there any other types of damage that
16  you would group under the heading winds beyond those
17  two types?
18      A.   The force of wind, I would -- and ensuing
19  damages as the result of, or as policies normally
20  say, caused by or the result of wind.
21      Q.   So resulting damages from those two types
22  that we just discussed?
23      A.   Yes, sir.
24      Q.   So getting back to your understanding when
25  you were first retained by Sunquest was to appraise

Page 83

1  the damages caused by wind, correct?
2      A.   Yes, sir.
3      Q.   Prior to you preparing the expert report
4  on behalf of Sunquest in this case for the Carriage
5  House property, did you generate other written work
6  in connection with furnishing professional services
7  for Sunquest?
8      A.   There was correspondence involved in my
9  exchanges with Ralph.
10      Q.   Do you still have copies of that
11  correspondence?
12      A.   A full copy of my file has been made.
13          VIDEOGRAPHER:  Two minutes.
14      A.   What -- whatever was copied is what was in
15  my files.
16      Q.   (By Mr. Gilmore)  So all of that
17  correspondence from before the time you began
18  working on your expert report in this case, you
19  believe was copied and given to counsel for
20  Sunquest?
21      A.   I believe so, sir.
22      Q.   And beyond correspondence with
23  Mr. Brockman, any other kind of written work product
24  such as initial estimates or appraisals?
25      A.   I think the initial estimates were

Page 84

1  mentioned in the correspondence in terms of what I
2  felt like the damages were.
3          MR. GILMORE:  Let's go off the record and
4  change the tape.
5          VIDEOGRAPHER:  Off the record at 11:12.
6  End of tape two.
7          (Off the record.)
8          VIDEOGRAPHER:  Beginning tape three.  On
9  the record at 11:13.
10      Q.   (By Mr. Gilmore)  We're going to start
11  looking at your report in a moment.  I just want to
12  ask you beyond the expert report that you prepared
13  and that's been served on Nationwide, do you have
14  any earlier drafts of that report that you've
15  generated?
16      A.   I don't -- I don't recall ever publishing
17  a draft of that report.  Internally within my
18  office, I'll produce drafts, and my wife who can
19  spell 1000 times better than I, and infinitely
20  better with grammar and sentence structure will mark
21  it up for me, and based on that type of draft
22  arrangement, I'll publish a finished product.
23      Q.   Do you still retain in your records the
24  prior drafts of your final finished expert report in
25  this case?

Page 85

1      A.   No, sir.  You know, we're talking about
2  sentence structure and spelling.  I would not
3  normally keep those type of drafts.
4      Q.   Would you -- you would -- you believe that
5  you would have thrown away any such prior drafts?
6      A.   Yes, sir.
7      Q.   What about saved on your computer, do you
8  have various versions --
9      A.   No, sir.
10      Q.   -- of an electronic document on your
11  computer?
12      A.   I believe I save it over the original
13  document which, in essence, wipes out the original
14  document.
15      Q.   Prior to finalizing and signing your
16  expert report in this case, did you send initial
17  drafts of the report to anyone at Sunquest or
18  Sunquest's attorneys?
19      A.   I sent it to the engineers for review.
20  Neither one of them provided me with any changes.
21  They felt that the report should stand as written,
22  so the report that was sent to them was the report
23  that was published.
24      Q.   Have you been asked -- beyond your report,
25  have you been asked to prepare any future reports

22 (Pages 82 to 85)

Page 86

1  of, for instance, rebuttals to any of Nationwide's
2  experts?
3      A.  The reports given to me were given to me
4  with the inference look this over and see if there's
5  anything that you need to respond to, so I guess you
6  could say yes, I have been asked to -- to work up a
7  rebuttal.
8      Q.  And specifically have you been asked to
9  prepare a written rebuttal report if you know?
10     A.  No structure of rebuttal has been
11 discussed yet. I just got this stuff yesterday.
12     (Exhibit 174 marked for identification.)
13     Q.  (By Mr. Gilmore)  I just handed you what's
14 marked as Defense Exhibit 174, which is your
15 June 29, 2009 Report of Findings in the Carriage
16 House case.
17     A.  Yes, sir.
18     Q.  Do you recognize it?
19     A.  Yes, sir.
20     Q.  And to date, this is the only report that
21 you've prepared for this case, correct?
22     A.  Yes, sir.
23     Q.  All right. As we sit here today, are you
24 aware of any changes or errors that you believe need
25 to be made or fixed in this report?

Page 87

1      A.  Well, there's a lot of comments made about
2  this report, and this engineer's report, and,
3  certainly, anybody worth their weight in salt is
4  going to take what another man has to say to heart
5  and see if any of it has any merit. I just got it
6  yesterday afternoon late. I really haven't had a
7  chance to finish reading it yet.
8      Q.  Beyond anything that you might need to
9  react to that was stated in other experts' reports,
10 are you aware of any other items that you would want
11 to change or correct in your report?
12     A.  No.
13     Q.  You intended to be thorough and accurate
14 in preparing this report and stating your
15 conclusions, right?
16     A.  Thorough and accurate? When you come in
17 behind somebody else on a claim, whether it's a slab
18 case where there's nothing to look at, or a case
19 where everything has been fixed, it's far less than
20 a perfect world you're operating in. You are having
21 to gather evidence wherever you can find it and draw
22 conclusions from that evidence, having something
23 else than a perfect set of photographs or videos to
24 work from. This is not an exact science. The term
25 thorough is a relative term in this industry. You

Page 88

1  gather what you can get your hands on and do the
2  best you can to put a thorough picture together, so
3  that word thorough is a relative term here and
4  that's all I'm trying to say.
5      Q.  Well, let's -- let's talk about some of
6  those limitations. You just stated one limitation
7  in your report was that you did not have an
8  opportunity to make a first hand inspection of the
9  property before it was repaired, correct?
10     A.  Correct.
11     Q.  Are there other limitations on the scope
12 of your report that would limit its thoroughness in
13 any way similar to that that you've mentioned?
14     A.  Yes, sir.
15     Q.  Could you name those other limitations on
16 your report?
17     A.  As an appraiser, I will just use -- the
18 best way to answer your question is to use an
19 analogy of one of my other Nationwide claims.
20 Nationwide hired a local gentleman here by the name
21 of Joe LaFranco, who owns Quest Forensic Services.
22 He's a licensed engineer and a licensed general
23 contractor. He's 10 years older than I am. We
24 wanted to see everything that both sides had to
25 offer. In the production of this report, I only had

Page 89

1  what one side had to offer plus the engineering
2  report -- not engineering report, excuse me, the
3  estimate provided by Nationwide. If I had any
4  knowledge that National Forensic Group had produced
5  a report on this property, I would have wanted it.
6  Joe and I aggressively sought every stitch of
7  information that was available from both sides, and
8  we gave it to each other so we had a full picture of
9  what both sides had to say about the claim, and from
10 that, we developed a balanced opinion on what the
11 loss was. Without everything Nationwide has to
12 offer, I was operating half blind.
13     Q.  Did you ever ask Sunquest if they had
14 received any kind of engineering reports on the
15 Carriage House property from Nationwide?
16     A.  Sunquest indicated to me that they had no
17 knowledge of engineering reports produced for
18 Nationwide on this case.
19     Q.  And as we sit here, you've never even seen
20 the NFC reports?
21     A.  That is correct.
22     Q.  The first time you learned of them, I
23 think you said was when you read about them in
24 Mr. Skee's engineering report, which you looked at
25 yesterday?

Page 90

1    A.   That is correct.  See, those reports were
2  contained in this other case that Joe LaFranco and I
3  were involved in.  In fact, there were three
4  different versions.  It appears that somebody was
5  telling the guy that ain't right, that ain't right,
6  I will accept that.  That was helpful to us to have
7  those reports.
8    Q.   Does this report state the opinions that
9  you intend to testify about in the trial of this
10 case?
11   A.   I really, really want to have everything
12 that both sides has to offer.  A good forensic
13 engineer will aggressively seek out all of the
14 information that's available on both sides.  The
15 reason I pursued people that don't work for Ralph,
16 don't have a dog in the hunt is I felt those people
17 would be the most likely to provide me a balanced
18 picture short of having what Nationwide has to
19 offer.
20   Q.   My question was a little different.
21 Understanding that you might receive additional
22 information that might cause you to change opinions
23 or reach an additional opinion, but with the
24 knowledge that you have as we sit here today, does
25 this report state the opinions that you would intend

Page 91

1  to testify about at trial?
2    A.   Yes, sir.
3    Q.   And there are no opinions that you intend
4  to testify about at trial that you know of as we sit
5  here today beyond what you've set forth in this
6  report?
7    A.   There's no fresh thoughts or formulas
8  floating around out there.  Obviously, if we get off
9  into why windows leak, we may dance around with that
10 for hours.  You know, there's all kind of material
11 out there on that.  Was I expected to have all that
12 scientific material to back up that opinion here
13 with me today?
14   Q.   Well, I will ask you about scientific
15 material that you've relied upon beyond what is
16 cited in the report.  You cite several textbooks or
17 treatises.  Are there other engineering or appraisal
18 authorities that you have relied on in preparing
19 this report not identified anywhere in the text
20 here?
21   A.   I don't remember whether I addressed it in
22 that report or not, but this builder that bought
23 this property owns Madison Homes.  He's a
24 homebuilder, and he was developing a subdivision
25 called Shell Landing right there in Gautier, and

Page 92

1  I've got pictures and video of leaf and other
2  organic material that blew past a brand new window
3  in a model home that didn't have carpet down yet all
4  the way across the room, stuck to the wall, the
5  switch plates and everything, to show the kind of
6  force that this wind can create on a window that's
7  not designed to handle that much force, and these
8  were significantly stronger windows than the ones at
9  the apartments, and we're talking about in the same
10 town during the same hurricane.  I believe I
11 mentioned that in the report, but if I didn't,
12 that's certainly something that -- that I will be
13 expounding upon when we get that far.  Did I mention
14 it in here?
15   Q.   Well, you referenced videotapes of wind
16 showing wind blown debris at properties -- other
17 properties outside of Carriage House.
18   A.   Yes, sir.
19   Q.   And that's something that you -- you
20 relied on --
21   A.   Yes, sir.
22   Q.   -- in reaching your opinions?
23   A.   Yes, sir.  I -- I lived through Camille,
24 and I watched windows spray at me like a garden hose
25 as that storm blew past in Memorial Hospital in

Page 93

1  Gulfport in 1969.
2    Q.   Are there other -- beyond this videotape,
3  are there other kinds of information that you
4  haven't identified in your report that you relied on
5  in reaching your opinions?
6    A.   I don't remember what all reference
7  material I talked in here about spraying windows,
8  but as you've mentioned, I'm five months from trial
9  in terms for preparing for -- for talking about all
10 of these things.  If I've got a document that I'm
11 going to use -- the video on this other property in
12 this subdivision not far from this one, certainly, I
13 would want to give you a copy of it.  I'm not going
14 to try to hold anything back.
15   Q.   And I would ask if that is something that
16 you've relied on in reaching your opinions and can
17 even envision using as an exhibit to illustrate your
18 testimony at trial that I would ask that you produce
19 a copy of that in response to our subpoena.
20   A.   Would you make a note of the window spray
21 theory?  I have a separate file set up just for
22 window spray.  It's such a big deal in the industry
23 that I've got an entire file on just that.
24       MR. GILMORE:  And on that note, we need to
25 go off the record.

24 (Pages 90 to 93)

Page 94

1      MR. BROWN:  Uh-huh (affirmative response).
2      VIDEOGRAPHER:  Off the record at 11:26.
3    (Off the record.)
4      VIDEOGRAPHER:  On the record at 12:45.
5    Q.   (By Mr. Gilmore)  Afternoon, Mr. O'Leary.
6    A.   Afternoon, sir.
7    Q.   We were looking at what's marked as
8    Defense Exhibit 174 before we broke for lunch.
9    A.   Yes, sir.
10    Q.   And that's your report in this case, the
11    Carriage House property case?
12    A.   Yes, sir.
13    Q.   On the first page of your report under the
14    heading "Background," you write in the third
15    sentence, "The available evidence suggests that all
16    of the buildings received some amount of flooding
17    ranging from less than a foot up to about 30
18    inches."  Did I read that correctly?
19    A.   Yes, sir.
20    Q.   You refer to available evidence there.
21    Can you tell me what the available evidence is that
22    you were referring to?
23    A.   Beyond the -- what I've described here as
24    interviews with witnesses and gathering of materials
25    from other experts in the industry, the photographs

Page 95

1    that were provided by the insured and the past
2    employees and Tammie Crossley.
3    Q.   And I will refer down to the bottom of
4    that page and going over to the top of the next
5    page, you have under "Discussion" a list of sources
6    of information.  Is that collectively what you
7    consider as the available evidence?
8    A.   Yes, sir.
9    Q.   Anything not listed under the heading
10    "Discussion" at the bottom of page 1 and top of page
11    2?
12    A.   Well, the one glaring thing that's not on
13    this list is the stuff that I'm now being provided
14    with that I consider critical in having a balanced
15    view on a case.
16    Q.   On the top of page 1, you say, "All
17    buildings received some amount of flooding."  You
18    agree that each of these 17 units of the Carriage
19    House property was inundated by some sort of
20    flooding during Hurricane Katrina?
21    A.   Yes, sir.
22    Q.   And that this -- the flooding from storm
23    surge during Hurricane Katrina, that caused some
24    level of damage in each of those 17 buildings?
25    A.   Yes, sir.

Page 96

1    Q.   Have you made any effort to quantify on an
2    item-by-item basis the damage caused by storm surge
3    flooding at the Carriage House property?
4    A.   Yes, sir.
5    Q.   And have you memorialized that effort to
6    quantify the storm surge damage on an item-by-item
7    basis?
8    A.   Yes, sir.
9    Q.   What have you -- where have you reduced
10    that itemization?
11    A.   Now, you said -- I'm sorry.  You said the
12    storm surge, you didn't say the -- I think I
13    misunderstood what you -- you're talking about.
14    You're asking me is there a damage estimate that I
15    have produced, a formal damage estimate that shows
16    what I believe is the damages done by the flooding?
17    Q.   That's correct, that is my question.
18    A.   I -- I stand corrected.  No, sir, I have
19    not produced a formal document.
20    Q.   Do you intend to produce such a document?
21    A.   If I did, it appears as though I would be
22    in violation of the court order in terms of how we
23    are to conduct ourselves in this appraisal.
24      MR. BROWN:  And now we're getting off
25    into -- you probably didn't intend to go there, but

Page 97

1    we're not doing discovery on the appraisal process
2    so...
3    Q.   (By Mr. Gilmore)  Yeah, I guess my --
4    well, I guess my question is are you going to be
5    putting -- not asking you to get into the appraisal
6    process, but are you going to be preparing some --
7    another estimate and report that either has both
8    wind and water damages in it or just a standalone
9    report that has water damage estimates that you
10    intend to introduce as an expert report in this
11    case?
12    A.   I believe I will be required as part of my
13    testifying, should I ever reach the point that I am
14    testifying in a trial, on what portion of the
15    damages out there were flood damages.  I have not
16    produced that yet.
17    Q.   So as we sit here today, you haven't done
18    an item-by-item estimate of flood damage cost of
19    repairs --
20    A.   Correct.
21    Q.   -- for the Carriage House property?
22    A.   Correct.
23    Q.   The next sentence still working on page 1
24    of your report under the "Background" heading, the
25    next sentence reads, "Many of the buildings also

25 (Pages 94 to 97)

Page 98

1  received major damage to their roofs and several
2  lost all or part of an end wall."  Did I read that
3  correctly?
4      A.  Yes, sir.
5      Q.  How many of the 17 buildings at the
6  Carriage House property received major damage to
7  their roofs?
8      A.  All of them had major damage to their
9  roofs.
10     Q.  Sir, in your opinion --
11     A.  What you're asking me.
12     Q.  That -- that is my question.  So a
13 slightly more accurate sentence there would read all
14 of the buildings --
15     A.  Yes.
16     Q.  -- also received major damage to their
17 roofs.  Is it your opinion that there was wind
18 driven rain intrusion to the interior of each
19 building at the Carriage House property?
20     A.  The term wind driven rain is a hotly
21 contested term in the insurance industry.  I believe
22 I understand what you're asking me with regard to
23 what is the definition of wind driven rain.
24     Q.  And we did discuss this before with the
25 understanding of what that term is as essentially

Page 99

1  water or rain that has been allowed to enter a
2  building because of wind damage; is that fair?
3      A.  Yes, sir.
4      Q.  And is it your opinion that such damage
5  occurred in each of the 17 buildings at the Carriage
6  House property?
7      A.  Yes.
8      Q.  Under the next heading "Foreward," you
9  write, "At the request of the insured, I was
10 enlisted to examine all available evidence and
11 create an estimate that most accurately identifies
12 the cost of all repairs caused by or the result of
13 wind force created by Katrina."  Did I read that
14 correctly?
15     A.  Yes.
16     Q.  You italicized request.  Is there a
17 particular reason why?
18     A.  Ask that question one more time, please.
19     Q.  Sure.  In that first sentence there in
20 your report, request is italicized, at the request
21 of the insured.  I was just wondering if there's a
22 particular reason why you've italicized that word.
23 Is that of some significance?
24     A.  I'm reasonably sure that it was at the
25 time I did that.  It doesn't come to mind now why I

Page 100

1  did that now.
2      Q.  And you say, "I was enlisted to examine
3  all available evidence and create an estimate that
4  most accurately identifies the cost of all repairs
5  caused by or the result of wind force created by
6  Katrina."  That was the assignment for which
7  Sunquest had retained you, correct?
8      A.  Yes, sir.
9      Q.  And that is an assignment that's narrower
10 in scope than your role as an appraiser?  We're
11 getting into what that role would be, but this
12 sentence here has to do with your role as a forensic
13 consultant, correct?
14     A.  Yes, sir.
15     Q.  You next write, "To first segregate the
16 scope of wind damages from those related to flooding
17 and then create a corresponding estimate for the
18 value for each different line item."  Did I read
19 that correctly?
20     A.  Yes, sir.
21     Q.  And is that what you had done with this
22 assignment, you have attempted to segregate wind
23 damages from flooding?
24     A.  And then create an estimate that dealt
25 with what's left over, the wind portion.

Page 101

1      Q.  Can you describe each step that you took
2  in order to segregate wind damage from flooding
3  damage?
4      A.  This is a pretty big project.  It would be
5  impossible to articulate that in anything under 1000
6  words.  Can you be more specific like the roof or a
7  particular wall or --
8      Q.  Well, I guess without -- we'll look at
9  specific portions of specific buildings, but
10 generally speaking, how did you segregate damage
11 caused by flooding versus damage that is caused by
12 wind?
13     A.  As a rule, the nature of the damage
14 created by flood is different than the nature of the
15 damage created by wind.
16     Q.  Can you explain that?
17     A.  Well, to begin with, if a building remains
18 essentially intact structurally, the damage created
19 by flooding is normally limited to something below
20 the water line.  You would not expect flooding
21 damage in a building that remained intact largely.
22 Anything above the water line could be flood.
23     Q.  Do you believe there was any structural
24 damage caused by flooding at any of the buildings of
25 the Carriage House property?

26 (Pages 98 to 101)

Lewis Edward O'leary, Jr. 10/6/2009

Page 102

1      A.   I have not seen evidence that suggests
2  there's any structural damage caused by flooding.
3      Q.   Did you make an effort to look for any
4  such evidence?
5      A.   Yes, sir.
6      Q.   That would have been looking at
7  photographs?
8      A.   Well, keep in mind that's all -- that and
9  testimony is all that's really available once you go
10 out to a property that's been completely repaired.
11     Q.   Besides -- besides looking at photographs
12 and, I guess, talking with witnesses, is there any
13 other effort you've made to determine whether there
14 was structural damage to flooding -- caused by
15 flooding?
16     A.   You can examine a property that remained
17 largely intact.  You can find crack lines, for
18 example.  A crack line that's a stair step crack
19 line could be an indicator of a settlement issue
20 that had nothing to do with flood or wind.  So based
21 upon the portion of the property that was not really
22 affected by the restoration effort, you could find
23 evidence of previous repairs and/or previous damage
24 that was not repaired.  I just gave you an example
25 of such a stair step type of effect, and this --

Page 103

1  this property doesn't have brick work.  Compass
2  Point does, but if I found evidence of stair step
3  right up the mortar from a corner, I would believe
4  that was probably a settlement issue that predated
5  the storm.
6      Q.   I think I understand what you said earlier
7  was that the first step in segregating flood damage
8  from wind damage was determining the water line.
9      A.   Yes, sir.
10     Q.   After you determine how high the flooding
11 had risen on the property, what were -- what would
12 be the next step or what was the next step that you
13 took in segregating flood from wind damage?
14     A.   What photographs and witnesses are
15 available, you attempt to get into the minutiae of
16 what the damages were in that specific area.  If you
17 have, for example, a window that largely was above
18 the water line, we'll say a window starts at 18
19 inches off the ground -- off the -- the floor,
20 finished floor is what I meant to say, not the
21 ground, and the flood line was 24 inches, which
22 means the flood line was up six inches into the
23 window, and you have evidence of severe mold above
24 that significantly higher so that you can't blame it
25 on the wicking from the water rising up in a

Page 104

1  capillary action to the Sheetrock, that water
2  entered that space via another method other than
3  flooding.  It could have entered it by what's called
4  a wind induced seal failure around the window that
5  wasn't designed to handle that kind of stress.
6      It could have come in through the roof
7  that -- that's in the process of failing.  You go
8  upstairs, or via the photographs, you go upstairs
9  metaphorically, and you find that this apartment had
10 a collapsed ceiling from the amount of water that
11 had entered it.  You now have a likely source that
12 the water came down via a wind source.
13     Q.   So in your opinion then, based on drawing
14 a water line and accounting for any wicking of water
15 from flooding up into the walls, anything -- any
16 damage beyond that area would be attributable to
17 wind; is that fair to say?
18     A.   Yes, sir.  Wind is not the only reason,
19 but wind would be the most likely reason.
20     Q.   The -- the flooding -- the area that was
21 inundated by flooding, that would show damage from
22 that flooding in photographs, correct?
23     A.   Yes, sir, where there are photographs.
24     Q.   And in the areas inundated by flooding,
25 the after the storm visual evidence would not show

Page 105

1  any independent damage that wasn't caused by
2  flooding, correct?
3      A.   You're going to have to ask that question
4  again.
5      Q.   That was a bad question.  I -- I'll --
6  when the flood waters rose and caused damage, that
7  left obvious evidence, visual evidence afterwards?
8      A.   Yes, sir.
9      Q.   That obvious visual evidence would have
10 masked any other damage that might have occurred in
11 the area inundated by flooding; is that fair to say?
12     A.   I'm going to try to answer your question
13 in a particular way.  If I don't answer it, tell me
14 so.  These windows prior to the storm surge arriving
15 were exposed to force roughly four times or better
16 the force these windows and exterior doors were
17 capable of handling, forces significantly higher
18 than what the roof was capable of handling, which
19 suggests to me, based upon my experience and the
20 physical evidence, that water was getting into this
21 building before the storm surge got there.
22     Q.   My question was a little different.  My
23 question was this:  If you look at a photograph
24 after the storm --
25     A.   Yes, sir.

27 (Pages 102 to 105)

Page 106

1      Q.   -- from that photograph, you wouldn't be
2   able to identify any damage beyond flooding damage
3   to the areas inundated by storm surge; is that fair
4   to say?
5      A.   Sometimes.  If I have a mustache around a
6   window where the water was blowing in around this
7   window because of a wind induced seal failure, and
8   I've got a flood line, remember the example I used
9   where it's six inches up into the bottom of the
10  window, the physical evidence above that tells me
11  this thing was leaking big time before the surge got
12  there.  Is the evidence masked below the water line,
13  yes.  Is there evidence to suggest there was already
14  physical damage there before the surge got there,
15  yes.
16     Q.   So just so I'm clear and the jury is
17  clear, looking at a photograph alone of an area that
18  had been inundated by a storm surge in the area
19  below that water line, it's impossible to identify
20  damage that was not caused by the flood; is that
21  fair to say?
22     A.   Impossible is too strong a word.  The --
23  if you have physical evidence to work with that I've
24  just described, this is all about the likelihood of
25  what happened.  That's what forensics is about,

Page 107

1   trying to put a picture back together again.  It's
2   not an exact science.  It's impossible to tell
3   exactly how bad the damages was below the water
4   line.  That I will agree with you, but whether or
5   not there was damages there below the water line
6   before the water got there, no, sir, it's not
7   impossible.
8      Q.   All right.  I will try and ask my question
9   a little bit more precisely.  Again, I'm just
10  talking about visual evidence that you can see in a
11  photograph.
12     A.   Yes, sir.
13     Q.   And I'm just trying to find out, can you
14  look at a photograph that shows an area that had
15  been inundated by a storm surge and identify a --
16  some feature within that area below the water line
17  that would not have been damaged by the storm surge
18  just from that photograph alone?  Can you do that?
19     A.   I cannot quantify the damages below the
20  water line that were the result of wind via the
21  photographs I've been working with.
22     Q.   Are there any estimates or descriptions of
23  damage in your report that are not caused solely by
24  wind?
25     A.   I believe some of the damages out there

Page 108

1   were caused by the wind and by the flooding.  Does
2   that answer your question?
3      Q.   Have you made any effort to quantify how
4   much of the damages that you describe in your report
5   were caused by both wind and flood acting together
6   or in some sequence?
7      A.   Up to now, the report I have produced was
8   geared toward a classic appraisal, and that is if
9   the damages were already in place, there's nothing
10  beyond ruined.  If carpet, for example -- if I
11  believe that this apartment, ground floor, was
12  already saturated, the carpet was ruined before the
13  flooding got there, you can't take something past
14  ruined.  It's -- there's no ruiner or ruinest, it's
15  ruined.  We've been allowed to make those type of
16  interpretations in many classic appraisals operated
17  under the classic guidelines for appraisers.
18     Q.   Well, I want to focus on your role and
19  your opinions as a forensic consultant that has been
20  retained by Sunquest --
21     A.   Yes, sir.
22     Q.   -- on causation.  And are there any
23  descriptions of damage in this report, Defense
24  Exhibit 174, that was caused both by winds and by
25  flood?

Page 109

1      A.   I'd have to go back and examine the
2   estimate to answer that accurately.  I believe I've
3   attempted on that report -- this report and the
4   supporting estimate to create what I believe was
5   caused by or the result of wind, and I think I laid
6   that out as the preface for why -- what I was doing
7   trying to articulate what was caused by or the
8   result of wind.
9      Q.   And in attempting to do that, have you
10  specifically excluded any damage that would have
11  been caused by wind and flood together?
12     A.   I don't -- I'm not sure at this moment
13  whether any specific line items were a concurrent
14  causation or not.  That's a real fine line we're
15  talking about here.  Is it possible that some of my
16  estimate could easily be argued as a concurrent
17  causation, yes.
18     Q.   Do you have any rough estimate of how much
19  of your estimate could be argued easily as a
20  concurrent causation?
21     A.   I'm not even sure about the width and
22  breadth and the scope of this moment so much -- much
23  less the dollar value of it.  My apologies.
24     Q.   I'm still working on page 1 of your
25  report, Defense Exhibit 174.

Page 110

1    A.  Yes, sir.
2    Q.  And at the last paragraph under the
3  "Foreward" section, you say, "My credentials exceed
4  that of virtually all adjusters that would have
5  otherwise been assigned for this task.  See tab
6  number 3, resume."  Did I read that correctly?
7    A.  Yes, sir.
8    Q.  And we've already gone through your resume
9  and credentials.  Your assertion that your
10  credentials exceed that of virtually all adjusters
11  that would have otherwise been assigned for this
12  task, it's fair to say that's just an assumption,
13  right, Mr. O'Leary?
14    A.  That is my opinion, that is correct.
15    Q.  Do you even know who the Nationwide
16  adjusters assigned to this claim were?
17    A.  Their names are on the estimates, but have
18  I interviewed them, no.  Would I like to interview
19  them, yes.
20    Q.  You don't -- do you know how much --
21  sitting here today, you don't know how much training
22  or experience any of the adjusters have, correct?
23    A.  I have to use their work product to
24  suggest to me their level of expertise given lack of
25  anything else.  When a -- when a gentleman presents,

Page 111

1  for example, carpet prices of 73 cents a square foot
2  and the standard number in Xactimate at that
3  particular point in time for Mississippi, Gulfport
4  cost code is two-and-a-half times that, it suggests
5  to me that he doesn't have as good a feel for what
6  costs should be as he should just to give you an
7  example.
8    Q.  The answer to my question is at this
9  point, sitting here today, you have not made any
10  investigation of the background and credentials of
11  the Nationwide adjusters who adjusted this, right?
12    A.  Beyond what I've just said, no, sir, I've
13  made no attempt.
14    Q.  Now, you learned just yesterday that
15  engineers from National Forensic Consultants have
16  been retained and prepared forensic engineering
17  reports for Nationwide in the course of adjusting
18  the claim, correct?
19    A.  Yes, sir.
20    Q.  Do you know -- are you familiar with NFC?
21    A.  Yes, sir.
22    Q.  Have you made any effort to identify who
23  the engineers were from NFC who inspected the
24  Carriage House property?
25    A.  When I get my hands on the reports, I'm

Page 112

1  sure it will show who they were.
2    Q.  Your next sentence reads, "Accordingly, I
3  was selected to go through all available records and
4  secure testimony to create the following estimate of
5  cost for the damages caused by or the result of wind
6  force.  The following are, perhaps, my opinions on
7  what portion of the damages should have been written
8  up as wind and why."  Did I read that correctly?
9    A.  Yes, sir.
10    Q.  Now, when you say you secure testimony,
11  what did you mean by that phrase, you were asked to
12  secure test -- or selected to secure testimony?
13    A.  I was selected to do an analysis.  How I
14  did my analysis was part of the reason that I was
15  selected.  Because I am so fiercely independent, I'm
16  going after anybody I can find that has no dog in
17  the hunt to see what their opinions were on what the
18  damages were as opposed to relying heavily on the
19  people that are tied to Mr. Brockman.
20    Q.  So when you used the phrase secure
21  testimony, you meant you went out and consulted with
22  other individuals for their information or opinions
23  as to your effort to estimate wind damages to the
24  Carriage House property; is that correct?
25    A.  Yes, sir.

Page 113

1    Q.  Those are the individuals that you've
2  identified in this report, correct?
3    A.  Yes, sir.
4    Q.  And when you use the phrase testimony, is
5  it your understanding that any of these individuals
6  are going to testify at trial in support of your
7  analysis?
8    A.  Whether they support or refute my analysis
9  will -- is yet to be determined.  I've identified
10  the people I went to to get information.  What they
11  say on a witness stand is yet to be determined.
12  Whether they support me or say no, that ain't what I
13  told him, I don't know.  These are not my experts.
14  These are people that were in place at the time.
15  They are fact witnesses.
16    Q.  And the next heading on -- still on page 1
17  of your report, Defense Exhibit 174, entitled
18  "Discussion," you write in the first sentence,
19  "Because of the visual evidence of the damage
20  appears to have been repaired prior to my
21  inspections, I approached this estimate in like
22  manner to estimating a Katrina slab case whereby the
23  physical evidence at the loss location that would
24  normally be available is either only partially
25  available or not at all."  Did I read all of that

29 (Pages 110 to 113)

Page 114

1  correctly?
2      A.  Yes, sir.
3      Q.  And I think you testified before, the
4  first time you visited the property in March of
5  2007, the repairs had already been completed,
6  correct?
7      A.  Yes, sir.
8      Q.  What contracting company had performed the
9  repairs on the Carriage House?
10     A.  Greg Stewart's company, which I believe he
11  operates as Madison Homes.  They have -- he's part
12  of a group partnership, and they had different names
13  for their partnerships, so in terms of which
14  specific name he was doing these repairs under, I
15  believe it was his primary company name, which is
16  Madison Homes, but have I verified that that's the
17  name he did it under, no, sir, I have not.
18     Q.  The -- the -- I guess Mr. Stork and his
19  company, are they affiliated with the buyers of the
20  Carriage House property?
21     A.  Stork, who is Stork?
22     Q.  I'm sorry, perhaps I misheard you.  I
23  thought you had said Greg Stewart.  Is --
24     A.  Stewart, Greg Stewart.  Greg Stewart is
25  part of a -- and I don't know how many people are

Page 115

1  part of the -- you know, if you're involved as a
2  developer, you have different partners and different
3  deals.  I believe the three partners involved in
4  buying these two properties, referring also to
5  Compass Point, was Greg Stewart, David Pilger and
6  Greg Freelander.  Greg Freelander is an attorney,
7  David Pilger is an attorney and David [sic] Stewart
8  is a contractor/developer.
9      Q.  So it's fair to say it's your
10  understanding that the partnership that bought
11  Carriage House and Compass Point from Sunquest
12  itself repaired and renovated the property; is that
13  fair to say?
14     A.  Internally -- I mean, at times, you have
15  one company name here that's arm's length from
16  another, but internally, this group did their own
17  repairs, yes, sir.
18     Q.  Was there a specific person that you --
19  involved in the repairs that you consulted when you
20  first began work on the Carriage House property?
21     A.  I've had a lot of conversations with Greg
22  Stewart and several of his superintendents and
23  Tammie Crossley.
24     Q.  Tammie Crossley is a public adjuster?
25     A.  Yes, sir.

Page 116

1      Q.  Was Ms. Crossley working with Greg Stewart
2  and David Pilger and their group that bought the
3  properties?
4      A.  She already had an ongoing relationship
5  with Greg Stewart and his group when I was asked to
6  begin working with her on other matters on a
7  technical support basis.  It was only after I had
8  worked with her to some degree at some point was I
9  introduced to one of her clients, which was Greg
10  Stewart and company.
11     Q.  When you first began working with
12  Mr. Stewart and Ms. Crossley, did you ask for
13  records that detailed the repairs that were
14  performed on the property by the new buyers?
15     A.  Understand, I didn't even know the new
16  buyer at this point, so I wasn't doing a forensic
17  examination of the property for anybody at first.
18     Q.  Have you ever looked at the records of the
19  actual repairs performed on the Carriage House
20  property?
21     A.  No, I have not.
22     Q.  Have you asked to look at those records?
23     A.  The accounting records, no, sir.
24     Q.  Well, I'm not talking about the accounting
25  records.  I'm -- just the accounting records.  Any

Page 117

1  kind of records that would detail what repairs were
2  done and how much those repairs cost, have you
3  looked at any of those kinds of records?
4      A.  I have not looked at their accounting
5  records for these two properties.
6      Q.  And I'm not sure if we're using accounting
7  records in the same way.  Accounting records to me
8  is something different than what I described.  I'm
9  talking about re -- actual records of the repairs
10  made.  Is that what you mean by accounting records?
11     A.  Let me try to explain why I'm answering
12  you the question the way I am, and if this works,
13  great.  If not, we'll try again.  Greg Stewart was
14  involved in about 35 properties after Katrina.  He
15  was bringing Sheetrock down from places like Jackson
16  and Birmingham by the truckload and distributing it
17  to the various properties after it got down here.
18  His accounting records, because these were
19  properties they were fast tracking to get back on
20  line quickly had massive overlap and were difficult
21  at best to follow.  I know this because I got deeply
22  involved in his accounting record on other
23  properties and realized that it was difficult, if
24  not impossible, to truly separate what was for this
25  property versus what was for that property.  Based

30 (Pages 114 to 117)

Page 118

1  on that inside knowledge on other properties, I did
2  not attempt to do the same for this one.
3      Q.   Have you ever asked Mr. Stewart or anyone
4  who works for him to come up with an overall
5  estimate of what it cost to repair the Carriage
6  House property?
7      A.   They have come up with accounting records
8  for this project, I'm told, and that the total
9  account -- accounting for the repairs they made to
10  them was in the range of seven-and-a-half million
11  dollars.  That is the extent that I have knowledge
12  with regard to what they spent to repair these two
13  properties.
14      Q.   And was that figure, that seven-and-a-half
15  million figure, was that just told to you verbally?
16      A.   Yes, sir.  I have not seen the accounting
17  records.
18      Q.   You've seen other accounting records that
19  Mr. Stewart and his company had for various
20  properties including Carriage House?
21      A.   Yes, sir.
22      Q.   You just have never seen a set segregated
23  just showing repairs and costs associated with those
24  repairs for Carriage House; is that fair?
25      A.   Yes, sir.

Page 119

1      Q.   And it's your understanding from what
2  Mr. Stewart and his company have told you that there
3  is no such set of just those records for the repairs
4  to Carriage House?
5      A.   I -- I can't comment on whether such
6  accounting exists.  I have no knowledge on that.
7      Q.   Just on a clear, did you ever ask
8  Mr. Stewart is there just a set of the records
9  showing the repairs just for the Carriage House
10  property?
11      A.   I have never asked him that question.
12  Excuse me.
13      Q.   Okay.  Back to your report.
14      A.   Page 1?
15      Q.   Yeah, still on page 1 under "Discussion."
16      A.   Yes, sir.
17      Q.   And in that first sentence, you said, "I
18  approached this estimate in like manner to
19  estimating a Katrina slab case."  Now, a slab case
20  is where the property was completely destroyed down
21  to the concrete slab hence the name, right?
22      A.   Yes, sir.
23      Q.   And in such cases, there's no structure
24  that's left behind to inspect after the damages
25  occurred, right?

Page 120

1      A.   That's correct.
2      Q.   That's different than what happened here,
3  the Carriage House damage?
4      A.   That is correct.
5      Q.   The buildings were still standing after
6  Hurricane Katrina had passed, right?
7      A.   Yes, sir.
8      Q.   And it would have been possible for
9  someone to come in shortly after the storm and
10  perform a visual inspection of what the actual
11  extent of damage was to the standing buildings at
12  the Sunquest Carriage House lookout, right?
13      A.   It would have been possible, yes, sir.
14      Q.   Well, you know, they could have taken
15  photographs of that damage, correct?
16      A.   Yes, sir.
17      Q.   And prepared estimates based on those
18  photographs and their own visual inspection of what
19  they saw with their own eyeballs, right?
20      A.   It is certainly possible, yes, sir.
21      Q.   Well, in fact, that's not impossible,
22  that's actually what happened in this case, right,
23  Nationwide's adjusters came in after the storm and
24  did a visual inspection and prepared estimates
25  before the property had been repaired, correct?

Page 121

1      A.   They pro -- provided an estimate of what
2  they -- somebody asserted was the damages.
3      Q.   And you said that you treated this as if
4  it had been a slab case; is that fair to say?
5      A.   Yes, sir.
6      Q.   And I want to make sure I understand what
7  you mean when you say that in your report.  Do you
8  mean to say that your estimates are designed to
9  treat the property as if it was a total loss?
10      A.   No, sir.
11      Q.   Can you explain what you mean by saying
12  that you treated it as if it were a Katrina slab
13  case?
14      A.   Sometimes you evaluate all of the physical
15  evidences there for you to inspect and make point by
16  point, line item by line item determination as to
17  what is the wind damage portion of the damages.
18  When you don't have the physical evidence still
19  there to work with, you have to work outside the box
20  so to speak, which is to gather whatever photographs
21  might be out there, whatever other physical evidence
22  and/or testimony is available, weather reports, tax
23  records.  You work largely outside of the routine
24  box in trying to rebuild a picture.  Adjusters do
25  this all the time.

31 (Pages 118 to 121)

Lewis Edward O'leary, Jr. 10/6/2009

Page 122

1    Q.   So when you're saying that you approached
2  estimating damages for this property as if it were a
3  slab case, what you mean simply is that because the
4  property had already been repaired by the time you
5  inspected it, it was as if you were looking at a
6  slab case where there is no remaining physical
7  evidence of what the damage had been?
8    A.   Yes, sir.
9    Q.   Now, under the "Discussion" heading still
10 on the page of -- first page of your report moving
11 over to the second page, you have a number of items.
12 Number 1, you state, "I collected all available
13 pictures, reports and estimates from all sources
14 available."  Did I read that correctly?
15   A.   Yes, sir.
16   Q.   Let's start with the pictures.  You attach
17 as tab 1 to your report a set of pictures that you
18 were provided.  Are those the pictures that you were
19 referring to?
20   A.   Yes, sir.
21   Q.   Beyond those pictures under tab 1, did you
22 have any other pictures of the damage to the
23 property in preparing your report?
24   A.   I believe the architect that went down
25 from Monroe had a bunch of pictures attached to his

Page 123

1  reports.  TBA, I think, was the name of the firm.
2    Q.   And that's also attached as a tab to your
3  report?
4    A.   Yes, sir.
5    Q.   Let me broaden my question just a bit.
6  Other than the photographs that you attached one way
7  or another to your report, are there any other
8  photographs that you reviewed in the course of
9  preparing the report that showed the damage to the
10 Carriage House property?
11   A.   I think I provided all of the photographs
12 I have.  I'm pretty sure I have.
13   Q.   Number 2, you say, "I interviewed
14 witnesses that could provide input as to the extent
15 of the loss."  Did I read that correctly?
16   A.   Yes, sir.
17   Q.   And then if you flip over to the top of
18 page 2 of your report, you list individuals.  You
19 say, "The witnesses I managed to find and talk to
20 thus far are as follows," and you have seven
21 individuals listed there, correct?
22   A.   Yes, sir.
23   Q.   Other than those individuals that you have
24 listed there, are there any other witnesses that you
25 talked to and received information from that was

Page 124

1  relevant to your conclusions in your report?
2    A.   I don't see Greg Stewart's group on this
3  list.  I apparently left him off the list.
4    Q.   In addition to Greg Stewart, are there
5  other individuals that work with Greg Stewart that
6  you spoke with?  Earlier you mentioned that you
7  might have interviewed some of the superintendents.
8    A.   Yes, sir, I've had multiple
9  conversation -- I think he has three
10 superintendents, but it may be four.  There were two
11 of them that were involved in this, and the two that
12 were involved in this, I had conversations.
13   Q.   And what were those individuals' names?
14   A.   I'm going to have to go back to the
15 records on that.  I can't remember right now.  I --
16 I will happily give you their names, I just -- I --
17 I don't know why I can't remember them right now.
18   Q.   And when you say you have to go back to
19 the records, it would be the -- your work file that
20 you've copied and produced and given to --
21   A.   Oh, there was correspondence that went
22 back and forth on this case.  I just -- I can't
23 remember their names right now.  I can certainly get
24 them for you.
25   Q.   Well, I would appreciate that, if you

Page 125

1  could, and any correspondence you had with those
2  individuals to the extent it hasn't been produced, I
3  would ask if you could --
4    A.   Okay.
5    Q.   -- produce that and give it to us or
6  counsel so that they can produce it to us.
7    A.   All right, sir.
8    Q.   Beyond Greg Stewart and his two
9  superintendents that you had mentioned, are there
10 any other individuals that you spoke with that
11 provided you information relevant to your opinions
12 in your report here?
13   A.   I'm trying to remember whether it was
14 David Pilger or Greg Stewart himself that -- that
15 got off into the supporting of Donna Bass'
16 assertions about all of the vandalism.  I think it
17 was David Pilger.
18   Q.   Mr. Pilger had first-hand knowledge of
19 vandalism that had allegedly occurred at the
20 property?
21   A.   I didn't ask him whether or not he had
22 heard it from his partner, Greg Stewart, or whether
23 he physically walked around and saw the evidence or
24 not.  I did not ask him that.  I was merely looking
25 for someone to affirm what Donna was telling us, and

32 (Pages 122 to 125)

Page 126

1 Donna was the on-site person that would have had
2 first-hand knowledge.
3        VIDEOGRAPHER:  Two minutes.
4        MR. GILMORE:  We can go off record and
5 change the tape.
6        VIDEOGRAPHER:  Off the record at 1:33.
7 End of tape three.
8        (Off the record.)
9        VIDEOGRAPHER:  Beginning tape four.  On
10 the record at 1:37.
11    Q.  (By Mr. Gilmore)  All right.  Still
12 working on page 1 at the bottom under "Discussion,"
13 you have item number 3, "I examined the property for
14 evidence of relatively recent repairs."  Did I read
15 that correctly?
16    A.  Yes, sir.
17    Q.  And what do you mean by that?  You were
18 looking for what appears to be repairs attributable
19 to Katrina damage; is that correct?
20    A.  Well, certain damages like Sheetrock
21 damage to a ceiling where there is a brand new
22 ceiling in this apartment would suggest that since
23 the roofs were all lost that was probably Katrina
24 damage for sure.
25    Q.  When you walked around examining the

Page 127

1 property for evidence of relatively recent repairs,
2 were you accompanied by anyone who worked for Greg
3 Stewart who had been involved in doing the repairs?
4    A.  No, the property manager.  They won't let
5 you go in -- in apartments where people's
6 furnishings are at by yourself.  You've got to be
7 escorted.
8    Q.  And the property manager, is that Donna
9 Bass?
10    A.  No.  She was the property manager at the
11 time of the storm.
12    Q.  So when you did your inspection, you were
13 going with the property manager of the new owner?
14    A.  Correct.
15    Q.  What was his or her name?
16    A.  I don't remember.  It was academic anyway.
17 They were just baby-sitting me while I did my thing.
18    Q.  Was it a man or a woman?
19    A.  It was a woman.
20    Q.  Did this -- you don't remember her name?
21    A.  No.
22    Q.  Did she have any idea of what had been
23 repaired --
24    A.  No.
25    Q.  -- to the property?

Page 128

1    A.  No.  Prior to bringing the property
2 managers on board, he did the renovations so whoever
3 he put out there after he finished with his
4 renovations and started showing the property and
5 renting it out, these people would have been after
6 the fact people.
7    Q.  Did you ever suggest either to the new
8 owners or to Sunquest that it would be helpful to
9 have someone accompany you to point out what
10 actually had been repaired at the Carriage House
11 property?
12    A.  These things are under ideal conditions
13 the best way to do it.
14    Q.  Is the answer no, you did not ask him?
15    A.  There -- there was not one single person
16 that had complete knowledge of each unit.  As I
17 mentioned earlier, Stewart had 35 properties he was
18 repairing, and he was utilizing his people to the
19 best he could, moving them around from property to
20 property, depending on what materials had just come
21 in because they were working as materials were being
22 received.  No one person had the total picture on
23 this, so there was no one person that could give me
24 the guided tour.
25    Q.  Item 4, you say, "I enlisted the

Page 129

1 assistance of those who could provide specialty
2 support on a variety of technical issues involving
3 relevant building codes (in1974 and in 2005),
4 meteorology, engineering and standard pricing
5 guidelines for those locations."  Did I read that
6 correctly?
7    A.  Yes, sir.
8    Q.  Now, if you turn to the back of your
9 report, page 6 under the "Credits" heading, you have
10 four individuals, and then you refer back to the
11 seven people on page 2 of your report.
12    A.  Yes, sir.
13    Q.  So those, I guess, 11 people in total, are
14 those the individuals you are referring to in item 4
15 on page 1 of your report?
16    A.  There is one missing here and that would
17 be Todd -- Todd Skinner.  Todd is an IA based in
18 Pensacola that teaches Xactimate, and he was my
19 source for getting back into what the 2005 prices
20 were in Xactimate.
21    Q.  And then we had already mentioned Greg
22 Stewart himself and the two superintendents.
23    A.  Yes, sir.  Yes, sir.  All of these names
24 should have been on my report.
25    Q.  Now, the four people you have listed under

33 (Pages 126 to 129)

Page 130

1  credits, those four people were not witnesses who
2  had direct factual information about the Carriage
3  House property, correct?
4      A.  You mean what was damaged?
5      Q.  That's right.
6      A.  Yes, sir, that is correct.
7      Q.  These were technical consultants of one
8  sort or another?
9      A.  Yes, sir.
10     Q.  The first one is Terry Moran, P.E.,
11  R.L.S., and he's with Moran-Machado or Machado
12  Engineering?
13     A.  Yes, sir.
14     Q.  How's that pronounced?
15     A.  Your guess is as good as mine.
16     Q.  Okay.  What did you consult with Mr. Moran
17  about for your report on the Carriage House
18  property?
19     A.  The windows -- the wind spray theory
20  around windows, seal -- wind induced seal failure,
21  the dynamics of water getting into an attic via
22  either violated seal strip shingles and/or soffit
23  louvers.  It was a variety of technical issues in
24  putting a picture like this together.  Those were
25  the two largest issues that come to mind right now.

Page 131

1      Q.  Beyond those two issues, are there any
2  other matters reflected in your report that you
3  consulted on with Mr. Moran?
4      A.  If I read through the report, there may
5  have been a couple of other minor points that we
6  went over together.
7      Q.  The next person is Steve Harned, correct?
8  He's a meteorologist?
9      A.  Yes, sir.
10     Q.  And he's actually been designated as the
11  expert in this case --
12     A.  Yes, sir.
13     Q.  -- by Sunquest?
14     A.  Yes, sir.
15     Q.  Had you worked with Mr. Harned before you
16  started work on this case?
17     A.  He was referred to me early on, in fact,
18  before Katrina.  Bill Haggard, William Haggard, one
19  of the old men of the climatology industry based in
20  Ashville had referred me to Steve, I'm going to say
21  four or five, six years ago.  Steve's the retired
22  technical adviser to the director for the National
23  Weather Service.  Currently, he is the executive
24  director of the National Weather Association, and
25  just so happens to live a few miles from me.

Page 132

1      Q.  And the meteorological opinions or --
2  well, meteorological opinions or information in your
3  report, is that attributable to Mr. Harned?
4      A.  Yes, sir.  I believe you have a copy of
5  his report.
6      Q.  The third person is Neil Hall.  What
7  matters did you discuss with Mr. Hall that are
8  reflected in your report?
9      A.  Neil and I have worked on a number of
10  claims together.  Neil has a -- an extensive
11  background in wind engineering.
12     Q.  You worked on Katrina cases before the
13  Sunquest properties with Mr. Hall?
14     A.  Uh-huh (affirmative response).  Yes, sir.
15     Q.  And what specifically did Mr. Hall
16  contribute that's reflected in your report here?
17     A.  We -- I talked to both engineers about the
18  window spray theory, about the violated seal strips,
19  about the wind blowing in via minor racking openings
20  created by a building moving in the storm.  I can't
21  tell you the nuts and bolts anymore of the specific
22  conversations, but I had basically the same
23  conversations with both of them.
24     Q.  Any other matters that Mr. Hall provided
25  inputs on that are reflected in your report?

Page 133

1      A.  He didn't provide any input on the
2  estimates, neither did Terry Moran.
3      Q.  Did you provide them with copies of your
4  estimates?
5      A.  No.
6      Q.  So they just saw this report, this
7  six-page report?
8      A.  Well, it was -- I believe I sent them the
9  attachments to go with the report, so if they wanted
10  to take the time to read them, I think I did copies
11  of the estimates.  Understand this report is 9,000
12  pages including attachments.
13     Q.  I understand.
14         MR. GAUDET:  All too well.
15     A.  I don't think they spent the time to study
16  them.
17     Q.  (By Mr. Gilmore)  Yeah, and I was really
18  trying to make a distinction between the report and
19  the tabs versus the estimates, and I think what you
20  were saying, just to make sure I'm clear, you asked
21  for Mr. Harned, Mr. Moran and Mr. Hall to weigh in
22  on the report and tabs not the building by building
23  estimates?
24     A.  Correct.
25     Q.  Now, the fourth person is Mr. Wiggins,

Lewis Edward O'leary, Jr. 10/6/2009

Page 134

1  Jerry Wiggins, and you have him listed as a
2  consultant.  What did Mr. Wiggins do or consult on
3  that's reflected in your report or estimates?
4      A.  Jerry actually produced these Xactimate
5  estimates for me.  Jerry is a specialist on sitting
6  down and printing out line after line of Xactimate
7  estimates.
8      Q.  Can you describe the process that you and
9  Mr. Wiggins had for preparing the estimates
10  themselves?
11      A.  We started with the Nationwide and the
12  World Claim estimates.  After a reasonably short
13  period of time, it appeared as though the World
14  Claim estimate had more credibility than the
15  Nationwide estimate.  We were looking for a starting
16  point is where I'm going.
17      Q.  When you -- when you say it appeared that
18  the World Claim estimates had more credibility than
19  the Nationwide estimates, can you explain why you
20  thought that?
21      A.  Well, when you leave a certain number of
22  things out of an estimate or you underestimate by
23  numbers that confound anyone that knew what you're
24  supposed to be paying for things, an estimate will
25  either survive or be brutalized in a scrutiny.  Both

Page 135

1  estimates were put under scrutiny, and it appeared
2  as though the World Claim estimate was closer to
3  reality than Nationwide in our opinion.
4      Q.  Okay.  It sounds like when you looked at
5  the Nationwide estimate and compared it to the World
6  Claim estimate, you had two issues with the
7  Nationwide estimates.  One, some of the item pricing
8  you thought was incorrect; is that fair to say?
9      A.  Yes, sir.
10      Q.  And then, two, you thought that specific
11  items that needed to be repaired were omitted from
12  the Nationwide estimate; is that correct?
13      A.  Yes, sir.
14      Q.  Beyond those two items, are there any
15  other differences or concerns you had about the
16  Nationwide estimates?
17      A.  Well, that's all these estimates are is an
18  endless string of little things.  That's just that
19  there's so many units that that endless string of
20  little things add up to big numbers.
21      Q.  So the next step, you and Mr. Wiggins took
22  the World Claim estimates as a starting point?
23      A.  Yes, sir.
24      Q.  Did Mr. Wiggins essentially plug in the
25  World Claim estimates into Xactimate; is that

Page 136

1  correct?
2      A.  World Claims used Xactimate to produce
3  their estimate, also, so it was fairly easy to -- to
4  enter into the -- the system with the same database
5  that they were operating from and expand on it.
6      Q.  And that's -- your last point is what I
7  want to ask about now.  After you had input the
8  World Claim estimates into Xactimate as a starting
9  point, what was the next step that you and
10  Mr. Wiggins took to prepare the estimates?
11      A.  To begin the methodical room by room,
12  apartment by apartment, building by building
13  rebuilding of these estimates to fill in the blanks.
14      Q.  And when you say there are blanks, what --
15  how did you determine if a blank should be filled
16  in?
17      A.  You have photographs and you have
18  witnesses to work with to try to rebuild the picture
19  as best you can after the fact.
20      Q.  Who is deciding how a blank was going to
21  be filled in?  Was that --
22      A.  That was my job.
23      Q.  And so you would make a decision that a
24  certain item of damage that was not in an estimate
25  already needed to be added?

Page 137

1      A.  Yes, sir.
2      Q.  You based that decision on looking at
3  photographs?
4      A.  And testimony.
5      Q.  And the testimony --
6      A.  And reviewing the property to see what
7  appeared to be recent damages versus something that
8  had no repairs done volatile which obviously means
9  it wasn't part of anything.  It was just something
10  that was there undamaged.  It still looks like the
11  way it did four years before except now it has a
12  fresh coat of paint on it.
13      Q.  And then Mr. Wiggins, what was his role,
14  simply to input the figure in the Xactimate system?
15      A.  Yes, sir.
16      Q.  Beyond inputting figures in the Xactimate
17  system, did Mr. Wiggins have any other duties in
18  preparing the Xactimate reports?
19      A.  There were things that came up that
20  neither of us knew exactly how to handle and Jerry
21  was making phone calls also back to some of the same
22  witnesses to try to get a feel for specific items.
23      Q.  Who are the actual witnesses you relied on
24  in preparing the Xactimate reports with Mr. Wiggins?
25      A.  I think the names are in here with the

35 (Pages 134 to 137)

Page 138

1  exception of the people that we've already talked
2  about that are not on the list.
3      Q.   Well, maybe if you can just -- we'll go
4  through the list.  On page 2 of your report, you
5  have listed Mr. Brandon, Timothy Brandon with TBA
6  Architecture, correct?
7      A.   Yes, sir.
8      Q.   And he provided the insured an independent
9  assessment of the loss.  That's what you say in your
10 report, correct?
11     A.   Yes, sir.
12     Q.   You've attached that as tab 4?
13     A.   Yes, sir.
14     Q.   Is he one of the individuals that you and
15 Mr. Wiggins consulted in preparing these Xactimate
16 reports?
17     A.   I believe we've talked to him about his
18 report, sir.
19     Q.   Specifically in connection with trying to
20 complete the Xactimate reports?
21     A.   Yes, sir.  At times people will tell you,
22 man, I don't remember.  That does happen.  It
23 happens to me sometimes, too.
24     Q.   Well, what would happen when people
25 couldn't remember whether a certain repair had been

Page 139

1  done?
2      A.   Well, if you've lost a ceiling upstairs,
3  and you've lost that roof, and the evidence is
4  pretty clear that you've lost that roof, you've lost
5  that ceiling and probably one beneath it.
6      Q.   Is it fair to say that as a general rule
7  where you estimated that the ceilings on the second
8  story needed to be repaired, you concluded that that
9  would result in the ceilings on the first floor
10 having to be repaired as well?
11     A.   Some of these buildings were more damaged
12 than others.  Jerry and I did a little bit of an
13 analysis last night, and it appears as though we
14 allowed for a five to 10 percent Sheetrock
15 replacement in some of the buildings.  We took
16 building 1 through 10 and did a crash effort.  Okay.
17 How much of it did we really replace trying to come
18 up with a global picture here for this morning.
19 Some of the buildings, we had only five to
20 10 percent of the Sheetrock being replaced.  Others,
21 we had 90, 95 percent, so there was no equivalent of
22 a cut and paste, as I described to you earlier,
23 going on with us.  We legitimately attempted to
24 articulate every single unit, and it varied widely
25 in terms of how much repairs we had in each unit

Page 140

1  based upon the input we could get.  It was not a
2  perfect system, though.  No matter how good these
3  people's memories were that we were working with,
4  their memories were not perfect.  A certain amount
5  of this work is guess work, but it's best guess.
6      Q.   Well, I want to understand what guesses
7  you made where there wasn't a photograph that showed
8  damage and where an individual couldn't remember
9  whether or not there had been damage that had
10 required repair, what would you and Mr. Wiggins then
11 do for that item in the Xactimate estimates?
12     A.   Well, that's where you get off into
13 handling it like a slab case where you take all of
14 the evidence as a whole in each individual area of
15 the structure, and you come up with best guess.  And
16 in this industry, best guess is a common technique
17 being used where the physical evidence is no longer
18 available.  That is an accepted practice in this
19 industry of utilizing all of the evidence you can
20 get your hands on, and from there, taking a leap of
21 faith and making the best guess possible.
22     Q.   Is it fair to say that there are estimates
23 for repairs of damage in your reports, your
24 Xactimate reports --
25     A.   Yes, sir.

Page 141

1      Q.   -- that are based on neither photographs
2  or witness interviews, but your guess work as you
3  just described; is that fair to say?
4      A.   There is no single section of this
5  estimate that is based purely on guess work.  We
6  would -- individual items, remember I mentioned that
7  all this is is a series of a lot of little items,
8  and because there's so many units, it just adds up
9  to a big number.  You can get stumped on whether or
10 not you need to replace the baseboard in this
11 particular bedroom or not, and you're just not sure,
12 and the evidence suggests that that's a new
13 baseboard in there.  Remember these properties are
14 old properties built in the '70s.  If in our
15 inspection, it's got a new baseboard in it, the odds
16 are likely that baseboard was replaced during this
17 major renovation effort because I don't think these
18 properties have ever been flooded before.  At least
19 I didn't see any evidence of it.
20     Q.   Have you looked at photos exterior and
21 interior of the property before Hurricane Katrina?
22     A.   Before Hurricane Katrina, I don't have
23 access other than Google Earth for photographs
24 before Katrina.  I would hope in this appraisal
25 process, if y'all have got some pre-Katrina

36 (Pages 138 to 141)

Lewis Edward O'leary, Jr. 10/6/2009

Page 142

1  photographs that y'all would provide it to us
2  appraisers, it might be helpful. Anything we can
3  get our hands on as appraisers, we really need to
4  get our hands on to have a balanced review of this.
5      Q.  Let me ask and try to be as precise as I
6  can with my question.  Are there any items of damage
7  that you have estimated repair for where there are
8  either no photographs, no witness testimony, and you
9  couldn't tell from your own visual inspection after
10  the repairs whether that item actually had been
11  repaired?
12      A.  I'm sure there are some areas where we did
13  the best guess.  I'm certain of it.
14      Q.  Do you have -- can you give any kind of
15  percentage estimate as to how many items you have
16  repair entries for in your Xactimate reports that
17  fall into the category we just discussed?
18      A.  If I were to give you a guess at this
19  point, I would say somewhere in the vicinity of
20  10 percent of our estimate is purely the best guess.
21      Q.  The individuals that you have -- you
22  consulted that are for kind of specialty information
23  or opinions that are listed on the last page of your
24  report, do you know if any of these individuals do
25  work for insurance companies?

Page 143

1      A.  I know Dr. Neil Hall has worked for
2  insurance companies.  Clearly, he works the consumer
3  side of the fence, also.  Steve Harned works both
4  sides of the fence, and Terry Moran before Katrina
5  worked primarily the other -- the carrier side of
6  the fence, and then both sides of the fence since
7  Katrina.  The only one that I don't know for sure
8  whether he's ever worked the carrier side of the
9  fence or not is Jerry Wiggins.
10      Q.  It's fair to say Neil Hall has done all or
11  substantially all of his Katrina related work on
12  behalf of property owners, right?
13      A.  I'm not in a position to address that.
14      Q.  Do you know for Mr. Harned or Mr. Moran?
15      A.  I know Steve Harned is working both sides
16  of the fence.  I know Mr. Moran is working both
17  sides of the fence.  Percentages --
18      Q.  Specifically on -- I'm sorry.
19      A.  -- I cannot -- I'm sorry.
20      Q.  Specifically with respect to Katrina
21  claims, do you know if they are working for
22  insurers, Mr. Moran or Mr. Harned?
23      A.  I only know what they've told me and that
24  is that they're working both sides of the fence.  To
25  articulate beyond that, I couldn't do it.  It would

Page 144

1  be just a wild guess.
2      Q.  If these four specialty consultants had
3  not contributed and discussed with you, what would
4  be not present in your report?
5      A.  Somebody else's name would be in their
6  place.
7      Q.  I think I -- that may be what I'm trying
8  to actually ask, though, is how much of what's in
9  your report now would not be there if these
10  individuals or individuals with their specialty
11  knowledge did not contribute and advise you?
12      A.  I don't even begin to know how to answer
13  that.  I consulted with people that have specialty
14  backgrounds on certain issues that I felt would be
15  contentious to try to shore up that I'm not the only
16  one thinking that way about certain items in this
17  report.  I turned to these people because these are
18  people that I know of that have these specialties.
19      Q.  Is there any specific analysis or opinion
20  that you would not have been able to include in this
21  report had you not gotten the inputs and consulting
22  from these four individuals?
23      A.  I don't know.
24      Q.  Okay.  If you turn to -- back to page 2 of
25  your report, Defense Exhibit 174, and under

Page 145

1  "Findings," you say that, "Working from this
2  estimate," it's World Claim's estimate, "as a
3  starting point, I made scope, unit pricing and
4  quantity corrections."  Is that right?
5      A.  Yes, sir.
6      Q.  Those are the corrections that we
7  discussed a few moments ago?
8      A.  Yes, sir.
9      Q.  Are there any sources of information from
10  making those corrections beyond photos that you
11  looked at interviews you had with witnesses and
12  your own inspection?
13      A.  I believe that covers it.
14      Q.  Were there any features in the Xactimate
15  software itself that you selected or activated that
16  caused any corrections of the sort that you identify
17  here?
18      A.  Keep in mind I did not produce the
19  Xactimate estimate.  I provided Jerry with the
20  guidance on what I wanted in the estimate, and
21  between him and Todd, these estimates are produced.
22  I don't -- I don't like Xactimate.  I believe these
23  guys rely too heavily on it to guide them through
24  how to put an estimate together, and it's not
25  designed to tell you what you need to put in there.

37 (Pages 142 to 145)

Page 146

1  If you don't know what you're missing, you ain't
2  going to get it in your estimate. Some of these
3  people that produce these estimates rely on it to
4  guide them, and it ain't going to do it. I do my
5  own spreadsheet when I do my own estimates.
6      Q. Well, did you prepare as sort of an
7  initial run your own spreadsheets of estimates for
8  each building here?
9      A. I created a scope that I wanted the
10  estimate built to which filled in the blanks of what
11  was missing from the World Claim estimate. Jerry
12  sat down and crunched the numbers. Jerry is very
13  proficient in producing an Xactimate estimate, and
14  with Todd's assistance, we were able to figure out
15  what the standard Xactimate rates were at that time
16  for the Mississippi Gulf Coast, 2005, fourth quarter
17  and versus what was presented to us.
18      Q. How many conversations did you have with
19  Mr. Wiggins about preparing these Xactimate reports?
20      A. At least 40 if not 60.
21      Q. Can you give an estimate of how many hours
22  you believe Mr. Wiggins spent preparing the
23  Xactimate estimates for the Carriage House property?
24      A. I certainly have the records on it. I
25  think I paid him well over $10,000 to produce these

Page 147

1  estimates.
2      Q. How was Mr. Wiggins compensated? Did you
3  bill his time through to Sunquest?
4      A. No, no. He -- he worked for me. To give
5  you an example, many adjusters, whether they're a
6  public adjuster or an independent adjuster, have
7  estimators that do estimates for them. They will
8  provide the field data, and many times, these
9  estimators will not even see the property. Because
10  of the size and complexity of this loss, I had Jerry
11  actively involved in going to the property and going
12  through the minutiae to make sure we were getting it
13  as right as we could. It wasn't the usual claim
14  where you could go out and physically see, well,
15  there's the damage, write it up. You know, there
16  was a certain amount of hand holding involved here
17  where you're trying to write something up that's not
18  that way anymore.
19      Q. How much -- how many visits did
20  Mr. Wiggins make to the Carriage House property?
21      A. I don't remember.
22      Q. Was it more than one?
23      A. Yes, sir.
24      Q. What would he do when you and he would go
25  and visit these properties?

Page 148

1      A. Well, initially, we sat out what we wanted
2  to do, and then you would run into minor issues, you
3  know, did we -- did we need to include the baseboard
4  in this room, what about the closet door, these sort
5  of things, and it would require follow-up phone
6  calls and/or visits. And keep in mind, Mr. Wiggins
7  doesn't just work for me. There are attorneys on
8  the Gulf Coast that hire Mr. Wiggins to produce
9  estimates for them. Jerry is a certified home
10  inspector. I believe he's a certified mold
11  remediation contractor. He's got several
12  credentials. I'm not his only client.
13      Q. Do you know, does Mr. Wiggins -- well, in
14  Katrina, you're not -- strike that. How many
15  Katrina-related cases, if you know, has Mr. Wiggins
16  consulted on?
17      A. I do not know.
18      Q. Have you and he worked on other Katrina
19  cases together besides the Sunquest cases?
20      A. Yes, sir.
21      Q. How many?
22      A. Four, five, six, and I work with -- I work
23  with other estimators also. I think Jerry has done
24  maybe a half a dozen with me, Katrina cases. Excuse
25  me.

Page 149

1      Q. How about overall, how many cases have you
2  and Mr. Wiggins worked together on?
3      A. Overall -- what does overall mean,
4  Katrina?
5      Q. Including Katrina but beyond just Katrina.
6      A. The first project Jerry and I worked on
7  together, I believe, was 1995.
8      Q. Can you give an estimate of just a
9  ballpark figure of how many different claims have
10  you and Mr. Wiggins worked on together since 1995?
11      A. 20 to 30.
12      Q. Do you believe that you are one of his
13  more lucrative clients?
14      A. No. Well, I don't know in the pecking
15  order. I'm not his -- his best client in terms of
16  bringing him income. I know I'm not number one. Am
17  I in the top 10, probably.
18      Q. What did Mr. Skinner contribute to the
19  preparation of the Xactimate reports?
20      A. Because he teaches Xactimate at the local
21  junior college to adjusters, he has more intimate
22  access to historical records than most. He can go
23  back into the Xactimate archives and pull up third
24  and fourth quarter cost codes for Gulfport for
25  Katrina.

38 (Pages 146 to 149)

Page 150

1    Q.   How much of the input -- sorry, strike
2  that.  How much of the estimate numbers in your
3  Xactimate reports reflect Mr. Skinner's additions or
4  corrections?
5    A.  I -- I'm not sure I could come up with
6  that even if I tried.
7    Q.   Would it be fair to say he provided
8  substantial changes or revisions to the kind of
9  initial versions of the reports that you and
10  Mr. Wiggins prepared?
11    A.  No.  He was involved after the initial
12  push.
13    Q.   And was his involvement substantial or
14  limited in terms of the multiple end product?
15    A.  Limited.
16    Q.   You worked with Mr. Skinner before this
17  property?
18    A.  Yes, sir.  He's one of the IAs.  He is an
19  independent adjuster that consults with me on
20  various and sundry situations that come up.
21    Q.   Did you speak with anyone at World Claim
22  regarding the preparation of the reports?  I see
23  you've identified someone named Michael Fusco.
24    A.  He owns the company.  I spoke with one
25  other person that was there.  The specific estimator

Page 151

1  that produced this report, he didn't know where he
2  was at.  It had been three years since the man had
3  produced the estimate and, apparently, the guy was a
4  contract estimator much like Jerry is for me on
5  this, and I was unable to actually find the young
6  man.  Would dearly love to talk to him if I can find
7  him.
8    Q.   Was it your understanding that that person
9  who had performed -- produced the World Claim
10  estimates had inspected the property prior to it
11  being repaired?
12    A.  Yes, sir.  Michael Fusco, and I don't
13  think he had any specific reason to do it, talked
14  about this young man as one of the best he had ever
15  had working for him, and he regretted that he wasn't
16  still working for him at this time.
17    Q.   Did Mr. Fusco provide any clarification or
18  additional details that you and Mr. Wiggins were
19  able to incorporate into your Xactimate estimates?
20    A.  He didn't work these claims on that level.
21  He was the owner of the company.  He was a public
22  adjuster himself, but he didn't have the intimate
23  minutiae level knowledge that I was looking for.
24    Q.   So your discussion with Mr. Fusco and
25  anyone else at World Claim did not really add

Page 152

1  anything of substance to your Xactimate estimate --
2    A.  No.
3    Q.   -- is that fair to say?
4    A.  That's fair to say.
5    Q.   Why don't we go off the record?  I think
6  both of us are losing our voice.  I think maybe we
7  can use a little water.
8    VIDEOGRAPHER:  Off the record at 2:13.
9    (Off the record.)
10    VIDEOGRAPHER:  On the record at 2:21.
11    Q.   (By Mr. Gilmore)  Mr. O'Leary, earlier you
12  had testified that you had prepared initial
13  spreadsheets that you then gave to Mr. Wiggins so he
14  could create an Xactimate report.
15    A.  No, sir.  I had indicated that when I do
16  an estimate, I will commonly do it on a spreadsheet
17  format.  I have my own estimating program that I use
18  to create my own estimates when I'm doing them by
19  myself and there's no one available to crunch
20  numbers for me using a particular format.  Because
21  everybody else had used Xactimate on this case, it
22  made sense that if I was going to produce yet a
23  third estimate that it follow the same basic program
24  as the other two guys and, accordingly, I engaged
25  Jerry Wiggins to work with me to develop, A, a scope

Page 153

1  to fill in the blanks, and B, to take that scope and
2  crunch the numbers using Xactimate setting these
3  numbers -- these scope items out to specific cost.
4    Q.   And when you say "scope," is that
5  something that you had written up?  I'm trying to
6  understand -- I mean, I understand the word scope,
7  but you seem to be using it in a different manner
8  here.
9    A.  We took a World Claim's estimate --
10    Q.   Uh-huh (affirmative response).
11    A.  -- and marked the heck out of it.
12    Q.   Just --
13    A.  And that became our scope combined -- and
14  if it was too much to put on -- on the page, we
15  would attach a page to it or write on the back of
16  the page.
17    Q.   When you say you took the World Claim
18  estimate and marked it up, you literally took a hard
19  copy and with a pen --
20    A.  Yes, sir.
21    Q.   -- wrote changes on it?
22    A.  Yes, sir.
23    Q.   Do you still have that marked up --
24    A.  No, sir.
25    Q.   -- World Claim scope?

39 (Pages 150 to 153)

Page 154

1      A.   No, sir.
2      Q.   You threw it away?
3      A.   The last time I kept stuff like that, I
4   had some colorful notes on it that came out, and I
5   decided I ain't keeping those anymore.
6      Q.   When did you throw away the World Claim
7   scope?
8      A.   When I had a working scope I could live
9   with that Jerry had produced.
10     Q.   What date was that?
11     A.   I can't tell you.
12     Q.   Was it this year?
13     A.   When did I produce it?  Wasn't it last
14  year I produced this estimate, September of '08?
15  I'm pretty sure the date on the final draft was
16  September of '08.  We've got the notebooks right
17  over there.  We can grab it and see what the date on
18  it is if you want.
19     Q.   We can take a look at it, but you're
20  talking about the day of your Xactimate estimates?
21     A.   Yes, sir.
22     Q.   Were there items that you thought World
23  Claim had added in their initial report that needed
24  to be taken out of the estimates you and Mr. Wiggins
25  were preparing?

Page 155

1      A.   I don't know that we took anything out.
2   There were certain units that didn't make sense in
3   terms of what they were claiming.  Let me think of
4   an example.  When you replace all of a ceiling, but
5   you only have an allowance for half of the attic
6   insulation above it where you can't have insulation
7   just hanging there, you've got to have all
8   insulation to match the square footage number of the
9   ceiling.
10     Q.   If all of the insulation needs to be
11  replaced.
12     A.   Well, you pull a ceiling down, that bulk
13  insulation is coming down with it.  It ain't going
14  to sit there in thin air.  You're going to have to
15  replace it also because now it's on the carpet.
16     Q.   That's another item that you thought they
17  had omitted or was incomplete on their estimate?
18     A.   Their -- their estimate was not perfect.
19     Q.   What I'm trying to understand is are there
20  any items either in the World Claim estimate or the
21  Nationwide estimate that you thought were improperly
22  included and you left out of your estimate?
23     A.   I can't remember a specific example where
24  I could say that.
25     Q.   It's fair to say all of the differences

Page 156

1   between your estimates and the World Claim and
2   Nationwide estimates are that you've either added
3   things or made the unit prices higher; is that fair
4   to say?
5      A.   Or corrected the scope was included.  The
6   example I just gave you a second ago didn't have
7   anything to do with pricing, it had to do with the
8   scope.  You've got half a ceiling worth of
9   insulation on your estimate and an entire ceiling
10  and it's blown insulation, you're going to lose all
11  of that ceiling insulation when you pull the
12  Sheetrock down.
13     Q.   That's fair.  So would it be fair to say
14  all of the changes in your report from the World
15  Claim and Nationwide estimates are either adding
16  items, enlarging the scope of items or increasing
17  the price of items?
18     A.   That pretty well describes it, I believe.
19     Q.   I'm still working on page 2 of your report
20  under the heading "Discussion," and say you
21  relied on the wind speed estimates from Steve
22  Harned, correct?
23     A.   Yes, sir.
24     Q.   Other than the meteorological information
25  that he provided, are there any other sources of

Page 157

1   wind speeds that you are relying on in your report?
2      A.   I have the same database that Steve has to
3   work from, which is the NOAA's HRD wind models and
4   the Katrina report.  I worked from the final edition
5   of the Katrina report as opposed to the interim
6   edition that this Mr. Slees -- not Slees, I'm sorry.
7   What was his name again?
8      Q.   Skees.
9      A.   Skees?
10     Q.   Uh-huh (affirmative response).
11     A.   My apologies.  He was -- he was citing the
12  interim edition in December of 2005.  The final
13  edition had significant changes to it in August of
14  2006, which is the one I worked with.
15     Q.   Did you consult with any other
16  meteorologist besides Mr. Harned?
17     A.   No.
18     Q.   Did you look at anemometer numbers from
19  any anemometers that measured wind speeds along the
20  coast?
21     A.   No.
22     Q.   Are you generally familiar with anemometer
23  numbers?
24     A.   I -- I am familiar with the fact that
25  NOAA's Hurricane Research Division affectionately

Page 158

1  referred to as HRD takes all of the private and
2  public data including local water towers, water
3  pumping stations, all of their data to create their
4  combined wind models after the storm. They are the
5  gold standard in the industry of who produces the
6  best wind data.
7       Q.   In your review then, NOAA's H wind --
8       A.   HRD wind models.
9       Q.   Right. And the HRD produces the H wind
10 analysis, correct?
11      A.   I've never heard it worded that way
12 before, but the wind data provided by the Hurricane
13 Research Division of NOAA, their wind models and the
14 H -- the Hurricane Research Center, HRC report of
15 August 2006 are considered the two sources for
16 Katrina wind data and flood data.
17      Q.   You have assumed for purposes of your
18 report that the maximum wind gusts were 110 miles
19 per hour, that's the speed cited here; is that
20 correct?
21      A.   He says increased to over 110. He --
22 privately, we talked in the range of about 114, but
23 for the sake of this report, we are just taking the
24 position over 110.
25      Q.   Somewhere in between 110 and 114?

Page 159

1       A.   Yes, sir.
2       Q.   In your opinion, will there be any
3  material difference between 110 and 114 mile per
4  hour wind speed on structures such as the Carriage
5  House property?
6       A.   We don't intend to go there. These
7  windows were rated for 35 miles an hour, and
8  70 miles an hour is four times the force because it
9  works exponentially. At 105 miles an hour, it's
10 nine times the force, which explains why the window
11 spray theory is so applicable to a property like
12 this.
13      Q.   Did you perform calculations based on wind
14 speed inputs from Mr. Harned designed to show that
15 the seals around windows and sliding doors would
16 have failed during the course of Hurricane Katrina?
17      A.   I have the test data for these style
18 windows that show what they are rated to, and beyond
19 that, they will fail, and it's reliable test data
20 from the industry itself. These are DP20s. They're
21 good for about 35 miles an hour.
22      Q.   And when we -- when you say fail, that
23 doesn't necessarily mean that the window shatters,
24 right?
25      A.   That's correct. We're not talking about

Page 160

1  structural failure. Most people think that a
2  window, if it's good for 100 miles an hour, that
3  it's also not going to leak before 100 miles an
4  hour. That's not even close to the truth. The test
5  pressure for your normal window against leak
6  resistance is around one-tenth of its structural
7  rating. A DP30, which is a common rating for a
8  current window, is tested one-half times at
9  45 pounds per square foot structurally, but leak
10 resistance is only 4.5 pounds per square foot.
11      Q.   Have you made any calculations to
12 determine how much water would begin to intrude once
13 the seals around windows and sliding doors failed?
14      A.   There's actually testing going on in
15 Florida right now to try to quantify this.
16      Q.   You, yourself, have not tried to quantify
17 it?
18      A.   That is correct. That is correct.
19      Q.   You would need to know how much rainfall
20 was being blown during Hurricane Katrina that might
21 intrude through these failed seals?
22      A.   There's a lot of factors. Whether or not
23 the window is in any sort of a bind from minor
24 racking is a factor.
25      Q.   What are some other factors beyond --

Page 161

1       A.   Age.
2       Q.   -- how much rain was actually falling and
3  whether the window had been racked, is that what you
4  would say?
5       A.   Racking is -- is -- everybody thinks
6  racking is something that's all twisted out of shape
7  like a pretzel. Low level racking where you're
8  approaching the design limit of a structure occurs.
9  Buildings do move, caulked joints around windows and
10 doors do break because of this minor movement beyond
11 what the caulked joint can handle.
12      Q.   Beyond those two factors, how much
13 rainfall and any sort of racking windows and sliding
14 doors, what other factors would you need to be able
15 to quantify in order to calculate how much rain
16 actually was being intruded through the failed seals
17 around windows and sliding doors?
18      A.   Wear and tear. As the window gets older,
19 the tolerances between the sash and the guides may
20 open up. It may not be as tight as it was when it
21 was new. You remember these test specs I'm quoting
22 to you are based upon the window being new.
23      Q.   Any other factors that you would need to
24 quantify in order to calculate how much wind blown
25 rain would have intruded past the seals of the

41 (Pages 158 to 161)

Lewis Edward O'leary, Jr. 10/6/2009

Page 162

1  windows and the sliding doors?
2      A.  Direction of the rain or direction of the
3  wind, excuse me, whether or not there was any cover
4  or not, the intensity of the rain.  One inch per
5  hour is going to have a signifi -- significantly
6  less factor on something like this than three inches
7  per hour.  There's -- there's enough factors
8  involved here to say that it would be nearly
9  impossible for someone without a lot of information
10  to quantify this.
11      Q.  And you have not attempted to quantify any
12  of those factors for purposes of your analysis in
13  this report, correct?
14      A.  I have attempted to take other
15  situations -- I mentioned Shell Landing to you,
16  which is also in Gautier, a brand new DP30 window,
17  which is a 50 percent higher rating than these
18  windows, brand new, no wear and tear, and
19  significant evidence all the way across the room
20  where there was no furniture to block it, on duplex
21  outlets, switch plates, trim around doors and open
22  wall areas themselves across from this window that
23  was not open and did not fail, the wind was strong
24  enough to basically coat that wall across the room
25  10 feet away.

Page 163

1      Q.  I don't think that answered my question.
2  My question was all of the factors that we ran
3  through that would be required to be quantified in
4  order to calculate how much wind blown rain intruded
5  through the windows and sliding doors at the
6  Carriage House properties, have you made any efforts
7  to quantify any of those factors?
8      A.  Other than the broad brush methodology
9  I've just described to you and the mustaches around
10  the windows that I found that we've also talked
11  about earlier, I found evidence that it did occur
12  and likely occurred more than just a drop or two.
13  Whether or not it was 50 gallons or five gallons
14  that came in during the six or seven hour process, I
15  can't quantify anymore than to say the evidence is
16  it was significant.  That's -- no one is going to be
17  able to, in all likelihood, come up with a more
18  defined than that.
19      Q.  Well, I mean, for instance, can you say
20  whether there was any --
21      A.  I'm sorry.
22      Q.  Can you say whether there was any standing
23  water on the first floor ground as a result of rain
24  that had intruded through failed seals around the
25  windows and sliding doors?

Page 164

1      A.  Had the property not flooded, very
2  probably, but the fact that the property did flood,
3  that evidence would no longer be available to view.
4      Q.  So you can't tell the jury there were --
5  there was one inch of water on the ground from wind
6  driven rain that intruded through failed seals
7  around windows and doors, correct?
8      A.  I could not quantify it to that level.
9      Q.  Okay.  Still working on page 2 under the
10  "Discussion" heading, Point C, you discuss
11  vandalism, which we had briefly mentioned earlier in
12  your deposition, and you state specifically on the
13  last sentence, "Vandals turned to breaking windows
14  and sliding glass doors along with stripping out the
15  copper piping and wires."  Did I read that
16  correctly?
17      A.  Yes, sir.
18      Q.  How did you reach that -- the opinion that
19  vandals turned to breaking windows and sliding glass
20  doors along with stripping out copper piping and
21  wires?
22      A.  Initially, I got it from Donna Bass.
23  Following up to try to attempt to determine whether
24  or not that was as bad as she described it, David
25  Pilger provided that input to Tammie.  Tammie

Page 165

1  Crossley was one of my main contacts in producing a
2  picture on this, and I didn't know Pilger and
3  Stewart as well as she did because she was working
4  with them on claims, so there was certain things I
5  asked her to do in terms of investigating because
6  she could get through to these people better than I
7  because I was a stranger in the crowd.  And since
8  Donna Bass never worked for Pilger or Stewart, we
9  were looking at two entirely separate sources,
10  neither of which had any dog in the hunt.
11      Q.  Have you seen any photographs that show
12  copper piping and wiring having been stripped out?
13      A.  No, I have not.
14      Q.  Can you turn to page 4 of your report?
15  Again, that's Defense Exhibit 174.
16      A.  Yes, sir.
17      Q.  And you -- at the beginning of this page,
18  you set up your conclusions regarding your analysis
19  for the Carriage House property, correct?
20      A.  Yes, sir.
21      Q.  And you have a summary of the Xactimate
22  estimates you prepared for each building, correct?
23      A.  Yes, sir.
24      Q.  Your total estimate is $6,334,990.03,
25  correct?

42 (Pages 162 to 165)

Lewis Edward O'leary, Jr. 10/6/2009

Page 166

1      A.   Yes, sir.
2      Q.   When you compare that to the estimates
3  that Nationwide -- Nationwide's adjusters developed,
4  that totaled $944,922.71, correct?
5      A.   Yes, sir.
6      Q.   So your estimate is more than 5 million
7  higher than Nationwide's estimate; is that correct?
8      A.   I believe that math is correct, yes, sir.
9      Q.   You have got a series of numbered points
10 at the bottom of page 4 here, and the first one
11 refers to the fact that Nationwide estimate includes
12 no decking replacement, correct?
13     A.   Yes, sir.
14     Q.   And in fact, as you know, the estimates
15 have a line item for replacing the decking, correct?
16     A.   There is a note on there that basically
17 says tell us later.
18     Q.   And that indicates an understanding that
19 there may be repairs that need to be paid for for
20 the decking, but a lack of information as to what
21 that scope of decking replacement was and how much
22 it costs; is that fair to say?
23     A.   That is a position that Nationwide took,
24 tell us how much decking you replaced later.
25     Q.   Well, have you had any conversations with

Page 167

1  anyone at Greg Stewart's company that worked on the
2  repairs of the property to get an understanding as
3  to how much of the roof decking actually was
4  replaced?
5      A.   Yes, sir.
6      Q.   You have?
7      A.   Yes, sir.
8      Q.   Who did you have those discussions with?
9      A.   He had two superintendent on the job.
10     Q.   Those two superintendent that we don't
11 know their names right now but --
12     A.   But you will have their names.
13     Q.   What did those two superintendents tell
14 you about the scope of decking replacement and the
15 repairs of the Carriage House property?
16     A.   Well, clearly, this picture shows daylight
17 where a sheet of four-by-eight plywood used to be
18 and now you're looking at the sky.  It has been my
19 experience and my training that if you see damages
20 when you're writing an adjustment, you write up what
21 you can see, and if you're going to leave a back
22 door open for a man to come back and supplement his
23 claim, you leave it, but you write up what you can
24 see.
25          VIDEOGRAPHER:  One minute.

Page 168

1          MR. GILMORE:  Go off the record.
2          VIDEOGRAPHER:  Off the record at 2:43.
3  End of tape four.
4          (Off the record.)
5          VIDEOGRAPHER:  Beginning tape five.  On
6  the record at 2:44.
7      Q.   (By Mr. Gilmore)  In your estimate, did
8  substantially all of the decking for the roofs at
9  the Carriage House property require replacement?
10     A.   There was a lot of decking replaced, but
11 it was nowhere near a total decking replacement.  I
12 think my estimates reflect that.
13     Q.   As point 2, you have average dumpster
14 rates, and you say, "It is normal practice to allow
15 at least two dumpster loads for roof decking jobs of
16 this size.  Nationwide has allowed only one at
17 $305.04, which is a third below the average $450
18 post-Katrina rates."  Did I read that correctly?
19     A.   Yes, sir.
20     Q.   Well, when you say it's normal practice to
21 allow at least two dumpster loads for a roof decking
22 job of this size, what is your source for that?
23     A.   I've had to unload about half of a
24 dumpster because of the weight issue.  You -- if you
25 can get it in a dumpster, a lot of people believe,

Page 169

1  well, you ought to be able to pick it up, but they
2  refuse to pick it up because you've gone over the
3  weight limit, and if you have to unload a dumpster a
4  time or two, you won't make that mistake again.
5  Somebody took the volume of a dumpster and figured
6  out, well, I can do all of this with one dumpster,
7  and after you run the calculations on how much
8  weight you just put in a 40 yarder, and you contact
9  the dumpster people and ask will you pick that up
10 with that much load in it, and they tell you no, you
11 won't do it twice in a row.
12     Q.   So your opinion there is not necessarily
13 the volume of the total debris that needs to be
14 cleaned up, just whether you can transport a full
15 dumpster.  Is that your position?
16     A.   It's a weight issue.
17     Q.   Weight issue.  The post-Katrina rates, you
18 say are $450.  What's your source for that number?
19     A.   Local.  Remember, I was raised out here.
20     Q.   Well, when you say you're a local, I mean,
21 can you be more specific?
22     A.   I was involved in a lot of Katrina claims,
23 and I got local input on a variety of different
24 things.  At some point in working Katrina claims,
25 certain numbers became second nature to me in terms

43 (Pages 166 to 169)

Page 170

1  of what was the normal rate for people like Waste
2  Industries, BFI. These guys all know what they --
3  they charge, and they -- they kind of work roughly
4  in the same pricing category. You're not going to
5  get one guy that works for a third less than the
6  other one, and knowing what their rates are, I'm
7  telling you, you can't get it done for these
8  numbers.
9      Q.  Do you have specific names of weight -- of
10  debris removal companies?
11      A.  I will be happy to provide you with
12  information directly from BFI or Waste Industries or
13  any of the other biggies that are out there in terms
14  of what their rates are. I will be happy to get
15  that for you, sir, or what the Xactimate would show
16  for the same job.
17      Q.  I would appreciate that.
18      A.  Yes, sir.
19      Q.  Mr. Todd got it, no need to worry, Mr.
20  O'Leary. Point 3, you say that Nationwide made no
21  allowance for a two-story charge even though such a
22  line item is available in Xactimate. All right.
23  Now, when you say even though such a line item would
24  be available in Xactimate --
25      A.  Yes, sir.

Page 171

1      Q.  -- I guess my question is, is the fact
2  that the item can be selected in an estimating
3  program sufficient for making the decision to add it
4  to an estimate?
5      A.  If it's a two-story building, the operator
6  of the estimate has to know that such items are
7  available. I mentioned to you earlier that a lot of
8  these adjusters are relying on these programs to
9  guide them, but the program's not there to guide
10  them. The program is there to serve as a tool for
11  them. If they don't already know that there's a
12  steep pitch charge, that there's a two-story charge,
13  that there's a charge for whirly birds, for wall
14  flashing, for lead Jackson boots, drip edge, all of
15  these things are in the program.
16      Q.  Well, the fact that it's in the program,
17  does that have any relation to whether that's
18  something that's actually charged by contractors?
19      A.  I can promise you contractors charge for
20  these things. I've -- I've done roofing in-house
21  for years, and if you don't charge extra for these
22  things, you ain't going to make any money on a roof
23  job.
24      Q.  What is that whirly bird?
25      A.  Have you ever seen something that's round

Page 172

1  up on a roof and it's twirling around, that's a
2  whirly bird. It's a ventilator. The nickname of
3  them are whirly birds.
4      Q.  Did the Carriage House buildings each have
5  whirly birds?
6      A.  I think they did.
7      Q.  You would see them in photographs, right?
8      A.  The photographs should tell the tale.
9      Q.  You say, "Cover and protect mature
10  landscaping in place here." That's another line
11  item available in Xactimate, correct, item 3?
12      A.  There are certain extra charges that are
13  legitimate services associated with this reroofing
14  that have been left off of their estimate. There
15  are actually items that you can put into Xactimate
16  and put an explanation box after the item in terms
17  of why you've added this item, which is not in the
18  estimate. To give you an example, do you have a
19  composition roof on your home? I'm just trying to
20  give you an example here, that's all.
21      Q.  Well, let me ask this question because I
22  don't think the jury really cares about my house as
23  much as the Carriage House properties.
24      A.  All right, sir.
25      Q.  When you would get -- hire a contractor to

Page 173

1  replace a roof, is item -- a line item such as
2  covering and protecting, when you say mature
3  landscaping, I assume you mean like a tree near the
4  house, is that going to be a separate line item?
5      A.  It's common that -- that in a property
6  that's this old, this property is 35 years old, that
7  mature landscaping is in place, and you bring
8  plywood sheets out and you cover it, so that as
9  you're pitching the shingles off the roof, and
10  you've got to first dislodge from the nails, and
11  commonly, a lot of them will slide down to the edge
12  before you can get them over into the dumpster. The
13  dumpster is going to be at one point around the
14  roof.
15      Q.  So this -- the mature landscaping you're
16  referring to here is flower beds and shrubs on the
17  ground?
18      A.  Yes, sir. You tear them up, you're going
19  to buy them.
20      Q.  It's fair to say, given the storm surge
21  inundation, there would have already been
22  substantial damage to these --
23      A.  Well, if you've got 20 year old bushes
24  around it, they're going to survive, but you could
25  tear them to pieces when several hunks of shingles

44 (Pages 170 to 173)

Lewis Edward O'leary, Jr. 10/6/2009

Page 174

1  come sliding off of the edge.
2      Q.  Point 4, you say, "27 man hours for
3  general cleanup is at best half of the allowance
4  necessary to remove a solid field of debris created
5  by most of the wall block wall collapsing and the
6  removal of the remaining section."
7      A.  First of all, this item right here is
8  talking about a block wall that collapsed.  If
9  you've got chunks of block wall that have fallen
10  over that vary from a piece of a block to maybe five
11  or six blocks still glued together by the mortar
12  that connected them, you're going to come in here
13  with a skid-steer or a front-end loader, and you're
14  going to load it into a dumpster.  There was no
15  allowance for any equipment like this.  The --
16  whoever wrote this estimate assumed that guys would
17  just come in there and break it up into tiny enough
18  pieces so that they could handle it and put one
19  individual piece at a time in a dumpster, and that
20  would take forever to do.  The approach to handling
21  this collapsed block wall was not real world.
22      Q.  Well, do you know how the debris from the
23  collapsed brick wall actually was cleaned up?
24      A.  I -- I watch them use skid-steers because
25  they own them.

Page 175

1      Q.  Well, you didn't watch the contractor --
2      A.  Not on this job.
3      Q.  -- on this job?
4      A.  That is correct.
5      Q.  Do you know, not have an opinion?
6      A.  I asked them how they handled that, and
7  they said we probably picked it up with a
8  skid-steer.
9      Q.  Who told you that?
10      A.  One of the two men's names who you are
11  about to get, I believe, or they told Jerry.  You
12  know, after a while if you do enough of these in
13  succession, they all kind of begin to run together.
14      Q.  You said "or they told Jerry."
15      A.  I told you that Jerry followed in behind
16  me on some stuff where we needed additional input.
17      Q.  And you did say that.  Did Mr. Wiggins
18  also himself have conversations with people at Greg
19  Stewart's company?
20      A.  He's had conversations with these same
21  people, yes, sir.
22      Q.  And you are aware of him having
23  conversations that you, yourself, were not
24  personally a part of --
25      A.  That's correct.

Page 176

1      Q.  -- that you learned of later?
2      A.  I trust him completely.  He's my
3  brother-in-law.
4      Q.  Is he married to your sister or is he --
5      A.  He's my sister's younger brother.
6      Q.  Your sister's younger brother?
7      A.  Wait a minute.  My wife's younger brother.
8  Wait a minute.  My wife's younger brother, yeah.  My
9  apologies for that.
10      Q.  Only two options.  Now, in number 5, you
11  say, "No allowance was afforded for broken, twisted
12  and/or racked framing members or the exterior
13  sheathing that would have been behind the block
14  walls at these locations."  Did I read that
15  correctly?
16      A.  Yes, sir.
17      Q.  You would agree that the brick veneer that
18  collapsed, collapsed because of inadequate
19  attachments to the framing sheathing, correct?
20      A.  I would be speculating to say that.
21      Q.  That's fair.  Do you not hold that opinion
22  then?
23      A.  When a building wiggles in a storm like
24  this, I'm not sure exactly what was happening.  I
25  know this much, there are a lot of properties around

Page 177

1  this one that didn't have roofs that were scraped
2  virtually clean like this.  We've stopped short of
3  saying that it appears as though tornadic type of
4  activity may have come through here, but you would
5  be surprised how much shaking and baking goes on if
6  a tornadic type of activity came through here and
7  caused this kind of wholesale roof damage and an old
8  block wall can come down then.
9      Q.  My question was a little bit more
10  specific.  Do you hold an opinion as to whether or
11  not the brick walls were inadequately attached to
12  the framing sheathing?
13      A.  By today's standards, absolutely, but this
14  is a 35 year old property.  Standards were much
15  lower back then.  You could build a property like
16  this to a wind code substantially lower than the
17  current wind codes back then.
18      Q.  Assuming that the brick veneers were not
19  attached --
20      A.  By the way, these are block.  I'm sorry.
21      Q.  -- to -- sir?
22      A.  These are block, not brick.  The brick is
23  on Compass Point.
24      Q.  I'm sorry.  If I said brick, I meant
25  the -- the concrete -- the concrete masonry units.

Page 178

1    A.   Yes, sir.
2    Q.   Assuming that the block walls collapsed --
3    that collapsed were not attached to the framing and
4    sheathing, when that collapse occurred, they would
5    not necessarily have ripped out any of the framing
6    or sheathing, correct?
7    A.   Not necessarily, but the picture seemed to
8    support that there was something there, whether it
9    was felt or -- or what have you.  You see various
10   areas of black, and I blew these pictures up, and it
11   suggested that there was some sort of black board
12   there.
13   Q.   And the areas in black in photos 6 and 7
14   on page 4 of your report --
15   A.   Yes, sir.
16   Q.   -- those aren't holes in the property
17   sheathing, those are black felt paper still stuck to
18   the sheathing; is that correct?
19   A.   Well, I can't tell whether it's felt or
20   asphaltic board.  Back in these days, they had an
21   asphalt impregnated exterior sheathing board that
22   was commonly used as the weather barrier.  I suspect
23   that's what it was.
24   Q.   But the point is that it's not holes that
25   have been ripped out of the plywood, that's your

Page 179

1    understanding, right?
2    A.   That's correct, sir.
3    Q.   Turn to the next page, page 5.
4    A.   Yes, sir.
5    Q.   Under point 7, you say, "In units where
6    the ceilings collapsed, the extreme amount of
7    moisture that was held there for an extended period
8    would have delaminated the plywood subfloors
9    requiring their replacement.  Nationwide tendered no
10   such allowance."  Did I read that correctly?
11   A.   Yes, sir.
12   Q.   And you're referring to the ceilings that
13   collapsed on the second story of the units?
14   A.   Well, the picture that you're looking at,
15   the second picture, I can see what appears to be
16   trusses, so you're looking into an attic space, so
17   that would be a second floor ceiling.
18   Q.   And so the plywood subfloors you're
19   talking about are the plywood underneath the
20   flooring of the second story flooring?
21   A.   Yes, sir.
22   Q.   Point 8, you say, "As a rule, Nationwide
23   affords six inches of insulation in the attic
24   spaces.  Standard practice would afford the industry
25   standard of 10 inches for the replacement

Page 180

1    insulation."  Do you know how much insulation
2    actually was in the attic spaces of the Carriage
3    House properties before Hurricane Katrina?
4    A.   It was suggested to me that the blown
5    insulation in the areas that were not damaged was
6    well above the top of this two-by-six, which
7    suggests that it's well above six inches.
8    Q.   When you say it was suggested to you --
9    A.   There were people that were heavily
10   involved in this project in the restoration of it,
11   and not all ceilings were lost, which means there
12   were areas of ceiling where the insulation remained.
13   Q.   So based on -- essentially probably these
14   two superintendents who worked on the repair
15   project?
16   A.   I don't remember who specifically, but
17   certainly the evidence is still out there.  During
18   the appraisal process, if we need to look at some of
19   these units where no work was ever done, we can
20   certainly verify whether or not it was 10 inches or
21   whether or not it's six inches.
22       MR. BROWN:  Could we get --
23       MR. GILMORE:  Go off the record.
24       VIDEOGRAPHER:  Off the record at 3:02.
25       (Off the record.)

Page 181

1        VIDEOGRAPHER:  On the record at 3:14.
2    Q.   (By Mr. Gilmore)  All right.  Still
3    working on page 5 of your report, Defense
4    Exhibit 174, under point 9, you say, "Nationwide has
5    afforded minimal amounts of wall replacement where
6    significant staining suggest these walls were soaked
7    by water entering from above which had run down."  I
8    guess in your opinion whether to replace a wall
9    would be based on signs of water stains or
10   moistness; is that correct?
11   A.   These pictures indicate significantly more
12   than just staining.  These tiny little pictures are
13   not good pictures in terms of having this
14   discussion, but there is significant mold on the
15   surface of these walls suggesting that a major
16   amount of water got into this wall cavity.  The
17   second picture, I mentioned previously the mustache
18   around windows, you can see the -- the mold mustache
19   around the edge of that window.
20   Q.   You're referring to the bottom photograph
21   on page 5?
22   A.   No, sir, but the bottom photograph would
23   also be a good example if it were a better picture.
24   I was referring to the second photograph.  There's a
25   window in that photograph, and there is a mold

46 (Pages 178 to 181)

Page 182

1  mustache around that window suggesting that water
2  blew in around that window as opposed to coming from
3  above. Certainly there's enough staining above it
4  also to suggest a major amount of water came from
5  above, also, but a number of these walls were not
6  included. Now, it could have easily been a case
7  that this mold developed over time. These pictures,
8  I believe these are March '06 pictures, and I
9  believe the last adjuster inspection was November --
10  I'm sorry, October. There is a late September
11  adjustment and there's a late October adjustment
12  provided by Nationwide adjusters, which suggests to
13  me that by roughly the middle of October, they were
14  already heading back to the office to work up
15  estimates because these are big estimates and they
16  take time to produce.
17      Q.  So you believe it is quite possible that
18  the mold that we see on photographs in March was not
19  there in October or November?
20      A.  I -- I believe that's a very real
21  possibility.
22      Q.  And there could have been steps to
23  mitigate the amount of moisture on the walls between
24  October and November of '05 and March of '06 to
25  prevent that mold from growing during that period,

Page 183

1  correct?
2      A.  Well, there -- there were tarps on the
3  roof, but it appears even from that three-page
4  report that -- I don't know why I can't remember his
5  name -- Skees, Mr. S.
6      Q.  Let's call him Mr. Skees. I will correct
7  you if you mispronounce his name.
8      A.  Very good, sir. Those tarps were torn up
9  in that picture that he took where there was one
10  building that had no tarp at all on it, and the
11  other buildings had tarps on them, but they were
12  clearly damaged from wind. No matter how good you
13  put tarps on, tarps are just a temporary cover.
14  They're not -- they're just not going to hold up
15  very well over the long haul because the Gulf Coast
16  gets a lot of squalls and a squall will tear a tarp
17  up.
18      Q.  Now, certainly, at least with respect to
19  the bottom photograph on page 5 --
20      A.  Yes, sir.
21      Q.  -- that appears to be a --
22      A.  It's an upstairs apartment with blown
23  insulation all over the floor.
24      Q.  Throughout the photographs, it is fair to
25  say that the mold is growing closer to the floor

Page 184

1  throughout these buildings. It's more prevalent
2  than in other locations in the interior?
3      A.  Well, water does have a tendency to run
4  down once it gets in a wall. You get wall -- water
5  in a water -- water in a wall cavity, over time, it
6  will show up more toward the bottom of the wall
7  because that's where the water is going to hit.
8  There's insulation in there which is going to
9  prevent it from going straight away down, but
10  fiberglass insulation has a tendency not to get wet.
11  It just lets the water remain active until it finds
12  some level to stop at.
13      Q.  Point 10, you say, "Because the floor
14  decking throughout the upper rooms would have been
15  soaked, the removal and replacement of bath vanities
16  and all base trim would have been required." Did I
17  read that correctly?
18      A.  Yes, sir.
19      Q.  Now, it's possible to remove a vanity to
20  replace the floor decking and reinstall that same
21  vanity if the vanity itself had not been damaged,
22  right?
23      A.  If the vanity is screwed to the wall, you
24  can unscrew it and put it back. If -- if it's a
25  typical pressed board vanity where the sides are a

Page 185

1  single piece and the water wicks up through this
2  pressed board, you ain't got nothing left to save.
3      Q.  Well, do you know what kind of vanities
4  were installed?
5      A.  They were pressed board vanities --
6      Q.  Do you --
7      A.  -- typical apartment grade. I'm sorry.
8      Q.  Sorry. My -- were you able to ask and
9  find out from the contractors who made the repairs
10  whether the fact they had to replace all of the
11  vanities in the upstairs?
12      A.  They did not have to replace all of the
13  vanities. This property was not totally damaged in
14  any building, so there were certain elements in this
15  property that was saved including some vanities, and
16  in other places, the vanities had to be replaced.
17  There's a disadvantage of putting a vanity directly
18  on the floor if it's a pressed board vanity. You
19  know what I mean when I say pressed board, it's not
20  like a true piece of lumber. It's wood fibers or
21  wood chips or sawdust glued together, and it will
22  have a vinyl piece over the outside of it that makes
23  it look like wood, but it's not.
24      Q.  Your estimates -- how -- how did you know
25  how many replacement vanities and base trim was

47 (Pages 182 to 185)

Page 186

1  required?
2      A.   We attempted to get the input we could
3  from people like Donna Bass and Greg Stewart's team
4  and Tammie.
5      Q.   Did they provide that to you on a
6  room-by-room or building-by-building basis?
7      A.   We spent a fair amount of time -- I think
8  we ended up paying Tammie Crossley $5,000 for the
9  amount of -- massive amount of time she spent with
10  us on this project.
11      Q.   What did Ms. Crossley do?
12      A.   She basically took what we thought and
13  turned it as best she could into correct
14  information.
15      Q.   When you say what you thought, you
16  provided her with your initial run of Xactimate
17  reports?
18      A.   We provided her with her competitor's
19  estimate, World Claim's estimate, the guy that beat
20  her out for the assignment and got her to help us
21  validate what was wrong with it, what was right with
22  it and to create a final estimate.
23      Q.   How did you go about correcting the World
24  Claim estimate that you then used as a starting
25  point for your own Xactimate estimates?

Page 187

1      A.   All of these people that were involved in
2  producing estimates originally, in defense of
3  Nationwide, only saw the damages up to a point.
4  Beyond that point, mold, vandalism were factors that
5  increased the scope of the repairs necessary. World
6  Claims didn't know what was beyond that point.
7  Nationwide didn't know, I guess, what was beyond
8  that point. The only people that remained actively
9  involved with this project as it was rebuilt knew
10  what the final shape was when it was sold by Ralph
11  Brockman to these people.
12      Q.   So was Tammie Crossley someone who had
13  first-hand knowledge of what the actual repairs
14  were?
15      A.   She had first-hand access to the people
16  who were clients and her friends that aided me in
17  putting a picture together because they are the ones
18  that bought it and had no reason to lie to me about
19  what they had to repair versus what they saved.
20      Q.   So she had discussions with Greg Stewart
21  and the people at his company about the scope of
22  repairs?
23      A.   She had most of the conversations.
24      Q.   And then she relayed those conversations
25  to you and Mr. Wiggins in the course of preparing

Page 188

1  Xactimate estimates?
2      A.   Keep in mind I was -- I was going to the
3  Coast every other week anyway. I was in her office
4  regularly. These were her contacts. These were
5  people that would stop what they were doing and talk
6  to her, but it wasn't until later that I ended up
7  doing work for them where I could garner some of the
8  same type of clout with them.
9      Q.   Page 12 -- I'm sorry, point 12 on page 5
10  of your report --
11      A.   Yes, sir.
12      Q.   -- I'm sorry, point 11, and you're again
13  talking about vandalism damage.
14      A.   Yes, sir.
15      Q.   As we sit here today, can you tell the
16  jury how many doors or windows were broken either by
17  the National Guard or vandals at the Carriage House
18  property?
19      A.   I can only tell you that the number of
20  doors I have, front doors on these properties are
21  all attributable to the National Guard or vandalism
22  according to the input I've gotten, and I didn't get
23  that input from Ralph. I got it from the people
24  that bought the place from them.
25      Q.   Are you saying -- let me just clarify what

Page 189

1  you're saying. You're saying each and every door to
2  each unit at the Carriage House property was
3  destroyed by either the National Guard or vandals?
4      A.   I don't think so.
5      Q.   I'm sorry, that's my question.
6      A.   Each and every front door --
7      Q.   Uh-huh (affirmative response).
8      A.   -- that I'm showing as a replacement on my
9  estimate was the result of vandalism or National
10  Guard. I don't think I have each and every door
11  on -- on the property on my estimate.
12      Q.   Now, you say that there was related loss
13  of Sheetrock and cabinet damages as a result of the
14  vandalism and theft of copper piping and wiring; is
15  that correct?
16      A.   Yes, sir.
17      Q.   Now, at least -- certainly with respect to
18  the first floor, the Sheetrock and cabinetry would
19  have been damaged by the storm surge flooding prior
20  to the vandalism, correct?
21      A.   With any flooding, damage would definitely
22  be in place, whatever that damage is, before the
23  vandalism, yes, sir.
24      Q.   And you haven't made any effort to
25  segregate storm surge flooding damage from vandalism

Lewis Edward O'leary, Jr. 10/6/2009

Page 190

1   damage on the first floor, have you?
2       A.   I've not attempted to segregate the
3   vandalism damage from the wind damage either.  If
4   you've got a plug that's roughly this high, 18
5   inches up, it's going to be above some of the
6   flooding and below some of it, and the wire runs up
7   from there because there's a slab to go down, so
8   it's not going to go down.  If people are pulling
9   wire out of walls, they're going to rip the
10  Sheetrock going up as opposed to going down.
11      Q.   Did you see any photographs that showed
12  kind of a straight line rip of a wire out of
13  Sheetrock?
14      A.   No, sir.
15      Q.   Did you see any photographs that showed a
16  piece of copper piping actually cut out of the
17  connecting parts?
18      A.   No, sir, I have not.
19      Q.   Now, on point 12 on page 5 on your
20  report --
21      A.   Yes, sir.  Yes, sir.
22      Q.   -- you talk about the actual design
23  pressure of the windows.  Were you able to learn
24  from someone who had first-hand knowledge of what
25  the actual design pressure of the windows that were

Page 191

1   used in the Carriage House property before Hurricane
2   Katrina was?
3       A.   These old windows are DP20s.  Those were
4   the standard builder grade window back in the early
5   '70s.  Just like today the standard builder grade
6   window today is a DP30.
7       Q.   Are any of those standard DP20s still in
8   place?
9       A.   Yes, sir.
10      Q.   So you were able to inspect when you went
11  to the property and see that's a DP20 window?
12      A.   Yes, sir.
13      Q.   How were you able to determine what kind
14  of --
15      A.   Well, if you buy enough of them, you know
16  what you're looking at.
17      Q.   Throughout your report, you used the terms
18  repair, and I believe, you know, renovate or
19  restore, and perhaps we've used those terms in the
20  deposition today.  Do you have any -- admit any
21  effort to separate what items of repairs were
22  actually upgraded from the existing materials when
23  Greg Stewart's company repaired the Carriage House
24  property?
25      A.   Based upon the finishes that are in these

Page 192

1   places, he didn't upgrade anything.  It's all base
2   grade.  It's apartment grade work.  It was apartment
3   grade work.  It is now apartment grade work.  He --
4   he really didn't build this to keep.  He built
5   this -- rebuilt this to sell, and he didn't do all
6   of the work he should have did.  He repainted some
7   walls that had mold on them.  I stayed in this
8   property.  I think I mentioned that to you.  He --
9   he didn't even come close to repairing it correctly.
10      Q.   You said you stayed overnight --
11      A.   Yes, sir.
12      Q.   -- in a unit?
13      A.   Yes, sir.
14      Q.   When did you do that?
15      A.   I'm going to guess and say March 2007.
16  The public adjuster, Tammie Crossley, they had two
17  units over there that were allocated to them as some
18  sort of fee arrangement with Greg Stewart on work
19  they were doing together, and one of the public
20  adjusters was out of town when I was coming in, so
21  they let me bunk there as opposed to having to get a
22  hotel room.
23      Q.   Okay.  If you turn to page 6 of your
24  report, under point 13, you say, "It has been my
25  experience while working Katrina claims that

Page 193

1   Nationwide unit rates may be from a special database
2   that they have created."  Did I read that correctly?
3       A.   Yes, sir.
4       Q.   Can you tell me the basis for your
5   assertion there?
6       A.   Well, the cost codes that are built into
7   Xactimate, the first four letters would be MSGU,
8   which is Mississippi, Gulfport, and then there would
9   be a 5 indicating 2005.  Nationwide has a stock
10  database for Gulfport and a number of the carriers
11  have had special databases created for them.  These
12  have shown up in more than one instance.  This is
13  not a revelation of any sort.  This -- many times a
14  carrier will have a special database for their
15  purposes and sometimes it doesn't match the
16  Xactimate numbers that were in the stock database.
17      Q.   Do you have any basis for comparing the
18  two sets of numbers that you believe exist, that is
19  the Xactimate stock numbers and the Nationwide
20  especially created numbers, to determine which set
21  is more accurate?
22      A.   I had Todd Skinner analyze the two, and
23  he's, in fact, working up a major report on the
24  differences between the stock Xactimate numbers
25  versus the numbers that Nationwide was using.  When

49 (Pages 190 to 193)

Page 194

1  I mentioned 73 cents a square foot for carpet
2  earlier versus something like $1.84 a square foot, I
3  was comparing the Nationwide number to the stock
4  number.
5      Q.   Well, I understand that you're saying that
6  the stock numbers and the Nationwide numbers are
7  different.
8      A.   Yes, sir.
9      Q.   My question is have you undertaken an
10 evaluation to determine which two sets of numbers
11 most closely match the actual prices for the
12 repairs?
13     A.   No, sir, I have not compared them to the
14 repairs.  I consider the repairs, to a large degree,
15 done out there as inferior.  I think he was strictly
16 rebuilding the thing for sale so...
17     Q.   Let me -- I asked a bad question, and I
18 understand your point on the actual repairs.  My
19 question, what I meant to ask was have you
20 undertaken a comparison of the stock Xactimate
21 numbers and the Nationwide numbers to determine
22 which of those sets most closely approximates actual
23 construction costs on the Mississippi Gulf Coast?
24     A.   I'm not sure why I would -- I have done
25 that.  I've compared stock Xactimate numbers to what

Page 195

1  local contractors are charging out there and found
2  variances where Xactimate is low by an average of
3  30 percent in certain types of finishes.  It's
4  called a storm index where contractors charge full
5  or retail and Xactimate doesn't pick up on that or
6  base charges where a contractor has to come out two
7  or three times for a particular item such as taping
8  and floating, which is a three-day process.  If you
9  don't have the base charge index in there, which
10 Nationwide's estimate didn't have, it can make a
11 significant difference in the total and value of the
12 estimate.
13     Q.   Do you have any actual quotes from
14 contractors on the Gulf Coast as to unit prices for
15 any of the items of damages that you've built into
16 your Xactimate estimates for the Carriage House
17 property?
18     A.   What we used was Xactimate stock numbers
19 comparing Xactimate stock numbers knowing their load
20 to the Nationwide numbers, which in many cases was
21 even lower by a substantial margin.
22     Q.   I understand that comparison.  My question
23 was different.  Have you gotten actual quotes of --
24 from contractors on the Mississippi Gulf Coast to
25 compare those quotes on unit prices to the prices

Page 196

1  that you have in your Xactimate reports?
2      A.   I -- I have not done that formally as of
3  this point on this project.
4      Q.   Now, number 14, you say, "The program used
5  by Nationwide includes in the database such extra
6  steps as move, cover and protect contents, detach
7  and reset A/C return and supply rules, remove and
8  reset curtains or drapes or mini-blinds and
9  hardware."  Did I read all of that correctly?
10     A.   Yes, sir.
11     Q.   I think we talked a little bit about that
12 these are various selections that the Xactimate
13 program allows an estimator to choose, correct?
14     A.   Yes, sir.
15     Q.   Do you have any understanding whether any
16 of these items that you've listed here are typically
17 included in contract quotes without being
18 specifically broken out as a line item?
19     A.   In a normal Xactimate (unintelligible) I
20 could mention several other programs, these are
21 normal items that are listed in each area of
22 repairs.  It's almost always going to be an A/C
23 grill in a room, and it is normal to list either
24 remove and reset or to remove and replace.  It's
25 actually easier to remove and reset than it is to

Page 197

1  tape it off.
2      Q.   Well, if the contractor provides a quote
3  to replace the drywall, it's just a single item, say
4  replace drywall in one room, $1,000.
5      A.   Okay.
6      Q.   In your experience, is that going to
7  include detaching and resetting the A/C return and
8  supply even if the quote that contractor provides
9  doesn't specifically break out that line?
10     A.   The contract -- the Sheetrock contractors
11 normally are going to give you a quote on a bare
12 wall configuration.  There ain't going to be any A/C
13 grills in place.  There ain't going to be any
14 baseboards in place.  A Sheetrock contractor is
15 normally not a demo contractor.  If you get a price
16 for $1,000 for a man to come in and put up Sheetrock
17 for you, tape and float it, ready for painting,
18 you're going to have the place ready for him to come
19 in with Sheetrock boards and install them, and then
20 tape and float, and he's not going to be worried
21 about A/C grills because they're not there at that
22 time.
23     Q.   Well, I guess my question is if you -- the
24 $1,000 is just a made up number --
25     A.   Of course.

50 (Pages 194 to 197)

Page 198

1    Q.    -- for purposes of this question.
2    A.    Of course.
3    Q.    My question really is if a contractor --
4  if you ask a contractor to replace the drywall on a
5  wall, that wall has an A/C vent, and he gives you a
6  quote for a certain amount of money --
7    A.    I apologize for that.  Please allow me to
8  turn it off.
9        MR. GILMORE:  Go off the record.
10       VIDEOGRAPHER:  Off the record at 3:40.
11       (Off the record.)
12       VIDEOGRAPHER:  On the record at 3:40.
13   Q.    (By Mr. Gilmore)  When you get a quote
14 from a contractor to perform replacement such as
15 replacing drywall ---
16   A.    Yes, sir.
17   Q.    -- is every single step necessary to do
18 that job properly going to be broken out as a line
19 item as a matter of normal contracting practice?
20   A.    As a matter of a normal contractor having
21 nothing to do with Xactimate or any of the other
22 programs, they will not normally quote a job like
23 this.  They will quote it by the board.  If they
24 have to bring in 20 boards, they're going to charge
25 you for 20 boards.  If there's two boards left on

Page 199

1  the floor, you paid for those two extra boards still
2  on the floor.  That's real world with regard to a
3  Sheetrock contractor.  In order to get a number up
4  to the same level where you -- you're allowing
5  enough money where somebody can pay that price, you
6  have to include all of the bits and pieces or you're
7  going to have an estimate that is not adequate to
8  pay for the work to be done.  The insurance industry
9  chooses to build a number up one tiny piece at a
10 time, whereas in the real world, it may be just a
11 single number price per board, $40 a board or
12 something like that.  When I say a board, I'm
13 talking about a four-by-eight, four-by-10,
14 four-by-12 sheet of Sheetrock.
15   Q.    Underneath point 14 on page 6 of your
16 report --
17   A.    Yes, sir.
18   Q.    -- you have a paragraph, and the paragraph
19 that begins, "This policy stipulates to the premise
20 that it affords special form coverage."
21   A.    Yes, sir.
22   Q.    And you discuss the -- your opinions on
23 the burdens that a carrier has in proving exclusion
24 of coverage; is that correct?
25   A.    I'm sorry, repeat that question.

Page 200

1    Q.    Well, this paragraph here offers your
2  opinion as to the burden a carrier bears to proving
3  that coverage is not provided for a portion of
4  damage, right?
5    A.    That is part of my conclusions, yes, sir.
6    Q.    You would agree that which party bears the
7  burden of proving coverage or exclusion of coverage,
8  that's a legal question, right?
9    A.    I believe that would probably fall under
10 your category, yes, sir.
11   Q.    Now, you finished this paragraph by
12 saying, "Absent proof that the finishes in question
13 here were not destroyed by wind prior to the arrival
14 of the flood waters, where special form coverage was
15 involved, standard practice of the industry has been
16 to afford these damages as wind damages.  See tab
17 10."  Did I read that correctly?
18   A.    Yes, sir.
19   Q.    That is your opinion as to the burden of
20 proving excluded flood damage, correct?
21   A.    Proving -- I'm not exactly sure how to
22 answer that question.  If you word --
23   Q.    I will rephrase the question.
24   A.    All right.
25   Q.    That statement that you have here that

Page 201

1  absent proof that damage was caused by flooding,
2  it's the standard practice of the industry to afford
3  these damages as wind damages, that's an assertion
4  that has informed your approach to determine --
5  making cause and origin determinations and estimates
6  of damages in your report, correct?
7    A.    I -- I was asked to try to come up with a
8  number for the wind damages, and in an effort to
9  come up with that, I had to arrive at certain
10 conclusions throughout the entire process, and in
11 areas where it could have just as easily have been
12 wind as opposed to water, I made certain decisions
13 to call it wind damage and provided an explanation
14 in terms of what my mind set was and what authority
15 I was drawing from to reach that mind set.
16   Q.    And my question is one of the authorities
17 that you're deriving on -- you are deriving those
18 decisions from was your understanding of what a
19 standard practice of the industry has been as you
20 articulate in this last statement --
21   A.    I pulled it from Insurance Institute of
22 America training manual.  I believe it was the
23 claims environment.
24   Q.    The next heading underneath "Conclusions"
25 on page 6 of your report that's entitled

51 (Pages 198 to 201)

Page 202

1   "Postscript," and the first bullet point in that
2   heading says, "It is an accepted practice of the
3   industry to recreate the loss with incomplete
4   evidence to work from." Did I read that correctly?
5        A.   Yes, sir.
6        Q.   You would agree that the most important
7   evidence is visual evidence from inspection of the
8   property damage, right?
9        A.   The best evidence you can have to work
10  with is the physical damage itself.
11       Q.   The next bullet point would be -- you say,
12  "My compensation for this assignment has been the
13  payment of $200 per hour for actual consulting and
14  $100 per hour for my travel time. Secretarial is
15  $35 per hour and expenses are billed at cost." Did
16  I read that correctly?
17       A.   Yes, sir.
18       Q.   How many actual consulting hours have you
19  spent in connection with the Carriage House work?
20       A.   I don't know. I could certainly find out,
21  but at this moment, I can't tell you.
22       Q.   Can you give a ballpark estimate? Would
23  it be more than 20 hours?
24       A.   Yes, sir.
25       Q.   More than 100 hours?

Page 203

1        A.   Yes, sir.
2        Q.   More than 200 hours?
3        A.   Yes, sir.
4        Q.   More than 500 hours?
5        A.   I don't think so.
6        Q.   Somewhere between 200 and 500 hours?
7        A.   In that -- yes.
8        Q.   And is it closer to 200 or 300 or is it
9   closer to 400 or 500?
10       A.   Now, you've got me. I -- I can't go
11  there.
12       Q.   Now, that's for actual consulting. How
13  about just pure travel time, how many hours have you
14  spent traveling in connection with your work at the
15  Carriage House property?
16       A.   Normally, I don't go on a trip just for
17  one customer. This particular trip is an exception
18  to that rule. I say that as a rule one out of every
19  15 or 20 trips I make is for one customer only.
20       Q.   Well, in terms of the actual travel time,
21  however you've allotted it among your various
22  customers, but the travel time you've billed to
23  Sunquest for the Carriage House property, can you
24  give me an estimate of how many hours that would be?
25       A.   I wish I could. You know, obviously, I

Page 204

1   have an accounting staff that can come up with what
2   I've billed for this assignment.
3        Q.   Well, I assume you had him -- you pointed
4   to my colleague suggesting that we should send a
5   request for some writing that you might have that
6   might show this. Have you submitted invoices for
7   your work?
8        A.   Yes, sir, I have.
9        Q.   And do you still have copies of all of
10  those invoices?
11       A.   I certainly can -- can come up with how
12  many hours for travel time, how much for travel
13  expenses, how many hours for consulting. I -- I can
14  give you a -- a total summary on everything.
15       Q.   You know, the actual invoice, copies of
16  the actual invoice or a summary, whatever is more
17  convenient for you, but I would appreciate that.
18       A.   I will just tell the girls to take care of
19  it and get it to y'all once -- once this little
20  shopping list comes in.
21       MR. GILMORE:  Let's go off the record for
22  a quick break.
23       VIDEOGRAPHER:  Off the record at 3:49.
24       (Off the record.)
25       VIDEOGRAPHER:  Beginning tape six. On the

Page 205

1   record at 4:00 o'clock.
2        Q.   (By Mr. Gilmore)  Mr. O'Leary, I'm going
3   to show you and ask you some questions about a few
4   of the estimates for certain buildings at the
5   Carriage House property. We're not going to go
6   through all 17 of them, but just some questions
7   about several of these.
8        (Exhibit 187 marked for identification.)
9        Q.   (By Mr. Gilmore)  I've handed you what's
10  marked as Defense Exhibit 187, and you recognize
11  this as your Xactimate estimate for Building Number
12  4 at the Carriage House property?
13       A.   Yes, sir.
14       Q.   Turn to page 2, you'll see an estimate for
15  general demolition.
16       A.   No reflection.
17       Q.   Take your time and clear your voice. Do
18  you need some more water?
19       A.   Thank you, sir.
20       Q.   So as I was saying, on page 2 of your
21  Xactimate estimate for Building 4, you have a line
22  item of 16 hours for general demolition, line item
23  of four hours for hauling debris and three dumpster
24  loads?
25       A.   Yes, sir.

Page 206

1    Q.   And that -- your estimate, therefore, is
2  that it would take 16 man hours and four truckloads
3  to haul seven to eight tons of debris from just this
4  one building?
5    A.   Where's the rest of this estimate?  It
6  starts with item number 14.  Where's the rest of it?
7    Q.   Well, this is how it was produced to us.
8  As you can see, it is number 2.  Page 1 is the cover
9  page.
10    A.   Yes, sir.
11    Q.   All of the line items have various numbers
12  listed on them, but they are not, as you noticed,
13  consecutively numbered from 1 going forward.  Can
14  you explain the numbering system for the line items?
15    A.   Not off the top of my head, but we've got
16  those estimates over there.  I think we've got the
17  full estimates in those notebooks over there.  Maybe
18  I can figure out what the deal is by looking at
19  those notebooks.
20    Q.   Well, when you say you have the full
21  estimates in the notebooks behind you, I'm just
22  trying to figure out what you mean by that.  These
23  were the estimates that were produced to us.
24    A.   The same computer -- they have a travel
25  stick here, a two gig travel stick that had my

Page 207

1  report and all of my attachments to it on the travel
2  stick, and I believe they somehow gave y'all a copy
3  of that.  Whether it was another travel stick or
4  hard copies, I don't know between the two law firms
5  how you got what you got.
6       MR. BROWN:  Well, let's put it this way.
7       MR. GILMORE:  Can we go off the record for
8  a second?
9       VIDEOGRAPHER:  Off the record at 4:04.
10       (Off the record.)
11       VIDEOGRAPHER:  On the record at 4:05.
12    Q.   (By Mr. Gilmore)  Okay.  So, Mr. O'Leary,
13  we're looking at Defense Exhibit 187, which is your
14  Xactimate estimate for Building 4 at the Sunquest
15  Carriage House property.
16    A.   Yes, sir.
17    Q.   Page 2, we just looked at.  It starts with
18  items 14, 15 and 13, which deal with demolition and
19  hauling debris; is that correct?
20    A.   Yes, sir.
21    Q.   And you estimate that it would have taken
22  16 man hours and four truckloads for wind-related
23  debris for this one building; is that correct?
24    A.   That's what it says.
25    Q.   That doesn't include interior demolition

Page 208

1  and debris hauling, it's just for the exterior?
2    A.   No, sir.  On item 1, it's showing unit 19
3  ahead of this.  This is a miscellaneous/temporary
4  category that applies to Building 4.  It doesn't
5  apply to one particular apartment.  It applies in
6  general to the building.  Otherwise, it would have a
7  designator on it at the beginning of each section
8  whether it's a general category or a unit category.
9    Q.   I think I might have used the term unit
10  incorrectly.  This -- but I think my question was --
11  and if you can clarify -- lines 14 through -- 14, 15
12  and 13 are for debris hauling for the overall
13  exterior of Building 4; is that correct?
14    A.   This doesn't say exterior.  This says this
15  is a miscellaneous/temporary category suggesting it
16  applies to the whole building.
17    Q.   Interior and exterior.
18    A.   That's what it suggests.
19    Q.   Now, this hauling of debris estimate, have
20  you made any effort to segregate out debris that
21  would have been damaged from storm surge?
22    A.   I believe this is our attempt to define
23  the portion that would be wind related.
24    Q.   So it is your belief that there would have
25  been even more debris beyond what you have provided

Page 209

1  an estimate for here, but some portion of that
2  additional debris would have been caused by the
3  storm surge flood damage?
4    A.   Yes, sir.
5    Q.   And that's not reflected in the estimate?
6    A.   That's correct.
7    Q.   Still working on page 2, you have line
8  items for temporary construction office, portable
9  trailer and temporary power usage per month,
10  commercial and temporary power hookup, temporary
11  toilet and temporary water usage.  Those are items
12  17, 19, 20, 21 and 22, correct?
13    A.   Yes -- yes, sir.
14    Q.   Now, have you made any effort to determine
15  how long it took for power to be restored at the
16  Carriage House property after Hurricane Katrina?
17    A.   I was told that it was approximately two
18  weeks.
19    Q.   You have .75 months.  Is that supposed to
20  be --
21    A.   Three weeks.
22    Q.   -- three weeks?  Temporary power hookup,
23  you have one each.  What is that unit measuring?
24    A.   It is a specific service.  You put up a T
25  pole, they bring power to your T pole, and you hook

53 (Pages 206 to 209)

Page 210

1   up your T pole to whatever.
2      Q.   How long did it take for water and sewer
3   utilities to be restored to the Carriage House
4   property?
5      A.   I don't recall. I'm not even sure I know.
6      Q.   Do you know if Greg Stewart's company had
7   a trailer or other sort of temporary construction
8   office on-site during the repairs of the Carriage
9   House property?
10     A.   I don't remember asking him about this.
11  Jerry may have asked him about it, but these are
12  classic things that you would normally allow for
13  this type of job had it of been the insured as
14  opposed to Greg Stewart.
15     Q.   Now, you have a line item, line 9, 4,981
16  still on page 2.
17     A.   Yes, sir.
18     Q.   That's entitled "structure drying."
19     A.   Yes, sir.
20     Q.   And the figure there is $12,306 --
21     A.   Yes, sir.
22     Q.   -- correct?
23     A.   Yes, sir.
24     Q.   What does the structure drying item
25  entail?

Page 211

1      A.   With all of the loss of roofing and loss
2   of Sheetrock ceilings, you had a pretty wet
3   structure sitting there, not counting the stuff that
4   was below the flood line. You would normally want
5   to dry it out before you enclosed it again.
6      Q.   Do you think there was more total moisture
7   that required drying in the building as a result of
8   the storm surge flooding or as a result of the total
9   rainwater that seeped in through the roof or through
10  failed seals around windows and sliding doors?
11     A.   There was certainly more gallons of water
12  delivered to the ground floor of this property by
13  the flood than by wind if you're going to look at it
14  in terms of raw gallons of water.
15     Q.   When you say structure drying, portions
16  that were already wet such as the drywall you would
17  already be replacing, correct?
18     A.   That's correct.
19     Q.   When that -- I guess my question is what
20  then is it that you say requires drying if wetted
21  drywall on the ceilings and walls are to be replaced
22  are on the floors, too?
23     A.   You leave framing lumber wet long enough,
24  and it will twist and curl on you and destroy every
25  window in the property. It will create its own

Page 212

1   version of racking damage to windows.
2      Q.   Did you see any of that --
3      A.   I wasn't --
4      Q.   -- actually occur?
5      A.   I wasn't there sir.
6      Q.   Well, in any of the photographs that show
7   the pre-repair state of the property, did you see
8   any wetted wood framing that became racked and
9   twisted?
10     A.   This is personal experience. When a
11  framing job takes too long, and you let the elements
12  get the frame wet too much, as part of the framing
13  is hanging windows, and if you don't dry it out
14  before you start putting in insulation and
15  Sheetrock, you're going to lose some windows. A
16  two-by-four that's naturally straight when it's
17  delivered to you can get awfully crooked if it gets
18  too wet and stays too wet.
19     Q.   Did you see any photographs that showed
20  that?
21     A.   No, sir.
22     Q.   Page 3.
23     A.   Yes, sir.
24     Q.   Item 25, you have laminated, 50 year
25  composite shingle roofing including felt.

Page 213

1      A.   Yes, sir.
2      Q.   The existing shingles that were shingle
3   roofing that was on the roof before Hurricane
4   Katrina was likely a 20, 25 year?
5      A.   25 year three tab.
6      Q.   How much more expensive is installing a 50
7   year roofing compared to 25 -- 20 or 25 year?
8      A.   I'm going to guess and say about $80 a
9   square.
10     Q.   $80 a square foot more?
11     A.   Yes, sir, per -- per square when it's 100
12  square feet.
13     Q.   Now, you have line item 24 on page 3 is
14  tear off, haul and dispose of composite shingles.
15  That's basically the demolition and hauling away of
16  the roof debris, correct?
17     A.   Yes, sir.
18     Q.   And do you know whether that specific line
19  item for the demolition and hauling away of roof
20  debris, how that is broken out from the line item on
21  page 2 for general demolition for the overall
22  building?
23     A.   As a rule, because a roof itself will
24  consume at least a dumpster all by itself, the tear
25  off and haul off of roof shingles is normally a line

Lewis Edward O'leary, Jr. 10/6/2009

Page 214

1  item separate and apart from the general demolition.
2  Not always, but as a rule it is.
3      Q.  Well, did you confirm in the Xactimate
4  report that that is actually how this report that
5  Mr. Wiggins generated in the program is --
6      A.  This -- this is an Xactimate estimate.
7      Q.  So it's your belief that the demolition
8  charges for the roof is not separately included in
9  the demolition and debris hauling on page 2?
10     A.  Understand this program can be manipulated
11 to the user's discretion.  You can use a single
12 value for a roof.  You can come in and say three tab
13 roof, $220 a square, single line item, and that can
14 include steep pitch charge, two-story charge,
15 plumbing vents and jacks, everything.  I can't
16 believe I did it twice in a row.
17     MR. GILMORE:  Go off the record.
18     A.  My apologies.
19     Q.  (By Mr. Gilmore)  That's fine.  We're
20 still on the record.  Turn to page 4.  If you look
21 at line item 648, it's about halfway down --
22     A.  Yes, sir.
23     Q.  -- "scaffolding per section, 22 five foot
24 sections for three-quarters of a month."  Did I read
25 that --

Page 215

1      A.  Yes, sir.
2      Q.  You would need 22 five foot sections for
3  three weeks just to perform the repairs on a single
4  building?
5      A.  If memory serves me correctly, this
6  building has got a front and a back, and if you
7  build a section of scaffolding, and you do some work
8  and you tear it down, and you take it back around to
9  the other side, then each side only counts for half
10 of that.  In other words, these five -- these
11 sections we're describing here is just for one side
12 of the building.  It doesn't wrap the whole
13 building.  Rather than buying enough scaffolding to
14 go on both the front and back, you build what you
15 need on the front, you use it, you tear it down, you
16 move it to the back, you use it, you tear it down,
17 and you take it back.  They charge you portal to
18 portal.
19     Q.  And that's required to paint and clean
20 stucco?
21     A.  I'll sit here and study this if you'd like
22 me to in terms of everything that scaffolding might
23 be needed for.  I -- you know, I'm not prepared to
24 sit here and tell you that that's all we were doing
25 on this particular building.  We might be taking

Page 216

1  down and rehanging louvers on either side of the
2  window.  Does this property have louvers on either
3  side of the window?  I think it does.  We can look
4  at the photographs.  Hanging gutters, I believe this
5  property had gutters on it, and it needed new
6  gutters on it when we were done.  You know, all of
7  the crafts use the same set of scaffolding is what
8  I'm telling you.
9      Q.  Turn to page 5.  This is the kitchen of
10 unit 19 in Building 4.
11     A.  Yes, sir.
12     Q.  You have a line item for paint the walls
13 and the ceiling, correct?  It's, I think, line items
14 463 through 466.
15     A.  Yes, sir.
16     Q.  I'm going to show you what we've marked as
17 Defense Exhibit 237.
18     (Exhibit 237 marked for identification.)
19     Q.  (By Mr. Gilmore)  These have Bates numbers
20 on them, if you turn to page 5960 and 5961.  I'm
21 sorry, if you flip back a few pages to 5954, you
22 will see a photograph of the door that says 19.
23     A.  59 what?
24     Q.  5954.
25     A.  Okay.

Page 217

1      Q.  The photographs that follow show interior
2  photographs for this unit, correct?
3      A.  Yes, sir.
4      Q.  So if you turn to 5960 and 5961, it shows
5  the kitchen in unit 19, correct?
6      A.  Yes, sir.
7      Q.  Now, you see a visible water line with
8  mold growing on it from the storm surge inundation
9  about up to the level of the countertop in these
10 photographs, correct?
11     A.  Yes, sir.
12     Q.  And these photographs don't show any other
13 signs of water staining or damage to drywall above
14 that water line, do they?
15     A.  Some of the strangest looking coloration
16 in the background here.  I mean, wall -- walls and
17 windows don't look traditionally like this.  I'm not
18 sure what's going on here with the color of this
19 picture.  I could have all kinds of stains coming
20 from above, and you couldn't tell it with this type
21 of coloration.  I mean, neither water nor wind makes
22 this type of coloration on a wall.
23     Q.  That's -- you're talking about the
24 pixelation because it's a digital photograph, the --
25     A.  It's one of the most distorted color

55 (Pages 214 to 217)

Page 218

1  pictures I've seen in a while. I mean, this wall in
2  all likelihood is not four different shades.
3      Q. You would agree -- if you could hold up
4  page 5960 for the camera, Mr. O'Leary.
5      A. (Witness complies.)
6      Q. And you would agree that the cabinets, the
7  upper cabinets there don't appear to show any damage
8  of any kind, do they?
9      A. In this picture, I don't see any evidence
10 of damage to these upper cabinets. When was this
11 picture taken?
12     Q. Similarly the blinds, the Venetian blind
13 in the window is still there, right?
14     A. Yes, sir.
15     Q. The only mold shown growing in this
16 photograph on the next photograph on 5961 are below
17 the water line where the storm surge flooding
18 inundated the property, right?
19     A. Yes.
20     Q. Now, if you turn to page 6 of your report,
21 going back to the report for Building 4, Defense
22 Exhibit 187.
23     A. Do you want me to leave these separated
24 out?
25     Q. Just leave them -- you can leave them

Page 219

1  right there for right now.
2      A. Go ahead. You're on 6?
3      Q. Yeah, page 6 under line item 2077, you
4  have line items to replace the cabinetry, upper
5  (wall) units - high grade. That's what that line
6  item says, right?
7      A. Yes, sir.
8      Q. And underneath that is line item 2078,
9  cabinet knob or pull - high grade.
10     A. That's what it says.
11     Q. Your estimates for this kitchen in unit 19
12 of Building 4 have the replacement of the cabinetry
13 in the upper wall in the kitchen, correct?
14     A. That's what this estimate says, yes.
15     Q. And not only do they replace those
16 cabinets, which we saw were not damaged in the
17 photographs we looked at a moment ago, but they
18 replaced them with high grade cabinetry, right,
19 according to your Xactimate estimate here?
20     A. These appear to be solid wood cabinets.
21 In the vernacular, when you have solid wood
22 cabinets, and you go into the Xactimate program, the
23 closest equivalent normally would be high grade
24 because they're solid wood, and that's what this
25 suggests to me, that they're solid wood.

Page 220

1      Q. Selecting high grade makes the repair
2  costs pricier, right?
3      A. If you're replacing cabinets with solid
4  wood cabinets, you're going to pay more than for
5  pressed board.
6      Q. Do you recall inspecting the cabinets and
7  being able to determine if they were made of pressed
8  board versus solid wood?
9      A. I can look at that cabinet door and tell
10 that's solid wood. I have the ability to do that,
11 and I can also tell these photographs were taken
12 very shortly after the storm, which doesn't include
13 any consideration of the fact these roofs were
14 unattended for months. That kitchen could be an
15 absolute abomination by the time March '06 rolls
16 around. I mean, this is right after the storm.
17 This is September '05, and this is not the condition
18 that these were in by March of '06, especially
19 without roofs in place.
20     Q. Before we just showed you these
21 photographs, had you ever actually seen a photograph
22 of the interior of the kitchen in unit 19 of
23 Building 4 as it looked right after the storm?
24     A. No.
25     Q. Okay. Okay. Still working on your

Page 221

1  Xactimate report for Building 4, Defense
2  Exhibit 187, if you look at pages 7 and 8 --
3      A. Yes, sir.
4      Q. -- you have basically replacing and
5  painting the ceiling -- walls and ceilings; isn't
6  that correct?
7      A. Which line item would you be referring to,
8  sir?
9      Q. Well, kind of all of the line items for --
10 I guess it's the subroom 1 and the closets and the
11 entry foyer for this unit under the -- at the top of
12 page 7, you have, you know, drywall to be hung. A
13 little bit below that, you have painting.
14     A. Yes, sir.
15     Q. The next page you have -- similarly, you
16 have walls and the ceiling being hung with drywall
17 and repainted, correct?
18     A. Yes, sir.
19     Q. And this is for the entry and foyer in the
20 unit 1 -- unit 19, correct?
21     A. Closet, subroom 1 and foyer entry, yes,
22 sir.
23     Q. Now, still looking at Defense Exhibit 237,
24 which are the photographs you have in front of you,
25 if you can turn to 5955 through 5956.

Page 222

1    A.   5955 and 5956, yes, sir, I have them in
2 front of me.
3    Q.   And these show the entry/foyer for unit
4 19, right?
5    A.   Yes, sir.
6    Q.   Now, you've got photographs that show a
7 visible water line from the storm surge flooding as
8 well as a fair amount of mold added below that water
9 line, correct?
10    A.   Yes, sir.
11    Q.   They don't show any obvious stains or
12 collapsed drywalling on the walls in these two
13 photographs in the entry foyer for this unit, right?
14    A.   There's some evidence around the light in
15 the entry.  It may just be a reflection, but the
16 lighting is so poor here, it's impossible to tell
17 whether that's a water stain or what.  There's
18 certainly a difference in finish there which could
19 be reflected by wetness.
20    Q.   It wouldn't be surprising if the walls and
21 ceiling in this area were intact and did not need
22 repair right after the storm, correct, based on the
23 photos that we see?
24    A.   Immediately after the storm, they appear
25 to be -- not all of them, of course.  Some of them

Page 223

1 appear to be in reasonably decent condition.
2 Judging from how much the verticals have been blown
3 about on the sliding doors, it would suggest that a
4 certain amount of water was blown in around those
5 doors.  Those verticals probably didn't get that
6 badly out of shape on their own.  That's the
7 configuration I would expect to see if water was
8 blowing in around those sliding doors, but clearly
9 that doesn't represent anywhere near the volume of
10 water that flooding would have represented.
11    Q.   Now, if you turn to page 9 in Building 4.
12    A.   Yes, sir.
13    Q.   And this is in the bathroom in unit 19.
14    A.   Yes, sir.
15    Q.   Towards the bottom, you have replacing
16 quarter inch plateglass mirror, correct?
17    A.   That's what it says, yes, sir.
18    Q.   Now, if you turn to 5962, you'll see a
19 picture of the bathroom in the unit, correct?
20    A.   Yes, sir.  I -- you're telling me this is
21 unit 19.  I'm going to have to take your word for
22 it.  I have no way of knowing.
23    Q.   In fact, before today, you had never seen
24 any of these photographs?
25    A.   That is correct.

Page 224

1    Q.   And these are, as we discussed earlier,
2 very important pieces of information to prepare
3 estimates of damage?
4    A.   Absolutely.
5    Q.   And you will see in this photograph of the
6 bathroom, there is a mirror still attached to the
7 wall and it's not broken or it hasn't fallen off of
8 the wall, correct?
9    A.   It appears to be intact.
10    Q.   You see in the bottom corner, there is
11 mold growing up the wall to approximately where the
12 water line from the flooding would have been, right?
13    A.   That -- that does appear to be the case,
14 yes, sir.
15    Q.   No other mold visible anywhere above that
16 water line in this photograph, right?
17    A.   No, sir.
18    Q.   If you turn to the next page, you will see
19 another room, 5963.  I'm sorry, next page of the
20 photographs, Defense Exhibit 237, you see a picture
21 of a room with the mold growing up to approximately
22 where the water line would have been, correct?
23    A.   Yes, sir.
24    Q.   There's a very clear dividing line between
25 mold and no mold?

Page 225

1    A.   Yes, sir.
2    Q.   Can you hold that up for the camera, Mr.
3 O'Leary?
4    A.   (Witness complies.)
5    Q.   Right about where the handlebars of that
6 bicycle are, the mold is growing below that and not
7 above that, right?
8    A.   Yes, sir.
9    Q.   Now, if you turn to pages 10 and 11 of
10 your report for Building 4 in Defense Exhibit 187.
11    A.   10 and 11, all right.
12    Q.   And those are estimates of repairs for the
13 dining room and living room, correct?
14    A.   Yes, sir.
15    Q.   It's $1,295.17 for the dining room and
16 $3,234.62 for the living room, right?
17    A.   I believe that's correct.
18    Q.   And among the repairs that are included
19 for both are repairing drywall, reapplying popcorn
20 texture to the ceiling and repaint the walls and
21 ceilings, correct?
22    A.   Yes, sir.
23    Q.   Now, if you turn to -- going back to the
24 photographs then, 5964 through 5969, there's a
25 series of photographs, right, that show the living

57 (Pages 222 to 225)

Page 226

1  room and dining room?
2      A.   Yes, sir.
3      Q.   In these photographs here, there is again
4  a visible water line from storm surge with mold
5  growing on it at and below that line.  No visible
6  damage from the walls and ceilings above that water
7  line, correct?
8      A.   That is correct.
9      Q.   Going back to your report for Building 4,
10  Defense Exhibit 187.
11     A.   What page?
12     Q.   Page 26 through 28.
13     A.   Okay.
14     Q.   And this is in the section for unit 20.
15  Now, if you -- sorry.  If you go back to page 22,
16  you'll see it starts for unit 20, correct?
17     A.   On page 20?  Which page did you say at the
18  beginning of this particular unit?  Unit 20 on page
19  22, yes.
20     Q.   Uh-huh (affirmative response).  So then if
21  you -- so we're -- beginning there, you have
22  estimates for unit 20.  On page 26 and 27, you have
23  the dining room and then the living room, correct?
24     A.   Yes.
25     Q.   And again, you have replacing drywall and

Page 227

1  repainting walls and ceilings for those rooms,
2  correct?
3      A.   Okay.
4      Q.   Now, if you turn to -- we're going to go
5  back in this big stack of photographs, turn to page
6  5878, and that's the beginning of photographs for
7  unit 20.  You'll see the door with the number there,
8  correct?  It's 5878.
9      A.   Yes.
10     Q.   Okay.  So if you then move ahead to 5900.
11     A.   5900?
12     Q.   I'm sorry.  I have you on the wrong --
13         MR. GILMORE:  Can we go off the record for
14  a second and find the right page?
15         VIDEOGRAPHER:  Off the record at 4:42.
16         (Off the record.)
17         VIDEOGRAPHER:  On the record at 4:49.
18     Q.   (By Mr. Gilmore)  Mr. O'Leary, let's stay
19  in unit 19.  If you go back to page 14 of your
20  report in Defense Exhibit 187.
21     A.   14.  Page 14, all right. sir.
22     Q.   And here you estimate $2,433.67 to replace
23  and repair the stairwell, including drywall,
24  replacing carpets, painting all of those items,
25  correct?

Page 228

1      A.   That's what it says, yes, sir.
2      Q.   Now, if you turn to page 5959 in these
3  stack of photos in front of you.
4      A.   5959.
5      Q.   Again, that's still within the stack of
6  photographs for unit 19.
7      A.   5959.  All right.
8      Q.   Now, can you hold that photograph up?
9      A.   (Witness complies.)
10     Q.   From the appearance of that photograph, it
11  would be hard to find $2,400 in damage to this
12  stairwell, it's fair to say?
13     A.   This is a closeup of the carpet going up
14  the stairs.  It's a poor quality picture, but I
15  don't see any evidence based on the quality of the
16  photograph of any water damage albeit flood or wind.
17     Q.   Now, I'm going to hand you a different
18  report.  I think there's a report for Building 1,
19  which we have marked as Defense Exhibit 184.
20         (Exhibit 184 marked for identification.)
21     Q.   (By Mr. Gilmore)  Just put that in front
22  of you right there.
23     A.   Same set of photographs?
24     Q.   And, actually, let me hand you a new set
25  of photographs, Defense Exhibit 236.

Page 229

1          (Exhibit 236 marked for identification.)
2      Q.   (By Mr. Gilmore)  Just put it right in
3  front of you.
4          MR. GAUDET:  Is that more pictures?
5      Q.   (By Mr. Gilmore)  Now, let's look at your
6  report for -- Xactimate report for Building 1 first.
7  It's Defense Exhibit 184.  If you'd turn to page 19
8  of your report.
9      A.   Very good.
10     Q.   It's actually -- actually 18 and 19.
11     A.   All right.
12     Q.   Again show replacement for the stairwell.
13     A.   All right.
14     Q.   And this is in Building 1, unit 1 and that
15  begins on page 5 from the report -- of your report,
16  which is Defense Exhibit 184.
17     A.   Page 5?
18     Q.   That's unit 1.  That continues on through
19  19.
20     A.   All right.  You want me to go to page 19?
21     Q.   Yes, please.
22     A.   All right.  Very good.
23     Q.   And that's where you have an estimate of
24  repairs for that stairwell of 2,000 -- of $2,414,
25  correct?

Page 230

1    A.  Yes, sir.
2    Q.  $2,414.72 to be exact, right?
3    A.  Yes, sir.
4    Q.  Now, turn to the photographs in Defense
5  Exhibit 236, and if you turn specifically to page
6  5602, and you will see a picture of the door with
7  unit 1 number on it, correct?
8    A.  Yes, sir.
9    Q.  Now, keep turning through these
10  photographs of unit 1 until you get to page 5619.
11    A.  Yes, sir.
12    Q.  Can you hold that -- can you hold that
13  picture up for the camera?
14    A.  (Witness complies.)
15    Q.  Now, that stairwell in unit 1 of Building
16  well -- Building 1, obviously, it suffered
17  significant damage, correct?
18    A.  Yes, sir.
19    Q.  Your estimate for repair for this
20  stairwell is approximately the same as the stairwell
21  in Building 4, unit 19; is that correct?
22    A.  Yes, sir.  Yes, sir.
23    Q.  Now, going back to your report for
24  Building 1, you can turn to page 29, which shows
25  damages for unit 2 in the kitchen for Building 1.

Page 231

1  Do you see that?
2    A.  Okay.  This is the beginning of unit 2,
3  okay, yes, sir.  The page was marked CH1 so that
4  threw me.
5    Q.  Right.  I think the CH1 refers to Building
6  1, so unit 2 of Building 1, and in the kitchen of
7  unit 2 of Building 1, you have estimates for
8  replacing all of the cabinets.  If you look down at
9  entry 2991, replacement cabinetry, upper wall units.
10    A.  Yes, sir.
11    Q.  "Remove cabinets and related components to
12  access drywall replacement, replace due to damages
13  caused by water from roof and removal."
14    A.  Yes, sir.
15    Q.  And similarly, you have detach and reset
16  cabinetry for the lower units, right?
17    A.  That's what it says.
18    Q.  Now, if you turn back to the photographs
19  in Defense Exhibit 236 --
20    A.  Yes, sir.
21    Q.  -- and turn to page 5635, you'll see a
22  picture that shows unit 2 on it.
23    A.  Yes, sir.
24    Q.  And then keep flipping through the
25  photographs in unit 2 until you get to page 5640.

Page 232

1    A.  Yes, sir.
2    Q.  Can you hold 5640 up?
3    A.  (Witness complies.)
4    Q.  And that's a photograph of the kitchen in
5  unit 2, Building 1, correct?
6    A.  If you say so.  There's nothing on here
7  that tells me this is unit 2, but I assume there's a
8  master index that does.
9    Q.  Well, working in the assumption that the
10  photographs following each door with the unit number
11  on it are associated with that building --
12    A.  Yes, sir.
13    Q.  -- you would agree that --
14    A.  This is probably the kitchen in unit 2.
15    Q.  And you would agree that this photograph
16  on 5640 doesn't show any visible evidence that the
17  cabinets -- the upper cabinets in the kitchen were
18  damaged, though, right?
19    A.  At the time of this photograph.
20    Q.  Now, we've looked at your estimates for
21  several of the units --
22    A.  Yes, sir.
23    Q.  -- in a couple of the buildings.  From
24  building to building, you and Mr. Wiggins took the
25  same approach conceptually in generating the

Page 233

1  Xactimate reports, right?
2    A.  Yes, sir.
3    Q.  You can put the photographs and your
4  reports to the side.
5    VIDEOGRAPHER:  Do you want me to change
6  the tape while he's getting --
7    MR. GILMORE:  Sure.  Go ahead and change
8  the tape.  Off the record to change the tape.
9    VIDEOGRAPHER:  Off the record at 5:03.
10  End of tape six.
11    (Off the record.)
12    VIDEOGRAPHER:  Beginning tape seven.  On
13  the record at 5:04.
14    Q.  (By Mr. Gilmore)  Mr. O'Leary, in 2001,
15  you were indicted and convicted for uttering a
16  forged endorsement --
17    MR. BROWN:  Objection to the form of the
18  question.  That's an improper question.  There's no
19  foundation for that conviction.
20    MR. GILMORE:  Counsel, please don't
21  interrupt me until I finish my question, please, and
22  put your objection on the record.  I'll start over
23  again.
24    Q.  (By Mr. Gilmore)  In 2001, you were
25  indicted and convicted at trial in North Carolina

59 (Pages 230 to 233)

Lewis Edward O'leary, Jr. 10/6/2009

Page 234

1  for uttering a forged endorsement and obtaining
2  property by false pretenses.
3     A.  That's incorrect.
4     Q.  That conviction was reversed by the Court
5  of Appeals, right?
6     A.  It's not a conviction until it's a final
7  conviction in my understanding.  Now, I am not a
8  lawyer, you are, but I am told that it's not a
9  conviction until it's final.
10    Q.  You were found guilty by a jury of your
11 peers at trial for the felony of uttering a forged
12 endorsement and obtaining property by false
13 pretenses.
14       MR. BROWN:  I'm going to object and
15 instruct the witness not to answer that question.
16 He's not a lawyer, he can't argue with you.  You
17 know what happened.  The Court of Appeals reversed
18 it, and this is totally inappropriate.  If you want
19 to ask him something about the case, that's fine,
20 but let's not quibble over convictions.  You know
21 what the record says.
22    Q.  (By Mr. Gilmore)  Mr. O'Leary, you were
23 indicted for a felony in North Carolina, right?  You
24 know what an indictment is?
25    A.  Five years before the trial, yes, sir, I

Page 235

1  was indicted.
2     Q.  You had done estimates for insureds,
3  property owners, correct?
4     A.  At the time of that incident, I was
5  working virtually exclusively for carriers providing
6  estimates.
7     Q.  Well, in this specific case, you did work
8  for --
9     A.  Joseph and Mary Gordon.
10    Q.  -- Mr. and Mrs. Gordon.  They had received
11 a payment from their insurer for about 52,000,
12 correct?
13    A.  Yes, sir.
14    Q.  And that check was made out to
15 Probuilders, which is your company, as well as the
16 Gordons and the Gordons' mortgage company, right?
17    A.  That is correct.
18    Q.  And that check ultimately found its way
19 into your company's bank account, right?
20    A.  Actually, it was Stan Soble's company,
21 Probuilders, Incorporated.
22    Q.  And you were the adjuster or consultant
23 who had been doing work for the Gordons, right?
24    A.  I was the construction manager for
25 Probuilders, Incorporated on that project.

Page 236

1     Q.  And the check bore an endorsement from an
2  employee at the Gordons' mortgage company even
3  though she testified that she never actually signed
4  that check over?
5     A.  Maxine Hall, SunTrust Savings.
6     Q.  Now, it's fair to say that the Court of
7  Appeals reversed your conviction for uttering a
8  forged instrument because it found that the state
9  could not prove how the check was deposited in your
10 company's bank account, right?
11    A.  The record speaks for itself.  I will not
12 try to interpret what a Court of Appeals ruling
13 says.
14    Q.  Let me hand you Defense Exhibit 258.
15       (Exhibit 258 marked for identification.)
16    MR. GILMORE:  Let's go off the record for
17 a second.
18       VIDEOGRAPHER:  Off the record at 5:09.
19       (Off the record.)
20       VIDEOGRAPHER:  On the record at 5:11.
21    Q.  (By Mr. Gilmore)  If you turn to -- I've
22 handed you Defense Exhibit 258, which is the
23 reported decision of the Court of Appeals in your
24 case.  Do you recognize that?
25    A.  Yes, sir.

Page 237

1       MR. BROWN:  I'm again going to object to
2  the form of the question just because you said it
3  was reported, and it was unpublished so...
4       MR. GILMORE:  Fair enough.
5     Q.  (By Mr. Gilmore)  Would you turn to page 4
6  of Defense Exhibit 258?
7     A.  Yes.
8     Q.  See the second to the last paragraph, and
9  the beginning of that paragraph, the Court of
10 Appeals wrote that, "There is evidence that someone
11 involved with the contract to repair the Gordons'
12 home forged Ms. Hall's endorsement and passed a
13 forged instrument for the sake of gain or with the
14 intent to defraud."  Did I read that correctly?
15    A.  I guess.
16    Q.  And so therefore, it's fair to say that
17 your conviction was reversed because the state, even
18 though it had shown there was evidence that someone
19 in your company had forged the signature on the
20 check, that they couldn't prove that it had been
21 deposited in your company's account.  Is that your
22 understanding of why you were --
23    A.  No, that's totally false.  You're assuming
24 that someone in my company put Maxine Hall's
25 signature on the back of that check.  The

60 (Pages 234 to 237)

Lewis Edward O'leary, Jr. 10/6/2009

Page 238

1  handwriting resembles coincidentally very much Mrs.
2  Gordon's handwriting, and there was no IBM manual
3  typewriter amongst us while we were away from home
4  up here handling claims, but she admitted she had
5  such a typewriter in her attic, but swore that it
6  didn't work, and we weren't about to start our job
7  without a third down. And miraculously, somehow she
8  managed to get a signature, hers, her husband's and
9  Maxine Hall's and handed it to us, and we proceeded
10 to spend $57,000. Yes, that is $5,000 more than the
11 amount on the check to try to please the lady to do
12 her job, and we brought those records to trial, and
13 interestingly enough, the DA wasn't interested in
14 those records.
15     Q.  That's not your -- it hasn't been your
16 only run-in with the law, has it been, Mr. O'Leary?
17 In 1994, in Harris County, Texas, you were indicted
18 for violation of the Texas property code; isn't that
19 right?
20     A.  Specifically, I went bankrupt because a
21 major developer for a shopping center I was building
22 went bankrupt, and all of a sudden, I couldn't
23 finish jobs that I was working on, and according to
24 the laws in Texas at that time, if you've been given
25 money on account, you're supposed to keep separate

Page 239

1  accounts, and because of the overall circumstances,
2  I was given what's called deferred adjudication,
3  which means after three years, there was no
4  conviction because of the circumstances. I was not
5  -- I was part of a chain of dominoes. Ted Pole was
6  the judge on that, one of the strictest judges in
7  Harris County at the time, and he didn't see fit to
8  put me in jail over something like that.
9      Q.  Beyond the two instances we've just
10 discussed, are there any other instances where
11 you've been charged with a crime?
12     MR. BROWN:  I'm going to instruct the
13 witness not to answer that. I don't know what
14 charging him with a crime has to do with anything.
15 If you have evidence of some type of action being
16 taken, that's fine.
17     Q.  (By Mr. Gilmore) Please answer the
18 question, Mr. O'Leary.
19     A.  To the best of my knowledge, other than
20 these things we've been talking about where he's
21 practicing law without a license or he's practicing
22 engineering without a license, he's practicing
23 adjustment without a license, since I jumped the
24 fence about 15 years ago, there probably have been
25 more complaints filed in North Carolina against me

Page 240

1  and in some other states, and it's interesting
2  because I'm functioning the same way I've always
3  functioned. The only difference is now I'm
4  functioning largely for the consumers, and yet the
5  complaints have come like rain.
6      Q.  So you're feeling that there's been some
7  kind of conspiracy among insurers to file complaints
8  against you since, as you said, you jumped the fence
9  and done almost all of your work for consumers,
10 property owners now?
11     A.  Do you remember early on when I -- we were
12 talking about HAAG, and I told you in any large
13 company, you've got stars, duds and everything in
14 between, it's the same for any industry, including
15 the insurance industry. You've got some of the
16 finest people in the world working for insurance
17 companies, and you've got some people that are
18 really low down people, and you've got everything in
19 between. It's expected in any large industry that
20 you've got good, bad and in between.
21     Q.  Have you ever been a defendant in a civil
22 suit?
23     A.  Yes, sir.
24     Q.  In connection with your professional
25 services either as a forensic consultant or a

Page 241

1  property appraiser, engineering services you've
2  provided?
3      A.  As a defendant?
4      Q.  Yes.
5      A.  I can't recall a time. The only times I
6  can recall being a defendant in a lawsuit was
7  involved in cases in Texas where -- and one in North
8  Carolina now that I think about it -- where a
9  contractor was, I believe, removed from the job, and
10 he didn't like being removed from the job. I would
11 have to get you the details on it, but I don't
12 remember the specifics anymore because it's been
13 about 12 years ago.
14     Q.  Have you ever been a plaintiff in a
15 lawsuit?
16     A.  Yes, sir, I've sued people before.
17     Q.  Have you ever sued an insurance company
18 regarding an insurance claim you had?
19     A.  I don't think so.
20     Q.  What -- do you have homeowners insurance
21 in your house where you live today?
22     A.  Yes, sir.
23     Q.  Which carrier do you have?
24     A.  Allstate.
25     Q.  Have you ever been insured by Nationwide?

61 (Pages 238 to 241)

Page 242

1     A.   You know, I'm not sure.  I've owned a
2  number of pieces of property in my lifetime.  I
3  wouldn't run from Nationwide.  I think Nationwide is
4  a decent company if that's what you're asking me.
5     Q.   That could be what I'm asking you.  We've
6  talked about your report in some detail and gone
7  through a few examples of your Xactimate estimates.
8  Is there anything significant that you expect to
9  testify about at trial that we have not touched upon
10  in your deposition today?
11     A.   If I can get my hands on what Nationwide
12  has, it could easily affect my report, because up to
13  now, I haven't had Nationwide's material, but I'm in
14  the process of getting Nationwide material.  I
15  already have Mr. Skees' report.  Did I get it right
16  that time?
17     Q.   Yeah.
18     A.   I'm about to get National Forensic Group's
19  reports, and God willing, a lot of photographs.
20  That makes a difference.  Writing a report based on
21  information that you can get on your own that was
22  either from independent third parties and one side
23  only is still not a complete picture.  I need a
24  whole picture to write a balanced report.
25     Q.   Please send us an e-mail or a letter if

Page 243

1  there's any material that you have not gotten that
2  you think Nationwide has.  We will be happy to
3  provide it to you if you want to review it for your
4  expert report.
5     A.   I think if you -- you will go in behind me
6  with this incredibly good forensic engineer here
7  locally, Joe LaFranco, Quest Forensic Services, you
8  will find that we've bent over backwards to try to
9  gather every piece of information there was so we
10  could write a balanced opinion on that case.
11     MR. GILMORE:  Mr. O'Leary, I don't have
12  any further questions for you at this time.
13  Counsel, we are reserving the right to reopen this
14  deposition to the extent Mr. O'Leary supplements or
15  changes his report as he discussed today.  And
16  further, we also reserve the right to redepose Mr.
17  O'Leary in his capacity as an appraiser if and when
18  the court allows the parties to proceed with
19  discovery regarding the appraisal process.
20     MR. BROWN:  Okay.  That sounds fair
21  enough.  I just have a couple of quick questions
22  which I hate to do this at 5:25.
23  EXAMINATION BY MR. BROWN:
24     Q.   Sir, would you look at the photographs
25  that were marked as D-237, and as you're looking

Page 244

1  through that package, would you look at all of the
2  photographs behind door number 19?
3     A.   (Examining.) Okay.
4     Q.   In reviewing those photographs, did you
5  see any indication in the photographs numbered
6  consecutively after door number 19 that indicated
7  that there was any damage to the ceiling of this
8  unit?
9     A.   There was extensive --
10     MR. GILMORE:  Objection to the form,
11  leading.
12     A.   There was extensive damage to the upstairs
13  ceiling.
14     Q.   (By Mr. Brown)  Okay.  Would you turn to
15  the first photograph and read the number of that
16  photograph that shows damage to the upstairs
17  ceiling?
18     MR. GILMORE:  Objection to the form,
19  leading.
20     A.   Numbers 5970, 5971.  Those are the only
21  two.
22     Q.   (By Mr. Brown)  Okay.  Could you hold up
23  those two photographs for the camera, please, sir?
24     A.   (Witness complies.)
25     Q.   And what do those photographs generally

Page 245

1  indicate to you?
2     MR. GILMORE:  Objection to the form.
3     A.   It appears to be a collapsed ceiling in a
4  bedroom.
5     Q.   (By Mr. Brown)  Okay.  And where were the
6  bedrooms likely located in this unit?
7     A.   Upstairs.
8     Q.   Would that have been the result of the
9  water rising from the flood surge?
10     A.   No, no, it would have been likely the
11  result of wind.
12     Q.   And does that look like -- would you say
13  water would have entered the unit from the ceiling?
14     A.   Yes.
15     Q.   And do you have any opinion as to what the
16  effects of that water entering from the ceiling
17  might have been?
18     MR. GILMORE:  Objection to the form,
19  leading.
20     Q.   (By Mr. Brown)  Go ahead.
21     A.   The roofs here were -- were severely
22  damaged, could easily allow a lot of water in.
23  These units had semi-gloss finish, I believe, and
24  semi-gloss won't normally stain unless you just
25  abuse it unbelievably, which is part of the reason

62 (Pages 242 to 245)

Page 246

1  why they use semi-gloss, one, because it's wipeable
2  in an apartment, and the other is because stains
3  don't show.  You could have significant staining on
4  a ceiling downstairs, and it wouldn't show until it
5  started bailing and collapsing.
6       Q.   What do these photographs indicate to you?
7       A.   That the amount of water that entered the
8  attic area above this bedroom was so significant
9  that the -- weight of the wet Sheetrock
10 insulation caused it to pull away from the nails and
11 collapse into the room.
12      Q.   And where would that water from the second
13 floor have ended up?
14      A.   It would likely soak through the carpet in
15 the subfloor.  If there was enough of it, it would
16 run down the stairs or it would just go through the
17 ceiling cavity to the ground floor.
18      Q.   Do you have any opinion as to whether that
19 amount of water that caused that damage to the
20 second floor ceiling would have also caused damage
21 to the walls, cabinets and other portions of the
22 first floor?
23      MR. GILMORE:  Objection, leading.
24      A.   If it had not --
25      MR. BROWN:  Okay.  Hold up right here.

Page 247

1  The man is an expert witness.  If I can't lead an
2  expert witness.  What rule are you on?
3       MR. GILMORE:  Respect my objections,
4  counsel, and ask your questions.
5       MR. BROWN:  You're just popping up with an
6  objection every time I say something.
7       MR. GILMORE:  Counsel, you don't need to
8  characterize my objections.  You didn't choose to
9  make any objections.  I'm just making a record here.
10 If you want to continue asking your witness
11 questions, that's fine.  He's not a hostile witness,
12 and I don't think you can treat him as a --
13      MR. BROWN:  I can't lead my own expert?
14      MR. GILMORE:  -- hostile witness.
15      MR. BROWN:  Is that your position?
16      MR. GILMORE:  I'm making my objections for
17 the record, counsel.  I'd like to make a flight.  If you want
18 to continue this deposition by asking your own
19 witness questions, I'm not going to stop you, but
20 I'd like to get out of here, so keep asking your
21 questions, and I will make my objections.  We don't
22 need to talk about it.
23      A.   I've forgot the question.
24      MR. BROWN:  Could you read back the

Page 248

1  question, please?
2       (Record read.)
3       A.   Clearly from the photographs presented to
4  me, the damage had not manifested itself to a point
5  where it was visible on the ground floor.
6  Semi-gloss paint will have a tendency to hide any
7  amounts of water that's coming down through the
8  ceiling or walls, but because of the condition of
9  these roofs, that downstairs was not more than one
10 squall away from being ruined because tarps just are
11 not going to prevent rain from a serious squall from
12 getting back into this attic again, and without that
13 Sheetrock ceiling in place anymore, it's heading
14 straight down the stairs.
15      Q.   Okay.  Let me show you the Defendant's
16 Exhibit 236.  You see there on page 5635 the -- the
17 number 2?
18      A.   Yes, sir.
19      Q.   Now, would you look through the
20 photographs that are there behind door number 2?
21      A.   This sounds like a game show, behind door
22 number 2.  Okay.
23      Q.   Was this a second -- two floor unit as
24 well?
25      A.   Are you asking me are there photographs of

Page 249

1  upstairs here?
2       Q.   Well, I'm asking you, first of all, if --
3       A.   I believe they were all two-story units.
4       Q.   And are there any photographs of the
5  upstairs?
6       A.   No, sir, just downstairs.
7       Q.   So can you form a picture from those five
8  or six photographs as to whether water entered this
9  unit from the second floor ceiling?
10      A.   I can't tell anything about the second
11 floor from these photographs because there are no
12 photographs of the second floor.  From the condition
13 the roofs are in, both the second floor and first
14 floor were one squall away from a catastrophe.
15      MR. BROWN:  I have no more questions.
16      MR. GILMORE:  I have no questions.
17      VIDEOGRAPHER:  Off the record at 5:30.
18 End of deposition.
19      (Off the record.)
20      (Time Noted:  5:30 p.m.)
21      SIGNATURE/NOT WAIVED
22
   ORIGINAL: ROBERT GILMORE, ESQ.
23 COPY:    MATTHEW BROWN, ESQ.
24
25

63 (Pages 246 to 249)

Page 250

1        CERTIFICATE OF DEPONENT
2  DEPONENT:  LEWIS EDWARD O'LEARY, JR.
     DATE:  October 6, 2009
3  CASE STYLE:  SUNQUEST PROPERTIES, INC. , ET AL. vs.
     NATIOWIDE, ET  AL.
4  ORIGINAL TO:  ROBERT B. GILMORE, Esq.
        I, the above-named deponent in the
5  deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
6  taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
7  them to contain a full and true transcript of the
     testimony as given by me.
8        Subject to those corrections listed below,
     if any, I find the transcript to be the correct
9  testimony I gave at the aforestated time and place.
   Page    Line              Comments
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16
17     This the ____ day of _____, 2009.
18                 _____
                   LEWIS EDWARD O'LEARY,
19  JR.
   State of Mississippi
20  County of _____
21     Subscribed and sworn to before me, this the
     _____ day of _____, 2009.
22
23  My Commission Expires:
24  _____
25                 Notary Public

Page 251

1        CERTIFICATE OF COURT REPORTER
2        I, Kelly M. Powell, Court Reporter and
3  Notary Public, in and for the State of Mississippi,
4  hereby certify that the foregoing contains a true
5  and correct transcript of the testimony of LEWIS
6  EDWARD O'LEARY, JR., as taken by me in the
7  aforementioned matter at the time and place
8  heretofore stated, as taken by stenotype and later
9  reduced to typewritten form under my supervision by
10  means of computer-aided transcription.
11        I further certify that under the authority
12  vested in me by the State of Mississippi that the
13  witness was placed under oath by me to truthfully
14  answer all questions in the matter.
15        I further certify that I am not in the
16  employ of or related to any counsel or party in this
17  matter and have no interest, monetary or otherwise,
18  in the final outcome of this matter.
19        Witness my signature and seal this the 8TH
20  day of  October, 2009.
21
22
23        _____
              Kelly M. Powell, CSR
24
   My Commission Expires:
25  March, 2011

64 (Pages 250 to 251)